# EXHIBIT B

# IN THE COURT OF APPEALS
# STATE OF ARIZONA
# DIVISION ONE

STATE OF ARIZONA,

                Appellee,

      v.

BRIAN LESLIE FINKEL,

                Appellant.

No. 1 CA-CR 04-0046

Maricopa County Superior
Court Nos. CR-2001-015515
           CR-2002-001431

## APPELLANT'S OPENING BRIEF

MARICOPA COUNTY PUBLIC DEFENDER

**EDWARD F. McGEE**
Deputy Public Defender
Attorney for APPELLANT
11 West Jefferson, Suite 5
Phoenix, Arizona 85003
Telephone (602) 506-0924
State Bar Membership No. 004235

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED FOR REVIEW                                    1

STATEMENT OF THE CASE                                         4

STATEMENT OF FACTS                                           8

ARGUMENT I                                                   20

                **THE TRIAL COURT ABUSED ITS DISCRETION AND REVERSIBLY ERRED IN JOINING COUNTS IN THIS SEX OFFENSE PROSECUTION ON THE THEORY THAT ALL COUNTS WOULD BE CROSS-ADMISSIBLE AS "OTHER ACTS," PURSUANT TO RULE 404(C) OF THE ARIZONA RULES OF EVIDENCE, FIRST, BECAUSE BEFORE RULING THE TRIAL COURT DID NOT PERSONALLY EVALUATE THE CREDIBILITY OF THE COMPLAINANTS, AS REQUIRED BY STATE V. AGUILAR; AND SECONDLY, BECAUSE BEFORE RULING, THE COURT DID NOT RECEIVE EXPERT TESTIMONY ON THE LIMITS OF PROPER TOUCHING IN GYNECOLOGICAL PROCEDURES.**

i

**TABLE OF CONTENTS (Continued)**

Page

ARGUMENT II                                                        32

      THE TRIAL COURT ABUSED ITS DISCRETION
AND REVERSIBLY ERRED WHEN IT PERMITTED
DR. ANN BURGESS TO TESTIFY ABOUT THE
RESPONSES OF SEXUAL ABUSE VICTIMS
BECAUSE, IN THE END, THIS AMOUNTED TO
NOTHING MORE THAN PROHIBITED "RAPE
TRAUMA SYNDROME" AND "OFFENDER
PROFILE" EVIDENCE.

ARGUMENT III                                                       37

      THE TRIAL COURT REVERSIBLY ERRED WHEN
IT BARRED THE DEFENSE EXPERT, DR.
ELIZABETH LOFTUS, FROM OFFERING
TESTIMONY ABOUT THE RISK OF IMPLANTED
MEMORIES, AND IN SO DOING, DENIED DR.
FINKEL DUE PROCESS OF LAW, CONTRARY TO
THE PROTECTIONS OF THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION AND ARTICLE 2, § 4 OF
THE ARIZONA CONSTITUTION.

**TABLE OF CONTENTS (Continued)**

                                                          <u>Page</u>

ARGUMENT IV                                                 42

>        THE TRIAL COURT REVERSIBLY ERRED AND
>        DENIED DR. FINKEL HIS RIGHTS TO
>        CONFRONTATION AND A PUBLIC TRIAL,
>        SECURED HIM BY THE SIXTH AMENDMENT TO
>        THE UNITED STATES CONSTITUTION AND
>        ARTICLE 2, § 24 OF THE ARIZONA
>        CONSTITUTION WHEN IT PERMITTED THE
>        WITNESS SHELLY CLUFF TO TESTIFY BY
>        MEANS OF A VIDEO-TAPED DEPOSITION,
>        WITHOUT FIRST ESTABLISHING THAT CLUFF
>        WAS UNAVAILABLE TO TESTIFY.

ARGUMENT V                                                  48

>        THE TRIAL COURT COMMITTED AN ERROR OF
>        LAW WHEN IT SENTENCED DR. FINKEL ON
>        COUNT TO "LIFETIME PROBATION, 99 YEARS,"
>        BECAUSE THE MAXIMUM AVAILABLE
>        PROBATIONARY TERM FOR A CLASS FIVE
>        FELONY COMMITTED IN 1986 WAS THREE
>        YEARS.

**TABLE OF CONTENTS (Continued)**

Page

ARGUMENT VI                                                                  50

    THE TRIAL COURT ERRED AS A MATTER OF
LAW WHEN IT ISSUED A MINUTE ORDER ON
COUNTS 31 AND 32 IN CR-2002-001431 IMPOSING
SENTENCES OF 2.75 YEARS, WHEN THESE TWO
COUNTS WERE NOT SUSCEPTIBLE TO
TREATMENT AS MULTIPLE OFFENSES, NOT
COMMITTED UPON THE SAME OCCASION, SO
THAT THE MAXIMUM ALLOWABLE SENTENCE
FOR EACH WAS NO MORE THAN 2.5 YEARS, AND
WHEN THE TRANSCRIPT OF THE ORAL
PRONOUNCEMENT OF SENTENCE REFLECTS
THAT THE COURT IMPOSED CONCURRENT
TERMS OF 1.75 YEARS ON EACH OF THESE TWO
COUNTS.

ARGUMENT VII                                                                 54

    THE TRIAL COURT ERRED IN FAILING TO ISSUE
A SENTENCING MINUTE ORDER THAT
EXPLAINED THAT IT HAD SENTENCED DR.
FINKEL TO CONCURRENT SENTENCES ON
COUNTS 10 AND 37/38 IN CR-2002-001431, MAKING
HIS TOTAL SENTENCE A STRING OF ELEVEN,
AND NOT THIRTEEN, BLOCKS OF CONSECUTIVE
SENTENCES.

iv

## TABLE OF CONTENTS (Continued)

Page

ARGUMENT VIII                                                          58

THE TRIAL COURT ERRONEOUSLY
AGGRAVATED ALL OF DR. FINKEL'S PRISON
SENTENCES, FIRST, BECAUSE IT CITED
AGGRAVATING FACTORS THAT WERE
ILLEGAL, OR NOT SUPPORTED BY THE
EVIDENCE, AND SECONDLY BECAUSE IT DID
NOT GRANT HIM A JURY TRIAL ON THE
SENTENCING AGGRAVATORS, CONTRARY TO
THE REQUIREMENTS OF THE SIXTH
AMENDMENT TO THE UNITED STATES
CONSTITUTION, ARTICLE 2, §§ 23 AND 24 OF THE
ARIZONA CONSTITUTION AND THE HOLDING
OF BLAKELY V. WASHINGTON.

CONCLUSION                                                            66

CERTIFICATE OF RULE 31.13(b) COMPLIANCE                              67

CERTIFICATE OF SERVICE                                               68

v

# TABLE OF CITATIONS

**Page**

**UNITED STATES SUPREME COURT CASES**

Apprendi v. New Jersey,                                      63
     530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)

Blakely v. Washington,                         3, 53, 58, 63, 64
     __ U.S. __. 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)

Coy v. Iowa,                                                 44
     487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)

Crawford v. Washington,                            2, 28, 29, 46
     541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)


**ARIZONA SUPREME COURT CASES**

State v. Aguilar,                             1, 20, 24-29, 66
     209 Ariz. 40, 97 P.3d 865 (2004)

State v. Brown,                                              63
     __ Ariz. __, 99 P.3d 15 (2004)

State v. Buccini,                                            44
     167 Ariz. 550, 810 P.2d 178 (1991),
     cert. denied, 502 U.S. 820, 112 S.Ct. 79,
     116 L.Ed.2d 53 *mem.* (1991)

State v. Burdick,                                            64
     209 Ariz. 452, 104 P.3d 183 (2005)

State v. Garza,                                              56
     192 Ariz. 171, 962 P.2d 898 (1998)

## <u>TABLE OF CITATIONS (Continued)</u>

<u>Page</u>

State v. Henderson,                                      65
 209 Ariz. 300, 100 P.3d 911 (2004)

State v. Huey,                                           35
 145 Ariz. 59, 699 P.2d 1290 (1985)

State v. Ives,                                           21
 187 Ariz. 102, 927 P.2d 762 (1996)

State v. Lee,                                          32, 35
 191 Ariz. 542, 959 P.2d 799 (1998)

State v. Lindsey,                                        41
 149 Ariz. 472, 720 P.2d 73 (1986)

State v. Martinez,                                       64
 209 Ariz. 280, 100 P.3d 30 (2004)

State v. McFarlin,                                       25
 110 Ariz. 228, 517 P.2d 87 (1973)

State v. Munninger,                                      64
 209 Ariz. 473, 104 P.3d 204 (2005)

State v. Terrazas,                                       25
 189 Ariz. 580, 944 P.2d 1194 (1997)

State v. Treadaway,                                      25
 116 Ariz. 163, 568 P.2d 1061 (1977)

**TABLE OF CITATIONS (Continued)**

<u>**Page**</u>

**ARIZONA COURT OF APPEALS CASES**

<u>State v. Alvarez</u>,                                                          61, 62, 64
    205 Ariz. 110, 67 P.3d 706 (App. 2003)


<u>State v. Ayala</u>,                                                            34, 39
    178 Ariz. 385, 873 P.2d 1307 (App. 1994)


<u>State v. Cifuentes</u>,                                                        32, 36
    171 Ariz. 257, 830 P.2d 469 (App. 1991)


<u>State v. Garcia</u>,                                                      48, 51, 55, 59
    162 Ariz. 471, 784 P.2d 297 (App. 1989)


<u>State v. Germain</u>,                                                          60
    150 Ariz. 287, 723 P.2d 105 (App. 1986)


<u>State v. Hanson</u>,                                                          52, 56
    138 Ariz. 296, 674 P.2d 850 (App. 1983)


<u>State v. Hardwick</u>,                                                         61
    183 Ariz. 649, 905 P.2d 1384 (App. 1995)


<u>State v. Speers</u>,                                                        39, 40, 41
    205 Ariz. 125, 98 P.3d 560 (App. 2004)

**CONSTITUTIONAL PROVISIONS**

**Arizona Constitution**
    Article 1, § 9                                                        49
    Article 2, § 4                                                       37, 41
    Article 2, § 23                                                      58, 63

**TABLE OF CITATIONS (Continued)**

<u>Page</u>

**CONSTITUTIONAL PROVISIONS (Continued)**

**Arizona Constitution**
Article 2, § 24                                       42, 44, 58, 63
Article 2, § 25                                                   49
Article 6, § 9                                                    7

**United States Constitution**
Fifth Amendment                                          37, 41, 61
Sixth Amendment                          42, 43, 44, 46, 53, 58, 63
Fourteenth Amendment                                         37, 41


**STATUTES**

**Arizona Revised Statutes**
§ 1-246                                                          49
§ 12-120.21(A)(1) (1992)                                          7
§ 13-105(29)                                                     61
§ 13-702(C)(9)                                               59, 60
§ 13-702(C)(21)                                                  59
§ 13-702.01                                                  51, 52
§ 13-702.02                               4, 50, 51, 52, 61, 62, 64
§ 13-708                                                         56
§ 13-709(A)                                                      56
§ 13-902                                                         49
§ 13-902(A)(2)                                                   48
§ 13-902(E)                                                      49
§ 13-1404                                                        48
§ 13-1420(C)                                                     25
§ 13-4031 (2001)                                                  7
§ 13-4033(A)(1) (Supp. 2002)                                      7

ix

## TABLE OF CITATIONS (Continued)

<u>Page</u>

**RULES**

**Arizona Rules of Criminal Procedure**
Rule 13.3(a)(1) .................................................. 26
Rule 13.4 ......................................................... 21, 31

**Arizona Rules of Evidence**
Rule 403 .......................................................... 22, 25, 26
Rule 404(b) ....................................................... 20, 21, 22
Rule 404(c) ....................................................... 1, 20-27, 40
Rule 404(c)(1)(A) ................................................ 25, 28, 29, 31
Rule 404(c)(1)(B) ................................................ 25, 28, 29
Rule 404(c)(1)(C) ................................................ 23, 26, fn. 3
Rule 404(c)(1)(C)(i)-(viii) ...................................... 26
Rule 404(c)(1)(D) ................................................ 26, 27, 28

**OTHER AUTHORITIES**

Livermore, Bartels and Hammeroff, LAW OF EVIDENCE, .......... 31
   4th Ed. (2000), § 608.5, pp. 221-24

x

## ISSUES PRESENTED FOR REVIEW

1. Did the trial court reversibly err when it joined all 67 counts in the instant sex offense prosecution, upon the theory that all counts were cross-admissible admissible against each other as "other acts," pursuant to Rule 404(c) of the Arizona Rules of Evidence, first because the trial court did not personally evaluate the credibility of the complainants as required by the holding of the Arizona Supreme Court in State v. Aguilar, 209 Ariz. 40, 97 P.3d 865 (2004), and secondly, because before ruling, the trial court did not receive expert testimony on the limits of proper touching in gynecological procedures?

