# EXHIBIT  C

# ARIZONA COURT OF APPEALS

## DIVISION ONE

STATE OF ARIZONA,

             APPELLEE,

—vs—

BRIAN LESLIE FINKEL,

             APPELLANT.

1 CA–CR 04–0046

MARICOPA COUNTY
SUPERIOR COURT
NO. CR 2001–015515
     2002–001431

## APPELLEE'S ANSWERING BRIEF

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

RANDALL M. HOWE
CHIEF COUNSEL
CRIMINAL APPEALS SECTION

NICHOLAS D. ACEDO
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS SECTION
1275 WEST WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
(STATE BAR NUMBER 021644)
ATTORNEYS FOR APPELLEE

## QUESTIONS PRESENTED FOR REVIEW

1.    Did the trial court commit fundamental error in denying Appellant's motion to sever offenses, where evidence of the other offenses would have been admissible under Rule 404(c), Arizona Rules of Evidence, if tried separately?

2.    Did the trial court abuse its discretion in permitting the State to introduce expert testimony on the response patterns of sexual abuse victims, when such knowledge was outside the common understanding of the jury, and assisted the jury in deciding the accuracy and credibility of the victims' testimony?

3.    Did the trial court abuse its discretion in permitting the defense to introduce expert testimony on suggestive interviewing techniques and the risk of memory contamination but precluding any testimony on the specific facts of the case, when such evidence is a direct comment on the victims' credibility?

4.    Has Appellant forfeited and waived appellate relief on the claim that the trial court erred in allowing victim Shelly Cluff (Counts 48–49, CR 2002–001431) to testify out of the presence of the jury, when he agreed to the procedure at trial and therefore invited any conceivable error?

5.    Did the trial court commit fundamental error in suspending imposition of sentence on Count 48 (CR 2002–001431), and placing Appellant on probation for a term of 99 years, pursuant to A.R.S. § 13–902(E)?

6.    Should this Court remand for clarification of sentence on Counts 31 and 32 (CR 2002–001431), when the sentencing minute entry and oral pronouncement of sentence are inconsistent and the discrepancy cannot be resolved by reference to the record?

7.    Did the trial court intend to order Count 10 (CR 2002–001431) to run concurrently with Count 2 (CR 2001–015515) and Counts 37/38 (CR 2002–001431) to run concurrently with Counts 17/18 (CR 2002-001431), when it did not expressly order that they run concurrently, as required by A.R.S. § 13–708, and the sentencing minute entry confirms that they are to run consecutively?

8.    Has Appellant forfeited appellate relief on the claim that his aggravated sentences are unlawful on the grounds that: (1) the trial court relied on improper aggravating factors; and (2) the aggravating factors were not found by a jury, when he did not raise this claim at sentencing, and has failed to establish fundamental error, as articulated in *Henderson*?

# TABLE OF CONTENTS

Page

QUESTIONS PRESENTED FOR REVIEW ................................................................i

TABLE OF CONTENTS ...........................................................................................iii

TABLE OF AUTHORITIES......................................................................................vi

STATEMENT OF THE CASE.................................................................................... 1

ARGUMENTS

I

      THE TRIAL COURT DID NOT COMMIT FUNDAMENTAL
      ERROR WHEN IT DENIED APPELLANT'S MOTION TO SEVER
      OFFENSES BECAUSE EVIDENCE OF THE OTHER OFFENSES
      WOULD HAVE BEEN ADMISSIBLE UNDER RULE 404(C) IF
      ALL CHARGES HAD BEEN TRIED SEPARATELY. ...................................17

II

      THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN
      IT PERMITTED THE STATE TO INTRODUCE EXPERT
      TESTIMONY ON THE RESPONSE PATTERNS OF SEXUAL
      ABUSE VICTIMS BECAUSE SUCH KNOWLEDGE WAS
      OUTSIDE THE COMMON UNDERSTANDING OF THE JURY,
      AND ASSISTED THE JURY IN DECIDING THE ACCURACY
      AND CREDIBILITY OF THE VICTIMS. ......................................................47

III

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT PERMITTED THE DEFENSE TO INTRODUCE EXPERT TESTIMONY ON SUGGESTIVE INTERVIEWING TECHNIQUES AND THE RISK OF MEMORY CONTAMINATION, BUT PRECLUDED ANY TESTIMONY ON THE SPECIFIC FACTS OF THIS CASE, BECAUSE SUCH EVIDENCE DIRECTLY COMMENTS ON THE ACCURACY AND CREDIBILITY OF THE VICTIMS. ................................................................................................. 56

IV

APPELLANT HAS FORFEITED AND WAIVED THE CLAIM THAT THE TRIAL COURT ERRED IN ALLOWING SHELLY CLUFF TO TESTIFY OUT OF THE PRESENCE OF THE JURY, BECAUSE HE AGREED TO THE PROCEDURE AT TRIAL, AND, THEREFORE, INVITED ANY CONCEIVABLE ERROR. .......................... 69

V

THE TRIAL COURT ERRED WHEN IT SUSPENDED IMPOSITION OF SENTENCE ON COUNT 48 (CR 2002–001431) AND PLACED APPELLANT ON PROBATION FOR A TERM OF 99 YEARS. ............... 84

VI

THIS COURT SHOULD REMAND FOR CLARIFICATION OF SENTENCE ON COUNTS 31 AND 32 (CR 2002–001431) BECAUSE THE ORAL PRONOUNCEMENT OF SENTENCE AND THE SENTENCING MINUTE ENTRY ARE INCONSISTENT, AND THE DISCREPANCY CANNOT BE RESOLVED BY REFERENCE TO THE RECORD. .............................................................................................87

VII

    THE TRIAL COURT INTENDED COUNT 2 (CR 2001–015515) TO RUN CONSECUTIVELY TO COUNT 10 (CR 2002–001431), AND COUNTS 37/38 (CR 2002–001431), COUNTS 33/34 (CR 2002–001431) AND COUNTS .17/18 (CR 2002–001431) TO RUN CONSECUTIVELY TO EACH OTHER. ......................................................90

VIII

    APPELLANT HAS FORFEITED HIS RIGHT TO OBTAIN APPELLATE RELIEF ON THE CLAIM THAT THE TRIAL COURT ERRONEOUSLY IMPOSED AGGRAVATED SENTENCES....................... 94

CERTIFICATE OF SERVICE ............................................................... 120

CERTIFICATE OF COMPLIANCE .................................................... 121

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE

Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000) ................................. 96

Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246 (1991).................................... 38

Barber v. Page, 390 U.S. 719,  88 S. Ct. 1318 (1968)................................................ 36

Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004) .................................. 97

Bordenkircher v. Hayes, 434 U.S. 357, 98 S. Ct. 663 (1978) .................................. 107

California v. Green, 399 U.S. 149, 90 S. Ct. 1930 (1970) ........................................ 36

Coy v. Iowa, 487 U.S. 1012, 108 S. Ct. 2798 (1988)................................................. 78

Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004) ........................... 35, 37

Delaware v. Fensterer, 474 U.S. 15, 106 S. Ct. 292 (1985) .................................... 37

Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866 (1981)........................................... 107

Huddleston v. United States, 485 U.S. 681, 108 S. Ct. 1496 (1988)........ 27–28, 32–33

In re MH 2004–001987, 211 Ariz. 255,  120 P.3d 210 (App. 2005).......................... 83

Jackson v. Schneider ex rel. County of Maricopa, 207 Ariz. 325, 86 P.3d 381 (App. 2004)............................................................................................................. 85

Jones v. United States, 527 U.S. 373,  119 S. Ct. 2090 (1999) .................................116

Kentucky v. Stincer, 482 U.S. 730, 107 S. Ct. 2658 (1987)...................................... 37

Logerquist v. McVey, 196 Ariz. 470, 1 P.3d 113 (2000) ................................ 27–28, 32

Malloy v. Hogan, 378 U.S. 1,  84 S. Ct. 1489 (1964) .............................................. 107

Maryland v. Craig, 497 U.S. 836,  110 S. Ct. 3157 (1990) ............................ 36, 79–82

Mattox v. United States, 156 U.S. 237, 15 S. Ct. 337 (1895) .................................. 79

Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307 (1999)............................ 106

Pennsylvania v. Muniz, 496 U.S. 582, 110 S. Ct. 2638 (1990)................................ 106

Pennsylvania v. Ritchie, 480 U.S. 39, 107 S. Ct. 989 (1987) .................................. 36

People v. Lopez, No. 03CA0049, 2005 WL 1773911 (Colo. App. July 28, 2005) .. 107

Sisson v. State, 16 Ariz. 170, 141 P. 713 (1914) ................................................ 43, 76

State ex rel. McDougall v. Superior Court in and for County of Maricopa, 172 Ariz. 153, 835 P.2d 485 (App. 1992)................................................................ 27–28, 32–33

State v. Aguilar, 209 Ariz. 40, 97 P.3d 865 (2004) .................................. 30–34, 40, 42

State v. Altieri, 191 Ariz. 1, 951 P.2d 866 (1997)...................................................... 65

State v. Alvarez, 205 Ariz. 110, 67 P.3d 706 (App. 2003)................ 104, 110–112, 117

State v. Anderson, 197 Ariz. 314, 4 P.3d 369, (2000).................................................. 38

State v. Bible, 175 Ariz. 549,  858 P.2d 1152 (1993) ...................................... 40, 46, 65

State v. Biezer, 947 S.W.2d 540 (Mo. App. 1997) ...................................................... 63

State v. Bolton, 182 Ariz. 290, 896 P.2d 830 (1995) ............................................. 64–65

State v. Bouchier, 159 Ariz. 346, 767 P.2d 233 (App. 1989) ...................................... 85

State v. Bowles, 173 Ariz. 214,  841 P.2d 209 (App. 1992). ................................ 89, 94

State v. Brown, 188 Ariz. 358,  936 P.2d 181 (App. 1997) ........................................ 77

State v. Brown, 209 Ariz. 200,  99 P.3d 15 (2004). .................................................... 97

State v. Carriger, 143 Ariz. 142,  692 P.2d 991 (1984).....................................109–110

State v. Carver, 160 Ariz. 167,  771 P.2d 1382 (1989) ............................................... 64

State v. Cifuentes, 171 Ariz. 257, 830 P.2d 469 (App. 1991).................................... 55

State v. Contreras, 180 Ariz. 450,  885 P.2d 138 (App. 1994) ................................... 94

State v. Correll, 148 Ariz. 468,  715 P.2d 721 (1986)................................................. 84

State v. Cox, 201 Ariz. 464, 37 P.3d 437 (App. 2002) ..............................................114

State v. Day, 148 Ariz. 490,  715 P.2d 743 (1986)...................................................... 93

State v. Diaz, 168 Ariz. 363,  813 P.2d 728 (1991) ............................................... 42, 76

State v. Edwards, 136 Ariz. 177, 665 P.2d 59 (1983).................................................. 29

State v. Ferrari, 112 Ariz. 324,  541 P.2d 921 (1975) ................................................. 45

State v. Garza, 192 Ariz. 171,  962 P.2d 898 (1998) ............................................ 91–92

State v. Germain, 150 Ariz. 287, 723 P.2d 105 (1986)............................. 104, 111–112

State v. Gonzales, 181 Ariz. 502, 892 P.2d 838 (1995) ............................................... 23

State v. Hamilton, 177 Ariz. 403, 868 P.2d 986 (App. 1993)...................................... 36

State v. Hardwick, 183 Ariz. 649 P.2d 1384 (App. 1995) .................................109–110

State v. Henderson, 200 Ariz. 300, 100 P.3d 911 (App. 2004)..........................108–110

State v. Henderson, 210 Ariz. 561, 115 P.2d 601 (2005). 24–25, 38–39, 46, 86, 96, 99, 101, 112–113, 115–118

State v. Hernandez, 170 Ariz. 301, 823 P.2d 1309 (App. 1991)................................. 36

State v. House, 169 Ariz. 572,  821 P.2d 233 (App. 1991)......................................114

State v. Huey, 145 Ariz. 59, 699 P.2d 1290 (1985)...................................... 52–54

State v. Hummert, 183 Ariz. 483, 905 P.2d 493 (App. 1994)............................... 28, 35