2. Did the trial court reversibly err when it permitted Dr. Ann Burgess to testify about responses of victims to sexual abuse, when this testimony amounted to nothing more than "rape trauma syndrome" and "offender profile" evidence?

3. Did the trial court reversibly err and deny Dr. Finkel due process of law under both the Arizona and United States Constitutions, when it barred the defense from calling defense expert Dr. Elizabeth Loftus to testify about the risk of implanted memories?

4. Did the trial court reversibly err and deny Dr. Finkel his rights to confrontation and a public trial, secured him by the Arizona and United States Constitutions, when it permitted the witness Shelly Cluff to testify by means of video-taped

1

deposition, without first establishing that Cluff was unavailable, as required by the holding of the United States Supreme Court in <u>Crawford v. Washington</u>, 541 U.S. __, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004)?

5.  Did the trial court reversibly err when it sentenced Dr. Finkel to "lifetime probation, 99 years," on Count 48, when the maximum probationary term available for that count at the time of its commission was three years?

6.  Did the trial court reversibly err when it issued a minute order on Counts 31/32 in CR-2002-001431 imposing concurrent sentences of 2.75 years, when these two counts were not susceptible to treatment as multiple offenses not committed upon the same occasion, so that the maximum allowable term for each was no more than 2.5 years, and when the transcript of the oral pronouncement of sentence reflects that the court actually imposed a sentence of 1.75 years?

7.  Did the trial court reversibly err in failing to issue a sentencing minute order that explained that Dr. Finkel's sentences on Counts 10 and 37/38 in CR-2002-001431 were actually concurrent to other sentences imposed on other counts, so that his total sentence was a string of 11 blocks of consecutive terms, and not a string of 13 blocks of consecutive terms?

8. Did the trial court reversibly err when it aggravated all of Dr. Finkel's sentences, first by citing illegal aggravating circumstances, or circumstances not supported by the evidence, and secondly because it did not grant him a jury trial on sentencing aggravators, contrary to the jury trial requirements of the United States Constitution and the Arizona Constitution, and the holding of the United States Supreme Court in Blakely v. Washington, __ U.S. __, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)?

3

# STATEMENT OF THE CASE

This prosecution commenced upon two separate indictments, consolidated for trial. (I-1, I-68 and M.O. 10-10-02). The state accused Dr. Brian L. Finkel of 67 counts of misconduct toward his patients, over a period spanning 18 years. (I-1 and I-68). Fifty-nine counts accused Dr. Finkel of Class Five felony sexual abuse; eight counts accused him of Class Two felony sexual assault. (*Id.*). Prior to consolidation, the state sought enhancement by alleging that the various counts constituted "offenses not committed upon the same occasion, but consolidated for trial," despite the fact that fifteen of the sixty-seven counts antedated the January 1, 1994 enactment of A.R.S. § 13-702.02, the statute authorizing that sort of enhancement. (I-27 and I-89).

At trial, a jury convicted Dr. Finkel of twenty-two counts of sexual abuse. (M.O. 12-2-03 and I-717). [1] Of the remaining forty-five counts, one sexual abuse case was dismissed prior to trial, and five sexual abuse cases and one sexual assault charge were dismissed pursuant to a Rule 20 motion at the close of the state's case; the jury reached no verdict on four counts of sexual abuse, and it acquitted Dr. Finkel of the remaining thirty-four counts, including all remaining charges of sexual assault.

---

[1] The minute order of 12-2-03 is erroneous to the extent that it reflects that the jury acquitted Dr. Finkel of Count 48 in CR-2001-015515, when the formal written verdict on that count clearly shows a conviction for sexual abuse of Shelly Cluff. (I-719).

(M.O. 8-11-03; M.O. 10-27-03; and M.O. 12-2-03).  The court dismissed the four hung counts.  (M.O. 1-2-04).

The court imposed 99 years probation on Count 48 in CR-2002-001431, to commence upon Dr. Finkel's "total release from DOC on Counts 33 and 34 in CR-2002-001431." (M.O. 1-2-04).  From the sentencing minute entry, it appears that the court imposed prison terms on the 21 remaining counts, arranging the sentences so that counts involving the same victim on the same date would run concurrently, but so that all counts involving different victims or occurring on different dates would run consecutively.  (*Id.*).  Just exactly how this was arranged, however, is unclear, because, as explained in Argument VIII, *infra,* the sentencing minute order and the transcript of the oral pronouncement of sentence differ.  What sentence the court imposed on Counts 31 and 32 in CR-2002-001431 is also unclear.  The sentencing minute order indicates that the court imposed concurrent, aggravated terms of 2.75 years, while the transcript of the oral pronouncement shows the sentences were concurrent, aggravated terms of 1.75 years. (*Id.*; R.T. 1-2-04, pp. 18-19).  The court further complicated the oral pronouncement of sentence by imposing concurrent, aggravated terms of 2.75 years on Counts 6 and 7 in CR-2001-015515, to run consecutively to Counts 13 and 14 in that same cause number, when, in point of fact, the jury found Dr. Finkel not guilty of Counts 6 and 7 in CR-2001-015515. (R.T. 1-2-

5

04, p. 20; R.T. 12-2-03, pp. 12-14; I-663, I-664; and M.O. 12-2-03).[2] Whatever the result as to Counts 6 and 7 in CR-2001-015515 and Counts 3 and 32 in CR-2002-001431, the court divided the seventeen remaining counts into eleven groups, and imposed eleven sets of consecutive, aggravated terms of 2.75 years as to each group. (M.O. 1-2-04). The net result was that Dr. Finkel received either 0 years or 2.75 years on Counts 6 and 7 in CR-2001-015515, and 1.75 or 2.75 years on Counts 31 and 32 in CR-2002-001431, to be followed by 99 years of consecutive probation on Count 48 in that same cause number and twelve consecutive terms of 2.75 years, for a grand total of either 34.75 years or 35.75 years or 38.5 years, depending upon how one reads the record. (*Id.* and R.T. 1-2-04, pp. 16-23). The court awarded Dr. Finkel 118 days of presentence incarceration credit on Counts 31 and 32 in CR-2002-001431 and no presentence credit on any other counts. (M.O. 1-2-04).

The court found upward departure from the presumptive sentences (1.5 years on Counts 31 and 32 in CR-2001-015515, and 2.25 years on all other counts, except Count 48 in CR-2002-001431) justified by several factors. (R.T. 1-2-04, pp. 17-18). Among these were the fact that Dr. Finkel caused his victims emotional harm, and that he caused some of them physical harm. (*Id.*). The court also cited abuse of a position

---

[2] The court could not have mistakenly meant to sentence Dr. Finkel on Counts 6 and 7 in CR-2002-001431, because it had earlier directed verdicts of not guilty on those two counts. (M.O. 10-27-03).

of trust as a physician, lack of remorse, and commission of crimes over a span of some 15 years. (*Id.*). The court found that this latter factor offset Dr. Finkel's lack of any prior criminal record. (*Id.*). In addition to the probation and prison terms described above, the court also ordered Dr. Finkel to pay restitution in the total amount of $11,708.88, allocating $2,504.88 to Erlinda Diaz and $11,708.88 to the Maricopa County Victims' Compensation Fund. (M.O. 1-2-04).

Dr. Finkel filed a timely Notice of Appeal. This Court has jurisdiction pursuant to Article 6, § 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1) (1992), 13-4031 (2001) and 13-4033(A)(1) (Supp. 2002).

7

## STATEMENT OF FACTS

Dr. Brian L. Finkel is a board-certified obstetrician/gynecologist. (R.T. 10-20-03, pp. 166-68 and 183-84). After serving as a physician in the Air Force, Dr. Finkel opened a private OB/GYN practice in Phoenix in 1982. (*Id.*, pp. 167-85). In time, his practice evolved into one that specialized in voluntary pregnancy termination, although Dr. Finkel also continued to offer "entry level" gynecological services as well. (*Id.*, pp. 186-91). Between 1982 and 2001, Dr. Finkel performed some 27,000 to 30,000 abortions, or about 20 per cent of all the abortions performed in the entire state. (*Id.*, pp. 189-90).

The thirty-five alleged victims in the sixty-six counts that proceeded to trial had all accused Dr. Finkel of having abused them during the rendition of gynecological services. Thirty-three of the women had sought abortions (R.T. 8-18-03, pp. 7-8; R.T. 8-20-03, pp. 6-7, 112; R.T. 8-21-03, pp. 53-54, 154-55; R.T. 8-25-03, pp. 57-58; R.T. 8-27-03, pp. 133-34; R.T. 9-2-03, pp. 135-36; R.T. 9-3-03, pp. 10-11, 106-8; R.T. 9-4-03, pp. 5-6, 67-68; R.T. 9-9-03, pp. 17-18, 106-8, 205-6; R.T. 9-10-03, pp. 35-38, 113-15, 200-203; R.T. 9-15-03, pp. 67-70, 147-49; R.T. 9-16-03, pp. 42-43, 172-77; R.T. 9-17-03, pp. 68-70; R.T. 9-18-03, pp. 107-8; R.T. 9-22-03, pp. 4-5, 65-66, 127-28, 201-3; R.T. 9-23-03, pp. 110-11; R.T. 9-24-03, pp. 5-8, 70-71, 145-48; and R.T. 9-25-03, pp. 4-8); one had seen him for a yeast infection (Ex. 325, 13:09:25 hrs.); and

one had consulted with him about pain during intercourse. (R.T. 9-25-03, pp. 100-108). While the details of sixty-six tried counts varied, essentially there were three areas of complaint. All alleged that Dr. Finkel had either:

1.   Gratuitously squeezed and fondled their breasts or pinched their nipples during breast exams; or that he had

2.   Gratuitously touched or rubbed their clitorises or labia or "vaginas" during application of K-Y jelly (a lubricant), prior to inserting instruments or fingers incident to internal pelvic examinations; or that he had

3.   Penetrated their vaginas or anuses with his fingers during pelvic examinations in a manner that went beyond the boundaries of clinical propriety and exceeded the scope of the consent they had given for such examinations.

Investigation of Dr. Finkel as a criminal suspect developed along several parallel lines that converged into a single effort directed by the Maricopa County Attorney's Office. Part of the investigation began with complaints by former patients, and part of it began with suggestions that Dr. Finkel's employees made to a police detective assigned to guard his clinic when abortion protesters gathered there.