State v. Islas, 132 Ariz. 590,  647 P.2d 1188 (App. 1982)..................................... 42, 76

State v. Jeffrey, 203 Ariz. 111, 50 P.3d 861 (App. 2002)............................................ 68

State v. Kerekes, 138 Ariz. 235,  673 P.2d 979 (App. 1983) .............................. 107

State v. Knight, 701 N.W.2d 83 (Iowa 2005) .......................................................... 107

State v. LaGrand (Walter), 153 Ariz. 21, 734 P.2d 563 (1987) ............................ 28, 32

State v. Laird, 186 Ariz. 203, 920 P.2d 769 (1996) ............................................... 23–24

State v. Lee, 191 Ariz. 542,  959 P.2d 799 (1998) ....................................................... 55

State v. Lindsey, 149 Ariz. 472, 720 P.2d 73 (1986) .............. 50–52, 60–61, 64–65, 76

State v. Logan, 200 Ariz. 564, 30 P.3d 63 (2001)........................................... 43, 76, 78

State v. Long, 207 Ariz. 140, 83 P.3d 618 (App. 2004)................................................. 2

State v. Lopez, 170 Ariz. 112,  822 P.2d 465 (App. 1991) ........................................ 51

State v. Lycett, 133 Ariz. 185,  650 P.2d 487 (App. 1982) ......................................... 45

State v. Martinez, 210 Ariz. 578,  115 P.3d 618 (2005)...................................... 98, 101

State v. McCall, 139 Ariz. 147, 677 P.2d 920 (1983) .................................................. 18

State v. Medina, 178 Ariz. 570, 875 P.2d 803 (1994).................................... 29, 45, 82

State v. Medina, 193 Ariz. 504,  975 P.2d 94 (1999)........................................ 104–105

State v. Melendez, 135 Ariz. 390,  661 P.2d 654 (App. 1983) .................................... 81

State v. Mendivil, 121 Ariz. 600,  592 P.2d 1256 (1979) ..................................... 85–86

State v. Mincey, 130 Ariz. 389, 636 P.2d 637 (1981) ...................................... 23, 49, 60

State v. Molina, 211 Ariz. 130, 118 P.3d 1094 (App. 2005)............................... 99, 101

State v. Moore, 203 Ariz. 515, 56 P.3d 1099 (App. 2002) .................................... 79, 82

State v. Moran, 151 Ariz. 378,  728 P.2d 248 (1986). ............................... 49–51, 60, 64

State v. Moreno, 173 Ariz. 471,  844 P.2d 638 (App. 1992) ............................... 43, 76

State v. Muscari, 807 A.2d 407 (Vt. 2002) ................................................. 107

State v. Nirschel, 155 Ariz. 206,  745 P.2d 953 (1987) ............................................ 65

State v. Pierce, 27 Ariz. App. 403, 555 P.2d 662 (1976) .......................................... 23

State v. Plew, 155 Ariz. 44, 745 P.2d 102 (1987) ..................................... 27–28, 32–33

State v. Riley, 196 Ariz. 40,  992 P.2d 1135 (App. 1999) ........................................ 37

State v. Rivera, 168 Ariz. 102,  811 P.2d 354 (App. 1990) ...................................... 77

State v. Robinson, 153 Ariz. 191,  735 P.2d 801 (1987)........................................... 83

State v. Romero, 178 Ariz. 45, 870 P.2d 1141 (App. 1993) .......................... 27, 32–33

State v. Ruggiero, 211 Ariz. 262, 120 P.3d 690 (App. 2005) ...................................117

State v. Scott, 177 Ariz. 131,  865 P.2d 792 (1993)................................................ 104

State v. Shreves, 60 P.3d 991 (Mont. 2002)............................................................ 107

State v. Simmons, 131 Ariz. 482,  642 P.2d 479 (App. 1982)................................... 29

State v. Smith, 114 Ariz. 415,  561 P.2d 739 (1977)..................................... 38–39, 113

State v. Speers, 209 Ariz. 125, 98 P.3d 560 (App. 2004) .............................. 61–62, 64

State v. Spreitz, 190 Ariz. 129, 945 P.2d 1260 (1997)............................................. 35

State v. Stevens, 173 Ariz. 494,  844 P.2d 661 (App. 1992)...................................... 94

State v. Terrazas, 189 Ariz. 580, 944 P.2d 1194 (1997)..................................... 27, 32

State v. Treadaway, 116 Ariz. 163, 568 P.2d 1061 (1977)....................................... 19

State v. Valdez, 160 Ariz. 9, 770 P.2d 313 (1989) .................................................116

State v. Vess, 157 Ariz. 236, 756 P.2d 333 (App. 1988)..................................... 79–82

People v. Villarreal, No. 03CA2396, 2005 WL 2155504 (Colo. App. Sept. 8, 2005)
................................................................................................................... 108

State v. Vincent, 159 Ariz. 418,  768 P.2d 150 (1989).................................... 80–81, 83

State v. Viramontes, 204 Ariz. 360, 64 P.3d 188 (2003).......................................... 101

State v. Viramontes, 208 Ariz. 336,  93 P.3d 536 (App. 2004)................................114

State v. Ward, 200 Ariz. 387,  26 P.3d 1158 (App. 2001) ..................................... 91–92

State v. Weekley, 200 Ariz. 421, 27 P.3d 325 (App. 2001) .................... 18, 35, 60, 109

State v. Wigg, 889 A.2d 233 (Vt. 2005) ......................................... 63, 66, 68

State v. Williams, 183 Ariz. 368, 904 P.2d 437 (1995) ................................ 26, 32–33

State v. Zuck, 134 Ariz. 509, 658 P.2d 162 (1982) .................................................. 77

United States v. Hamilton, 107 F.3d 499 (7th Cir. 1997) ............................................ 79

United States v. Johnson, 903 F.2d 1084 (7th Cir. 1990) ......................................... 108

United States v. Olano, 507 U.S. 725,  113 S. Ct. 1770 (1993) ...............................116

United States v. Rouse, 111 F.3d 561 (8th Cir. 1997)..................................... 63, 65–66

Weaver v. Graham, 450 U.S. 24, 101 S. Ct. 960 (1981) ............................................ 84

White v. Illinois, 502 U.S. 346,  112 S. Ct. 736 (1992) ............................................. 83

CONSTITUTIONAL PROVISIONS

Ariz. Const. art. II, § 25.................................................................................. 84

Ariz. Const. art. VI, § 9 ................................................................................. 16

U.S. Const. art. I, § 10 .................................................................................. 84

U.S. Const. Amend VI................................................................................... 78

STATUTES

A.R.S. § 1–246 ............................................................................................. 84

A.R.S. § 12–120.21(A)(1) ............................................................................ 16

A.R.S. § 13–702(B) ...................................................................................... 95

A.R.S. § 13–702(C) ...................................................................................... 95

A.R.S. § 13–702(C)(1) ............................................................................... 102

A.R.S. § 13–702 (C)(9) .......................................................................102, 114

A.R.S. § 13–702(C)(21) ................................................................115

A.R.S. § 13–702(D) ...............................................101, 114–115

A.R.S. § 13–702.01 ................................................................. 87

A.R.S. § 13–702.01(A)(4) .................................................88, 115

A.R.S. § 13–702.02 ...............................................1, 87, 110, 112

A.R.S. § 13–702.02(B) .......................................................88, 114

A.R.S. § 13–702.02(B)(3) .............................................88, 90, 115

A.R.S. § 13–702.02(B)(4) ...............................88–89, 95, 114–115

A.R.S. § 13–702.02(D) ..................................................88–90, 114

A.R.S. § 13–708 ..................................................................... 91

A.R.S. § 13–902(A)(2) (1986) .............................................. 85

A.R.S. § 13–902(E) .............................................................. 84

A.R.S. § 13–4031 ................................................................. 16

A.R.S. § 13–4033(A) ............................................................ 16

## RULES

Rule 13.3(a), Ariz. R. Crim. P. ............................................. 18

Rule 13.4(b), Ariz. R. Crim. P. ......................................18–19

Rule 13.4(c), Ariz. R. Crim. P. ............................................. 23

Rule 31.13, Ariz. R. Crim. P. ............................................. 121

Rule 31.13(c)(1)(vi), Ariz. R. Crim. P. ............................... 64

Rule 104(a), Ariz. R. Evid ................................................... 28

Rule 104(b), Ariz. R. Evid. .........................................26, 35

Rule 403, Ariz. R. Evid. ..............................................18, 40

Rule 404(b), Ariz. R. Evid. ................................................. 18

Rule 404(c), Ariz. R. Evid. .........................................26, 32

Rule 404(c)(1)(A), Ariz. R. Evid....................................................... 17, 26–27

Rule 404(c)(1)(B), Ariz. R. Evid....................................................... 17, 43–44

Rule 404(c)(1)(C), Ariz. R. Evid....................................................... 18

Rule 404(c)(1)(D), Ariz. R. Evid....................................................... 18

Rule 611, Ariz. R. Evid..................................................................... 71

Rule 702, Ariz. R. Evid. .................................................................. 50, 60

OTHER AUTHORITIES

1994 Ariz. Legis. Serv. 317 (West)................................................... 86

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1034 (2002) ..... 103

## STATEMENT OF THE CASE

On October 23, 2001, the State filed an indictment in Maricopa County Superior Court charging Appellant with 16 counts of sexual abuse, class 5 felonies (CR 2001–015515, Counts 1–6, 8–17), and one count of sexual assault, a class 2 felony (CR 2001–015515, Count 7). (R.O.A., Item 68.) A second indictment was filed on January 25, 2002, charging Appellant with an additional 43 counts of sexual abuse, class 5 felonies (CR 2002–001431, Counts 1–6, 8–12, 14, 16–26, 29–39, 41, 42, 44–50), and seven counts of sexual assault, class 2 felonies (CR 2002–001431, Counts 7, 13, 15, 27–28, 40, 43). (R.O.A., Item 1.) The trial court granted the State's motion to consolidate the charges in both indictments. (R.O.A., Item 66.)

The charges arose after an investigation into allegations that Appellant, an osteopathic physician certified in obstetrics and gynecology (OB/GYN), was sexually molesting his patients during various gynecological procedures and related examinations. The 67 charged offenses represented crimes committed against 35 of Appellant's patients, spanning over 18 years. (*Id.*) The State alleged that the crimes, as they related to each victim, were multiple offenses not committed on the same occasion, but consolidated for trial, pursuant to A.R.S. § 13–702.02. (R.O.A., Items 27, 89.) The evidence presented at trial for those victims/charges that resulted in convictions, taken in

the light most favorable to sustaining the trial jurors' verdicts and resolving all reasonable inferences against Appellant,[1] reflects the following.

## I.   THE CRIMES.

### Counts 48–49 (CR 2002–001431) involving Shelly Cluff.

In June or July of 1986, 16-year-old Shelly Cluff went to Appellant's medical clinic for a gynecological exam.  (Exhibit 325, at 13:09, 14:07.)  Once there, Shelly was taken to an examination room, where she waited for Appellant.  (*Id.* at 13:14–15.)  When Appellant entered the room, he told Shelly to lay on the examination table, and to pull her shirt up.  (*Id.* at 13:15.)  Shelly, who was not wearing a bra, complied.  (*Id.*)  Appellant then "touched" Shelly's breasts, putting both hands on one breast and "massaging around."  (*Id.* at 13:16.)  Appellant's "whole" hand, including his fingers and palm, came in contact with her breast.  (*Id.* at 13:17.)  It was a "rubbing and cupping," and not a "clinical" exam.  (*Id.*)  Appellant did this to both of Shelly's breasts.  (*Id.* at 14:13.)  Then, with his index finger and thumb, Appellant "pinched" "the very tip" of Shelly's nipples at the same time.  (*Id.* at 13:18–20; 14:14.)  When Shelly told Appellant that prior physicians had told her that a breast exam was not necessary for a 16-year-old girl, Appellant did not respond.  (*Id.* at 13:21.)

---

[1] *See State v. Long*, 207 Ariz. 140, ¶ 2, 83 P.3d 618 (App. 2004).

Appellant then told Shelly to undress from the waist down, and left the room. (*Id.* at 13:22.)