9

The first patient to denounce Dr. Finkel was Reina Tobin-McKinney.  She had gone to Dr. Finkel in October, 1995, for a fetal "size check," preparatory to an abortion.  (R.T. 9-18-03, pp. 107-10).  She accused Dr. Finkel of having rubbed her clitoris and of having smirked at her as he did so.  (*Id.*, pp. 119-21).  She said nothing to Dr. Finkel at the time, but when she returned to the reception area, Tobin-McKinney became embroiled in such an argument with one of Dr. Finkel's employees that he had to show her the door.  (*Id.*, pp. 123-26; R.T. 10-21-03, pp. 154-62).  She soon returned, however, and created such a disturbance that Dr. Finkel had to summon the police.  (R.T. 10-21-03, pp. 162-64).  It was only during this return encounter that she for the first time accused Dr. Finkel of having inappropriately touched her.  (R.T. 9-18-03, pp. 164-83; R.T. 10-21-03, pp. 162-63).  When she learned that Dr. Finkel had phoned 911, Tobin-McKinney departed, without speaking to officers.  (R.T. 9-18-03, pp. 128-29).  Some days later, however, she contacted detectives and complained that Dr. Finkel had rubbed her clitoris unnecessarily during her pelvic examination.  (*Id.*, pp. 130-31).  When Dr. Finkel declined to admit any wrong-doing, either during a "confrontation call," or during a police interview, the matter lapsed.  (*Id.*; R.T. 9-30-03, pp. 90-102).

The next person to complain was Heather Brown.  On January 31, 2000, she told Phoenix Detective James Newhouse that during a breast exam a week earlier, Dr.

10

Finkel had pinched her nipples and had rubbed her clitoris prior to inserting his fingers for an internal examination. (R.T. 9-23-03, pp. 116-26 and 139-40; R.T. 10-20-03, pp. 139-41). She also accused Dr. Finkel of having licked her clitoris. (R.T. 9-23-04, pp. 131-32). Investigation of Brown's complaint apparently went nowhere, however, until other persons came forward.

The real catalyst seems to have been Kathe Kalmansohn, who obtained an abortion from Dr. Finkel on March 1, 2000. (R.T. 8-18-03, pp. 78-80). She asserted that during the course of her examination, procedures and recovery, Dr. Finkel had touched her breasts or nipples non-consensually on four occasions. (*Id.*, pp. 98-102). Apparently concerned that she might have been sexually assaulted while under anesthesia, after leaving Dr. Finkel's clinic, Kalmansohn made a 911 call to the Phoenix Police. (*Id.*, pp. 110-11). Following a hospital examination, she spoke with officers about her suspicions. (*Id.*, pp. 121-31). Kalmansohn's case was initially assigned to Phoenix Detective Art Haduch, but responsibility for the overall investigation eventually fell to Detective Mark Stribling of the Maricopa County Attorney's Office. (*Id.*, pp. 130-31; R.T. 10-2-03, p. 89; R.T. 10-6-03, pp. 101-21).

At about the same time that Detective Stribling assumed responsibility for the investigation of Kalmansohn's claims, Renee Imrisek, one of Dr. Finkel's medical assistants, began talking to Phoenix Detective Becky Jo Bulkley. (R.T. 9-4-03, pp.

11

188-94 and R.T. 10-15-03, pp. 93-96).   Detective Bulkley had been assigned to monitor Dr. Finkel's clinic when abortion protesters were present, and from time to time, when Imrisek took breaks, she would tell Bulkley that she was concerned about what she saw during patient examinations. (R.T. 10-15-03, pp. 93-96).   When Imrisek declined to provide any specifics, out of concern for patient confidentiality, Detective Bulkley gave Imrisek's name to Detective Stribling.  (*Id.*).   When pressed, Imrisek told Stribling that she had seen inappropriate clitoral touching, and provided the names of potential victims Krista Aumiller and "K.G.," (who apparently never accused Dr. Finkel of any wrong-doing). (R.T. 9-4-03, pp. 162-69 and 185-208; R.T. 9-8-03, pp. 5-11 and 102-5; R.T. 10-14-03, pp. 10-11).

In the meantime, Kalmansohn complained about Dr. Finkel to reporters from the Arizona New Times, and in August or September, 2001, that publication ran an article critical of Dr. Finkel.  (R.T. 9-18-03, pp. 131-32 and R.T. 10-6-03, p. 122). This article prompted a number of women to call Detective Stribling, complaining about Dr. Finkel.  (*Id.*).  As part of his follow-up to these complaints, he interviewed Heather McKay, Jennifer Harris, Tracy Piechna, Kari Martin and Tammy Dion. (R.T. 10-6-03, p. 123).  At this juncture, Detective Stribling also interviewed the original complainants, Kalmansohn, Tobin and Brown. (*Id.*, pp. 125-26).  Then, after speaking with Imrisek, he interviewed Krista Aumiller. (*Id.*, p. 123).  These women constituted

12

the eleven alleged victims named in the indictment in CR-2001-015515. (*Id.*, pp. 125-26).

Dr. Finkel's arrest on October 24, 2003, attracted publicity, and was the subject of television and radio news broadcasts. (I-70; R.T. 8-20-03, pp. 244-45; R.T. 8-21-03, pp. 87-88 and 184-85; and R.T. 10-6-03, pp. 130-31). Maricopa County Attorney Rick Romley also discussed Dr. Finkel's case during a televised press conference following his indictment. (R.T. 10-6-03, p. 144). This attention caused the remaining twenty-four victims to come forward, and their complaints produced the indictment in CR-2002-001431. (I-1; R.T. 10-6-03, pp. 130-31).

In support of its accusations, the state called not only all thirty-five alleged victims, but also a five of Dr. Finkel's former employees. In addition to Renee Imrisek, the jury also heard from medical assistants Dawn Normoyle, Crystal Sykes, Cynthia Romo and Karen Corbett. (R.T. 8-25-03, pp. 130-31 and 166-69; R.T. 8-28-03, pp. 3-10 and 40-53; R.T. 9-18-03, pp. 156-57 and 173-181; R.T. 10-8-03, pp. 5-7, 26-28, 30-36, 40-44). These employees, to one degree or another, all thought that Finkel's pelvic examination technique, and particularly his touching of the clitoris, was unusual. (*Id.*). They all declared, however, as did Dr. Finkel himself, that office policy required that there be an attendant present in the procedure room at all times when Dr. Finkel was conducting pelvic examinations, and that all concerned adhered

13

to this policy. (R.T. 8-25-03, pp. 150 and 157; R.T. 9-2-03, p. 10; R.T. 9-4-02, p. 170;

R.T. 9-17-03, pp. 167-68; R.T. 9-18-03, pp. 10-11; R.T. 10-21-03, p. 55). Only on

rare occasions would an attendant eave the room briefly to obtain a piece of

equipment, and only then if no other attendant answered the call button that was

present in every room; and, when that occurred, Dr. Finkel would push back from the

patient on his stool to await the return of the medical assistant. (R.T. 8-26-03, pp. 77-

78 and 94; R.T. 9-18-03, pp. 11-13; R.T. 10-8-03, pp. 83-84; R.T. 10-21-03, p. 55).

On these occasions, the attendant would also leave the door of the procedure room

open. (R.T. 9-18-03, p. 11; R.T. 10-21-03, p. 55).

The prosecution bolstered the conclusions of the medical assistants with the

testimony of Dr. Sydney Wechsler, M.D., a physician and former medical professor

with extensive experience in abortion practice. (R.T. 9-29-03, pp. 4-26). He

confirmed that breast examination is an appropriate pre-abortion procedure. (*Id.*, p.

39). He went on to state, however, that it was not necessary to perform a breast

examination with one's bare hands, and that squeezing the breast, as one might

squeeze an orange and pinching or twisting the nipple were not medically appropriate

activities. (*Id.*, pp. 40-54). He insisted that in obtaining a PAP smear prior to manual

examination of the pelvic area, it was essential to apply no lubricant, because the

lubricant could contaminate the cells the smear sought to preserve. (*Id.*, p. 59). Only

14

after the PAP smear did he think it necessary to apply lubricant. (*Id.*, pp. 60-61). Dr. Wechsler asserted that the clitoris is never touched during a manual pelvic examination, in the absence of specific complaint by the patient about a problem with her clitoris. (*Id.*, pp. 61-62). Only in such cases, and after advance warning to the patient that he was about to touch the clitoris, should the physician palpate that organ, and he should conduct this examination while seated, as the clitoris is best seen at eye level. (*Id.*, pp. 63-65). In Dr. Wechsler's view, there is no medical reason for a physician to touch the clitoris while standing prior to insertion of the fingers for a pelvic examination. (*Id.*). This procedure is simply not indicated in pre-abortion examinations. (*Id.*, p. 64). Dr. Wechsler also opined that a rectal examination is not part of the pre-abortion physical examination protocol, at least not for patients under forty years of age. (*Id.*, p. 67).

The defense case consisted of a rebuttal of the state's expert witness testimony, a denial by Dr. Finkel of any wrong-doing, and a suggestion by experts and defense counsel that the detectives had planted false memories in the 35 victims by suggestive interviewing techniques.

The defense expert on gynecological procedures, Dr. Gordon Davis, M.D., an adjunct professor at the University of Arizona College of Medicine, pointed out, for example that with the introduction some five years ago of a new test medium called

15

"Thin Prep," it is no longer necessary to avoid using lubricant on the speculum when obtaining a PAP smear, because the new test filters out all contaminants. (R.T. 10-1-02, p. 95). He further asserted that no physician is taught to conduct a breast examination while wearing gloves, because an examination conducted with bare fingers is much more accurate. (*Id.*, pp. 21-22). He also explained that during a breast examination, it is very important to express the nipples to check for discharges that might indicate intraductal papillomas or pituitary tumors. (*Id.*, pp. 23-25). Dr. Davis further stated that in applying lubricant, his assistant first applies it to his gloved hand, and that he then applies it to his patients' vaginal area, moving his hand both downward and upward. (*Id.*, p. 38). He also told the jury that when examining a patient for a complaint of painful intercourse, it is necessary both to move the fingers in and out of the vagina. (*Id.*, pp. 39-43). He also stated that he performs rectal examinations on 100 per cent of his patients, and that for patients complaining of dyspareuina, or painful intercourse, a rectal examination is absolutely indicated. (*Id.*, pp. 46 and 53).

Dr. Thomas Streed, Ph.D., an expert on police interview methods, explained that generally a narrative interview format produces the most reliable results. (R.T. 10-15-03, pp. 184-85). It was his contention that a question and answer interview format tended to elicit responses that conformed more to the examiner's preconceived

16

notion of what the facts must have been and produced a less impartial result. (*Id.*).

Dr. Streed explained that if a police questioner exhibits any kind of bias that can impact the integrity of the responses he elicits, particularly if the interviewer injects into the conversation some kind of expectation of what he expects the potential witness to tell him. (R.T. 10-20-03, p. 10). He then discussed the phenomenon of false confessions, noting that in all, some 200 persons confessed to the Lindbergh kidnapping. (*Id.*, pp. 11-24).

Dr. Elizabeth Loftus, Ph.D., an internationally known expert on memory formation and retention, explained to the jury that interviews conducted with leading questions can implant false memories, as can post-event suggestions. (R.T. 10-16-03, pp. 26-32). Such questions can entirely contaminate witness memories, and that repetition and rehearsal of false memories can increase their vividness. (*Id.*, pp. 26-28 and 34). To illustrate this phenomenon, she offered the example of persons who have claimed to have been abducted by aliens. (*Id.*, pp. 31-32). Dr. Loftus stated that this phenomenon is not the exclusive province of children. (*Id.*, p. 37). She explained that information received through the news media can also have the effect of exaggerating or distorting the memory of the listener. (*Id.*, p. 55).