A little while later, Appellant came back in the room, this time with a medical assistant, and told Shelly to lay back on the examination table. (*Id.* at 13:22, 25.) As she did, Appellant "grabbed [Shelly's] ankles and [] jerked [her] down to the end of the table." (*Id.* at 13:25.) Appellant "started feeling around" Shelly's labia, then "moved up" to Shelly's clitoris and "felt around." (*Id.* at 13:27–28.) Appellant then "spread it open really wide . . . like it was like tearing like he was hurting me." (*Id.*) At this point, Shelly started to cry from the pain: "[I]t hurt, what he was doing to my clitoris . . . It felt like it was being popped open like he was popping it open" with his fingers. (*Id.* at 13:29.) When Shelly turned and reached her hand out, the medical assistant looked down at the floor, folded her arms and stepped away. (*Id.* at 13:30.) Appellant then performed a pelvic examination, and left the room. (*Id.* at 13:33–34.) Before leaving, Appellant told Shelly, "[W]ell, at least you don't have herpes, yet." (*Id.*)

Counts 31–32 (CR 2002–001431) involving Gretchen O'Hair.

On June 6, 1994, 18-year-old Gretchen O'Hair went to Appellant's medical clinic for an abortion. (R.T. 8/20/03, at 113–14.) Once there, she was taken to an examination room, and told to change into a paper gown. (*Id.*

3

at 117–18.)  After she undressed, Appellant came into the room and conducted a pelvic examination.   (*Id.* at 119, 120.)   Appellant then exposed both of Gretchen's breasts, and proceeded to conduct a breast examination.   (*Id.* at 122–23.)  The exam "started off as any normal regular breast exam," but when Appellant "got to the areola portion of [her] breast," he "took his finger and stimulated" the area until her nipples became "erect." (*Id.* at 122–25, 203.) Appellant then "pinched and pulled" both of Gretchen's nipples.  (*Id.* at 125, 203.)  During the exam, Appellant told Gretchen that she was "very heavy breasted" and "had nice breasts for a girl of [her] age." (*Id.* at 126.)  Appellant performed the abortion the next day.  (*Id.* at 129.)

About 2 weeks later, Gretchen returned to Appellant's medical clinic for a follow-up examination.  (*Id.* at 130.)  Following the exam, Gretchen walked out into the hallway, where her mother was waiting with a medical assistant. (*Id.* at 134–39.)  As they were standing there, Appellant approached them and began a conversation with Gretchen's mother.  (*Id.* at 141–43.)  Then, without warning, Appellant "reached across and grabbed" Gretchen's breasts.  (*Id.* at 143–44.)   Appellant "took his hands, thumbs down, kind of cupped underneath slightly, lifted and squeezed," and told Gretchen that she had "nice" "womanly breasts." (*Id.* at 143.)  Appellant's hands were on Gretchen's breasts for about 5 seconds.  (*Id.* at 144.)

4

<u>Count 2 (CR 2001–015515) involving Reina Tobin.</u>

On October 27, 1995, 25-year-old Reina Tobin went to Appellant's medical clinic for an abortion. (R.T. 9/18/03, at 106–07, 134–35.) Once there, Reina was taken to an examination room, and told to undress. (*Id.* at 114.) After she undressed, Reina laid down on the examination table and waited until Appellant and a medical assistant entered the room. (*Id.* at 114–15, 119.) Appellant put on a pair of gloves, and stood in between Reina's legs. (*Id.* at 118–19.) Appellant then put "KY jelly" on his fingers and started "rubbing" Reina's clitoris "very hard, abruptly, fast." (*Id.* at 119.) Appellant rubbed Reina's clitoris "up and down, up and down" with his two fingers four times. (*Id.* at 119–21.) As he did this, Appellant looked at Reina "smiling" and "smirking." (*Id.*) When he was done, Appellant told Reina, "I can make you unpregnant tomorrow, girlfriend," and walked out. (*Id.*)

<u>Count 10 (CR 2002–001431) involving Erlinda Diaz.</u>

On November 18, 1995, 29-year-old Erlinda Diaz went to Appellant's medical clinic for an abortion. (R.T. 8/21/03, at 155, 157–58.) Approximately 2 weeks later, Erlinda returned to Appellant's medical clinic for a follow-up examination. (*Id.* at 166, 169.) Once there, Erlinda was taken to an examination room, and told to undress from the waist down. (*Id.* at 170–71.) After she undressed, Appellant and a medical assistant entered the room. (*Id.*

at 172.)  Appellant told Erlinda to "lay back" on the examination table with her feet in the stirrups.  (*Id.*)  Meanwhile, the medical assistant walked over to the counter and began "doing something" with her back turned.  (*Id.* at 172, 178.)  Appellant then put "some kind of jelly" on his bare hand, and started "rubbing" Erlinda's clitoris and labia with his two fingers.  (*Id.* at 173–74.)  Appellant continued "rubbing" Erlinda's clitoris "up and down" for about 10 seconds.  (*Id.*)  Appellant then "inserted" his fingers inside Erlinda's vagina, and "move[d] them around inside."  (*Id.* at 176.)  Erlinda looked down at Appellant, who was "standing" in between her legs, and saw "what appeared to be like if he was simulating sex."  (*Id.*)  Appellant's pelvis was "very close to his hand," and he was "moving his fingers" in an "in and out motion."  (*Id.* at 177.)  Erlinda "could feel his thighs rubbing on [her] legs."  (*Id.* at 173.)  Erlinda "flinched away," and Appellant stopped what he was doing.  (*Id.* at 178.)  During a subsequent conversation about birth control, Appellant told Erlinda that he knew she was going to be "sexually active" because her "genital area [was] shaved and that women that shave their genital areas are sexually active."  (*Id.* at 179–80.)

Count 50 (CR 2002–001431) involving Rise McEndree.

On September 12, 1996, 32-year-old Rise McEndree went to Appellant's medical clinic for an abortion.  (R.T. 9/2/03, at 135–36.)  Prior to her

examination, Rise had a consultation with Appellant in his office. (*Id.* at 145.) During their conversation, Appellant asked Rise if she "enjoyed oral sex as opposed to vaginal sex," whether she had "ever experimented with any anal sex," and about the "monogamy of [her] relationship." (*Id.* at 147–48.) After the consultation, Rise was taken to an examination room, and told to undress. (*Id.* at 149–50.)

Approximately 10 minutes later, Appellant entered the room, and conducted a breast examination. (*Id.* at 150–52.) After the breast examination was done, Appellant proceeded with the pelvic examination. (*Id.* at 152.) The examination was "normal to begin with," but then it "started lasting a little while." (*Id.*) Rise then felt Appellant "touching" her clitoris with his fingers. (*Id.* at 152, 154.) At that point, Rise "raised up" on her elbows and looked at Appellant. (*Id.* at 152–53.) Appellant told Rise, "[L]ay back down, we're almost done." (*Id.*) Appellant "touched" Rise's clitoris "at least two more times" during the examination. (*Id.* at 154.)

Counts 11–12 (CR 2002–001431) involving Dawn Eanes.

On January 30, 1998, 27-year-old Dawn Eanes went to Appellant's medical clinic for an abortion. (R.T. 9/22/03, at 128, 134, 142.) Once there, Dawn was taken to an examination room, and changed into a gown. (*Id.* at 144.) Appellant entered the room, and began to conduct a breast

examination. (*Id.* at 145.) The breast examination was "normal" at first, but after examining one of Dawn's breasts, Appellant "touched" her nipple "[l]ike you would touch them if you were with your lover." (*Id.* at 145, 147.) Appellant "[p]inch[ed] them, kind of twist[ed] them around," "[l]ike he was playing with them." (*Id.* at 147–48, 175.) Appellant did this to both of Dawn's nipples. (*Id.*)

Counts 37–38 (CR 2002–001431) involving Kim Romero.

On June 24, 1998, 28-year-old Kim Romero went to Appellant's medical clinic for an abortion. (R.T. 9/10/03, at 36, 40; R.T. 10/22/03, at 132.) Once there, Kim was taken to an examination room, and told to change into a gown. (*Id.* at 45.) After Kim undressed, Appellant came into the room, and started to conduct a breast examination. (*Id.* at 46.) However, it was not a "clinical" breast examination. (*Id.* at 47.) Appellant placed his hands on Kim's breasts and began "groping" and "massaging" both of her breasts at the same time, like he was "just really trying to feel them." (*Id.* at 48–49, 97, 101.) As he did this, Appellant told Kim that she had "large breasts," and asked her if her breasts were "real." (*Id.* at 63.) During the pelvic examination, Appellant "touched" Kim's clitoris "like he was trying to make play with it." (*Id.* at 55–56, 105.) When Kim told Appellant, "[T]hat's not where it is," Appellant responded, "Relax. I've seen a clam before." (*Id.* at 57–58.)

8

<u>Counts 13–15 (CR 2002–001431) involving Kelly Easter.</u>

On July 16, 1998, 19-year-old Kelly Easter went to Appellant's medical clinic to receive a "Deprovera" shot, a form of birth control, and because she was experiencing pain during intercourse.  (R.T. 9/25/03, at 103, 105, 182.) Once there, Kelly was taken to an examination room, and told to undress.  (*Id.* at 109–10.)  A little while later, Appellant and a medical assistant entered the room, and Appellant conducted a "Pap smear" examination.  (*Id.* at 111–12.) After the "Pap smear," Appellant told Kelly that he had discovered why she was experiencing pain during intercourse, and said, "[Your] boyfriend's dick is too big for [your] small pussy." (*Id.* at 113–14.)  Appellant then told Kelly that "Astro Glide" was a good lubricant to use during sexual intercourse.  (*Id.* at 118.)  Appellant then put some "Astro Glide" lubricant on his fingers, inserted them into Kelly's vagina, and "thrusted" about five or six times.  (*Id.* at 115–16, 174–75.)  As he did this, Appellant intermittently "touched" Kelly's clitoris, and asked her "if that felt good." (*Id.*)  It was "like the equivalent of what your boyfriend or husband would do during a sex act." (*Id.* at 141.)

Appellant then took his fingers out of Kelly's vagina, and began preparing the "Deprovera" shot.  (*Id.* at 117–18.)  When Kelly held out her arm to receive the shot, Appellant told her, "[W]e only give it in the ass here," and helped her roll over.  (*Id.* at 119.)  Appellant then slapped Kelly's "butt" with

his hand, and administered the shot. (*Id.* at 120.) As Kelly rolled back onto her back, Appellant "jabbed" his finger into Kelly's anus and "pulled it right back out." (*Id.* at 120, 171.) Before Kelly could react, Appellant took his gloves off, threw them in the trash, and walked out of the room. (*Id.* at 121.)

Counts 4–5 (CR 2002–001431) involving Doreen Barnes.

On April 2, 1999, 32-year-old Doreen Barnes went to Appellant's medical clinic for an abortion. (R.T. 9/16/03, at 172, 174, 177.) Once there, Doreen was taken to an examination room, and told to undress. (*Id.* at 188.) A little while later, Appellant and a medical assistant came into the room. (*Id.* at 189–91.) Before starting the pelvic examination, Appellant rubbed Doreen's labia with his fingers three or four times. (*Id.* at 193–96.) Appellant then proceeded with the pelvic examination, and performed the abortion the next day. (*Id.* at 196–200.) About two weeks later, Doreen returned to Appellant's medical clinic for a follow-up examination. (*Id.* at 203–04.) Prior to the pelvic examination, Appellant again "played with" Doreen's labia with his fingers as he had done at the preliminary examination. (*Id.* at 206–07.)

Counts 33–35 (CR 2002–001431) involving Rana Patrick.

On March 11, 2000, 27-year-old Rana Patrick went to Appellant's medical clinic for an abortion. (R.T. 9/9/03, at 205–06, 211.) Once there, Rana was taken to an examination room, and told to undress. (*Id.* at 218–19.)