Attorney Rosann Johnson had sat in on Detective Haduch's interview of Detective Finkel in the year 2000. (R.T. 10-20-03, pp. 89-97). She recalled that from

17

time to time during the interview, Detective Haduch would change the wording of previous responses of Dr. Finkel, and would then incorporate these distorted statements into subsequent questions. (*Id.*, pp. 99-100). As an example, she recalled that Detective Haduch was insistent that Dr. Finkel had told his patients that he was "going" to touch their clitorises, when, in fact, Dr. Finkel kept insisting that he had only warned his patients that he "might" touch them there. (*Id.*, p. 127). When Haduch did this, she challenged him. (*Id.*, pp. 99-100). Later, however, when she received a transcript of the interview, she noted that her corrections were missing. (*Id.*). This led her to conclude that Haduch had not tape-recorded their conversation despite representations that he had done so. (*Id.*, pp. 97-100). Later, she was told that Haduch's tape had run out. (*Id.*).

Dr. Finkel testified himself and explicitly denied having misused any of the alleged victims. (R.T. 10-21-03, pp. 156-83; R.T. 10-22-03, pp. 3-141; R.T. 10-23-03, pp. 3-12). He explained that he had fired Crystal Sykes some years earlier, because she had become a "toxic employee," who caused discord among other members of his staff. (R.T. 10-23-03, pp. 20-21). As an example, he cited the difficulty that arose after Sykes accused her fellow medical assistant, Dawn Normoyle, of taking drugs from the sample cabinet and shorting patients on painkillers so that she could pocket them for her own use. (*Id.*, p. 21). When Dr. Finkel brought this accusation to

18

Normoyle's attention, she took offense and resigned. (*Id.*). Dr. Finkel confirmed an earlier observation of his medical assistant, Karen Corbett, that transference of emotions was a common phenomenon among his abortion patients, and that many of them would blame him and his staff for the problems that brought them to his office. (*Id.*, p. 32; R.T. 10-8-03, pp. 113-14). He also told the jury that after victim Nealie Amaechi had denied all knowledge of whether she had sued him civilly, he was greeted at the door to the judge's chambers by a process server who presented him with Amaechi's summons and complaint. (R.T. 10-22-03, pp. 59-60). Finally, Dr. Finkel related that he had a long history as a target of abortion protesters, and that one, an attorney by the name of John Jacubczyk, had sued him repeatedly in an effort to make it impossible for Dr. Finkel to obtain malpractice insurance. (R.T. 10-21-03, pp. 120-22). He described how, on one occasion in particular in 1989, even with 50 officers on his premises, three men broke into his office and overpowered him and a security guard. (*Id.*, pp. 124-25). After this, he started wearing a handgun at the office, and even body armor, on high threat days. (*Id.*). The jury must have been persuaded by that part of this presentation, because in the end, it convicted Dr. Finkel of only 22 of the 60 charges submitted for its resolution, and none of the convictions were for the more serious charges of sexual assault.

19

# ARGUMENT I

**THE TRIAL COURT ABUSED ITS DISCRETION AND REVERSIBLY ERRED IN JOINING COUNTS IN THIS SEX OFFENSE PROSECUTION ON THE THEORY THAT ALL COUNTS WOULD BE CROSS-ADMISSIBLE AS "OTHER ACTS," PURSUANT TO RULE 404(C) OF THE ARIZONA RULES OF EVIDENCE, FIRST, BECAUSE BEFORE RULING THE TRIAL COURT DID NOT PERSONALLY EVALUATE THE CREDIBILITY OF THE COMPLAINANTS, AS REQUIRED BY STATE V. AGUILAR; AND SECONDLY, BECAUSE BEFORE RULING, THE COURT DID NOT RECEIVE EXPERT TESTIMONY ON THE LIMITS OF PROPER TOUCHING IN GYNECOLOGICAL PROCEDURES.**

**A.     Facts Material to a Discussion of the Issue.**

Prior to trial, the state sought to join all counts against Dr. Finkel in a single prosecution. (I-49; I-136). The state urged the trial court to do this arguing first, that, because all counts charged sex offenses, the evidence in support of any one count would be admissible in the prosecution of all other counts, in any event, pursuant to the provisions of Rule 404(c) of the Arizona Rules of Evidence, as proof of emotional propensity for sexual aberration. (*Id.*). The state further argued that the evidence in each count was admissible in each other count, pursuant to the provisions of Rule 404(b) of the Arizona Rules of Evidence, as proof of intent, motive, plan, preparation, knowledge, opportunity, lack of mistake or accident and common plan or scheme.

20

(*Id.*).  The defense countered, contending that Dr. Finkel was entitled to 35 separate

trials, grouped as to victim, as of right, pursuant to the provisions of Rule 13.4 of the

Arizona Rules of Criminal Procedure.  (I-141; I-144).  Defense counsel argued that

Rule 404(c) did not apply, because Dr. Finkel's acts did not constitute "aberrant"

behavior.  (*Id.*).  Defense counsel further argued that the "similarities" which the state

cited were all "mere artifacts" of the conditions under which the conduct occurred,

and that these were conditions dependant not on Dr. Finkel's motivation, but instead,

were secondary to the medical procedures he performed.  (*Id.*).  Defense counsel noted

that the state had not explained how nipple pinching was inappropriate to a breast

examination; that the state did not explain at all its "lack of mistake" theory; and that

the state's "opportunity" argument failed because lack of an assistant in the room

when Dr. Finkel treated one patient proved nothing about whether an assistant was

present when he treated another patient.  (*Id.*).

On September 13, 2002, the trial court granted severance and denied joinder.

(M.O. 9-13-02).  The court resolved the Rule 404(b) issue by finding that while the

charged acts were similar in nature, the state had not alleged "common plan or

scheme," and that, in any event, the state had not established that the alleged offenses

were based on the same conduct or otherwise connected in their commission and that

under State v. Ives, 187 Ariz. 102, 927 P.2d 762 (1996), a defendant is always entitled

to severance of counts that are joined solely because they are "of the same or similar character." (M.O. 9-13-02). The court also denied joinder on Rule 404(c) grounds, finding that the fact that all of the charged acts took place during gynecological examinations tended to defeat the claim of sexual aberration, and that the state had not carried its burden of proving the contrary by clear and convincing evidence. (*Id.*). Finally, the court found, pursuant to the provisions of Rule 403 of the Arizona Rules of Evidence, that the prejudicial effect of such "other act" evidence would outweigh its probative value. (*Id.*).

The state sought reconsideration, stating that in support of this request, it had filed with the court, under seal, transcripts of the interviews of all thirty-five alleged victims. (I-162). The state also requested an evidentiary hearing to offer expert testimony on what acts by gynecologists might be aberrant. (*Id.*). The state also complained that the court had itself decided the propensity question, when that was a decision for the jury. (*Id.* and I-65). The state also argued that the trial court got its 404(b) ruling wrong, to the extent that repeated clitoral touchings, in the face of a blanket denial, would go to intent or lack of mistake or accident. (I-162).

Defense counsel objected to the fact that he had not been provided copies of the packet of sealed documents that the prosecutor submitted in support of her renewed joinder request. (R.T. 10-10-02, pp. 2-5). He contended that he was either entitled to

22

see these materials, or to cross-examine the persons whose proposed testimony they contained. (*Id.*). The prosecution countered that defense counsel had received all the submitted materials at one time or another (presumably through the discovery process). (*Id.*). Defense counsel further complained that he was not aware until he read the state's reply, that the state had also provided the court with transcripts of interviews of Dr. Finkel's medical assistants. (*Id.*). He also complained that while the prosecution had supplied the court with transcripts of police interviews of victims and witnesses, the court had not had access to the unrecorded portions of the conversations that had preceded these interviews. (*Id.*).

The trial court granted the state's motion for reconsideration without an evidentiary hearing and joined all sixty-seven counts for trial, observing that "The rulings of a court are only as good as the information it has before it." (R.T. 10-10-02, pp. 2-11; M.O. 10-10-02). The court expressed its ruling in the following language:

> Upon careful review of the transcripts of these interviews this court now finds: that the State has satisfied its burden under Rule 404(c) that the evidence of the alleged acts of sexual misconduct is sufficient for a trier of fact to find that Defendant committed the other acts; that the commission of the other acts provides a reasonable basis to infer that the Defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime(s) charged; and weighing the factors under Rule 404(c)(1)(C), this court does not find that the probative value of introducing the evidence of the other acts (which this court

23

finds greater than it originally believed) is substantially outweighed by the danger of unfair prejudice to Defendant, confusion of the issues or misleading the jury. (*Id.*).

Following reconstruction of the record on appeal pursuant to this Court's order of December 22, 2004, it is now apparent that the documents the court considered were transcripts of unsworn police interviews of 35 alleged victims and six medical assistants. (M.O. 2-22-05; Exhibit 3 from Evidentiary Hearing of 2-18-05). As noted above, defense counsel complained that he was effectively the victim of an *ex parte* "sandbagging" by the prosecution, insofar as he was not provided with copies of the materials submitted to the court in support of the reconsideration request. Trial counsel repeated this complaint in his testimony at the reconstruction hearing. (R.T. 2-18-05, pp. 21-24).

**B.    Standard of Review.**

This Court reviews rulings on the admissibility of evidence and joinder deriving therefrom on an abuse of discretion basis. State v. Aguilar, 209 Ariz. 40, 49, 97 P.3d 865, 874 (2004).

**C.    Discussion.**

In State v. Aguilar, 209 Ariz. 40, 97 P.2d 865 (2004), the Arizona Supreme Court laid to rest, once and for all the question whether Rule 404(c) of the Arizona Rules of Evidence permits evidence at trial that an accused has committed other sex

24

offenses, when these other offenses are not crimes of perversion, such as child

molesting, but, in fact, are acts that would not be criminal at all, except for a claim of

lack of consent. In holding that any crime defined as a "sexual offense" by A.R.S. §

13-1420(C) could qualify as "other act" evidence, the Supreme Court explained that,

with the adoption of Rule 404(c) in 1997, the earlier restrictions imposed on such

evidence in State v. McFarlin, 110 Ariz. 228, 517 P.2d 87 (1973) and State v.

Treadaway, 116 Ariz. 163, 568 P.2d 1061 (1977), were explicitly lifted. Aguilar, 209

Ariz. at 47, 97 P.3d at 872.

The Supreme Court stated, however, that before admitting such evidence, three

determinations are necessary:

> First, the trial court must determine that *clear and*
> *convincing* evidence supports a finding that the defendant
> committed the other act. Ariz. R. Evid. 404(c)(1)(A). State
> v. Terrazas, 189 Ariz. 580, 582, 944 P.2d 1194, 1196
> (1997). Second, the court must find that the commission of
> the other act provides a *reasonable basis* to infer that the
> defendant had a character trait giving rise to an aberrant
> sexual propensity to commit the charged sexual offense.
> Ariz. R. Evid. 404(c)(1)(B). Third, the court must find that
> the evidentiary value of proof of the other act is not
> substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or other factors mentioned in Rule
> 403. Aguilar, 209 Ariz. at 49, 97 P.3d at 874. [Emphasis
> supplied.].