A little while later, Appellant and a medical assistant came into the room. (*Id.* at 220.)  Appellant opened Rana's gown, exposing both of her breasts, and started to conduct a breast examination. (*Id.* at 221.)  The examination started out normally, but then Appellant began to "cup" and "grab" both of her breasts. (*Id.* at 223–24.)  Appellant then "fanned his fingers out" and "flicked them on [her] nipples" like he was trying to get them "hard."   (*Id.* at 224–25.)  Appellant "grabbed" Rana's breasts "a little bit more," and then "took his left hand to [her] right nipple and took it and twisted it all around" and "smirked" at Rana. (*Id.* at 225.)

Appellant then proceeded to conduct a pelvic examination. (*Id.* at 227–28.)  During the examination, Appellant "brushed" Rana's clitoris with his fingers. (*Id.* at 228–30.)  Rana was then given a sedative, and Appellant performed the abortion. (*Id.* at 231–32.)  Following the procedure, Rana got dressed and headed towards the lobby. (*Id.* at 232.)  As she did, Appellant, who was standing in the doorway of his office, reached out his arms and gave Rana a hug. (*Id.* at 233.)  Appellant told Rana, "I don't want to see you in here again," and then reached around and grabbed her "right cheek." (*Id.*)

Counts 17–18 (CR 2002–001431) involving Emily Francom.

On March 19, 2001, 20-year-old Emily Francom went to Appellant's medical clinic for an abortion. (R.T. 8/21/03, at 54; R.T. 10/22/03, at 90.)

11

Once there, Emily was taken to an examination room, and told to change into a gown. (*Id.* at 62–63.) A little while later, Appellant and a medical assistant came into the room. (*Id.* at 64.) Appellant told Emily to pull her gown down, and that he was going to conduct a breast examination. (*Id.* at 65.) Emily, who was sitting at the end of the examination table, complied, exposing both of her breasts. (*Id.* at 65–66.) Appellant then put both of his hands on Emily's breasts, with the palms of his hands touching Emily's nipples, and began "[m]assaging" and "[s]queezing" them for "a couple of minutes." (*Id.* at 67–68.) While his hands were on her breasts, Appellant asked Emily if she had "breast implants." (*Id.* at 68–69.) Appellant told Emily that he "liked them," and stated, "I've seen a lot of tits in my life and yours are great." (*Id.* at 69–70.) Appellant said this while still "massaging" Emily's breasts. (*Id.*) Appellant then "took a step back," and told Emily, "I really like those. They are great." (*Id.* at 71–72.) He then stepped back towards Emily, and continued "massaging" her breasts for "[a]nother minute or two." (*Id.*)

When he was finished, Appellant told Emily to "scoot down on the table." (*Id.* at 72.) As she started to lay down, Appellant "grabbed [her] from under [her] knees and pulled [her] to the end of the table." (*Id.*) Appellant then proceeded with the pelvic examination. (*Id.* at 76.) During the examination, Appellant told Emily that she had a "swollen cookie." (*Id.* at 77.)

12

He then said, "[Y]ou're all pink and red. I can give you something for that."
(*Id.*) At that point, Appellant started "massaging" Emily's vagina and clitoris.
(*Id.* at 79.) Emily lost consciousness from the anesthesia shortly thereafter.
(*Id.* at 81–83.)

Counts 16–17 (CR 2001–015515) involving Tracy Piechna.

On August 7, 2001, 31-year-old Tracy Piechna went to Appellant's
medical clinic for an abortion. (R.T. 9/15/03, at 147, 149, 153.) Once there,
Tracy was taken to an examination room, and told to change into a paper
gown. (*Id.* at 161–62.) A little while later, Appellant and a medical assistant
came into the room. (*Id.*) Appellant then began checking Tracy's heart rate by
placing a stethoscope on her bare chest. (*Id.* at 162–63.) As he pulled the
stethoscope out from underneath her gown, Appellant "pinched" Tracy's right
nipple. (*Id.*) Appellant then told Tracy to lie down, and conducted a breast
examination. (*Id.* at 164.)

Following the breast examination, Appellant told Tracy to "scoot down"
to the edge of the table. (*Id.* at 165.) As she started to lay down, Appellant
"grabbed [Tracy] and physically pulled [her] to the edge of the table." (*Id.*)
Appellant then proceeded with the pelvic examination, telling Tracy that he
"may brush across [her] clitoris." (*Id.*) Throughout the examination, Appellant
"would brush across" Tracy's clitoris, but "[i]n a sexual way," "[n]ot in a bump

or an accident kind of thing." (*Id.* at 168.) "[I]t was like a rubbing back and forth a couple times and then on to the pelvic exam. And then he did it again maybe two or three times." (*Id.* at 170–71.) Appellant did this for about 15 seconds. (*Id.*)

Counts 13–15 (CR 2001–015515) involving Kristin Aumiller.

On August 7, 2001, 26-year-old Kristin Aumiller went to Appellant's medical clinic for an abortion. (R.T. 9/4/03, at 67–68.) Once there, Kristin was taken to an examination room, and told to undress. (*Id.* at 79–80.) A little while later, Appellant and a medical assistant came into the room. (*Id.*) Appellant then exposed both of Kristin's breasts, and, with one hand on each breast, he started "touching" and "squeezing" them. (*Id.* at 81–82.) It was a "very soft caress, just feeling the skin. There was no feeling for lumps, swelling, anything like that." (*Id.*) Appellant then "rubbed" his finger around Kristin's areola, and asked her why she dyed her hair. (*Id.* at 83–84.) Kristin, a "natural redhead" with dyed blond hair, did not respond. (*Id.*) Appellant continued "rubbing" Kristin's areola, and told Kristin that "he could tell [she was] a natural redhead" because of the color of her areola.[2] (*Id.* at 84, 120.)

---

[2] Kristin's pelvic area was "covered completely," and at no time prior was her pelvic area exposed. (*Id.* at 84.)

14

Kristin was then given anesthesia, and Appellant performed the abortion. (*Id.* at 86.)

A few weeks later, Kristin was suffering from "very heavy bleeding," and returned to Appellant's medical clinic for a follow-up examination. (*Id.* at 88–89.) Kristin was taken to the examination room, told to undress, and given a "paper napkin" to cover her breasts and a "flat paper sheet" to cover her pelvic area. (*Id.* at 91–92.) Appellant entered the room, removed the paper napkin from Kristin's chest, and asked her if her "breasts were real or implants." (*Id.* at 92.) When Kristin told him that they were "real," Appellant replied, "[T]hat's what I thought." (*Id.* at 93.) Appellant then began "caressing" and "squeezing" Kristin's breasts, at one point telling Kristin, "[I]t must be hard to sleep on these babies." (*Id.* at 92–93.) Appellant's demeanor "seemed sexual" when he was making these comments. (*Id.* at 95–96.)

## II.   VERDICTS AND SENTENCING.

A jury convicted Appellant on Counts 4–5 (Doreen Barnes), 10 (Erlinda Diaz), 11–12 (Dawn Eanes), 14 (Kelly Easter), 17–18 (Emily Francom), 31–32 (Gretchen O'Hair), 33–34 (Rana Patrick), 37–38 (Kim Romero), 48 (Shelly Cluff), and 50 (Rise McEndree) in CR 2002–001431, and Counts 2 (Reina Tobin), 13–15 (Krista Aumiller), and 16–17 (Tracy Piechna) in CR 2001–015515. (R.O.A., Item 783.) The jury acquitted Appellant on Counts 1–3, 13,

15–16, 20–22, 24–25, 27–30, 35–36, 40–46, and 49 in CR 2002–001431, and Counts 1, 3–7, 9–10, and 12 in CR 2001–015515. (R.T. 12/2/03, at 10–29.) The jury was unable to reach a unanimous verdict on Counts 8 and 39 in CR 2002–001431, and Counts 8 and 11 in CR 2001–015515. (*Id.*) Counts 6–7, 9, 19, 23, 26, and 47 in CR 2002–001431 were dismissed prior to deliberation. (R.T. 10/27/03, at 52–53.)

At sentencing, the trial court suspended imposition of sentence on Count 48 (Shelly Cluff), and placed Appellant on lifetime probation. (R.O.A., Item 783.) The court then imposed aggravated sentences of 2.75 years' imprisonment on all remaining Counts, pursuant to § 13–702.02. (*Id.*) The court ordered that sentences imposed for counts involving the same victim run concurrently. (*Id.*) The court further ordered the sentences imposed for counts involving different victims run consecutively, totaling 35.75 years' imprisonment. (*Id.*)

On January 20, 2004, Appellant filed a timely notice of appeal from the judgments and sentences. (R.O.A., Item 785.) This Court has jurisdiction under Arizona Constitution Article VI, Section 9, and Arizona Revised Statutes §§ 12–120.21(A)(1), 13–4031, and –4033(A).

16

## ARGUMENTS

### I

**THE TRIAL COURT DID NOT COMMIT FUNDAMENTAL ERROR WHEN IT DENIED APPELLANT'S MOTION TO SEVER OFFENSES BECAUSE EVIDENCE OF THE OTHER OFFENSES WOULD HAVE BEEN ADMISSIBLE UNDER RULE 404(C) IF ALL CHARGES HAD BEEN TRIED SEPARATELY.**

Appellant contends that the trial court abused its discretion in joining all of the charged offenses into a single prosecution. His claim is twofold. First, he argues that the trial court was precluded from joining the offenses because it did not "personally evaluate the credibility of the [victims]" before finding that there was sufficient evidence from which a jury could find that Appellant committed the other offenses, as required by Rule 404(c)(1)(A), Arizona Rules of Evidence. (Opening Brief at 20.) Second, he argues that the trial court was precluded from joining the offenses because it did not receive "expert testimony" before finding that the commission of the offenses provided a reasonable basis to infer that Appellant had a character trait giving rise to an aberrant sexual propensity, as required by Rule 404(c)(1)(B), Arizona Rules of Evidence. (*Id.*) Appellant did not raise these objections in the trial court, nor did he renew his motion to sever at trial. Moreover, he has failed to establish

17

fundamental error and prejudice on appeal.   Therefore, he has forfeited his

right to obtain appellate relief on these claims.[3]

## A.   RELEVANT FACTS.

Prior to trial, the State moved to consolidate the counts charged in CR

2001–015515 with those counts charged in CR 2002–001431, pursuant to Rule

13.3(a), Arizona Rules of Criminal Procedure.  (R.O.A., Item 136.)  The State

argued that Appellant was not entitled to severance as a matter of right under

Rule 13.4(b), Arizona Rules of Criminal Procedure, because, if tried separately,

evidence of all charged offenses would be cross-admissible under Rule 404(c)

to show that Appellant had a character trait giving rise to an aberrant sexual

propensity.[4]  (*Id.*)  The State maintained that expert testimony was not required

under Rule 404(c)(1)(B) to show that the charged offenses were sexually

aberrant, but asserted that, "if requested by the court, the State will happily

provide." (*Id.*)

---

[3] Appellant does not raise any claims relating to Rules 403, 404(c)(1)(C), or
404(c)(1)(D), Arizona Rules of Evidence.  Therefore, he has abandoned all
such claims on appeal.  *State v. McCall*, 139 Ariz. 147, 165, 677 P.2d 920, 926
(1983); *State v. Weekley*, 200 Ariz. 421, ¶ 15, 27 P.3d 325 (App. 2001).

[4] The State also argued that evidence of the other charged offenses would have
been admissible under Rule 404(b), Arizona Rules of Evidence, to show intent,
opportunity, and absence of mistake or accident.  (R.O.A., Item 136.)

In response, Appellant argued that he was entitled to severance as a matter of right, pursuant to Rule 13.4(b), because evidence of the other offenses would not be admissible if the charges were tried separately. (R.O.A., Item 141.)   Relying on *State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977), Appellant argued that Rule 404(c) had "no application" in this case because "heterosexual relations" did not constitute aberrant sexual behavior. (*Id.* at 3.) Appellant further argued that expert testimony to demonstrate sexual aberrancy was "inadmissible." (*Id.*)   Appellant did not argue that there was insufficient evidence to permit the trier of fact to find that he had committed the other offenses.   Subsequently, Appellant filed a motion to sever counts, grouped by victim, and incorporated his response to the State's motion to consolidate. (R.O.A., Items 144, 150.)