25

The Supreme Court went on to declare that in making a determination under Rule 403, the trial judge must have considered the factors listed in Rule 404(c)(1)(C)(i)-(viii).[3] And, finally, the Supreme Court pointedly noted that Rule 404(c)(1)(D) requires the trial judge to have made "...*specific* findings with respect to each of the prerequisites for admission under the rule." *Id.* [Emphasis in the original]. There is a two-fold rationale for this final requirement: first, it is necessary in order to avoid the danger of undue prejudice; and secondly, it is necessary to enable an appellate court "...to effectively examine the basis for the trial judge's decision to admit other act evidence under Rule 404(c)." *Id.*

When the Supreme Court applied these tests to David Aguilar's rape cases, it found the necessary proof for joinder entirely lacking. Aguilar was charged with the rape of four women. He denied knowing one of the women, and asserted that the other three had consented to sex. The first case was dismissed prior to trial. The other three were joined pursuant to Rule 13.3(a)(1) of the Arizona Rules of Criminal

---

[3] These include:
    (i)     remoteness of the other act;
    (ii)    similarity or dissimilarity of the other act;
    (iii)   the strength of the evidence that the defendant committed the other act;
    (iv)   frequency of the other acts;
    (v)    surrounding circumstance;
    (vi)   relevant intervening events;
    (vii)  other similarities or differences;
    (viii) other relevant factors.  (Ariz. R. Evid. 404(c)(1)(C)).

26

Procedure, however, after the trial court found that they involved sufficient "'same or similar circumstances,'" and that the evidence as to each victim would be cross-admissible in the trial of each other victim by operation of Rule 404(c) of the Rules of Evidence. Aguilar, 209 Ariz. at 41, 97 P.3d at 866. The Aguilar trial judge reached this conclusion after considering the transcript of the grand jury proceedings, the pleadings and the oral argument of counsel. Id., 209 Ariz. at 49-50, 97 P.3d at 874-75. The trial court heard no testimony from any of the victims and considered their accounts, only as related to the grand jury through a police officer. Id.

In reversing, the Supreme Court focused on the fact that the trial judge found that there was clear and convincing evidence that Aguilar had committed the other acts, because he admitted sexual contact with the three victims. This, the Supreme Court declared, "missed the point." Id. The issue was not whether Aguilar had sexual contact with the victims—rather, it was whether that sexual contact was without the victims' consent. Id. And this question, the Supreme Court emphasized, required the trial court to make a credibility determination that it could only make by hearing from the victims themselves or by considering prior *testimony* from them. Id.

The Supreme Court went on to note that Rule 404(c)(1)(D) requires the trial judge to do more than just parrot the language of the rule:

27

> We do note, however, that Rule 404(c)(1)(D) requires something more than just repeating the language of the three elements of Rule 404(c)(1)(A) through (C); it mandates some specific indication of why the trial court found those elements satisfied.

Under Aguilar, it is clear that joinder of Dr. Finkel's sixty-seven counts and thirty-five alleged victims constituted reversible error. This is so for three reasons.

First, as in Aguilar, lack of consent was an element of every one of the charges against Dr. Finkel that the state sought to cross-admit and join. Thus, in the face of Dr. Finkel's absolute denial of any sort of wrong-doing, it was necessary for the trial judge to determine the credibility of all thirty-five accusers, in order to satisfy the requirement imposed by Rule 404(c)(1)(A) that the court find by clear and convincing evidence that the accused committed the acts charged. And, as Aguilar notes, a trial judge can make this assessment only by hearing from the alleged victims in person, or by considering their former testimony. Here, the prosecution presented the court with nothing more than transcripts of unsworn police interviews of former patients and employees.

Secondly, the Aguilar requirement that the court determine witness credibility in joinder hearings squares with the confrontation clause requirements recently enunciated in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). This is so because Crawford requires that in "any prosecution" the state

28

cannot rely upon hearsay evidence to convict the accused, but instead must produce live witness testimony.  Because Aguilar demands that the trial judge personally assess the credibility of witnesses in a joinder hearing, such hearings have now taken on the primary attribute of a trial:  assessment of the truthfulness of a defendant's accusers.  And, Crawford teaches us that that can occur only when the trier of fact hears from these witnesses in person, in open court, where they must run the gauntlet of cross-examination.

Third, the accusations of the thirty-five victims, standing alone, even if they were sufficient to satisfy Rule 404(c)(1)(A), do not in any way satisfy the requirement enunciated in Rule 404(c)(1)(B) that the state prove, by clear and convincing evidence, that they "provid[e] a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime charged."  This is so because all thirty-five victims, as gynecological patients, had consented, to some degree, to the touching of their breasts and genitalia, as necessary incidents to their medical treatment.  Indeed, Dr. Finkel obtained this consent from all his patients in writing.  (Exhibits 57-67, 69, 71, 72, 89, 97, 100, 108, 113, 115, 118, 124, 127, 133, 136, 143, 146, 147, 151, 154 and 206).  Except for Count 32 in CR-2002-001431 involving Gretchen O'Hair Janovetz (who claimed that Dr. Finkel grabbed her breast in the hallway of his office after her procedure had concluded), this

29

was not a case in which the victims accused Dr. Finkel of having had intimate contact other than during the rendition of medical treatment. (R.T. 8-20-03, pp. 141-44). The issue, thus, was whether Dr. Finkel's conduct vitiated patient consent, and the trial court could not have made this determination without having heard expert gynecological testimony on the extent of touching necessary for the medical treatment the victims sought.   The interviews of Dr. Finkel's medical assistants were meaningless, first, there existed no foundation to establish that they had the slightest idea what constituted proper gynecological practice, and secondly, because the state did not present them in person or offer their former testimony, under oath and subject to cross-examination.   Thus, the court had no more opportunity to assess their credibility than it did to assess the credibility of the victim-witnesses.   This was critical, because Dr. Finkel had fired medical assistants Crystal Sykes and Karen Corbett for cause, and Dawn Normoyle had resigned after an accusation that she was pilfering drugs and shorting patients on pain medication and retaining it for herself. (R.T. 10-8-03, pp. 46-51; R.T. 10-23-03, a.m., pp. 20-21).  A fourth assistant, Renee Imrisek, felt that Dr. Finkel had been making improper advances toward her. (R.T. 9-8-03, p. 84).  In addition, when they first contacted the authorities, Sykes and Corbett were attempting to recover profit-sharing monies from Dr. Finkel. (R.T. 8-28-03, pp. 76-89, 108 and 120; R.T. 10-8-03, pp. 23-25).  Thus, four of the six medical assistants

30

whose interview transcripts the court read may have had a bias against Dr. Finkel, and at least two of them had financial interests or motives in bringing legal pressure to bear upon him.   These are considerations with a profound impact on witness credibility. (Livermore, Bartels and Hammeroff, LAW OF EVIDENCE, 4th Ed. (2000), § 608.5, pp. 221-24).

Because the trial court failed to consider proof sufficient to establish that Dr. Finkel committed the alleged offenses, as required by Rule 404(c)(1)(A) of the Arizona Rules of Evidence, and because the trial court also failed to consider proof necessary to show that Dr. Finkel's conduct showed an emotional propensity for sexual aberration, the court's joinder order violated Dr. Finkel's right to severance of counts, as to victim, secured him by Rule 13.4 of the Arizona Rules of Criminal Procedure.  This Court should reverse and grant Dr. Finkel a new trial.

31

## ARGUMENT II

**THE TRIAL COURT ABUSED ITS DISCRETION AND REVERSIBLY ERRED WHEN IT PERMITTED DR. ANN BURGESS TO TESTIFY ABOUT THE RESPONSES OF SEXUAL ABUSE VICTIMS BECAUSE, IN THE END, THIS AMOUNTED TO NOTHING MORE THAN PROHIBITED "RAPE TRAUMA SYNDROME" AND "OFFENDER PROFILE" EVIDENCE.**

A.   **Facts Material to a Discussion of the Issue.**

Defense counsel sought to bar two proposed state's witnesses, Dr. Dennis Doren and Dr. Ann Burgess, on the ground that their testimony would amount to no more than "offender profile evidence," prohibited by the holdings of the Arizona Supreme Court in State v. Lee, 191 Ariz. 542, 959 P.2d 799 (1998), and this Court in State v. Cifuentes, 171 Ariz. 257, 830 P.2d 469 (App. 1991). (I-224). At a pre-trial hearing, the prosecutor confirmed that Dr. Doren would "...testify to the general characteristics of sex offenders." (R.T. 8-8-03, p. 36). The state did not tip its hand about the proposed testimony of Dr. Burgess. The trial court granted the defense motion, in part, barring Dr. Doren, but permitting Dr. Burgess to testify. (M.O. 8-8-03).

At trial, when Dr. Burgess proposed to testify about the response of *rape* victims to their abuse, the court sustained a defense objection on relevance grounds.

32

(R.T. 10-1-03, pp. 147-51).   However, the court overruled a similar objection to testimony about the responses of victims of unwanted sexual abuse or sexual contact. (*Id.*).  Dr. Burgess then shared her observations and opinions on this issue with the jury, and spoke in detail about cases of sexual abuse of patients by doctors.  (*Id.*, pp. 153-185).  She told the jury:

1)   That a doctor/patient relationship is an authority relationship, in which the doctor is the authority and the patient is the subservient person;

2)   That confrontation was not the primary response to unwanted physical touching;

3)   That in cases of improper touching the responses varied:  some patients evidenced denial, others rationalized that the doctor knew what he was doing, others feared of the consequences if they complained and still others made excuses to stop the exam without complaining of the touching;

4)   That a big factor was the patient's concern for her own health;

5)   That generally, the more invasive the procedure during which the touching occurred, the less likely the patient was to ask that the physician stop his misbehavior;

33

6)      That in the OB/GYN setting, patients were particularly vulnerable, because they were flat on their backs, unable to get up and run;

7)      That if all other aspects of the examination were normal, the overall situation for the patient was only more confusing;

8)      That the presence of a medical assistant in the examining room caused self-doubt and tended to lull the victim into thinking that the problem lay with her;

9)      That such patients would cry and feel embarrassed;

10)     That for such patients, unwanted physician touching presented the risk of "disastrous disclosure;"

10)     That it was not uncommon for such victims to return to the same doctor who had touched them inappropriately;

11)     That generally, the victims of physician touching would not come forward without some kind of support or media reporting; and

12)     That a lot of victims had trouble pinpointing the dates of the touchings. (*Id.*).

**B.      Standard of Review.**

This Court reviews the admission of evidence on an abuse of discretion basis. State v. Ayala, 178 Ariz. 385, 387, 873 P.2d 1307, 1309 (App. 1994).

C.    **Argument.**

In Arizona, "rape trauma syndrome" evidence is admissible only where there is other evidence of sexual assault, and the expert testimony only goes to the issue of consent.  State v. Huey, 145 Ariz. 59, 699 P.2d 1290 (1985).  Huey noted that evidence of this kind had been disallowed by other courts for the purpose of proving an act of rape itself.  Id., 145 Ariz. at 63, 699 P.2d at 1294.  The problem with the testimony of Dr. Burgess in this case, was that it was not consent that was the issue— it was whether the touchings had occurred at all—and that is specifically the sort of "rape trauma syndrome" evidence, albeit offered in the context of a less serious sex crime, that Huey and the decisions it cites do not permit.

Moreover, because virtually all of Dr. Burgess' testimony and examples dealt with the abuse of patients by doctors, the "offender profile" quality of her evidence is obvious.  In State v. Lee, 191 Ariz. 542, 544, ¶ 12, 959 P.2d 799, 801 (1998), a drug case, the Arizona Supreme Court condemned the use of "profile evidence" as substantive proof of guilt.  Such evidence consists of an "'informal compilation of characteristics' or an 'abstract of characteristics' typically displayed by persons" engaged in a particular crime.  Id.  As Division Two of this Court has explained in the context of an auto theft case, the "use of profile evidence to indicate guilt...creates too

35

high a risk that a defendant will be convicted not for what he did but for what others are doing." <u>State v. Cifuentes</u>, 171 Ariz. 257, 257, 830 P.2d 469, 469 (App. 1991).

Here, Dr. Burgess told the jury, in no uncertain terms, that doctors can easily molest their women patients with little fear of exposure unless the patients have a good support system or the encouragement of the media.   Given the publicity attendant upon Dr. Finkel's arrest and prosecution, it can hardly have been lost on the jury that Dr. Burgess was talking about the very sort of behavior and accusations that occurred in this case.   The trial court abused its discretion and reversibly erred when it permitted Dr. Burgess to offer this testimony.