The trial court initially denied the State's motion for consolidation, and granted Appellant's motion for severance, ruling:

> [T]he State has not sustained its burden to show that the alleged acts of sexual misconduct rise to a level of sexual aberration as required under Rule 404(c) or that commission of those other acts provide a reasonable basis to infer that the defendant has a character trait which gives rise to an aberrant sexual propensity to commit the crimes alleged in the indictment and otherwise.

(R.O.A., Item 62, at 4.)   The court noted that "[t]he fact that the alleged conduct took place in a doctor's office where the patients availed themselves of

19

a physical examination by a gynecologist makes it difficult to conclude that the conduct is aberrant so as to trigger Rule 404(c)." (*Id.* at 3–4.) It further noted, however, that there were "limitations on what conduct may occur even in a gynecological setting." (*Id.* at 4.)

The State then filed a motion for reconsideration, asking the trial court to reconsider its ruling. (R.O.A., Item 162.) Acknowledging the court's apparent inability to determine the sexual aberrancy of the charged offenses solely from the terms used in the indictments, the State attached to its motion transcripts of the interviews of each of the victims.[5] (*Id.* at 1–2.) The State encouraged the court to review the transcripts, and to analyze the specific facts that supported each of the charges. (*Id.* at 2.) The State further asked the trial court to allow the presentation of expert testimony, and proffered expert testimony from Dennis Doren, Ph.D. and Sidney Weschler, M.D., to assist the court in making its aberrant sexual propensity finding. (*Id.* at 4–5.)

In response, Appellant filed separate motions objecting to both the trial court's examination of the victims' interview transcripts and the State's request to present expert testimony. (R.O.A., Items 163, 164.) Appellant argued that

---

[5] Interview transcripts were not provided for victims Jennifer Jennings (recorder malfunction) or Reina Tobin. However, summaries of their interviews, as related by the detectives who conducted the interview, were included.

the trial court's *in camera* review of the victims' interview transcripts denied him his right to confrontation.  (R.O.A., Item 164.)  Appellant did not request an evidentiary hearing; nor did he assert that the trial court was required to make any sort of credibility assessment.  (*Id*.)  Appellant also argued that the State's request to present expert testimony was "an abuse of the Rules of Criminal Procedure" and "unsupported by any authority."  (R.O.A., Item 163.)

In its reply, the State made two offers of proof.  (R.O.A., Item 167.) First, the State proffered that Dr. Wechsler would testify about "proper medical examination techniques and would opine that, based on his review of the materials in this case, the defendant's contact with these victims was not proper medical procedure and would be considered abusive."  (*Id*. at 4.)  Second, the State proffered that Dr. Doren would testify that "sex offenders can exist in any profession, and that offending behavior can be disguised amid otherwise normal activity."  (*Id*.)  The State also attached to its reply transcripts of the interviews of seven of Appellant's medical assistants, and asked the court to review their statements "as an offer of proof."  (*Id*.)

In its minute entry dated October 10, 2002, the trial court granted the State's motion for reconsideration, vacating its prior ruling granting Appellant's motion to sever, and ordered cause numbers CR 2001–015515 and CR 2002–001431 to be consolidated.  (R.O.A., Item 66.)  The court ruled:

21

The rulings of a court are only as good as the information it has before it. In the State's Motion for Consolidation, what this court was presented to support a consolidation under Rule 404(b) and 404(c) was a mere statement that consolidation was appropriate, and vague assertions of alleged sexual misconduct on the part of the Defendant. The circumstances under which the alleged conduct occurred are extremely important, especially when it is the *manner* in which many of the alleged improper acts took place that make them aberrant. Based upon what this court had before it at the time, its September 13, 2002 rulings were correct.

*          *          *

The transcripts of interviews with the 35 patients [however] reveal accounts of what can be considered aberrant conduct under the circumstances during which the breast and pelvic examinations of the patients occurred. The manner and circumstances under which these alleged acts of sexual misconduct occurred as described in the patient interviews are corroborated by the Defendant's employees in their interviews. The incidents, as they vary from patient to patient, appear similar in nature.

Upon careful review of the transcripts of these interviews this court now finds: that the State has satisfied its burden under Rule 404(c) that the evidence of the alleged acts of sexual misconduct is sufficient for a trier of fact to find that Defendant committed the other acts; that the commission of the other acts provides a reasonable basis to infer that the Defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime(s) charged; and weighing the factors under Rule 404(c)(1)(C), this court does not find that the probative value of introducing the evidence of the other acts (which this court finds greater than it originally believed) is substantially outweighed by the danger of unfair prejudice to Defendant, confusion of the issues or misleading the jury.

(*Id.* at 2–3.)  The trial then proceeded with all 35 victims testifying before the jury. (R.O.A. Item 233.)  Appellant did *not* renew his motion to sever at trial.

**B.**    **ARGUMENT.**

**1.**    **Appellant has Waived All Claims by Failing to Renew His Motion to Sever at Trial.**

Rule 13.4(c) of the Arizona Rules of Criminal Procedure, requires a defendant to renew a motion to sever, if originally denied, "during trial at or before the close of the evidence."  The "[f]ailure to do so results in waiver of the severance issue."  *State v. Laird*, 186 Ariz. 203, 206, 920 P.2d 769, 772 (1996); *State v. Gonzales*, 181 Ariz. 502, 508, 892 P.2d 838, 844 (1995); *State v. Mincey*, 130 Ariz. 389, 399, 636 P.2d 637, 647 (1981); *State v. Pierce*, 27 Ariz.App. 403, 406, 555 P.2d 662, 665 (1976); *see also* Rule 13.4(c), Ariz. R. Crim. P. (severance issue waived if not timely renewed).  Therefore, because Appellant failed to renew his motion to sever at trial, *all* of his claims are waived.  *See Laird*, 186 Ariz. at 206, 920 P.2d at 772.

**2.**    **Appellant has Forfeited and Waived Each Individual Claim by Failing to Raise Them in the Trial Court.**

In addition to failing to renew his motion to sever at trial, thereby waiving *all* of his severance claims, Appellant also failed to raise specific objections to the trial court's 404(c)(1)(A) and 404(c)(1)(B) rulings.  In support of his motion for severance, Appellant only argued that Rule 404(c) had "no

application" in this case because "heterosexual relations" did not constitute aberrant sexual behavior. (R.O.A., Items 141, 144.) At no point did he argue that severance was required because there was insufficient evidence to permit the trial court or the jury to find by clear and convincing evidence that he committed the other offenses under Rule 404(c)(1)(A). Nor did he ever request a "joinder hearing," or assert that the trial court was required to assess the credibility of the victims before making its 404(c)(1)(A) ruling. Furthermore, Appellant *opposed* the admission of *any* expert testimony to establish that his conduct was sexually aberrant under Rule 404(c)(1)(B). (R.O.A., Item 163.) Appellant's failure to preserve these claims, in addition to his failure to renew his motion to sever at trial, limits this Court's review for fundamental error only. *State v. Henderson*, 210 Ariz. 561, ¶ 19, 115 P.2d 601 (2005); *Laird*, 186 Ariz. at 206, 920 P.2d at 772.

"The scope of review for fundamental error is limited." *Henderson*, at ¶ 19. A defendant who has failed to properly preserve an issue at trial "forfeits the right to obtain appellate relief except in those rare cases that involve 'error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial.'" *Id.* (citations

omitted).  In addition, the burden of persuasion in fundamental-error review is on the defendant. *Id*.

To prevail under this standard of review, a defendant must satisfy a three-prong test. First, the defendant "must prove error." *Id*. at ¶ 23. Second, the defendant must show that the error was fundamental in nature—i.e., "the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, *and* is of such magnitude that he could not have received a fair trial." *Id*. at ¶ 24 (emphasis added).  Finally, if the defendant carries his burden of proving error, *and* that it is one of the "rare cases" where the error is deemed "fundamental," the defendant must *also* "demonstrate that the error caused him prejudice." *Id*. at ¶¶ 20, 26.  If a defendant fails to establish *any one* of these prongs, he will be denied appellate relief on his claim. *Id*. at ¶ 24.

a.  <u>Appellant has Forfeited His Right to Obtain Appellate Relief on the Credibility Assessment Issue.</u>

Appellant first argues that the trial court's finding under Rule 404(c)(1)(A) was deficient because it "failed to consider proof sufficient to establish that [he] committed the alleged offenses."  (Opening Brief at 31.) Specifically, he argues that, under Rule 404(c)(1)(A), the trial judge was required to assess the credibility of the victims before determining whether he committed the other charged offenses.  He further argues that the *only* way the

trial judge could have made this assessment was by conducting a "joinder hearing," in which the trial judge heard live testimony, in open court, and subject to cross-examination. (Opening Brief at 28–29.) Appellant has failed to satisfy his burden of proving both fundamental error and prejudice. Therefore, he has forfeited his right to obtain appellate relief on this claim.

First, there is no error. Pursuant to Rule 404(c), "other act" evidence is admissible "if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged." Before "other act" evidence may be admitted pursuant to Rule 404(c), the trial court must first find that the "evidence is sufficient to permit the trier of fact to find that the defendant committed the other act." Rule 404(c)(1)(A), Ariz. R. Evid. Accordingly, such evidence is conditionally relevant, and its admissibility is governed by Rule 104(b), Arizona Rules of Evidence.

Under Rule 104(b), conditionally relevant evidence is admissible upon, or subject to, "the introduction of evidence sufficient to support a finding of the fulfillment of the condition." In determining whether the proponent of the evidence has met its burden for admissibility under Rule 104(b), the trial judge need only find that sufficient evidence exists from which a jury could find by clear and convincing evidence that the condition was fulfilled—i.e., the defendant committed the other acts. *State v. Williams*, 183 Ariz. 368, 378, 904

P.2d 437, 447 (1995); *State v. Plew*, 155 Ariz. 44, 50, 745 P.2d 102, 108 (1987); *State v. Romero*, 178 Ariz. 45, 51, 870 P.2d 1141, 1147 (App. 1993); *State ex rel. McDougall v. Superior Court in and for County of Maricopa*, 172 Ariz. 153, 156, 835 P.2d 485, 488 (App. 1992); *see also Huddleston v. United States*, 485 U.S. 681, 690, 108 S. Ct. 1496 (1988) ("In determining whether the Government has introduced sufficient evidence to meet Rule 104(b) . . . [t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact."); *State v. Terrazas*, 189 Ariz. 580, 583, 944 P.2d 1194, 1197 (1997) (recognizing propositions in *Williams* and *Huddleston*); *id.* at 582, 944 P.2d at 1196 (clear and convincing evidence standard); *see generally* Rule 404(c)(1)(A), Ariz. R. Evid. (court may admit "other act" evidence only if it first finds that proffered evidence is "sufficient to permit the *trier of fact* to find that the defendant committed the other act.") (Emphasis added.)  The proponent of the evidence is *not* required to convince the trial court by clear and convincing evidence that the defendant committed the other acts, nor is the trial court required to make such a finding. *Huddleston*, 485 U.S. at 682, 686–87, 690; *see also Logerquist v. McVey*, 196 Ariz. 470, ¶ 52, 1 P.3d 113 (2000) ("The right to jury trial does not turn on the judge's preliminary assessment of testimonial reliability.   It is the jury's function to determine accuracy, weight, or credibility.").

A trial court's Rule 104(b) inquiry "'should be limited to asking whether evidence in the record would permit a reasonable person to believe' the evidence on the preliminary questions." *Plew*, 155 Ariz. at 50, 745 P.2d at 108 (quoting *State v. LaGrand (Walter)*, 153 Ariz. 21, 28, 734 P.2d 563, 570 (1987)).   In making that inquiry, issues such as the "veracity-reliability-credibility" of the evidence are issues that "traditionally fall within the province of the jury rather than the judge." *Id.* at 49–50, 745 P.2d at 107–08 (quoting *LaGrand*, 153 Ariz. at 28, 734 P.2d at 570); *McDougall*, 172 Ariz. at 156, 835 P.2d at 488; *see also Huddleston*, 485 U.S. at 690 (the trial court does not weigh credibility of evidence in determining whether proponent of evidence has met its Rule 104(b) burden); *Logerquist*, at ¶ 52 ("It is the jury's function to determine accuracy, weight, or credibility."). "We do not believe that a judge should be able to bootstrap himself into the jury box via evidentiary rules." *Plew*, 155 Ariz. at 50, 745 P.2d at 108.