36

## ARGUMENT III

**THE TRIAL COURT REVERSIBLY ERRED WHEN IT BARRED THE DEFENSE EXPERT, DR. ELIZABETH LOFTUS, FROM OFFERING TESTIMONY ABOUT THE RISK OF IMPLANTED MEMORIES, AND IN SO DOING, DENIED DR. FINKEL DUE PROCESS OF LAW, CONTRARY TO THE PROTECTIONS OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, § 4 OF THE ARIZONA CONSTITUTION.**

A. **Facts Material to a Discussion of the Issue.**

The state sought by an *in limine* motion to bar testimony by defense expert Dr. Elizabeth Loftus about the "credibility of specific witnesses or victims in this case." (I-533). The state also sought to bar Dr. Loftus from opining that there is no way to differentiate a real memory from a false memory without corroboration of the real memory. (*Id.*). Defense counsel conceded that Dr. Loftus could not opine on the truthfulness of the state's witnesses; he asserted, however, it was well within Dr. Loftus' area of expertise to state that false memories cannot be distinguished from true memories by any internal indicia, and he insisted that, contrary to the state's assertions, such testimony did not implicate issues of ultimate fact nor did it evidence a conflict between Dr. Loftus' area of expertise and Arizona law. (I-577). Defense counsel further argued that because the state's expert, Dr. Ann Burgess, had already

offered theories that bolstered the credibility of the victims, the state should not now be heard to complain from a defense expert who had a contrary opinion. (*Id.*).

The trial court ruled that Dr. Loftus could testify only as a "cold expert" on the subjects of memory and its malleability and susceptibility to contamination. (R.T. 10-16-03, p. 4). The court directed that Dr. Loftus not offer opinions concerning the specific facts of the instant case and it precluded counsel from asking hypotheticals drawn from the facts of Dr. Finkel's case, as this would invade the province of the jury. (*Id.*).

Defense counsel made an offer of proof, declaring that but for the court's ruling, she would have told the jury that the questions Detective Haduch put to Crystal Sykes and Karen Corbett, and his technique of attributing statements to other witnesses in questioning these two medical assistants completely contaminated their interrogation. (RT. 10-20-03, pp. 4-6). Counsel avowed that but for the *in limine* strictures, Dr. Loftus would have told the jury that Detectives Stribling and Lewis of the County Attorney's Office also contaminated the interviews of their subjects by supplying specific verbs, such as "fondling," "manipulating," and "rubbing." According to defense counsel, Dr. Loftus would also have testified that the bias of the state's examiners consistently drove them toward more criminal, rather than less criminal characterizations of behavior, and this presented the risk that the memories of

38

the interviewees were altered to conform to the views of their examiners.  (*Id.*).
Finally, defense counsel told the court that Dr. Loftus would have testified that the
County Attorney's press release and the things published and broadcast about Dr.
Finkel all presented the possibility of having contaminated witness memories.  (*Id.*,
pp. 6-7).

**B.    Standard of Review.**

This Court normally reviews the admission of evidence on an abuse of
discretion basis.  State v. Ayala, 178 Ariz. 385, 387, 873 P.2d 1307, 1309 (App.
1994).  However, when the admissibility of expert testimony is a question of law or
logic, the standard is *de novo*.  State v. Speers, 205 Ariz. 125, 129, 98 P.3d 560, 564
(App. 2004).

**C.    Argument.**

In the closely related context of child molesting and child pornography cases,
this Court has held it reversible error to bar the defense from calling properly qualified
experts to rebut "propensity evidence" by explaining to the jury the dangers of
contaminated memories and suggestive interviewing practices.  State v. Speers, 205
Ariz. 125, 98 P.3d 560 (App. 2004).  In Speers, the defendant charged with child
molesting had computers seized from his home.  These contained images that led to
additional charges of child pornography.  At Speers' trial on the pornography charges,

39

the state offered as Rule 404(c) propensity evidence the fact that he was also a child molester.   In rebuttal, Speers sought to offer the expert testimony of one Dr. Underwager to the effect that suggestive interviewing techniques can influence children's memories.  The trial court denied this request.

In reversing, the Court of Appeals found that as a matter of due process, Speers had the right to offer relevant evidence challenging the validity and reliability of the state's 404(c) evidence.  This Court found that a defendant should be able to explore with the jury "...how the victim came to relate the facts which led to the bringing of the criminal charges." *Id.*, 205 Ariz. at 131, 98 P.3d at 566.  For the <u>Speers</u> court, the key issue was this:

> The purpose of expert testimony concerning interview techniques is not to show that the child witness is not telling the truth, but to question whether the facts believed to be true by the witness are reliable. *Id.*

As <u>Speers</u> notes, "child sexual abuse cases are a special lot."  For them, "A major distinguishing aspect...is how the victim came to relate the facts which led to the bringing of criminal charges." *Id.*  Analytically, however, there is little to distinguish child sexual abuse from the sort of charges lodged against Dr. Finkel.  If Dr. Burgess is to be believed, both likely involve authority relationships; and both likely involve situations where the victims are physically powerless to resist.

40

Doubtless, molestation is as confusing for a child as for a gynecological patient, and the victims of each must be wracked by self-doubt and fear of repercussions in the event of disclosure. Delayed disclosure is apparently a common feature of both kinds of cases. Other factors are suggested in State v. Lindsey, 149 Ariz. 472, 473-74, 720 P.2d 73, 74-75 (1986), and similar cases. Without further belaboring the point, it is fair to say that the parallels are striking.

Seen in this light, it was every as much an error of law for the trial court to restrict Dr. Loftus from testifying about memory contamination and suggestive interview techniques in the instant case as it was to bar Dr. Underwager from offering similar evidence in Speers. In each case, there was little to suggest that the victims did not believe they were truthful when recounting their experiences to the jury. The problem, in each case, was that there existed the distinct possibility that interviewing techniques caused impressionable and emotionally stressed victims and witnesses to recall matters differently after being interviewed than before interrogation. This is what Dr. Loftus would have explained, and the trial court denied Dr. Finkel due process of law, contrary to the protections of the Fifth and Fourteenth Amendments of the United States Constitution and Article 2, § 4 of the Arizona Constitution when it barred her from telling these things to the jury.

## ARGUMENT IV

**THE TRIAL COURT REVERSIBLY ERRED AND DENIED DR. FINKEL HIS RIGHTS TO CONFRONTATION AND A PUBLIC TRIAL, SECURED HIM BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, § 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED THE WITNESS SHELLY CLUFF TO TESTIFY BY MEANS OF A VIDEO-TAPED DEPOSITION, WITHOUT FIRST ESTABLISHING THAT CLUFF WAS UNAVAILABLE TO TESTIFY.**

**A.    Facts Material to a Discussion of the Issue.**

One of Dr. Finkel's accusers was a woman named Shelly Cluff.  Her claims comprised Counts 48 and 49 in CR-2002-001431. (I-1).  Prior to trial, Cluff retained counsel, who tried to quash the state's subpoena for Cluff. (M.O. 8-8-03).  The court re-visited the issue in mid-trial, when it conducted a hearing, but apparently issued no minute order. (R.T. 9-5-03).  At that hearing, Dr. Crow, a therapist for Ms. Cluff, told the court that his patient was in the midst of a divorce and was subject to panic attacks, and he was fearful of the consequences to her mental and emotional health if she were required to testify in the case. (*Id.*, pp. 6-7 and 10-12).  At the beginning of this hearing, defense counsel appeared to acquiesce in the court's suggestion that Ms. Cluff testify by means of a video deposition.  (*Id.*, pp. 15-16).  Later, however, he stated he was opposed to it and he filed a written motion objecting to the entire

42

procedure as violative of the confrontation clause of the Sixth Amendment to the United States Constitution. (*Id.*, p. 24 and I-367). And, when the court took up the issue once again ten days later, he protested that there was no provision for video deposition in lieu of live testimony in adult criminal proceedings, "because the right to confrontation is a bedrock principle of our Constitutional rights." (R.T. 9-15-03, pp. 4-5). Defense counsel noted that Cluff had stated at the previous hearing that if she had known it would be necessary to testify, she might not have complained about Dr. Finkel at all. (*Id.*). He protested "[that in the face of such an admission]…anything that erodes the gravity of testimony denies the right to confrontation. Giving her testimony without the jury present erodes the gravity of the occasion." (*Id.*). Defense counsel further protested that with a deposition procedure, there would be no way for the jury to pose questions to Ms. Cluff. (*Id.*).

The trial court resolved these issues by permitting Ms. Cluff to testify in court, for video recordation, outside the presence of the jury. (*Id.*, pp. 9-10). In making this ruling, the trial court made no finding about whether Cluff was available.

Ms. Cluff gave her deposition two weeks later, in a locked courtroom. (Ex. 325, 13:30:06 hours). Four days thereafter, Ms. Cluff's deposition, now Exhibit 325, was played for the jury. (M.O. 10-7-03). The court resolved the matter of juror questions by requiring Ms. Cluff to appear in open court to respond to these inquiries.

43

(R.T. 10-7-03, pp. 59-61).   In offering this solution, the court announced that defense counsel would have more than the usual latitude in cross-examining Ms. Cluff about her responses.   (*Id.*).

**B.      Standard of Review.**

The claims of impropriety in the use of Shelly Cluff's video deposition in lieu of live testimony present mixed questions of law and fact.   Here, the action of the trial court implicates state and federal Confrontation Clause rights, and the review of mixed questions of law and fact which implicate constitutional rights is *de novo*.   State v. Buccini, 167 Ariz. 550, 556, 810 P.2d 178, 184 (1991), cert. denied, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 53 *mem.* (1991).

**C.      Argument.**

The United States Supreme Court has made it plainly clear that the Sixth Amendment confrontation clause requires *face-to-face* confrontation of state's witnesses in open court.   Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).   In Arizona, there has never been any doubt about this requirement, because Article 2, § 24 of the state constitution declares that "In criminal prosecutions, the accused shall have the right to appear and defend in person…[and] to meet the witnesses against him face to face…."

44

Here, the trial court attempted to broker a compromise between the rigid demands of the constitutional right to confrontation and the sensibilities of Ms. Cluff by concocting a hybrid procedure, half in a confidential deposition room, and half in open court before the jury. This solution was just as constitutionally deficient as a complete denial of Dr. Finkel's confrontation and public trial guarantees, and his conviction on Count 48 pertaining to Ms. Cluff cannot stand.

Confrontation of one's accusers in open court contemplates that a criminal defendant will enjoy an entire package of safeguards. Included among these are the right to have an accuser declare, under oath, *in public*, before a panel of disinterested citizens, that the accused committed a crime. In this setting, the accuser must endure cross-examination, and, in Arizona, questions by the jury.

When the court permitted Ms. Cluff to deliver the great bulk of her testimony in private, Dr. Finkel did not enjoy the safeguard that the pressure of the confrontation requirement is intended to create for witnesses. Had Ms. Cluff been required to deliver her principal accusations with a jury in the box, staring at her, she might not have demonstrated the confidence and self-assurance she displays on videotape. And, when defense counsel did cross-examine her in the presence of the jury, Ms. Cluff had already had the benefit of a dress rehearsal, in the form of her earlier video deposition. She was familiar with the general area of inquiry, she was accustomed to the style of

45

counsel's cross-examination, and having once delivered her performance in a locked room, she appeared for juror questions and limited cross-examination prepared and delivered of those very anxieties that might reveal a chink in her testimonial armor.