Moreover, in deciding whether the proponent of evidence has satisfied their conditional burden under Rule 104(b), the trial court is not bound by the rules of evidence in determining preliminary questions concerning the admissibility of evidence.  Rule 104(a), Ariz. R. Evid; *see also, e.g., State v. Hummert*, 183 Ariz. 483, 495, 905 P.2d 493, 504 (App. 1994), *vacated on other grounds*, 188 Ariz. 119, 933 P.2d 1187 (1997) (trial court not limited by rules

of evidence in determining admissibility of Rule 404(b) other act evidence); *State v. Edwards*, 136 Ariz. 177, 183, 665 P.2d 59, 65 (1983) (hearsay admissible to show good faith effort to locate a witness); *State v. Simmons*, 131 Ariz. 482, 485, 642 P.2d 479, 482 (App. 1982) (certification of documentary evidence). In fact, the Arizona Supreme Court has held that a prosecutor's avowals can be considered in deciding preliminary questions of admissibility. *State v. Medina*, 178 Ariz. 570, 575, 875 P.2d 803, 808 (1994).

In this case, the trial court had to make a preliminary finding under Rules 104(b) and 404(c)(1)(A) that sufficient evidence existed from which the jurors could find by clear and convincing evidence that Appellant committed the charged offenses. To this end, the State provided the trial court with transcripts of the victims' interviews with detectives, in which they described, in graphic detail, Appellant's sexual contact, and the surrounding circumstances of his actions.[6] A review of these first-hand accounts leaves no doubt that there was sufficient evidence from which the jurors could find by clear and convincing evidence that Appellant committed the charged offenses.

---

[6] These transcripts were filed with this Court on February 23, 2005, and made part of the record on appeal following a record reconstruction hearing on February 18, 2005. They are identified only as "Exhibit 3." (See Attachment 1, entry 57.)

Appellant argues, however, that *State v. Aguilar*, 209 Ariz. 40, 97 P.3d 865 (2004), requires a trial judge to determine the victims' credibility before making such a finding, and that such a determination cannot be made by simply reviewing their transcribed interviews. In *Aguilar*, the defendant was charged with sexually assaulting three women. *Id.* at ¶ 2. The defendant admitted that he had sexual contact with the women, but maintained that the acts were consensual. *Id.* The defendant moved to sever the counts, but the trial court denied the motion, ruling that evidence as to each victim would have been admissible under Rule 404(c) in separate trials. *Id.* at ¶¶ 3–4. In determining whether the State had satisfied its burden under Rule 404(c)(1)(A), the trial court limited its review to the grand jury transcript, the pleadings, and the arguments of counsel at oral argument, and ultimately ruled that clear and convincing evidence established that the defendant committed the other acts because "Aguilar admitted to the police that he had sexual contact with the three victims." *Id.* at ¶¶ 33–34.

The Arizona Supreme Court held that the fact that the defendant had admitted to sexual contact missed the point:

> [T]he question here is not simply whether Aguilar had
> sexual contact with the victims, but also whether that sexual
> contact was without the victims' consent. Thus, the court's
> focus should have been on whether clear and convincing
> evidence established that Aguilar committed the other

sexual assaults, not on Aguilar's admission that he had consensual sexual contact with the victims.

The resolution of *this* issue--whether the victims consented to the sexual contact--turns largely on the credibility of the witnesses. Consequently, the trial court had to make a credibility determination that the victims' accounts of the assaults were more credible than Aguilar's for the court to make the necessary finding that clear and convincing evidence established that the sexual contact in each incident was non-consensual. That could not have occurred here, when the court neither heard from the victims nor was presented with any prior testimony from them.

*Id.* at ¶¶ 34–35 (emphasis added). As a result, the court held that the evidence presented was insufficient to support cross-admission of the three allegations of sexual assault under Rule 404(c)(1)(A).

*Aguilar* has no application here. In *Aguilar*, a credibility determination was required to resolve the issue of consent: "whether the victims consented to the sexual contact." *Id.* at ¶ 35. In this case, consent was *never* at issue. Both parties agreed that the contact was consensual in so far as it was pursuant to a legitimate medical procedure. Instead, the core issue before the trial court at the time it considered the State's request for consolidation was whether the contact was incident to a legitimate medical procedure, or whether it was simply for sexual gratification. (R.O.A., Items 62, 66, 121, 127, 134, 136, 140, 143.) Unlike the issue in *Aguilar*, resolution of *this* issue did *not* turn on the credibility of the victims. Indeed, a credibility determination of their accounts

31

would have done *nothing* to resolve the critical issue—i.e., whether the contact was medically necessary. *Aguilar* instructs that a credibility determination of a witness is *only* required to resolve the issue of consent. at ¶¶ 34–35. In all other cases, the "veracity-reliability-credibility" of the evidence are issues left for the jury to decide. *Plew*, 155 Ariz. at 49–50, 745 P.2d at 107–08; *McDougall*, 172 Ariz. at 156, 835 P.2d at 488; *see also Huddleston*, 485 U.S. at 690; *Logerquist*, at ¶ 52. Therefore, there was no error, and Appellant has forfeited his right to obtain appellate relief.

Even assuming that *Aguilar* requires a credibility determination in *all* Rule 404(c)(1)(A) cases, overruling *Logerquist*, *Plew*, *LaGrand*, and *McDougall*, and departing from *Huddleston*, the trial court's consideration of the victims' interviews was sufficient. As discussed above, in determining whether the proponent of Rule 404(c) evidence has met its burden for admissibility under Rule 104(b), the trial judge need only find that sufficient evidence exists from which *a jury* could find by clear and convincing evidence that the condition was fulfilled. *Williams*, 183 Ariz. at 378, 904 P.2d at 447; *Plew*, 155 Ariz. at 50, 745 P.2d at 108; *Romero*, 178 Ariz. at 51, 870 P.2d at 1147; *McDougall*, 172 Ariz. at 156, 835 P.2d at 488; *see also Huddleston*, 485 U.S. at 690; *Terrazas*, 189 Ariz. at 583, 944 P.2d at 1197; *see generally* Rule 404(c), Ariz. R. Evid. Accordingly, the trial court needed only to find that

sufficient evidence existed from which a jury could find that the victims' accounts of the sexual abuses were "more credible than" Appellant's version.[7] *Aguilar*, at ¶ 35.

In *Aguilar*, the court held that the trial court's review of the grand jury proceedings, the pleadings, and the arguments of counsel was insufficient to find that the victims' accounts were "more credible than" the defendant's admissions to police because the materials consisted of "a third party's recitation of the victims' claims." at ¶¶ 33, 35, 37.  In this case, however, the trial court reviewed statements directly from the victims—first-hand accounts. The court also reviewed the interviews of Appellant's medical assistants, which included claims that Appellant often inappropriately touched his patients' clitorises and breasts during their examinations.  (See footnote 7.)  These statements corroborated the victims' accounts.  Furthermore, the trial court was not presented with any direct statements by Appellant, only general assertions in pleadings (by his attorney) that the contact was a "necessary part of his

---

[7] Although language in *Aguilar* could be construed as requiring a trial court itself to find that the victims are credible, *see id.* at ¶ 35 ("[T]he trial court had to make a credibility determination that the victims' accounts of the assaults were more credible than Aguilar's for the court to make the necessary finding that that clear and convincing evidence established that the sexual contact in each incident was non-consensual."), such a construction is inconsistent with the holdings in *Williams*, *Plew*, *Romero*, *McDougall*, and *Huddleston*, and the explicit language of Rule 404(c)(1)(A).

medical treatment." (R.O.A., Items 121, 127, 134, 143.)  From this record, sufficient evidence existed from which a jury could find that the victims' accounts were "more credible than" Appellant's general conclusion.  Thus, the trial court's reliance on the victims' interviews was not error.[8]

Appellant nonetheless claims that the *only* way the trial judge could have assessed the credibility of the victims was by conducting a "joinder hearing," in which the trial judge heard live testimony, in open court, and subject to cross-examination.  (Opening Brief at 28–29.)  First, as just discussed, the trial court was *not* required to find that the victims were credible.  The trial court was only required to find that sufficient evidence existed from which a jury could find that the victims' accounts of the sexual abuses were "more credible than" Appellant's version.  *Aguilar*, at ¶ 35.  Moreover, *Aguilar* does not require a "joinder hearing."  Although *Aguilar* did state that the trial court "neither heard from the victims nor was presented with any prior testimony from them," at ¶ 35, it did not indicate that this list was exhaustive.  Rather, these are just two ways that a trial court can assess a victim's credibility.  If the Arizona Supreme Court intended to require "live testimony," it would have

---

[8] The trial court's reliance on the interview *summaries* for Jennifer Jennings and Reina Tobin (see footnote 5, *supra*) was error if this Court concludes that *Aguilar* applies to the instant case.  But as will be discussed *infra*, this error was not fundamental, and did not cause Appellant prejudice.

explicitly stated so.  But the fact that it included "prior testimony" (presumably by transcript) as *one* possible method of review further indicates that "live" testimony is not required.  Furthermore, Rule 104(b) instructs that a trial court is not bound by the rules of evidence in determining preliminary questions concerning the admissibility of evidence. *See also Hummert*, 183 Ariz. at 495, 905 P.2d at 504.

Appellant's reliance on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), in support of his claim that a "joinder hearing" is required, is unavailing.  First, Appellant did not argue below that the Sixth Amendment's Confrontation Clause entitled him to such a hearing.  Rather, he only argued that his right to confrontation precluded the trial court from reviewing *in camera* the victims' interviews in reconsidering its severance ruling.[9]  Indeed, Appellant's sole objective was to prevent the trial court from reviewing *any* materials that could influence its initial favorable severance ruling.  Thus, the constitutional support on which he now relies was not properly preserved below. *See State v. Spreitz*, 190 Ariz. 129, 145, 945 P.2d 1260, 1276 (1997);

---

[9] Appellant does not argue on appeal that the trial court's consideration of the victims' interviews violated his confrontation rights, and has, therefore, abandoned any such claim on appeal. *See Weekley*, at ¶ 15.

*State v. Hamilton*, 177 Ariz. 403, 408, 868 P.2d 986, 991 (App. 1993); *State v. Hernandez*, 170 Ariz. 301, 306–07, 823 P.2d 1309, 1314–15 (App. 1991).

Forfeiture aside, the Confrontation Clause does not compel "joinder hearings" for 404(c)(1)(A) determinations.  The United States Supreme Court has made clear that the Sixth Amendment's right to confrontation is a *trial* right, and does not extend to pretrial evidentiary hearings.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S. Ct. 989 (1987) ("The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination."); *id* at 54 n.10 ("[T]he Court normally has refused to find a Sixth Amendment violation when the asserted interference with cross-examination did not occur at trial."); *California v. Green*, 399 U.S. 149, 157, 90 S. Ct. 1930 (1970) ("[I]t is this literal right to 'confront' the witness *at the time of trial* that forms the core of the values furthered by the Confrontation Clause.") (Emphasis added); *Barber v. Page*, 390 U.S. 719, 725, 88 S. Ct. 1318 (1968) ("The right to confrontation is basically a *trial* right.") (Emphasis added); *see also Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the *trier of fact*.") (Emphasis

added); *Kentucky v. Stincer*, 482 U.S. 730, 744, 107 S. Ct. 2658 (1987) (holding that, because the defendant had the opportunity for full and effective cross-examination of the victims during trial, the defendant's exclusion from the victims' pre-trial competency hearing did not violate Confrontation Clause); *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292 (1985) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish."); *State v. Riley*, 196 Ariz. 40, ¶ 7, 992 P.2d 1135 (App. 1999) ("It is well established, however, that confrontation rights do not apply to the same extent at a pretrial suppression hearing as they do at trial.").

Appellant's reliance on *Crawford* is misplaced. *Crawford* holds that testimonial statements of witnesses absent from trial may only be *admitted at trial* if the witness is unavailable and the defendant had a prior opportunity to cross-examine. 541 U.S. at 59, 68. *Crawford* does not require cross-examination or confrontation for purposes of a *pretrial* evidentiary ruling. Therefore, Appellant did not have a Sixth Amendment right to a "joinder hearing," or to cross-examine the victims prior to trial.