In addition to the foregoing considerations, however, there is another defect in the trial court's solution to Ms. Cluff's problems:  it failed to find that she was *unavailable* to testify in open court.  With its recent decision in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court stated in no uncertain terms that out-of-court testimonial statements of witnesses are barred under the confrontation clause, even where the accused had a prior opportunity to cross-examine, where the state has not established that the witness was unavailable. *Id.*, 541 U.S. at 57-59, 124 S.Ct. at 1367-69.  Justice Scalia put it succinctly when he noted that:

> Our cases have thus remained faithful to the Framer's understanding:  Testimonial statements of witnesses absent from trial have been admitted only where the declarant *is unavailable*, and only where the defendant has had a prior opportunity to cross-examine. *Id.*, 541 U.S. at 59, 124 S.Ct. at 1369. [Emphasis supplied].

Here, where there was no attempt to show that Cluff was unavailable, but only that she preferred not to appear in person, and where the court made no finding that she was unavailable, the Sixth Amendment was not satisfied.

Dr. Finkel had a right to require Ms. Cluff to accuse him before the jury in the first instance, in open court, subject to cross-examination, without prior preparation. This Court should restore those rights to Dr. Finkel and grant him a new trial on Count 48.

**ARGUMENT V**

**THE TRIAL COURT COMMITTED AN ERROR OF LAW WHEN IT SENTENCED DR. FINKEL ON COUNT TO "LIFETIME PROBATION, 99 YEARS," BECAUSE THE MAXIMUM AVAILABLE PROBATIONARY TERM FOR A CLASS FIVE FELONY COMMITTED IN 1986 WAS THREE YEARS.**

A.    <u>Facts Material to a Discussion of the Issue.</u>

Count 48 in CR-2002-001432 accused Dr. Finkel of having sexually abused Shelly Cluff between June 1 and December 1, 1986. (I-1). As punishment for this crime, the court sentenced Dr. Finkel to "lifetime probation, 99 years, to commence upon the defendant's total release from the Department of Corrections." (R.T. 1-2-04, p. 16).

B.    <u>Standard of Review.</u>

Sentencing error are errors of law. This court reviews questions of law *de novo*. <u>State v. Garcia</u>, 162 Ariz. 471, 473, 784 P.2d 297, 299 (App. 1989).

C.    <u>Argument.</u>

Sexual abuse of a person over the age of fifteen years is now, and was in 1986, a class five felony. (A.R.S. § 13-1404, present version, and versions in effect in 1986). In 1986, the maximum probationary term available for a class five felony was three years. (Former version of A.R.S. § 13-902(A)(2)). Lifetime probation for

48

violation of all sections of Chapter 14 of did not become a legal possibility until January 1, 1994, when A.R.S. § 13-902(E) became effective. ("Application" and "Historical and Statutory Notes" appended to A.R.S. § 13-902). Retroactive application of the lifetime probation feature of § 13-902(E) offends not only the enabling legislation for this statute; it also contravenes the *ex post facto* protections embodied in A.R.S. § 1-246, Article 2, § 25 of the Arizona Constitution and Article 1, § 9 of the United States Constitution. Accordingly, this Court must remand Count 48 for re-sentencing, with instructions to impose a probationary term no greater than three years.

49

## ARGUMENT VI

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ISSUED A MINUTE ORDER ON COUNTS 31 AND 32 IN CR-2002-001431 IMPOSING SENTENCES OF 2.75 YEARS, WHEN THESE TWO COUNTS WERE NOT SUSCEPTIBLE TO TREATMENT AS MULTIPLE OFFENSES, NOT COMMITTED UPON THE SAME OCCASION, SO THAT THE MAXIMUM ALLOWABLE SENTENCE FOR EACH WAS NO MORE THAN 2.5 YEARS, AND WHEN THE TRANSCRIPT OF THE ORAL PRONOUNCEMENT OF SENTENCE REFLECTS THAT THE COURT IMPOSED CONCURRENT TERMS OF 1.75 YEARS ON EACH OF THESE TWO COUNTS.**

A.    **Facts Material to a Discussion of the Issue.**

As noted in the Statement of the Case, *supra*, prior to trial, the state sought enhancement by alleging that all counts in both indictments constituted multiple crimes, not committed upon the same occasion, but consolidated for trial, pursuant to the provisions of A.R.S. § 13-702.02.  (I-27; I-49).  The state filed this allegation without consideration of the fact that counts occurring prior to January 1, 1994, were not susceptible to this sort of enhancement.  In the end, however, the jury only convicted Dr. Finkel of one count occurring before the effective date of A.R.S. § 13-702.02, and that was Count 48 in CR-2002-001431.  (M.O. 12-2-03).

The trial court was aware of the fact that Count 48 was not susceptible to A.R.S.

§ 13-702.02 treatment, and so stated prior to sentencing. (R.T. 1-2-04, p. 15). The

court declared that Dr. Finkel was susceptible to § 13-702.02 on all other counts.

(*Id.*). The court further noted, however, that Dr. Finkel was probation eligible on

Count 48, as well as on Counts 31 and 32 in CR-2002-001431. (*Id.*). Despite this

observation, the trial court declined to place Dr. Finkel on probation on Counts 31 and

32, and instead sentenced him to prison on those two charges. (M.O. 1-2-04).

Whether the prison term was for "an aggravated term" of 1.75 years, as reflected in

the oral pronouncement of sentence, or 2.75 years, as reflected in the sentencing

minute entry, is unclear. (R.T. 1-2-04, pp. 18-19; M.O. 1-2-04).

**B.      Standard of Review.**

Sentencing error are errors of law. This court reviews questions of law *de novo*.

State v. Garcia, 162 Ariz. 471, 473, 784 P.2d 297, 299 (App. 1989).

**C.      Argument.**

The problem presented by a sentence of 2.75 years for Counts 31 and 32

consists in the fact that the maximum allowable sentence for a first offense for a crime

committed after January 1, 1994, is 2.5 years. (A.R.S. § 13-702.01). This is also the

maximum allowable sentence allowed for second offense class five felony prosecuted

as a multiple offense not committed upon the same occasion, pursuant to the

51

provisions of A.R.S. § 13-702.02. While the trial court made conflicting statements in finding that Dr. Finkel was probation eligible on Counts 31 and 32, and that he was also susceptible to § 13-702.02 enhancement on those counts, when that sort of enhancement bars probation, this conflict is of no moment because Dr. Finkel did not receive probation on these two counts in any event, and the court gave no indication that it would have placed him on probation for them, but for this bar.

The significant issue is the fact that regardless of whether the court treated Dr. Finkel as a first offender susceptible to an exceptionally aggravated sentence, pursuant to A.R.S. § 13-702.01, or whether it treated him as a second offender pursuant to A.R.S. § 13-702.02, it had no authority to impose a prison term in excess of 2.5 years. Consequently, Dr. Finkel's sentences of 2.75 years on each of these two counts are illegal for this reason alone.

More importantly, however, where there is a conflict between the written record of sentence and the transcript of its oral pronouncement, the oral pronouncement controls. State v. Hanson, 138 Ariz. 296, 304-305, 674 P.2d 850, 858-859 (App. 1983). Here, where the court unambiguously imposed a term of 1.75 years during the oral proceedings, and where a sentence of 2.75 years would have been unlawful, in any event, it is clear the longer term reflected in the sentencing minute entry is erroneous. For reasons explained in Argument VIII, below, however, even a sentence

52

of 1.75 years is illegal, because it is an aggravated term based on factors not found by a jury, in violation of the Sixth Amendment jury trial guarantees and the holding of Blakely v. Washington, __ U.S. __. 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Consequently, this Court must remand this matter, with instructions to the trial court to reconsider all sentences, except that on Count 48, in light of the Blakely decision.

## ARGUMENT VII

**THE TRIAL COURT ERRED IN FAILING TO ISSUE A SENTENCING MINUTE ORDER THAT EXPLAINED THAT IT HAD SENTENCED DR. FINKEL TO CONCURRENT SENTENCES ON COUNTS 10 AND 37/38 IN CR-2002-001431, MAKING HIS TOTAL SENTENCE A STRING OF ELEVEN, AND NOT THIRTEEN, BLOCKS OF CONSECUTIVE SENTENCES.**

A.     **Facts Material to a Discussion of the Issue.**

The sentencing minute order commits Dr. Finkel to prison on 21 of the 22 counts of which he was convicted, pairing the multiple counts pertaining to each victim, so that they would run concurrently, except for the three counts relating to Krista Aumiller, which occurred on two separate dates. (M.O. 1-2-04). The sentencing minute order thus imposed probation for Count 48, pertaining to Shelly Cluff, and thirteen consecutive prison terms for the other 21 counts (Counts 13, 14 and 15 in CR 2001-015515). (*Id.*; I-1 and I-68). According to the sentencing minute entry, Dr. Finkel should be serving a total of 35.75 (2.75 X 13) years. (M.O. 1-2-04).

The transcript of the oral sentencing proceedings, however, does not reflect such a clearly linear sequence. It shows, instead, that the court twice ordered two sets of sentences to start at the same time.

Thus, the court sentenced Dr. Finkel on Counts 31/32 (CR-2002-001431), 2 (CR-2001-015515), 50 (CR-2002-001431), 11/12 (CR-2002-001431), 4/5 (CR-2001-0015515) and 14 (CR-2002-001431), with each of these sentences to begin upon on the conclusion of the sentence preceding it. (R.T. 1-2-04, pp. 18-20). Following that, the court began a second string of consecutive sentences, without making that string specifically consecutive to the first string. (*Id.*, pp. 20-22). That second sequence started with Counts 33/34 (CR-2002-001431), followed by Counts 17/18 (CR-2002-001431), Counts 13/14 (CR-2001-015515), Counts 16/17 (CR-2001-015515) and finished by Count 15 (CR-2001-015515). (*Id.*).

Counts 37/38 (CR-2002-001431) and Count 10 (CR-2002-001431) were anomalous, to the extent that they had start dates that coincided with the start dates of other sentences in the two longer strings. Thus, the trial court ordered Counts 37/38 to start upon the conclusion of Counts 33/34, just as it had ordered Counts 17/18 to start upon the conclusion of Counts 33/34, and Count 10 (CR-2002-001431) was ordered to start upon the conclusion of Counts 31/32, just like Count 2 (CR-2001-015515). (*Id.*, pp. 20-23).

**B.    Standard of Review.**

Sentencing error are errors of law. This court reviews questions of law *de novo*. State v. Garcia, 162 Ariz. 471, 473, 784 P.2d 297, 299 (App. 1989).

C.     **Argument.**

The problem presented by this conflict between the sentencing minute entry and the transcript of the oral pronouncement of sentence is that it produces two different outcomes for Dr. Finkel.  If the sequence set out in the minute order controls, Dr. Finkel must serve 35.75 years; however, if the sequences of the oral pronouncement control, as they must, pursuant to State v. Hanson, *supra,* then Dr. Finkel need serve only 30.25 years.  This is so for the following reasons.

A.R.S. § 13-709(A) provides that a sentence commences upon the date it is imposed. A.R.S. § 13-708 stipulates that in the case of multiple sentences imposed at the same time, the terms shall run consecutively, unless the court states otherwise.  If the court does not run the terms consecutively, A.R.S. § 13-708 requires that the court state its reasons for deviating from what case law has determined to be the "default requirement" of consecutive terms.  State v. Garza, 192 Ariz. 171, 962 P.2d 898 (1998).