Even assuming that the trial court's consideration of the victims' interviews to satisfy Rule 404(c)(1)(A) was improper, any conceivable error

was not fundamental in nature. An error is fundamental only if it involves "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Henderson*, at ¶¶ 19, 24 (citations omitted). Although the supreme court did not specify those types of errors that could be deemed "fundamental," it strongly indicated that such was limited to those *approaching* the level of "structural error."[10] *See id.* at ¶ 25 (discussing denial of a jury trial on aggravating facts, applying the wrong burden of proof, and shifting the burden of proof to the defendant); *see also State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977) (holding that fundamental error "usually, if not always, involves the loss of federal constitutional rights.").

In this case, Appellant has not even alleged that the claimed error went to the foundation of his case, took from him a right essential to his defense, or was of such magnitude that he did not receive a fair trial. *Henderson*, at ¶¶ 19, 24. Nor can he say that it did. The alleged violation does not involve the loss

---

[10] "[E]rrors are considered structural rather than trial error when they 'affect the entire conduct of the trial from beginning to end,' and thus taint 'the framework within which the trial proceeds.'" *Henderson*, at ¶ 12 (quoting *State v. Anderson*, 197 Ariz. 314, ¶ 22, 4 P.3d 369, (2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 309–10, 111 S. Ct. 1246 (1991))).

of federal constitutional rights. *Smith*, 114 Ariz. at 420, 561 P.2d at 744. Rather, Appellant's claim is based solely on a state evidentiary rule. Therefore, because Appellant has failed to demonstrate that the alleged error was fundamental in nature, he has forfeited his right to obtain appellate relief. *Henderson*, at ¶ 24.

Furthermore, any conceivable error did *not* cause Appellant prejudice. Fundamental-error review places the burden on the defendant to affirmatively prove prejudice. *Henderson*, at ¶¶ 19–20. Here, Appellant has failed to make *any* showing of prejudice. Rather, he simply concludes that "the court's joinder order violated [his] right to severance of counts." (Opening Brief at 31.) This claim is insufficient to satisfy his burden of proving actual prejudice. Under *Henderson*, a defendant must affirmatively prove prejudice before obtaining appellate relief. *Id*. at ¶¶ 19–20.

More importantly, no prejudice in fact occurred. Appellant never challenged the trial court's 404(c)(1)(A) ruling below. Nor did he argue in his response to the State's motion for consolidation/reconsideration that the materials submitted to the trial court were insufficient to permit the trier of fact to find by clear and convincing evidence that the offenses occurred. Similarly, on appeal, Appellant does not claim that the materials considered by the trial court were insufficient to support its 404(c)(1)(A) ruling, or that the evidence

does not support the jury's verdicts beyond a reasonable doubt. He also does not allege that the consolidation of charges was prejudicial under Rule 403. He simply argues that *Aguilar* requires certain procedures, and that those procedures were not followed in this case.

In addition, as discussed above, the materials reviewed by the trial court were more than sufficient to support the trial court's finding. In *Aguilar*, the court held that the trial court's failure to make a sufficient finding under Rule 404(c)(1)(A) "might be harmless error if the record contained substantial evidence that the requirements of admissibility were met." at ¶ 37. The court in *Aguilar* could not conclude that the error was harmless, however, because the materials reviewed by the trial court consisted of a third-party's recitation of the victims' claims. *Id.* In this case, the materials reviewed by the trial court were statements made directly by the victims. (See footnote 7.) Their statements certainly support the trial court's finding that there was sufficient evidence to permit the jury to find by clear and convincing evidence that the defendant committed the offenses. Moreover, the victims' trial testimony clearly supports the trial court's finding. Had Appellant renewed his motion to sever at trial, there would have been no error by the trial court in denying the motion based on the victims' testimony. *See State v. Bible*, 175 Ariz. 549, 572,

858 P.2d 1152, 1175 (1993) (prejudice must be evaluated in light of the entire record when reviewing for fundamental error).

Finally, the jury's verdicts make clear that Appellant was not prejudiced by the trial court's 404(c)(1)(A) ruling.  The jurors were instructed that "[e]ach count charges a separate and distinct offense," and that it "must decide each count separately on the evidence with the law applicable to it, uninfluenced by [their] decision on any other count."  (R.T. 10/27/03, at 64.)  They were further instructed that it "may find that the State has proved beyond a reasonable doubt all, some or none of [the] charged offenses."  (*Id.* at 65.)  Indeed, the jurors carefully considered each individual count.   Of the 60 charged counts presented for their deliberation, the jurors convicted on 22 counts, acquitted on 34 counts, and were deadlocked on 4 counts.  (R.O.A. Item 783.)   In some instances, their verdicts included both convictions and acquittals on counts involving the same victim (Kelly Easter, Rana Patrick, Shelly Cluff).  (*Id.*)  The jurors' indiscriminate verdicts demonstrate that they were not influenced by the number of victims involved, or by a belief that Appellant had a character trait that predisposed him to commit the charged crimes.  Therefore, it cannot

be said that Appellant was prejudiced by the trial court's 404(c)(1)(A) ruling.[11]

Because Appellant has failed to establish actual prejudice, and no prejudice in

fact occurred, he has forfeited his right to obtain appellate relief on this claim.

  b.    Appellant Invited, and Therefore Waived, Appellate Review
        of the Expert Testimony Issue.

Appellant next argues that the trial court "failed to consider proof

necessary to show that [his] conduct showed an emotional propensity for

sexual aberration." (Opening Brief at 31.)  Specifically, he argues that, under

Rule 404(c)(1)(B), the trial judge was *required* to receive expert testimony on

the limits of proper touching in gynecological procedures before it could find

that he had a character trait giving rise to an aberrant sexual propensity to

commit the charged offenses.  (*Id*. at 29.)  Appellant invited any conceivable

error, and has, therefore, waived his right to appellate review on this claim.

Under the invited-error doctrine, a party may not complain on appeal of

an error that he or she has invited or contributed to the case.  *State v. Diaz*, 168

Ariz. 363, 365, 813 P.2d 728, 730 (1991); *State v. Islas*, 132 Ariz. 590, 592,

647 P.2d 1188, 1190 (App. 1982).  This is so because a party "may not be

_____

[11] In *Aguilar*, the court could not rely on the jury's verdicts to find the error harmless because the jury was instructed that they "*must* consider [the other acts] in determining whether [the defendant] had a character trait that predisposed him to commit the crimes charged." at ¶ 37 n.12.  In this case, however, no such instruction was given. (R.T. 10/27/03, at 52–73.)

heard [on appeal] to decry a result fashioned by his own handiwork." *State v. Moreno*, 173 Ariz. 471, 473, 844 P.2d 638, 640 (App. 1992) (quoting *Sisson v. State*, 16 Ariz. 170, 175, 141 P. 713, 714–15 (1914)). "If an error is invited, a reviewing court will not consider whether the alleged error is fundamental," and will consider the error waived. *State v. Logan*, 200 Ariz. 564, ¶ 9, 30 P.3d 63 (2001).

In this case, the State made several requests to offer expert testimony to establish sexual aberrancy, and to assist the trial court in making its 404(c)(1)(B) finding. (R.O.A., Items 136, 162.) Appellant staunchly opposed *any such testimony*, arguing that it was "inadmissible," an "abuse of the Rules of Criminal Procedure," and "unsupported by any authority." (R.O.A., Item 141, 164.) Certainly, Appellant's position contributed to the trial court's decision not to entertain expert testimony on the matter, and he cannot complain of his "handiwork" on appeal. Therefore, because Appellant invited any error, this Court cannot review this claim, and it is waived. *Logan*, at ¶ 9.

Invited error aside, there was no error. Before "other act" evidence may be admitted pursuant to Rule 404(c), the trial court must first find that the "commission of the other act provides a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime charged." Rule 404(c)(1)(B), Ariz. R. Evid.   The Rule

43

permits "admission of evidence of the other act either on the basis of similarity or closeness in time, supporting expert testimony, *or* other reasonable basis that will support such an inference. Comment to Rule 404(c)(1)(B), Ariz. R. Evid. (emphasis added).

Rule 404(c)(1)(B) makes clear that expert testimony is *not* required to demonstrate that there is a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the charged crimes. A trial court may rely on the similarity or closeness in time of the other act evidence or any other reasonable basis that will support such an inference. In this case, the trial court relied on three things in finding a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the charged crimes: (1) interviews of the 35 victims involved; (2) interviews of five of Appellant's medical assistants; and (3) an offer of proof of expert testimony. (R.O.A., Items 162, 167; Attachment 1, entry 57, "Exhibit 3".) These submissions provided the court with a detailed, first-hand account of over 67 acts of sexual contact occurring between April 1983 and September 2001. (*Id.*) All of the contact occurred during various gynecological procedures and related examinations conducted by Appellant. (*Id.*) The victims' accounts were corroborated by the medical assistant's statements that Appellant often inappropriately touched his

patients' clitorises and breasts during their examinations. (*Id.*) These statements alone provided a reasonable basis to infer that Appellant had a character trait giving rise to an aberrant sexual propensity to commit the charged crimes. (R.O.A., Item 66.) Expert testimony on the "extent of touching necessary for the medical treatment the victims sought" was unnecessary. The descriptions by the victims and the medical statements made clear that Appellant's conduct far exceeded medical treatment, and was sexually aberrant.

Furthermore, the State proffered that Dr. Wechsler would testify about "proper medical examination techniques and would opine that, based on his review of the materials in this case, the defendant's contact with these victims was not proper medical procedure and would be considered abusive." (R.O.A., Item 167.) As discussed above, a prosecutor's avowals can be considered in deciding preliminary questions of admissibility. *Medina*, 178 Ariz. at 575, 875 P.2d at 808. Moreover, a trial court may, upon the avowals of the prosecutor, vary the order of proof and admit the declarations subject to the subsequent production of the independent proof. *State v. Ferrari*, 112 Ariz. 324, 328, 541 P.2d 921, 925 (1975); *State v. Lycett*, 133 Ariz. 185, 193, 650 P.2d 487, 195 (App. 1982). This offer of proof, and subsequent testimony at trial, likewise provided a reasonable basis to infer that Appellant had a character trait giving

45

rise to an aberrant sexual propensity to commit the charged crimes. Therefore, there was no error.

Even assuming that this evidence did not support the trial court's 404(c)(1)(B) finding, any conceivable error was not fundamental in nature. As discussed above, it is the defendant's burden to show that the alleged error went to the foundation of his case, took from him a right essential to his defense, or was of such magnitude that he did not receive a fair trial. *Henderson*, at ¶¶ 19, 24. Moreover, the alleged error does not involve the loss of a federal constitutional right. *Id.* ¶ 25. Therefore, because Appellant has failed to demonstrate that the alleged error was fundamental in nature, he has forfeited his right to obtain appellate relief. *Id.* at ¶ 24.

Furthermore, any conceivable error did *not* cause Appellant prejudice. Once again, Appellant has failed to make *any* showing of prejudice. Moreover, it would be disingenuous for Appellant to now claim prejudice when he strongly opposed the State's request to offer expert testimony at trial. (R.O.A., Items 141, 143.) Finally, Dr. Wechsler's expert testimony was presented at trial, and certainly supported the trial court's finding that there was a reasonable basis to infer that Appellant had a character trait giving rise to an aberrant sexual propensity to commit the charged crimes. (R.T. 9/29/03, at 5–90; R.T. 9/30/03, at 46–72.) *See Bible*, 175 Ariz. at 572, 858 P.2d at 1175

(prejudice must be evaluated in light of the entire record when reviewing for fundamental error).   Because Appellant has failed to prove actual prejudice, and no prejudice in fact occurred, he has forfeited his right to obtain appellate relief on this claim.