Here, the two longer sequences of sentences must arguably run consecutively, under the terms of A.R.S. § 13-708, because the trial court did not specify when they were to start, and so, it is presumed that one will run after the other.  The problem arises with the sentences imposed on Counts 10 and 37/38 in CR-2002-001431.  The trial court stated that the sentences for those counts were to run consecutively to

56

Counts 31/32 and 33/34, respectively, even though other counts were also ordered to run consecutively to Counts 31/32 and 33/34, as well. Because there is nothing in the law that prevents more than one sentence from starting at the same time as another sentence, even though each of the two latter sentences is ordered to be served consecutively to a so-called "mother term," this Court should correct the sentencing minute order, stating that Count 10 is to run consecutively to Counts 31/32 (and is, *de facto* concurrent with Count 2 in CR-2001-015515) and that Counts 37/38 are to run consecutively to Counts 33/34, even though Counts 17/18 (in CR-2002-001431) also start when 33/34 come to an end, and are therefore also *de facto* concurrent with Counts 37/38.

57

**ARGUMENT VIII**

**THE TRIAL COURT ERRONEOUSLY AGGRAVATED ALL OF DR. FINKEL'S PRISON SENTENCES, FIRST, BECAUSE IT CITED AGGRAVATING FACTORS THAT WERE ILLEGAL, OR NOT SUPPORTED BY THE EVIDENCE, AND SECONDLY BECAUSE IT DID NOT GRANT HIM A JURY TRIAL ON THE SENTENCING AGGRAVATORS, CONTRARY TO THE REQUIREMENTS OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, ARTICLE 2, §§ 23 AND 24 OF THE ARIZONA CONSTITUTION AND THE HOLDING OF BLAKELY V. WASHINGTON.**

**A.**   **Facts Material to a Discussion of the Issue.**

As noted above, Dr. Finkel received aggravated terms on every count, except Count 48, for which he received a sentence of life-time probation.  The court based the aggravated sentences on five factors:

1) The emotional harm done to the victims, including depression, humiliation and fear;

2) The physical harm (not specified) done to some of the victims;

3) The fact that Dr. Finkel violated his position of trust as a doctor;

4) The fact that Dr. Finkel failed to express remorse and did not accept responsibility for his crimes; and

58

5)     The fact that Dr. Finkel committed his crimes over a period of approximately 15 years.

**B.**     **Standard of Review.**

Sentencing error are errors of law.  This court reviews questions of law *de novo*. State v. Garcia, 162 Ariz. 471, 473, 784 P.2d 297, 299 (App. 1989).

**C.**     **Argument.**

**1.**     **The Trial Court Cited Three Illegal or Unproved Aggravating Factors.**

While it would appear that the emotional harm to Dr. Finkel's victims would qualify as an aggravating factors under A.R.S. § 13-702(C)(9) and that his violation of his position of trust would qualify as an aggravating factor under the so-called "catch-all" factor presently found in § 13-702(C)(21), all of the other factors cited by the court are problematic.  This is so, either because the proof of them is lacking, or because they are included within other statutory factors, or because their use as aggravators is prohibited by law.

The factor of physical harm is problematic for two reasons.  First, it is redundant, to the extent that it repeats the violation of A.R.S. § 13-702(C)(9), already cited by the court in finding that Dr. Finkel had caused the victims emotional harm.

59

This statute makes it abundantly clear that harm done to victims is but a single aggravator, when it states that the court shall consider:

> The physical, emotional and financial harm caused to the victim or, if the victim has died, as a result of the conduct of the defendant, the emotional and financial harm caused to the victim's immediate family. A.R.S. § 13-702(C)(9).

To cite factor (C)(9) twice, as the court did here, is nothing less than a double-counting of aggravators. Double-counting of aggravators is prohibited, except where specifically authorized by statute. State v. Germain, 150 Ariz. 287, 290, 723 P.2d 105, 108 (App. 1986). No statute permits a court to count factor (C)(9) twice, and the trial court reversibly erred when it did so.

Secondly, there is no evidence to support the claim that Dr. Finkel physically harmed any of the victims. No victim testified that she was bruised, cut, abraded or otherwise injured in any way. Some testified that his pulling or twisting of their nipples caused discomfort or "kind of hurt." (E.g., R.T. 9-9-03, p. 243). None, however, testified that she experienced anything more than momentary pain. Indeed, at least one witness described Dr. Finkel's breast examination technique as considerably less painful than "normal breast exams." (R.T. 9-4-03, pp. 89 and 118). Most of the pain Dr. Finkel's patients described pertained to the PAP smear or pregnancy termination procedures, neither of which constituted a basis for any of the

charges against Dr. Finkel. (*E.g.,* R.T. 9-22-03, pp. 147-56 and R.T. 25-03, pp. 112-13).   No witness testified that anything that Dr. Finkel did in touching them inappropriately caused the impairment of any physical condition, which is the definition of "physical injury," as that term is defined by A.R.S. § 13-105(29), and as it is used in the Arizona Criminal Code.

Lack of remorse is also an improper aggravating factor.  This factor offends the self-incrimination privilege of the Fifth Amendment to the United States Constitution, and trial courts may not use it to justify upward departure from the presumptive term. State v. Hardwick, 183 Ariz. 649, 656, 905 P.2d 1384, 1391 (App. 1995).

Finally, the trial court erred when it found that Dr. Finkel had committed his crimes over a period of fifteen years.  This is so because the repetitive quality of Dr. Finkel's misconduct has already been used to justify sentence enhancement pursuant to A.R.S. § 13-702.02.  In State v. Alvarez, 205 Ariz. 110, 67 P.3d 706 (App. 2003), Division Two of this Court found that it was an improper exercise in "double-counting" to both enhance with a § 13-702.02 allegation, and then cite to "multiple victims" as an aggravating factor.  Division Two explained that this was so,

> …because the existence of a victim was implicit in the cluster of offenses Alvarez committed on each occasion, [and] to say that he had "multiple victims" reflects nothing more, on these facts, than his commission of multiple offenses over time.

61

*     *     *     *

Based on the particular facts of this case, we conclude the trial court erred in imposing aggravated sentences on the basis of "multiple victims" alone. Alvarez did not have "multiple victims" in the sense in which that term is normally used, denoting multiple victims of a single act, episode, or scheme. Alvarez, 205 Ariz. at 114, 67 P.3d at 710.

Nothing logically distinguishes Dr. Finkel's case from that of Jose Alvarez. Like Alvarez, Dr. Finkel stands convicted, not of having improperly touched or fondled multiple women all upon the same occasion, but of having done this, one victim at a time, over a span of fifteen years. The state chose to punish the repetitive quality of his conduct by alleging and proving a §13-702.02 allegation. Alvarez holds that Dr. Finkel cannot be punished for his repeated misdeeds a second time, by a trial court finding that he abused multiple victims.

Because three of the five sentencing aggravators cited by the trial court were either illegal, or unproved, or both, the aggravated sentences that Dr. Finkel received on all counts except Count 48 are also illegal. This Court should reverse Dr. Finkel's sentences on all the imprisonment counts and remand the matter to the trial court for re-sentencing.

62

2.    **The Trial Court Failed to Give Dr. Finkel a Jury Trial on His Sentencing Aggravators, Contrary to the Provisions of the Sixth Amendment to the United States Constitution and Article 2, §§ 23 and 24 of the Arizona Constitution.**

With its landmark decision in Blakely v. Washington, __ U.S.__, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court held that it violates the jury trial guarantee of the Sixth Amendment to the United States Constitution for a trial court to impose an aggravated sentence, based upon factors found by the trial judge alone, sitting without a jury.  The only sentencing factors falling outside this jury trial requirement (commonly referred to as "Blakely-compliant factors) are facts which the defendant has admitted, or facts that are implicit in the verdict of the jury that heard the guilt phase of a case. Blakely, *supra*, __ U.S. at __, 124 S.Ct. at 2537. The Supreme Court's earlier decision in Apprendi v. New Jersey, upon which Blakely was based, also makes clear that prior convictions constitute a Blakely-compliant factor. Apprendi v. New Jersey, 530 U.S. 466, 489-90, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000).

In State v. Brown, __ Ariz. __, 99 P.3d 15 (2004), the Arizona Supreme Court held that Arizona's sentencing scheme is regulated by Blakely, and that for Blakely purposes, the presumptive sentence is the "statutory maximum" term a court can impose, without convening a jury to find the non-Blakely-compliant factors.

63

Subsequent decisions of the Court of Appeals have split over whether a jury trial on non-Blakely-compliant factors is necessary, if a case presents at least one Blakely-compliant factor.  *E.g.*, State v. Munninger, 209 Ariz. 473, 104 P.3d 204 (2005) [finding that a jury trial is still required]; State v. Martinez, 209 Ariz. 280, 100 P.3d 30 (2004) [finding no jury trial required].

Regardless of the outcome of the controversy over the need for a jury trial when a case presents Blakely-compliant factors, Dr. Finkel was entitled to have a jury trial on all the aggravating factors cited in his case, because of the none of the legally correct factors are Blakely-compliant.  This is so, first, because none of the factors cited, except the time span of the offenses, is necessarily inherent in the verdict of the guilt phase jury.  All of the others were either unproved (such as physical injury to the victims) or are subjective assessments of the trial judge, which were susceptible to being viewed differently by a sentencing jury, and hence, are not Blakely-compliant. State v. Burdick, 209 Ariz. 452, 104 P.3d 183 (2005).  So far as the "time span" factor is concerned, for the reasons stated above, that is not a factor that can be considered in aggravation at all, because it was already used for sentence enhancement pursuant to the provisions of A.R.S. § 13-702.02, and its use is barred by the holding of State v. Alvarez, 205 Ariz. 110, 67 P.3d 706 (App. 2003).  Accordingly, Dr. Finkel should have had a jury trial on the remaining legally acceptable factors.  His failure to make a

64

request for a jury trial on them was fundamental error, and was not harmless.  <u>State v.</u>

<u>Henderson</u>, 209 Ariz. 300, 100 P.3d 911 (2004).

## CONCLUSION

For all the reasons set forth above, Dr. Brian Finkel is entitled to a new trial on all count with instructions to the court below to conduct the joinder/severance proceedings in conformity with the requirements of <u>State v. Aguilar</u>.  At that new trial, the state should be barred from offering offender profile evidence, and Dr. Finkel should be allowed to offer expert testimony on implanted memory phenomena.  At that new trial, no available witness should be permitted to testify by way of video deposition.  Regardless of whether there is a new trial, Dr. Finkel's sentence on Count 48 should be reduced to no more than three years probation; and on all counts, the sentencing minute order should conform to the oral pronouncement of sentence.  Finally, as to all counts, Dr. Finkel should have a jury trial on the aggravating factors, and the sentencing court should not aggravate his sentences with factors that are not proved or are illegal.

Respectfully submitted,

MARICOPA COUNTY PUBLIC DEFENDER

By _____
EDWARD F. McGEE
Deputy Public Defender
Attorney for APPELLANT

66

## CERTIFICATE OF RULE 31.13(b) COMPLIANCE

The brief is double-spaced, uses a 14-point Times New Roman proportionately-spaced typeface, and contains 13,911 words, according to the processing system used to prepare this brief.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

**EDWARD F. McGEE**
Deputy Public Defender
Attorney for APPELLANT

67

## CERTIFICATE OF SERVICE

**TWO COPIES** of Appellant's Opening Brief mailed this 4th day of April, 2005, to RANDALL M. HOWE, Chief Counsel, Criminal Appeals Section, Attorney General's Office, 1275 West Washington, Phoenix, Arizona 85007.

**ONE COPY** of Appellant's Opening Brief mailed this 4th day of April, 2005, to BRIAN LESLIE FINKEL, #182486, Arizona State Prison Complex, Eyman - SMU I, P.O. Box 4000, Florence, Arizona 85232.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

**EDWARD F. McGEE**
Deputy Public Defender
Attorney for APPELLANT
11 West Jefferson, Suite 5
Phoenix, Arizona 85003
Telephone (602) 506-0924
State Bar Attorney No. 004235

KLEM040405P

68