## II

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT PERMITTED THE STATE TO INTRODUCE EXPERT TESTIMONY ON THE RESPONSE PATTERNS OF SEXUAL ABUSE VICTIMS BECAUSE SUCH KNOWLEDGE WAS OUTSIDE THE COMMON UNDERSTANDING OF THE JURY, AND ASSISTED THE JURY IN DECIDING THE ACCURACY AND CREDIBILITY OF THE VICTIMS.**

Appellant contends that the trial court abused its discretion when it permitted Dr. Ann Burgess to testify about the response patterns of sexual abuse victims.   (Opening Brief at 32.)   Specifically, he argues that her testimony "amounted to nothing more than prohibited 'rape trauma syndrome' and 'offender profile' evidence." (*Id.*)   These claims are without merit.  The trial court did not abuse its discretion in admitting Dr. Burgess' expert testimony because it was outside the common knowledge of the jury, and assisted the jury in determining the accuracy and credibility of the victims' testimony.

## A.   RELEVANT FACTS.

Prior to trial, the State filed a supplemental notice of witnesses to include Dr. Ann Burgess, an expert in the response patterns of sexual abuse victims.  (R.O.A., Item 154; R.T. 10/1/03, at 125, 143, 151–52.)  Appellant subsequently filed a motion *in limine* to preclude Dr. Burgess from testifying, arguing that "'profile' evidence regarding the 'general characteristics of sex offenders'" had "no basis in clinical or medical science."  (R.O.A., Item 224.)

At oral argument on the motion, the State proffered that Dr. Burgess would testify to the responses and reactions of sexual abuse victims "to trauma that they encounter in the physician-patient relationship," and the reasons for their "delayed disclosure."  (R.T. 8/8/03, at 64.)  The State further argued that Dr. Burgess' testimony would assist the jury in evaluating the victims' testimony, particularly their responses to questions by the defense about "why they behaved the way that they did" following the event.  (*Id.*)  Appellant's counsel complained:  "Dr. Burgess doesn't know anything about the facts of the case, hasn't read any client charts, no interviews, doesn't know anything about Dr. Finkel."  (*Id.* at 64–65.)  The trial court ultimately denied Appellant's motion.  (R.O.A., Item, 231.)

At trial, Dr. Burgess related the various responses to "unwanted sexual contact" by victims/patients during an examination.  (R.T. 10/1/03, at 162–69.)

48

She testified that confrontation is not the primary action taken by a victim/patient, and that it is uncommon for a victim/patient to suddenly stop the examination. (*Id.*) Dr. Burgess further testified that victims/patients often do not confront the physician following the examination, and that reporting the abuse to authorities is a "very difficult action for a patient to take." (*Id.* at 171–72.) If allegations "come[] forward in a public way," however, Dr. Burgess related that other victims/patients are more susceptible to come forward. (*Id.* at 180–82.) Finally, Dr. Burgess testified that victims/patients often have a difficult time "pinpointing" the date of the abuse, mainly because they try to suppress the event. (*Id.* at 183–84.)

**B.     STANDARD OF REVIEW.**

The admission of expert testimony is a matter within the sound discretion of the trial court, and will not be disturbed on appeal absent a clear abuse of discretion. *State v. Mincey*, 141 Ariz. 425, 441, 687 P.2d 1180, 1196 (1984). Whether the expert testimony will aid the jury is a "fact-bound inquir[y] uniquely within the competence of the trial court." *State v. Moran*, 151 Ariz. 378, 381, 728 P.2d 248, 251 (1986).

**C.     ARGUMENT.**

The trial court did not abuse its discretion in admitting Dr. Burgess' expert testimony. A trial court has discretion to allow expert testimony "where

it may assist the jury in deciding a contested issue, including issues pertaining to accuracy or credibility of a witness' recollection or testimony." *State v. Lindsey*, 149 Ariz. 472, 473, 720 P.2d 73, 74 (1986); *see also* Rule 702, Ariz. R. Evid. A trial court may exercise this discretion when there is "a reasonable basis to believe that the jury will benefit from the assistance of expert testimony that explains recognized principles of social or behavioral science which the jury may apply to determine issues in the case." *Id.* Such testimony is only permitted when "the facts needed to make the ultimate judgment may not be within the common knowledge of the ordinary juror." *Id.*

The purpose of allowing behavioral testimony is to provide the jury with information that it may use "in weighing the evidence to determine accuracy or credibility of a witness." *Id.* at 474, 720 P.2d at 75. "'Jurors, most of whom are unfamiliar with the behavioral sciences, may benefit from expert testimony' explaining behavior they might otherwise attribute to inaccuracy or prevarication." *Moran*, 151 Ariz. at 381, 728 P.2d at 251 (quoting *Lindsey*, 149 Ariz. at 474, 720 P.2d at 75). Such evidence "merely informs jurors that commonly held assumptions are not necessarily accurate and allows them to fairly judge credibility." *Id.* at 382, 728 P.2d at 252. Specifically, courts have recognized that expert testimony on the general behavior characteristics of sexual abuse victims help "explain a victim's seemingly inconsistent behavior

and aid jurors in evaluating the victim's credibility." *Moran*, 151 Ariz. at 381,

384, 728 P.2d at 250, 254; *Lindsey*, 149 Ariz. at 473–74, 720 P.2d at 74–75;

*State v. Lopez*, 170 Ariz. 112, 118, 822 P.2d 465, 471 (App. 1991).

Although an expert may give testimony on behavioral characteristics

that affect the credibility or accuracy of a witness' observations, they are not

allowed "to give their opinion of the accuracy, reliability or credibility of a

particular witness in the case being tried" or "of the type under consideration."

*Lindsey*, 149 Ariz. at 475, 720 P.2d at 76.  It is not the expert's function "to

'tell the jury' who is correct or incorrect, who is lying and who is truthful." *Id.*

at 474, 720 P.2d at 75.  Nor are they permitted to give an opinion about their

"belief of guilt or innocence." *Id.*  In other words, an expert may *not* testify

that the victim's behavior is consistent with the crime having occurred, and,

therefore, the charged crime must have been committed. *Moran*, 151 Ariz.

at 385, 728 P.2d at 255.

In this case, Dr. Burgess testified regarding the response patterns of

victims of physician-patient sexual abuse, and the reasons for their delayed

disclosure.  Such evidence was outside the common knowledge of the jury, and

assisted the jury in evaluating the victims' credibility. *Moran*, 151 Ariz. at 381,

384, 728 P.2d at 250, 254; *Lindsey*, 149 Ariz. at 473–74, 720 P.2d at 74–75.  At

trial, Appellant repeatedly attacked the victims' credibility and the truthfulness

of their claims because they did not confront Appellant following the abuse, and waited years to report it to authorities. (Exhibit 325, at 13:36–39; R.T. 8/20/03, at 146; R.T. 8/21/03, at 73, 80, 86–87, 128, 180–85; R.T. 9/2/03, at 154–55, 161, 181, 184–85; R.T. 9/4/03, at 83, 89, 97, 157; R.T. 9/9/03, at 226, 230–37; R.T. 9/10/03, at 25, 30, 49–51, 58–59, 61, 70, 90; R.T. 9/15/03, at 166, 170, 174–77; R.T. 9/16/03, at 12, 25–27, 195; R.T. 9/17/03, at 13–14; R.T. 9/18/03, at 121, 185; R.T. 9/22/03, at 148, 157, 194, 197–98; R.T. 9/25/03, at 123–126; R.T. 10/28/03, at 104.) Dr. Burgess' testimony provided the jury with an alternative explanation for why victims of sexual abuse do not confront their abusers or immediately report the abuse. In doing so, Dr. Burgess did *not* express her personal opinion of the credibility of any victim, *nor* did she express an opinion on the issue of Appellant's guilt or innocence. Indeed, Dr. Burgess testified: "I know nothing about this case. I know nothing of the facts of this case." (R.T. 10/1/03, at 144–45.) Therefore, Dr. Burgess' testimony was proper, and admissible to assist the jury in determining the credibility of the victims.

Appellant's claim that Dr. Burgess' testimony "amounted to nothing more than prohibited 'rape trauma syndrome' and 'offender profile' evidence" is unavailing. The term "rape trauma syndrome" was first discussed in *State v. Huey*, 145 Ariz. 59, 699 P.2d 1290 (1985). In *Huey*, the defendant was charged

with kidnapping and repeatedly sexually assaulting a 19-year-old girl over the course of a week. *Id.* at 60, 699 P.2d at 1291. At trial, the State called Dr. Lesley McEldoon, the psychiatrist who had treated the victim after her escape. *Id.* at 62, 699 P.2d at 1293. Dr. McEldoon testified that the victim initially was extremely upset, irritable, and frightened. *Id.* He also testified that her mental state was consistent with the experience she had described to him, and explained her condition as an "'[a]djustment reaction with mixed emotional features.'" *Id.*

On appeal, the defendant argued that Dr. McEldoon's testimony essentially described "rape trauma syndrome," and further argued that such evidence was inadmissible in a rape case to prove that a rape occurred. *Id.* The Arizona Supreme Court disagreed. The court first discussed the meaning of the term "rape trauma syndrome:"

> The term refers to a type of post-traumatic stress disorder exhibited by rape victims. The disorder is essentially a two phase response pattern in which the first phase is marked by fear of physical injury, mutilation and death. The second begins from two to six weeks after the assault and is characterized by a change in lifestyle, dreams, nightmares, depression and the development of fears related to the attack. Some researchers have described the syndrome in terms of a four phase phenomenon; however, all agree that the basic stages are an acute stage and a long term resolution stage. Since the discovery of this syndrome, five courts have had occasion to determine whether evidence of rape trauma is admissible in criminal cases. In those cases, the testimony consisted of a

> description of both the stages of rape trauma and the
> victim's mental state and a conclusion that the victim
> exhibited the symptoms found by other rape victims.

*Id.* at 62, 699 P.2d at 1293 (citations omitted).   The court concluded that

Dr. McEldoon's testimony did not describe the "rape trauma syndrome"

phenomenon.   *Id.*   Rather, his testimony "centered more on general

observations of stress than on a description of a unique psychological response

and was admissible." *Id.* at 62–63, 699 P.2d at 1293–94.

The court went on to hold, however, that even if the testimony did

describe "rape trauma syndrome" it *would have* been admissible. *Id.* at 64, 699

P.2d at 1295.   The court acknowledged that if an expert were to testify to the

symptoms of "rape trauma syndrome," compare them to the victim's mental

state, and *then* conclude that because of the similarities the victim was raped,

such testimony would most likely be inadmissible. *Id.* at 63, 699 P.2d at 1294.

The court held, however, that such testimony would be admissible to show lack

of consent. *Id.*  In *Huey*, the defendant did not deny the acts, but contended

that the conduct was with the victim's consent.   *Id.* at 61, 699 P.2d at 1292.

Thus, the court held, such testimony, if presented, would have been admissible.

*Id.* at 64, 699 P.2d at 1295.

Like the expert testimony in *Huey*, Dr. Burgess' testimony cannot be

characterized as "rape trauma syndrome" testimony.   Rather, her testimony

focused on the response patterns of sexual abuse victims—specifically, the reasons victims of sexual abuse do not immediately confront their abusers, and often delay disclosure.   Moreover, unlike the expert testimony in *Huey*, Dr. Burgess did *not* discuss the response pattern of any of the victims.  Instead, she spoke in general terms.  Furthermore, as discussed above, Dr. Burgess did *not* express her personal opinion on the ultimate issue of guilt.  Nor did she conclude that the victims in this case were sexually abused.   Therefore, whether consent was an issue is irrelevant.

Appellant's claim that Dr. Burgess' testimony amounted to "offender profile" evidence also fails.   The Arizona Supreme Court has described "profile" evidence as an "informal compilation of characteristics" typically displayed by persons known to have committed the offense.  *State v. Lee*, 191 Ariz. 542, ¶ 10, 959 P.2d 799 (1998).   Such "profile" evidence is inadmissible when used to suggest that a defendant "must be guilty" simply because his behavior is "similar to that of other known violators."  *Id.* at ¶¶ 18–19.  "[U]se of profile evidence to indicate guilt . . . creates too high a risk that a defendant will be convicted not for what he did but for what others are doing."  *Id.* at ¶ 12 (quoting *State v. Cifuentes*, 171 Ariz. 257, 830 P.2d 469 (App. 1991)).

In this case, Dr. Burgess did *not* set forth an "informal compilation of characteristics" typically displayed by physicians known to sexually abuse