their patients.  Nor did she suggest that Appellant's behavior was consistent with that of known sex offenders, and, therefore must likewise be a sexual offender.  Appellant's claim that "Dr. Burgess told the jury, in no uncertain terms, that doctors can easily molest their women patients with little fear of exposure" is baseless, and unsupported by the record.  (Opening Brief at 36.) Her testimony was limited to the behavior patterns of sexual abuse *victims*, and did not include any mention of Appellant or the conduct of physicians in general.

## III

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT PERMITTED THE DEFENSE TO INTRODUCE EXPERT TESTIMONY ON SUGGESTIVE INTERVIEWING TECHNIQUES AND THE RISK OF MEMORY CONTAMINATION, BUT PRECLUDED ANY TESTIMONY ON THE SPECIFIC FACTS OF THIS CASE, BECAUSE SUCH EVIDENCE DIRECTLY COMMENTS ON THE ACCURACY AND CREDIBILITY OF THE VICTIMS.**

Appellant argues that the trial court reversibly erred when it barred defense expert, Dr. Elizabeth Loftus, from offering "testimony about the risk of implanted memories."  (Opening Brief at 37.)  Specifically, he argues that it was "an error of law for the trial court to restrict Dr. Loftus from testifying about memory contamination and suggestive interview techniques."  (*Id.* at 41.)  The trial court properly permitted expert testimony on suggestive

interviewing techniques and the risk of memory contamination. Such testimony was outside the common knowledge of the jury and assisted the jury in determining whether the facts believed by the victims were reliable. In addition, the trial court's restriction on "any opinion or testimony concerning the specific facts of this case" was at most harmless error.

A.     RELEVANT FACTS.

Prior to trial, the defense filed a supplemental notice of witnesses to include Dr. Elizabeth Loftus, an expert in memory "creation, contamination and malleability." (R.O.A., Item 208.) The State subsequently moved *in limine* to preclude Dr. Loftus from "offering any opinion or testimony that comments on the credibility of specific victims or witnesses in this case," or from "comparing her theories or models of memory to 'hypotheticals' drawn from the facts of this case." (*Id.*) Appellant agreed, and ensured the court that no such testimony would be elicited. (R.O.A., Item 577.)

Prior to Dr. Loftus' testimony, the following exchange took place:

> THE COURT: I told you people a few days ago, my inclination on Ms. Loftus' testimony was to limit her testimony to testimony about general characteristics of memory, including the position that memory is malleable, subject to suggestion as well as memory contamination issues in general, and that she be precluded from offering any opinion or testimony concerning the specific evidence in this case.

So I've prepared you for this ruling.  Is there any other input you people want?

MR. GIERLOFF [Appellant's counsel]:  Just so I'm clear, Your Honor, so I'm not going to be permitted to pose her hypothetical questions based on any of the evidence that might have been adduced in this case?

THE COURT:  Correct.  Because that would invade the province of this jury.  I don't think the jury needs that assistance in this case.

MR. GIERLOFF:  All right.  But the malleability suggestion --

THE COURT:  Memory in general, characteristics of memory, memory contamination issues, things of that nature.

(R.T. 10/16/03, at 7.)

On direct examination, Dr. Loftus testified that human memories are affected by new information known as "post-event information," which can supplement, alter, or distort memory.  (*Id.* at 21.)  Such "post-event information" can add a detail in the memory of a real event, and can also plant an entirely false event into a person's memory.  (*Id.* at 24.)  She further related that when police officers ask leading questions or questions with "loaded" terms during an interview, they supply "post-event information" to those people they are interviewing, which can "cause distortion or an exaggeration in the recollection of the person who is recounting what happened."  (*Id.* at 22, 25, 29–30, 38–39, 133.)  The witness' memory becomes increasingly

contaminated—i.e., "in-line" with the suggestive information—as he or she recalls the event in subsequent interviews. (*Id.* at 35–36.) As a result, when that witness is later called to testify, their memory is distorted, and the witness will recount those false details that had been planted in prior interviews. (*Id.* at 40–41.) Dr. Loftus further testified that suggestive information presented by media coverage can also contaminate a witness' memory. (*Id.* at 22, 54–55.) Finally, Dr. Loftus informed the jury that her studies included memories of sexual abuse victims, and that she had reviewed the transcripts of the police interviews in this case, but was precluded from discussing them. (*Id.* at 79–80, 89, 117, 132–33.)

On the day following Dr. Loftus' testimony, Appellant's counsel made an offer of proof based on the trial court's ruling that Dr. Loftus "could not address specific fact-based issues in the trial." (R.T. 10/20/03, at 4.) Specifically, Appellant's counsel proffered that Dr. Loftus "would have testified" that, based on her review of the interviews conducted in this case: (1) Detective Mark Stribling and Detective Steven Lewis contaminated the victims' memories by supplying "particular verbs" such as "fondling" or "rubbing" to describe the conduct related by the victims; and (2) Detective Art Haduch's interview with Karen Corbett was "completely tainted" because he represented that he had spoken with Crystal Sykes and attributed certain

statements to her.   (*Id.* at 4–6.)   Appellant's counsel also proffered that Dr. Loftus would have testified that the media coverage in this case contaminated the victims' memories.[12]  (*Id.* at 7.)

**B.    STANDARD OF REVIEW.**

The admission of expert testimony is a matter within the sound discretion of the trial court, and will not be disturbed on appeal absent a clear abuse of discretion. *Mincey*, 141 Ariz. at 441, 687 P.2d at 1196.  Whether the expert testimony will aid the jury is a "fact-bound inquir[y] uniquely within the competence of the trial court." *Moran*, 151 Ariz. at 381, 728 P.2d at 251.

**C.    ARGUMENT.**

As discussed above in Argument II, a trial court has discretion to allow expert testimony "where it may assist the jury in deciding a contested issue, including issues pertaining to accuracy or credibility of a witness' recollection or testimony." *Lindsey*, 149 Ariz. at 473, 720 P.2d at 74; *see also* Rule 702, Ariz. R. Evid.  Such testimony is only permitted when "the facts needed to make the ultimate judgment may not be within the common knowledge of the ordinary juror." *Id.*  This Court has held that expert testimony regarding

---

[12] Appellant's counsel made several additional offers of proof, but Appellant has abandoned them by failing to include them in his opening brief. *Weekley*, at ¶ 15.

suggestive interview techniques and its influence on the memory of sex abuse victims is not within the common knowledge and understanding of the jury, and, therefore, admissible. *State v. Speers*, 209 Ariz. 125, ¶¶ 20–21, 24, 98 P.3d 560 (App. 2004) (citation omitted). Accordingly, the trial court properly permitted the introduction of general expert testimony on suggestive interviewing techniques and the risk of memory contamination.

Appellant argues, however, that the trial court's restriction on "any opinion or testimony concerning the specific facts of this case" was reversible error. Appellee disagrees. Although an expert may give testimony on behavioral characteristics that affect the credibility or accuracy of a witness' observations, they are not allowed "to give their opinion of the accuracy, reliability or credibility of a particular witness in the case being tried" or "of the type under consideration." *Lindsey*, 149 Ariz. at 475, 720 P.2d at 76. Nor are they permitted to give an opinion about their "belief of guilt or innocence." *Id*. Thus, the extent of an expert's testimony is limited.

In *Speers*, the defendant attempted to introduce expert testimony on suggestive interview techniques and its influence on children's memories to rebut testimony from the victims that they were sexually abused. *Id*. at ¶¶ 11–12. The trial court ruled that such expert testimony was within the common knowledge and understanding of the jury, and precluded its admission. *Id*.

at ¶ 12.   On appeal, the State further argued that the proffered "expert testimony would have been a comment on the credibility, veracity, or competence of the witnesses with regard to the particular facts of the case, and would have invaded the province of the jury." *Id.* at ¶ 23.

In addressing these claims, this Court noted that "the propriety and effect of interviewing techniques in child sexual abuse cases 'is a subject with which a lay juror may be unfamiliar,'" and stated that the "purpose of expert testimony concerning interview techniques is not to show that the child witness is not telling the truth, but to question whether the facts believed to be true by the witness are reliable." *Id.* at ¶¶ 21, 23 (citation omitted).   It further held that "[t]estimony intended to demonstrate that an interview of a child victim was suggestive or otherwise inappropriate and the risks created by such questioning 'represents evidence only an expert could give on matters not within the knowledge of a juror . . . [and] would assist the jury directly in evaluating the weight given to the testimony.'" *Id.* at ¶ 24 (citation omitted).   Accordingly, this Court reversed, and stated that at the defendant's new trial:

> [Such expert testimony] is properly limited to explaining to the jury the dangers of contaminated memories and suggestive practices when interviewing children *and discussion of the particular practices employed in the instant case.*   It must be confined to providing the jury information 'which it may use in weighing the evidence to determine accuracy or credibility of a witness' *and may not*

> *include any opinion regarding the accuracy, reliability or*
> *credibility of any particular witness.*

*Id.* at ¶ 25 n.3 (emphasis added).

Distinguishing between expert testimony which would assist the jury in weighing the accuracy, reliability, or credibility of a witness, and testimony that inappropriately comments on the accuracy or credibility of any particular witness is not always easy. The difficulty in making this distinction has been expressed by at least one other court:

> A qualified expert may explain to the jury the dangers of implanted memory and suggestive practices when interviewing or questioning child witnesses, but may not opine as to a child witness's credibility. That leaves a troublesome line for the trial judge to draw--as the expert applies his or her general opinion and experiences to the case at hand, at what point does this more specific opinion testimony become an undisguised, impermissible comment on a child victim's veracity?

*United States v. Rouse,* 111 F.3d 561, 570 (8th Cir. 1997); *see also State v. Wigg,* 889 A.2d 233, 240 (Vt. 2005) (discussing *Rouse*). Indeed, such testimony could "inject[] a collateral issue into the case and may confuse and muddle the mission of the jury," or lead to a "'battle of experts' and lead the jury away from the main issues in the case." *State v. Biezer,* 947 S.W.2d 540, 543 (Mo. App. 1997).

In this case, Dr. Loftus' testimony was properly "limited to explaining to the jury the dangers of contaminated memories and suggestive practices when

interviewing [witnesses] and discussion of the particular practices employed in the instant case." *Speers*, at ¶ 25 n.3. Dr. Loftus provided extensive testimony about suggestive interview techniques, in general, and the risks of memory contamination. (R.T. 10/16/03, at 7–143.) She further related her opinion as to the use of leading questions and "loaded terms" by police officers during witness interviews—"the particular practice[] employed in the instant case." *Id.* Likewise, the trial court properly precluded any comment on the actual interviews conducted by Detectives Stribling, Lewis, and Haduch, or any opinion that their interview techniques contaminated the victims'/witness' memories. *Moran*, 151 Ariz. at 385, 728 P.2d at 255; *Lindsey*, 149 Ariz. at 475, 720 P.2d at 76; *Speers*, at ¶ 25 n.3. These ultimate *conclusions* necessarily imply that the victims'/witness' testimony cannot be taken as true. Such testimony directly comments on the accuracy and credibility of their testimony, and invades the province of the jury. Therefore, the trial court properly limited Dr. Burgess' testimony.[13]

-----

[13] Although Appellant restates Dr. Loftus' offer of proof regarding the media's effect on the witness' memories, he makes no attempt to develop this claim in his opening brief. Instead, he focuses only on memory contamination by suggestive interview techniques. Failure to provide a "significant argument" in an opening brief, as required by Rule 31.13(c)(1)(vi), Arizona Rules of Criminal Procedure, abandons appellate review of the issue. *State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995); *State v. Carver*, 160 Ariz. 167,

(continued ...)

Even assuming that Dr. Burgess was permitted to comment on the specific interviews conducted in this case, any conceivable error was harmless, and does not warrant reversal. An error is harmless if it did not "contribute to or affect the verdict" beyond a reasonable doubt. *Bible*, 175 Ariz. at 588, 858 P.2d at 1199.

In *Rouse*, as in this case, the trial court allowed general expert testimony about proper techniques of interviewing victims, but precluded case-specific evidence criticizing the methods of questioning actually used in investigating the case. 111 F.3d at 570–71. Without deciding whether any error occurred, the Eighth Circuit held that "exclusion of this additional expert testimony was, in any event, harmless." *Id.* at 572. In considering the harmlessness of the alleged error, the court cited several factors in reaching its conclusion: (1) the jury heard the general expert testimony of proper and improper interviewing techniques and its impact on the memory of witnesses; (2) during closing

_____

( ... continued)
175, 771 P.2d 1382, 1390 (1989); *State v. Nirschel*, 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987). Furthermore, although Appellant asserts that his state and federal constitutional rights were violated, he does not separately argue his claim on these grounds. Therefore, his constitutional claims are waived. *See Bolton*, 182 Ariz. at 298, 896 P.2d at 838; *State v. Altieri*, 191 Ariz. 1, 2 n.1, 951 P.2d 866, 867 n.1 (1997) (defendant's failure to separately argue claim based on Arizona constitutional provision abandoned that claim for purposes of review).

argument, the defendant's counsel relied upon this general expert testimony to define their theory of implanted memory; (3) the jury heard evidence of the interview techniques actually used in the case; and (4) the jury observed the testimony of the witnesses. *Id.*; *Wigg*, 889 A.2d at 243–44.

Identical considerations are present here.  First, as a preliminary matter, it is important to note that Appellant did not argue at trial that the interviews involving victims Doreen Barnes, Dawn Eanes, Rana Patrick, Rise McEndree, Reina Tobin, and Tracy Piechna were suggestive or contaminated as claimed above.  (R.T. 9/2/03, at 168–89; R.T. 9/10/03, at 4–25; R.T. 9/15/03, at 184–207; R.T. 9/16/03, at 4–15; R.T. 9/17/03, at 19–52; R.T. 9/18/03, at 143–76; R.T. 9/22/03, at 165–89.)  Nor did he argue that the detectives used these suggestive interview techniques with regard to Gretchen O'Hair (Count 32, CR 2002–001431), Kim Romero (Count 37, CR 2002–001431), Shelly Cluff (Count 48, CR 2002–001431), or Kristin Aumiller (Counts 13–14, CR 2001–015515).  (R.T. 8/20/03, at 153–212; R.T. 9/4/03, at 112–159; R.T. 9/10/03, at 72–95; Exhibit 325.)  Rather, Appellant's theory of implanted memory only pertained to victims Erlinda Diaz (Count 10, CR 2002–001431), Kelly Easter (Counts 14, CR 2002–001431), Emily Francom (Counts 17–18, CR 2002–001431), and Count 31 (CR 2002–001431) involving victim Gretchen O'Hair, Count 37 (CR 2002–001431) involving victim Kim Romero, and Count 15

(CR 2001–015515) involving victim Kristin Aumiller.[14]   (R.T. 8/20/03, at 153–212; R.T. 8/21/03, at 95–151; R.T. 8/25/03, at 11–48; R.T. 9/4/03, at 112–159; R.T. 9/25/03, at 141–78; R.T. 10/15/03, at 54–55.)   Certainly, the remaining Counts, and resulting convictions, that did not involve allegations of improper interview techniques were not affected by the trial court's ruling, and any error was necessarily harmless.

Regarding Counts 10, 14, 17–18, 31, 37 (CR 2002–001431), and Count 15 (CR 2001–015515), the error was clearly harmless.   First, the jury heard Dr. Loftus testify at length about suggestive interview techniques, including the use of leading questions and "loaded" terms by police officers during victim/witness interviews, and the risks of memory contamination.   (R.T. 10/16/03, at 7–143.)   In addition, Appellant presented expert testimony by Dr. Thomas Streed, specifically discussing suggestive police interrogation tactics, including leading questions.   (R.T. 10/15/03, at 174–192; R.T. 10/20/03, at 8–82.)   The jury also heard extensive evidence regarding the interviewing techniques used by Detectives Haduch, Stribling, and Lewis in this case, including a discussion, and exploitation, about their use of leading questions and "loaded terms" in their interviews with the victims/witnesses in

---

[14] Appellant was acquitted on Counts 13, 15, and 49 (CR 2002–001431).

this case. (R.T. 10/2/03, 82–178; R.T. 10/6/03, at 7–53, 114–19, 134, 148–55; R.T. 10/14/03, at 29–109; R.T. 10/15/03, at 12–60.)    Evidence of the victims'/witness' suggestive interviews was not only exploited on cross-examination of the detectives (see *id.*), but was also discussed on cross-examination of the victims/witnesses themselves.   (R.T. 8/20/03, at 153–212; R.T. 8/21/03, at 95–151; R.T. 8/25/03, at 11–48; R.T. 9/4/03, at 112–159; R.T. 9/25/03, at 141–78; R.T. 10/8/03, at 51–69.)  Appellant's counsel used all of this testimony during closing argument and cross-examination to criticize the particular interview techniques employed in this case, and to define their theory of implanted memory.  (R.T. 10/28/03, at 62–64, 73–85, 108–113; R.T. 10/29/03, at 6–12, 42–43, 70–93, 107–12.)

Finally, the jury acquitted Appellant on Count 49, involving Shelly Cluff, and on charges involving at least five other victims in which Appellant similarly argued that their memories were contaminated by suggestive interview techniques.  (R.O.A., Item 783; R.T. 10/14/03, at 38, 53, 59–61, 85, 88; R.T. 10/15/03, at 27–28, 31–33.)  This demonstrates that the jury was clearly aware of the reliability questions surrounding the victims'/witness' testimony. *Wigg*, 889 A.2d at 244.  Furthermore, the evidence presented at trial overwhelmingly establishes Appellant's guilt on the convicted counts.  *See State v. Jeffrey*, 203 Ariz. 111, ¶ 15, 50 P.3d 861 (App. 2002) (erroneous

preclusion of expert testimony harmless where evidence of guilt overwhelming). Therefore, any conceivable error was harmless.

## IV

**APPELLANT HAS FORFEITED AND WAIVED THE CLAIM THAT THE TRIAL COURT ERRED IN ALLOWING SHELLY CLUFF TO TESTIFY OUT OF THE PRESENCE OF THE JURY, BECAUSE HE AGREED TO THE PROCEDURE AT TRIAL, AND, THEREFORE, INVITED ANY CONCEIVABLE ERROR.**

Appellant argues that the trial court denied him his federal and state constitutional "rights to confrontation and a public trial" when it permitted Shelly Cluff to testify "by means of a video-taped deposition." (Opening Brief at 42, 45–46.) He further argues that the trial court reversibly erred when it failed to find that the witness was "unavailable" to testify "in open court." (*Id.*) Appellant invited any conceivable error when it rejected the trial court's offer to require the witness to give live testimony in front of the jury. Therefore, his claims are waived, and not subject to review.

## A.    FACTUAL BACKGROUND.

Prior to trial, Shelly Cluff (Counts 48–49, CR 2002–001431) filed a motion to quash the criminal subpoena requiring her attendance and testimony at trial. (R.O.A., Items 231, 351; R.T. 8/8/03, at 3–9.) At a hearing on the motion, Shelly's attorneys, Mr. Paul de Blank and Ms. Sherri Toussaint, and

Shelly's psychiatrist, Dr. Gregory Crow, expressed to the trial court their concerns for Shelly if she was forced to testify at trial. (R.T. 9/5/03, at 3–29.) Dr. Crow, who had visited with Shelly nine times prior to the hearing, related that he was "very concerned about Shelly's stability" because she was "undergoing a divorce situation," which was "triggering old memories and trauma." (*Id*. at 6–7.) As a result, Shelly was suffering from "panic attacks," and was having "a lot of trouble sleeping." (*Id*.) Dr. Crow told the trial court that he was "really afraid of what would happen" if Shelly was forced to testify, because she was "on the edge," and testifying "could put her over the edge, it could hospitalize her." (*Id*.) Dr. Crow further told the trial court that there was a "real risk" that Shelly would "breakdown in the process of testifying." (*Id*. at 12.) Dr. Crow explained that, if Shelly were to testify, it would "stimulate a lot of shame," more so than a typical abuse victim, which would then "stimulate a lot of anxiety and depression for her." (*Id*. at 9–10.) Dr. Crow further explained that "if she were to snap and would need hospitalization that there wouldn't be a safe place for her children." (*Id*. at 11.)

Shelly told the trial court that she recently found out that her husband was sexually abusing her two children. (*Id*. at 19.) She related that her main concern was that "if she snaps and can't handle this . . . there won't be anybody there to take care of them." (*Id*.) Shelly further related that she was "just

trying to hold all the pieces together," and "[did not] need another thing." (*Id.* at 22.) Shelly's attorney told the trial court that Shelly had a "history of having nervous breakdowns," one of which resulted in her institutionalization when she was 17-years-old following the sexual abuse by Appellant. (*Id.* at 20–21.)

Based on this, Appellant's counsel expressed his concern that Shelly would have "some sort of breakdown" in the midst of his cross-examination, causing "a hugely prejudicial scene in front of the jury," and grounds for a mistrial. (*Id.* at 16, 23.) To alleviate this concern, the prosecutor suggested that they videotape Shelly's testimony out of the presence of the jury, and then play the video recording to the jury. (*Id.* at 15.) Appellant's counsel responded: "That's why I asked the doctor the question, is it a problem of her not wanting to appear in front of the jury and not wanting to make it public, *because that can be done.*" (*Id.*, emphasis added.) But when later asked by the trial court if it could "deprive the State of an opportunity to bring a charge like this," Appellant's counsel changed his tune, and stated that he was opposed to the procedure. (*Id.* at 17, 24.)

The trial court issued the following ruling:

> Rule 611 of the Arizona Rules of Evidence grants a judge authority to exercise reasonable control over the mode and order of interrogating witness and presenting evidence. While there is little question that the moving party testifying in connection with the trial in this case is likely to be detrimental to her health and well-being, this

Court is aware of no authority for this Court entering an order which precludes the County Attorney's Office from calling a properly-subpoenaed witness to testify.

IT IS THEREFORE ORDERED denying the Motion to Quash Criminal Subpoena; however, the parties are to present this witness's testimony at the trial of this matter by a videotaped deposition, with the witness being allowed to have present at the deposition her psychiatrist and attorney, if she chooses. The deposition is to take place at a time and place mutually agreed upon by the witness's attorney and counsel trying this case. . . .

(R.O.A., Item 349.)   Appellant subsequently filed a formal objection to the video deposition, arguing that such a procedure violated his right to confrontation under the Sixth Amendment to the United States Constitution. (R.O.A., Item 367.)

Several days later, the trial court heard further argument on the motion, and permitted Appellant to develop his confrontation claim.  (R.T. 9/15/03, at 4.) Specifically, the trial court inquired how Appellant's confrontation rights were compromised if Shelly's testimony was taken in the courtroom, with Appellant present, and videotaped so that the jurors were "able to see the mannerism of the witness when she testifies."  (*Id.* at 4–5.)  Appellant's counsel responded that allowing Shelly to give her testimony without the jury present "erodes the gravity of the occasion." (*Id.* at 5.)  He further argued that

the jurors would not have an opportunity to ask the witness questions.[15]   (*Id.*)

The trial court reaffirmed its initial ruling, stating that "there's a realistic

chance [testifying in front of a jury] could be detrimental to the mental health

of the [witness]."   (*Id.* at 9.)   It further ordered, however, that Shelly's

testimony be given, and videotaped, in the courtroom.   (*Id.*)

On October 10, 2003, Shelly Cluff appeared and testified in the

courtroom.   The trial judge, attorneys for both parties, and Appellant were all

present.   (Exhibit 325.)   Her testimony was recorded by videotape, during

which the camera was focused on Shelly's face and upper body.   (*Id.*)   During

her testimony, Shelly appeared calm and uninterested.   (*Id.* at 14:32, 34, 40,

47.)   Throughout her testimony, Shelly smiled, laughed, and even mocked

Appellant's counsel.   (*Id.* at 13:30, 32–34, 42–46, 14:07, 11, 14, 26, 37, 39, 49,

55.)   At one point, Shelly appeared to be communicating with someone in the

gallery.   (*Id.* at 13:47; R.T. 10/5/03, at 6.)   Shelly was extensively cross-

examined. (*Id.*)

On the following day of trial, Appellant's counsel noted for the record

that Shelly "did not appear the least bit fragile while she was testifying," and

complained that "the whole treatment which she was afforded seemed to be

---

[15] Appellant's counsel further moved to preclude Shelly as a witness "for Rule
15 and discovery violations." (*Id.* at 6–7.)

unjustified." (R.T. 10/6/03, at 3.)  The trial court agreed that there was "quite a contrast" in her demeanor from when she "appeared in my office" to when she "was on the stand." (*Id.* at 4.)  The following exchange then took place:

THE COURT:  It may be that the difference in demeanor was a result of her not being here in front of a jury.  It may have been a different situation.  *I guess, you may want to think whether you want her to testify live under the circumstances.*

MR. GIERLOFF [Appellant's counsel]:  *I've been thinking about it.*

THE COURT:  *Would you like her to testify live?*  There are two issues:  bring her back here live to respond to questions the jurors may have.

MR. GIERLOFF:  I think at a minimum I would ask that.

THE COURT:  And I've got no problem with that.  *And do you want to start over again?*

MR. GIERLOFF:  *I don't know.  I'm unprepared to make [a] decision.*

THE COURT:  *Why don't you think about it.*  My inclination is, I don't see any problem forcing her to come back and respond to questions spontaneously but - -

MR. GADOW [Prosecutor]:  Your Honor, you know, my concern would be that now she thinks this is over in terms of her testimony.

THE COURT:  I told her she may well be back to answer questions.

74

MR. GADOW:  Answer questions is one thing, but I do think when I met with her, her demeanor would have been much different had she been testifying in front of the jury, because I think she would be a lot more emotional and more -- her demeanor would be more closer to how she was in the judge's chambers rather than how she was on Friday.

THE COURT:  I kept -- with the exception of the first minute or so when we had counsel questioning, I locked the camera on her so the camera was locked on her.  You're going to see in there that she appeared to be quite relaxed.

MR. GIERLOFF:  Yes.

THE COURT:  When, I think it was -- somebody was conferring, she was looking at her friend who was in the back of the courtroom.

MR. GIERLOFF:  Uh-huh.

THE COURT:  And she is kind of smiling at her, almost a silent communication.  *You ought to think about it.  You may not want her to appear any differently than she appeared on the video.*

MR. GIERLOFF:  *Right.*

(*Id.* at 4–6, emphasis added.)

The next day, the trial court admitted Shelly's videotaped testimony in evidence, and played it for the jury in its entirety.  (R.T. 10/7/03, at 59–61.)  The jurors then submitted their questions.  (*Id.* at 61.)  The trial court informed the parties that it would allow "more latitude" for follow-up questions, and permitted counsel "to get into other areas even if they were not directly related to the jurors' questions."  (*Id.* at 54, 63.)  Shelly then appeared in court, and

answered each of the jurors' questions in person while under oath and on the witness stand. (*Id.* at 64–69.) She also answered follow-up questions from both parties. (*Id.* at 69–73.)

**B.    STANDARD OF REVIEW.**

Under the invited error doctrine, a party may not complain on appeal of an error that he or she has invited or contributed to the case. *Diaz*, 168 Ariz. at 365, 813 P.2d at 730; *Islas*, 132 Ariz. at 592, 647 P.2d at 1190. This is so because a party "may not be heard [on appeal] to decry a result fashioned by his own handiwork." *Moreno*, 173 Ariz. at 473, 844 P.2d at 640 (quoting *Sisson*, 16 Ariz. at 175, 141 P. at 714–15). "If an error is invited, a reviewing court will not consider whether the alleged error is fundamental." *Logan*, at ¶ 9. Rather, the alleged error will be considered waived. *Id.*; *see also Lindsey*, 149 Ariz. at 477, 720 P.2d at 78.

**C.    ARGUMENT.**

Appellant argues that the admission of Shelly's videotaped deposition in lieu of her live, in-court testimony violated his confrontation rights. But as the above restatement of facts make clear, Appellant clearly invited any conceivable error. After conducting the videotaped deposition, Appellant's counsel argued that Shelly's demeanor during her videotaped testimony did not warrant the special circumstances—testimony by videotape—provided by the

trial court.   (R.T. 10/6/03, at 3–4.)   The trial court agreed, and offered Appellant's counsel the choice to either proceed with the videotaped testimony, or to "start over again" and have Shelly "testify live." (*Id.* at 4.)   The trial court noted, and Appellant's counsel agreed, that proceeding with the videotaped testimony was beneficial for the defense:   "You may not want her to appear any differently than she appeared on the video." (*Id.* at 5–6.) Indeed, Shelly appeared uninterested and unaffected on the videotape. (Exhibit 325.)   Appellant's counsel did not immediately make a decision, but took the trial court's advice to "think about it." (R.T. 10/6/03, at 5–6.)

The next day, the trial court confirmed that Shelly would be available to answer jury questions, and informed counsel that it would be afforded "more latitude" in asking follow-up questions.   (R.T. 10/7/03, at 53–54.)   The videotape was then played for the jury. (*Id.* at 59–61.) There is no discussion in the record concerning Appellant's apparent decision to move forward with the videotaped testimony.   But "[w]here matters are not included in the record on appeal, the missing portions of the record will be presumed to support the action of the trial court." *State v. Zuck*, 134 Ariz. 509, 512–13, 658 P.2d 162, 165–66 (1982); *State v. Rivera*, 168 Ariz. 102, 103, 811 P.2d 354, 355 (App. 1990); *see also State v. Brown*, 188 Ariz. 358, 359, 936 P.2d 181, 182 (App.

1997) ("[A] matter not contained in the record on appeal is presumed to support the trial court's decision.").

The record indicates that the trial court gave Appellant the choice to either submit the videotaped testimony to the jury or to have the witness testify live, and, ultimately, the videotape was played for the jury; thus, it must be presumed that Appellant took the former course of action. Accordingly, because Appellant injected at trial the very grounds for his claim on appeal— i.e., he requested that Shelly's videotaped testimony be played to the jury in lieu of her live testimony—he has invited and waived this claim on appeal, and it is not subject to fundamental-error review. *Logan*, at ¶ 9.

Invited error notwithstanding, the trial court did not abuse its discretion in allowing Shelly's testimony to be videotaped. The Sixth Amendment's Confrontation Clause provides that, in all criminal prosecutions, an accused has the right to be "confronted with the witnesses against him." U.S. Const. amend. VI. Most notably, the Confrontation Clause provides two types of protections for a criminal defendant: the right to a "face-to-face" meeting with witnesses appearing before the trier of fact, and the right to conduct cross-examination. *Coy v. Iowa*, 487 U.S. 1012, 1016–17, 108 S. Ct. 2798 (1988). Face-to-face, in-court testimony not only insures that the witness will give statements under oath, and forces the witness to submit to cross-examination,

but it also "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Craig*, 497 U.S. at 846; *see also Mattox v. United States*, 156 U.S. 237, 242–43, 15 S. Ct. 337 (1895) (personal examination of witness allows jury "to judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."); *State v. Moore*, 203 Ariz. 515, ¶ 7, 56 P.3d 1099 (App. 2002) (quoting *United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997)) (face-to-face, in-court testimony "ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness.").

The Confrontation Clause's "face-to-face" requirement, however, is not absolute, and "must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 844 (citation omitted); *Moore*, at ¶ 8. This Court has held that exceptions may be made "on a showing of necessity and of the minimal abridgement of the right in order to accommodate that necessity." *State v. Vess*, 157 Ariz. 236, 238, 756 P.2d 333, 335 (App. 1988). If there is a showing of "particularized need" to afford special protection to a testifying witness at the expense of the defendant's right to have a jury personally observe their testimony, then that procedure may be

followed.  *Id.* at 237–38, 756 P.2d at 334–35; *see also State v. Vincent*, 159 Ariz. 418, 426–29, 768 P.2d 150, 158–61 (1989) (substituting videotaped testimony for face-to-face confrontational testimony in open court permitted if "particularized findings" are made justifying special protection for witness); *see generally Craig*, 497 U.S. at 850 (defendant's right to confront witness may be satisfied absent a physical, face-to-face confrontation at trial "where denial of such confrontation is necessary to further an important public policy.").

In this case, the trial court found that requiring Shelly to testify in open-court would "likely [] be detrimental to her health and well-being."  (R.O.A., Item 349; R.T. 9/15/03, at 9.)  This finding was based on evidence presented by Shelly's psychiatrist that Shelly would be severely traumatized, and possibly hospitalized, if forced to testify.  (R.T. 9/5/03, at 3–29.)  Shelly had recently found out that her husband was sexually abusing her two children, and she consequently was getting a divorce.  (*Id.* at 6–7, 19.)  These events were "triggering old memories and trauma," and, as a result, Shelly was suffering from "panic attacks," and was having "a lot of trouble sleeping."  (*Id.*)  These factors, along with Shelly's history of nervous breakdowns, including one that resulted in her institutionalization, posed a "real risk" that she would "breakdown in the process of testifying."  (*Id.* at 12, 20–21.)  If this happened,

the safety of her children would have been at risk.  (*Id.* at 19.)   And, as Appellant's counsel pointed out at trial, if Shelly were to have "some sort of breakdown" during his cross-examination, it would cause a "hugely prejudicial scene in front of the jury." (*Id.* at 16, 23.)   Certainly, these "particularized findings" were sufficient to justify the special protection afforded to Shelly. *See Vess*, 157 Ariz. at 238, 756 P.2d at 335 (showing that "the atmosphere of the courtroom" or the "presence of the defendant" would traumatize the victim or render her unable to communicate" were compelling reasons to justify televised testimony); *State v. Melendez*, 135 Ariz. 390, 392–93, 661 P.2d 654, 656–57 (App. 1983) (presentation of victim's testimony by videotape permitted where victim expressed fear of testifying before a jury, and clinical psychologist who examined victim related that she would be uncommunicative if called to testify before jury); *see also Craig*, 497 U.S. at 851–52 (holding that Maryland statute authorizing use of one-way closed circuit television procedure to transmit child victims' testimony to jury did not impinge on Confrontation Clause where judge, jury, and defendant were able to view by video monitor the demeanor of the witness as they testified); *cf. Vincent*, 159 Ariz. at 428–29, 768 P.2d at 160–61 (generalized finding—e.g., that in-court testimony by *any* child under such circumstances would be traumatic—rather than individualized assessment of *particular* child is

81

insufficient); *Moore*, at ¶ 12 (mere inconvenience of a witness to testify in court insufficient reason to infringe on defendant's confrontational rights).

Moreover, Appellant's confrontation rights were minimally abridged to afford this protection. *Vess*, 157 Ariz. at 238, 756 P.2d at 335. Shelly gave her testimony under oath, in the courtroom, and in the presence of Appellant. (Exhibit 325.) Appellant was also permitted to conduct a thorough cross-examination. (*Id.*) Shelly's videotaped testimony was shown directly to the jurors. (R.T. 10/7/03, at 59–61.) Furthermore, Shelly appeared live before the jury, under oath, to answer the jurors' questions, and to answer follow-up questions by counsel, which were not limited in scope. (*Id.* at 54, 63–73.) The jurors had ample opportunity to personally judge her demeanor in person and on the videotape. Therefore, the process in which Shelly's testimony was presented to the jury was appropriate, and did not violate Appellant's confrontation rights.

Appellant last argues that the trial court "failed to find that [Shelly] was *unavailable* to testify in open court" before allowing her to testify by video. (Opening Brief at 46.) This claim is without merit. "The limitations imposed by the Confrontation Clause for in-court procedures are separate from the 'requirements the Confrontation Clause imposes as a predicate for the introduction of out-of-court declarations." *Medina*, 178 Ariz. at 574, 875 P.2d

at 807 (quoting *White v. Illinois*, 502 U.S. 346, 354, 112 S. Ct. 736 (1992)).

Thus, to the extent that Appellant claims that a finding of "unavailability" was

necessary to justify the *in-court* procedure employed, he is mistaken.

If, however, Appellant's claim is that the videotaped testimony should

not have been admitted in evidence without first finding on the record that

Shelly was "unavailable," it must also fail.  Where, as here, the trial court

correctly finds that face-to-face, in-court testimony would likely be detrimental

to the witness' health and well-being, such a finding is "tantamount to a finding

of unavailability."  *See Vincent*, 159 Ariz. at 432, 768 P.2d at 164; *see also*

*State v. Robinson*, 153 Ariz. 191, 203–04, 735 P.2d 801, 813–14 (1987)

(holding that child victim was "unavailable" for purposes of confrontation

clause where expert testimony indicated that victim would be traumatized by

courtroom proceedings).  That the trial court did not expressly state on the

record that Shelly was "unavailable" is of no consequence.  The record

sufficiently supports the trial court's finding that it was necessary for Shelly to

testify outside the presence of the jury.  *See In re MH 2004–001987*, 211 Ariz.

255, ¶ 24, 120 P.3d 210 (App. 2005).

**V**

**THE TRIAL COURT ERRED WHEN IT SUSPENDED IMPOSITION OF SENTENCE ON COUNT 48 (CR 2002–001431) AND PLACED APPELLANT ON PROBATION FOR A TERM OF 99 YEARS.**

Appellant argues that the trial court's application of A.R.S. § 13–902(E), which authorizes a term of probation "up to and including life" for sexual offense convictions, violated the United States and Arizona Constitutions' prohibition against the enactment of *ex post facto* laws, because the offense was committed prior to the effective date of the statute. The trial court's reliance on § 13–902(E) to impose a probation term of 99 years on Count 48 was fundamental error, and resulted in prejudice.

Both the federal and Arizona Constitutions prohibit the enactment of *ex post facto* laws. U.S. Const. art. I, § 10, cl. 1; Ariz. Const. art. II, § 25; *see also* A.R.S. § 1–246. "The prohibition on *ex post facto* laws forbids a state from enacting a law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *State v. Correll*, 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986) (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S. Ct. 960 (1981)). Although "probation is not a sentence, but rather a feature of the suspension of imposition of sentence," probation constitutes a penalty for purposes of the *ex*

84

*post facto* laws because "curtailment of the defendant's freedom however minimal constitutes a penalty." *State v. Mendivil*, 121 Ariz. 600, 602, 592 P.2d 1256, 1258 (1979) (citation omitted).  Thus, the retroactive application of an amended statute that increases the length of a probation term violates the *ex post facto* law prohibition. *Id*.

In this case, Appellant was convicted of sexually abusing Shelly Cluff "on or between June 1, 1986 [and] December 31, 1986."[16] (R.O.A. Item 719.) The trial court suspended imposition of sentence on this Count, and placed Appellant on "lifetime probation, 99 years," pursuant to § 13–902(E). (R.O.A., Item 783; R.T. 1/2/04, at 16.)  At the time Appellant committed the offense, however, the maximum probation term available was 3 years.  *See* A.R.S. § 13–902(A)(2) (1986).  Lifetime probation under § 13–902(E) did not become available until January 1, 1994.  *See* 1994 Ariz. Legis. Serv. 317 (West).  Therefore, the retroactive application of amended § 13–902(E) to impose a term of lifetime probation violated the *ex post facto* law prohibition. *See Mendivil*, 121 Ariz. at 602, 592 P.2d at 1258.  Furthermore, this error was fundamental in nature, *see Jackson v. Schneider ex rel. County of Maricopa*, 207 Ariz. 325, ¶ 10, 86 P.3d 381 (App. 2004) (citing *State v. Bouchier*, 159

---

[16] Count 48, CR 2002–001431.  (R.O.A., Item 1.)

Ariz. 346, 347, 767 P.2d 233, 234 (App. 1989)) ("It is fundamental error to prescribe a probationary term that exceeds the period permitted by statute."), and resulted in prejudice since the trial court is required to impose a different sentence.  Thus, Appellant is entitled to appellate relief.

Appellant argues that the proper remedy is to remand Count 48 (CR 2002–001431) for resentencing with instructions to impose a probationary term no greater than 3 years.  (Opening Brief at 49.)  But it is unclear whether the trial court, now knowing that the maximum probation term it can impose is only 3 years, would again suspend imposition of sentence and place Appellant on probation, or whether it would instead impose a sentence of imprisonment. Therefore, the proper remedy is to remand for resentencing without limiting the trial court's discretion in imposing a lawful sentence.

On remand, the trial court should have the opportunity to either:  (1) suspend imposition of sentence and place Appellant on probation for a term not exceeding 3 years; or (2) impose a sentence not exceeding that authorized by the sentencing statutes in effect at the time the offense was committed.  What is clear is that the trial court intended to place Appellant on lifetime probation following his incarceration.  Therefore, if, on remand, the trial court believes that lifetime probation is still appropriate it should be authorized to vacate the sentence imposed on any one of the other convictions in which a lifetime

probation term under § 13–902(E) would be lawful—e.g. Count 31 (CR 2002–001431) (See discussion *infra*), suspend imposition of that sentence, and place Appellant on lifetime probation.

## VI

**THIS COURT SHOULD REMAND FOR CLARIFICATION OF SENTENCE ON COUNTS 31 AND 32 (CR 2002–001431) BECAUSE THE ORAL PRONOUNCEMENT OF SENTENCE AND THE SENTENCING MINUTE ENTRY ARE INCONSISTENT, AND THE DISCREPANCY CANNOT BE RESOLVED BY REFERENCE TO THE RECORD.**

Appellant contends that the sentencing minute entry is inconsistent with the trial court's oral pronouncement of sentence on Counts 31 and 32 (CR 2002–001431). He further argues that, because the sentences as they appear on the sentencing minute entry are illegal, the sentences pronounced at sentencing control, and the sentencing minute entry should be corrected to conform therewith. The sentences as they appear on the sentencing minute entry are not authorized by statute, and, therefore, illegal. However, because the trial court's intentions are unascertainable from the record, a remand for clarification of sentence is appropriate.

Under A.R.S. §§ 13–702.01 and 13–702.02, a person who is convicted of two or more non-dangerous, class 5 felonies, that were not committed on the same occasion but consolidated for trial, may receive a maximum sentence of

up to 2.5 years' imprisonment for the *first* offense (A.R.S. § 13–702.01(A)(4)),

a maximum sentence of up to 2.5 years' imprisonment for the *second* offense

(A.R.S. §§ 13–702.02(B)(3); –702.02(D)), and a maximum sentence of up to

3.75 years' imprisonment for all offenses *subsequent to the second* offense

(A.R.S. §§ 13–702.02(B)(4); –702.02(D)).   A defendant sentenced pursuant to

§ 13–702.02 is not eligible for suspension of sentence or probation for the

second or subsequent felony convictions. A.R.S. § 13–702.02(B).

In this case, the State alleged that the offenses, as they related to each

victim, were multiple offenses not committed on the same occasion but

consolidated for trial, pursuant to § 13–702.02.[17]   (R.O.A., Items 27, 89.)

Accordingly, because Appellant was convicted of more than two non-

dangerous, class 5 felony offenses, not committed on the same occasion but

consolidated for trial, the maximum sentence authorized for the *first* offense

(Counts 31/32 in CR 2002–001431) was 2.5 years' imprisonment.   A.R.S. §

13–702.01(A)(4).   The maximum sentence authorized for the *second* offense

not committed on the same occasion (Count 10 in CR 2002–001431) was 2.5

years' imprisonment.      A.R.S.   §§   13–702.02(B)(3);   13–702.02(D).   The

---

[17] Count 48 (CR 2002–001431) involving victim Shelly Cluff was committed
prior to the enactment of § 13–702.02, and, therefore, was not subject to its
sentencing provisions.

maximum sentence authorized for all *subsequent* offenses was 3.75 years' imprisonment. A.R.S. §§ 13–702.02(B)(4); –702.02(D).

The sentencing minute entry, however, indicates that the trial court imposed concurrent sentences of 2.75 years' imprisonment on Counts 31 and 32 (CR 2002–001431)—the *first* offense for purposes of § 13–702.02. (R.O.A., Item 783.) These sentences are clearly erroneous since they exceed those authorized by § 13–702.01. If, indeed, this was the trial court's intent, the sentences must be vacated. However, the sentencing transcript indicates that the trial court imposed concurrent sentences of 1.75 years' imprisonment on these counts. (R.T. 1/2/04, at 18–19.) Whether the trial court intended to impose lawful sentences of 1.75 years (in which case the sentencing minute entry was incorrectly recorded) or unlawful sentences of 2.75 years (in which case the sentencing transcript was incorrectly recorded) is unknown.

In Arizona, "when there is a discrepancy between the oral pronouncement of sentence and the minute entry that cannot be resolved by reference *to the record,* a remand for clarification of sentence is appropriate." *State v. Bowles,* 173 Ariz. 214, 216, 841 P.2d 209, 211 (App. 1992). Here, the record lends no support. Thus, a remand for clarification of sentence is appropriate. If the trial court intended to impose 1.75-year sentences, it will affirm. If, however, the trial court intended to impose 2.75-year sentences, it

will now know that the maximum sentence authorized by statute is 2.5 years, and can impose lawful sentences accordingly.

Furthermore, the trial court's sentence on Count 10—the second offense for purposes of § 13–702.02—must be vacated and remanded for resentencing. A.R.S. § 13–702.02(B)(3) and 13–702.02(D) prescribe a maximum sentence of 2.5 years for the second offense not committed on the same occasion. The trial court's sentence of 2.75 years exceeds this maximum.  (R.O.A., Item 783.) Therefore, a remand for resentencing is necessary on this Count.

## VII

**THE TRIAL COURT INTENDED COUNT 2 (CR 2001–015515) TO RUN CONSECUTIVELY TO COUNT 10 (CR 2002–001431), AND COUNTS 37/38 (CR 2002–001431), COUNTS 33/34 (CR 2002–001431) AND COUNTS 17/18 (CR 2002–001431) TO RUN CONSECUTIVELY TO EACH OTHER.**

Appellant argues that, because the trial court ordered both Count 2 (CR 2001–015515) and Count 10 (CR 2002–001431) to run consecutively to Counts 31/32 (CR 2002–001431), but did not specify whether Count 2 and Count 10 were to run consecutively to, or concurrently with, each other, this Court should order that Count 2 and Count 10 are "*de facto*" concurrent. (Opening Brief at 57.)  Similarly, Appellant argues that, because the trial court ordered both Counts 17/18 (CR 2002–001431) and Counts 37/38 (CR 2002–

001431) to run consecutively to Counts 33/34 (CR 2002–001431), but did not specify whether Counts 17/18 and Counts 37/38 were to run consecutively to, or concurrently with, each other, this Court should order that Counts 17/18 and Counts 37/38 are "*de facto*" concurrent. (*Id.*) Appellee disagrees.

Under A.R.S. § 13–708, "if multiple sentences of imprisonment are imposed on a person at the same time . . . the sentences imposed by the court shall run consecutively unless the court expressly directs otherwise, in which case the court shall set forth on the record the reason for its sentence." Thus, when a trial court fails to indicate whether sentences are to run consecutively or concurrently, § 13–708 creates a "default designation" of consecutive sentences. *State v. Garza*, 192 Ariz. 171, ¶ 12, 962 P.2d 898 (1998); *State v. Ward*, 200 Ariz. 387, ¶ 3, 26 P.3d 1158 (App. 2001).

At sentencing, the trial court ordered Counts 31/32 (CR 2002–001431), Count 2 (CR 2001–015515), Count 50 (CR 2002–001431), Counts 11/12 (CR 2002–001431), Counts 4/5 (CR 2002–001431), and Count 14 (CR 2002–001431) to run consecutively, in that order. (R.T. 1/2/04, at 18–20.)[18] The court then ordered Counts 17/18 (CR 2002–001431), Counts 13/14 (CR 2001–015515), Counts 16/17 (CR 2001–015515), and Count 15 (CR 2001–015515)

---

[18] Counts involving the same victim (e.g., Counts 31/32) were expressly ordered to run concurrently.

to run consecutively, in that order. (*Id.* at 20–21.) The court ordered Counts 17/18 (CR 2002–001431 to run consecutively to Counts 33/34 (CR 2002–001431). (*Id.* at 20.) The court then ordered Counts 33/34 (CR 2002–001431) to run consecutively to Counts 37/38 (CR 2002–001431), and Counts 37/38 (CR 2002–001431) to run consecutively to Counts 33/34 (CR 2002–001431). (*Id.* at 21.) Finally, the court ordered Count 10 (CR 2002–001431) to run consecutively to Counts 31/32 (CR 2002–001431). (*Id.* at 23.)

As Appellant correctly points out, the trial court ordered both Count 2 (CR 2001–015515) and Count 10 (CR 2002–001431) to run consecutively to Counts 31/32 (CR 2002–001431), and both Counts 17/18 (CR 2002–001431) and Counts 37/38 (CR 2002–001431) to run consecutively to Counts 33/34 (CR 2002–001431). The court failed, however, to indicate whether Count 2 and Count 10 were to run consecutively to, or concurrently with, each other, and whether Counts 17/18 and Counts 37/38 were to run consecutively to, or concurrently with, each other. But as just discussed, when a trial court fails to indicate whether sentences are to run consecutively or concurrently, § 13–708 creates a "default designation" of consecutive sentences. *Garza*, at ¶ 12; *Ward*, at ¶ 3. Therefore, by default, the sentences are to run consecutively.

Furthermore, the record shows that the trial court intended the sentences to be consecutive. In the sentencing minute entry, Count 10 is specifically

ordered to run "consecutive to Counts 31 and 32 (in CR2002–001431)," and Count 2 is specifically ordered to run "consecutive to Count 10 (in CR 2002–001431)." (R.O.A., Item 783.) Likewise, Counts 37/38 are specifically ordered to run "consecutive to Count 14 (in CR2002–001431)," Counts 33/34 are specifically ordered to run "consecutive to Counts 37 and 38 (in CR2002–001431)," and Counts 17/18 are specifically ordered to run "consecutive to Counts 33 and 34 (in CR2002–001431)." (*Id.*) The sentencing minute entry, when examined together with the trial court's oral pronouncement at sentencing, demonstrate that the court intended to run *all* counts, grouped by victim, consecutively, and in the order in which they were committed.[19] *See State v. Day*, 148 Ariz. 490, 499, 715 P.2d 743, 752 (1986) (where concurrent/consecutive nature of sentences ambiguous, reviewing court looked to sentencing order to discern trial court's intent).

Appellant's request that this Court order the counts to run concurrently is not only contrary to the trial court's intent, but it directly contradicts what § 13–708 prescribes. Furthermore, his attempt to create a "conflict" between the sentencing minute entry and the transcript of the oral pronouncement at

---

[19] It appears the trial court used the dates indicated in the original indictments, and not the dates as they were amended by the evidence presented at trial. (R.O.A., Items 1, 68, 783.)

sentencing is unavailing.  The sentencing minute entry does *not* conflict with the trial court's oral pronouncement.  Rather, it makes clear what the court failed to announce at sentencing.  Furthermore, even assuming a discrepancy did exist, the oral pronouncement does not automatically control.  When there is a discrepancy between the oral pronouncement of sentence and the minute entry that cannot be resolved by reference to the record, the appropriate remedy is to remand for clarification of sentence.  *Bowles*, 173 Ariz. at 216, 841 P.2d at 211; *see also State v. Stevens*, 173 Ariz. 494, 496, 844 P.2d 661, 663 (App. 1992) ("Upon finding a discrepancy between the oral pronouncement of sentence and a minute entry, a reviewing court must try to ascertain the trial court's intent by reference to the record.").  But where, as here, "we are able to ascertain the trial court's intention by reference to the record, remand for clarification is unnecessary." *State v. Contreras*, 180 Ariz. 450, 453 n.2, 885 P.2d 138, 141 (App. 1994).

## VIII

## APPELLANT HAS FORFEITED HIS RIGHT TO OBTAIN APPELLATE RELIEF ON THE CLAIM THAT THE TRIAL COURT ERRONEOUSLY IMPOSED AGGRAVATED SENTENCES.

Appellant argues that the trial court erroneously aggravated his sentences because it relied on "illegal" and/or "unproved" aggravating factors.

(Opening Brief at 58.)  He further argues that the trial court violated his Sixth Amendment jury-trial right when the aggravating factors were not found by a jury.  (*Id.*)  Appellant has forfeited and waived his right to obtain appellate relief on these claims because he did not object to the aggravating factors at sentencing, and has failed to carry his burden of proving "fundamental error" *and* prejudice on appeal.

## A.    RELEVANT FACTS.

Appellant was sentenced to aggravated terms of 2.75 years' imprisonment on all but one count.[20]  *See* A.R.S. §§ 13–702(B), –(C), –702.02(B)(4). (R.O.A., Item 783.)  For purposes of aggravation, the trial court made the following findings:

> The defendant has caused - - these are aggravating factors - - has caused emotional harm to his victims, including depression, humiliation and fear, has caused physical harm to some of them.  A violation of his position of trust in his violation of the oath he took when he became a doctor to help people, not harm them.
>
> I've already addressed my reaction to the argument about threat to society.  I do not feel the defendant has expressed any remorse.  He has not accepted any responsibility for his crimes.  And as pointed out in the pre-sentence report, this does not bode well for rehabilitation.

---

[20] The court suspended imposition of sentence on Count 48 (CR 2002–001431) involving Shelly Cluff, and placed him on lifetime probation.  (R.O.A., Item 783.)

> And he committed this over an extended period of time,
> approximately 15 years. These are all aggravating factors.

(R.T. 1/2/04, at 18.)  Appellant did not object to these findings in aggravation;

nor did he assert his right to a jury trial.  The trial court did not find any

mitigating factors.

**B.    STANDARD OF REVIEW.**

A defendant who fails to object at sentencing forfeits the right to obtain

appellate relief unless he can affirmatively prove: (1) an error occurred; (2) the

error was fundamental in nature; *and* (3) the error caused him prejudice.

*Henderson*, at ¶¶ 19–26.

**C.    ARGUMENT.**

**1.    The Trial Court's Imposition of Aggravated Sentences Did Not
    Violate Appellant's Sixth Amendment Jury-Trial Right.**

Appellant argues that he was "entitled to have a jury trial on all

aggravating factors" relied upon by the trial court to aggravate his sentences.

(Opening Brief at 64.)   He further argues that that trial court's failure to

provide a jury trial violated the state and federal constitutions, and constituted

fundamental error.  This claim is without merit.

In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348 (2000),

the United States Supreme Court held that the Sixth Amendment to the United

States Constitution requires that "other than the fact of a prior conviction, any

fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531 (2004), the court clarified that the "statutory maximum" is "the maximum sentence a judge may impose solely *on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" In Arizona, the "statutory maximum" is the presumptive term. *State v. Brown*, 209 Ariz. 200, ¶ 12, 99 P.3d 15 (2004). Therefore, *Blakely* requires that any fact—other than a prior conviction—that increases the penalty for a crime above the presumptive term can only be found if (1) it is proved true beyond a reasonable doubt to a jury, (2) its existence is implicit in the jury's guilty verdict, or (3) the defendant admits to it. 542 U.S. at 303.

In this case, the trial court made the following findings in aggravation: (1) emotional harm caused to the victims; (2) physical harm caused to some of the victims; (3) Appellant violated a position of trust; (4) lack of remorse; and (5) the crimes were committed over an extended period of time of 15 years. (R.T. 1/2/04, at 18.) Appellant concedes that the trial court's finding that the crimes were committed over a period of 15 years was implicit in the jury's

verdicts.[21]   (Opening Brief at 64.)   Indeed, the jury's verdicts explicitly find Appellant guilty of committing 22 offenses from June 1986 to August 2001. (R.O.A., Items 659, 668–672, 676–677, 717, 719, 727–728, 731–734, 744–745, 748, 750–752.)

Under Arizona's statutory sentencing scheme, "once a jury finds or a defendant admits a single aggravating factor, the Sixth Amendment permits the sentencing judge to find and consider additional factors relevant to the imposition of a sentence up to the maximum prescribed in the statute." *State v. Martinez*, 210 Ariz. 578, ¶ 26, 115 P.3d 618 (2005).   Consequently, because the trial court's "extended period of time" finding was inherent in the jury's verdicts, it was free to find and consider any other facts to determine the appropriate sentence within the aggravated range, without having those facts proved to a jury.   Therefore, the trial court's imposition of aggravated sentences based on additional facts not found by a jury was not error, and Appellant is not entitled to appellate relief.

Even if we were to assume that the trial court's "extended period of time" finding was not inherent in the jury's verdict, or was improper as

---

[21] Appellant's claim that this factor could not be used to *aggravate* his sentence because it was used to *enhance* his sentence pursuant to § 13–702.02 is refuted in Argument VIII(C)(2) below.

Appellant contends, the trial court's findings in aggravation, and resulting aggravated sentences, did not prejudice Appellant.[22]   Because *Blakely* error involves the deprivation of the right to a jury trial, a defendant must show that "a reasonable jury, applying the appropriate standard of proof, could have reached a different result than did the trial judge." *Henderson*, at ¶ 27.   Error is not prejudicial when the facts found by the trial court are "undisputed." *Id.* at ¶ 33.   Once it is determined that *one* aggravating circumstance "would have been found by a jury had the court complied with the requirements of *Blakely*, we need not address whether the jury could have reached a different conclusion as to the other aggravating circumstances." *State v. Molina*, 211 Ariz. 130, ¶ 23, 118 P.3d 1094 (App. 2005); *see also Henderson*, at ¶ 28.

In this case, Appellant has not demonstrated, nor has he even alleged, that a jury would have reached a different result.   With the exception of the "physical harm" finding, the remaining aggravating circumstances are factually undisputed.   Moreover, the evidence overwhelmingly supports the trial court's findings.   For example, testimony and statements by the victims clearly support the trial court's finding that the victims suffered emotional harm.   (R.O.A., Items 777, 781; Exhibit 325, at 14:14, 47; R.T. 8/20/03, at 242; R.T. 8/21/03,

---

[22] The Arizona Supreme Court has held that *Blakely* error is fundamental in nature. *See Henderson*, at ¶ 25.

at 73, 80, 85, 94, 174, 176, 182, 189; R.T. 8/28/03, at 23, 40–41; R.T. 9/2/03,

at 149; R.T. 9/4/03, at 83–84, 89, 96, 151; R.T. 9/9/03, at 224, 230–31, 233;

R.T. 9/10/03, at 50, 58, 61, 110; R.T. 9/15/03, at 156–57, 165, 171; R.T.

9/17/03, at 28, 66; R.T. 9/18/03, at 121, 128; R.T. 9/22/03, at 156–57; R.T.

9/25/03, at 116, 119, 123, 171–72; R.T. 10/6/03, at 139.)   The victims'

testimony further establishes the dates of the sexual abuse, which prove that

the offenses occurred over a span of 15 years.  (Exhibit 325, at 14:07; R.T.

8/20/03, at 114, 130; R.T. 8/21/03, at 54, 169; R.T. 9/2/03, at 136; R.T. 9/4/03,

at 68, 89; R.T. 9/9/03, at 211; R.T. 9/10/03, at 40; R.T. 9/15/03, at 153; R.T.

9/16/03, at 177, 206–07; R.T. 9/18/03, at 134–35; R.T. 9/22/03, at 134; R.T.

9/25/03, at 103.)  And, as will be discussed below in Argument VIII(c)(2)(a)(i),

there was sufficient evidence to support the trial court's finding that some of

the victims suffered physical harm.

Furthermore, Appellant's remarks to the presentence investigation

reporter and his statements during allocution certainly support the trial court's

finding that he has not taken any responsibility for his crimes. (R.O.A., Item

781; R.T. 1/2/04, at 9–11.)   And, there is overwhelming evidence that

Appellant violated his position of trust. (R.O.A., Item 777; R.T. 9/4/03, at 157;

R.T. 9/15/03, at 175; R.T. 9/16/03, at 17.)  Because no reasonable jury could

possibly reach a different conclusion on at least one of these aggravating

factors, e.g., emotional harm caused to the victims, the trial court was free to consider the additional aggravating factors without having them proved to a jury. *Molina*, at ¶ 23; *see also Henderson*, at ¶ 28. Therefore, because Appellant has failed to make any showing of prejudice resulting from the trial court's finding of aggravating factors, *and* no prejudice in fact occurred, he has forfeited appellate relief on this claim.

**2.   The Aggravating Factors Relied Upon by the Trial Court were Proper and Supported by the Record.**

    a.   *No Error Occurred.*

       i.   <u>Physical Harm to the Victims.</u>

Appellant first argues that there is no evidence to support the trial court's finding that he caused physical harm to some of the victims. (Opening Brief at 60.) The Sixth Amendment requires that a jury find beyond a reasonable doubt any fact necessary to establish the *range* within which a trial judge may sentence a defendant. *Martinez*, at ¶ 26. If *additional* facts are relevant to the exercise of a trial judge's discretion in determining the specific sentence to impose *within* that range, such facts need only be found by a preponderance of the evidence. *Martinez*, at ¶ 26; *see also* A.R.S. § 13–702(D); *but see State v. Viramontes*, 204 Ariz. 360, ¶ 14, 64 P.3d 188 (2003) (holding that aggravating factors need only be supported by "reasonable evidence."). As discussed *supra*, because at least one other aggravating circumstance lawfully established

the aggravated sentencing range in this case, the aggravating fact that Appellant caused physical harm to some of his victims need only be found true by a preponderance of the evidence.

Appellant contends that, because no victim testified that "anything Dr. Finkel did in touching them inappropriately caused the impairment of any physical condition, which is the definition of 'physical injury,' as that term is defined by A.R.S. § 13–105(29)," there is insufficient evidence to support the trial court's finding. (*Id.* at 61.) But the trial court did not find that Appellant caused "physical injury" to the victims. *See* A.R.S. § 13–702(C)(1) (trial court may consider infliction or threatened infliction of "serious physical injury.") Rather, it only found that Appellant caused physical *harm* to some of the victims. *See* A.R.S. 13–702(C)(9) (a trial court may consider the "physical, emotional and financial harm caused to the victim."). The term "harm" means "to cause hurt or damage to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1034 (2002).

In this case, Appellant was convicted of sexual abuse on Count 34 (CR 2002–001431)—"[Defendant] twisted Rana Patrick's right nipple before abortion procedure." (R.O.A., Item 1, 731.) At trial, Rana testified that Appellant "took his left hand to [her] right nipple and took it and twisted it all around." (R.T. 9/9/03, at 225.) When asked how it felt physically, Rana

testified: "It just was shocking, and someone to grab your nipple and twist it, *it kind of hurts*." (*Id.* at 243, emphasis added.) Similarly, Appellant was convicted of sexual abuse on Count 14 (CR 2002–001431) involving Kelly Easter. (R.O.A., Item 748.) At trial, Kelly testified that Appellant "slapped [her] butt" with his open hand. (R.T. 9/25/03, at 119–20.) When asked if it caused her pain, Kelly replied, "Yes." (*Id.* at 120.) At sentencing, Kelly related in a letter to the trial court that, as a result of Appellant's abuse, she developed a fear of physicians, and did not receive regular healthcare. (R.O.A., Items 777, 781.) This resulted in a "medical condition" that may prevent her from having children. (*Id.*)

Finally, Shelly Cluff (Counts 48–49, CR 2002–001431) testified that when Appellant "felt around" her clitoris, he "spread it open really wide . . . like it was like tearing like he was hurting me." (Exhibit 325, at 13:27–28.) Shelly testified: "[I]t hurt, what he was doing to my clitoris . . . It felt like it was being popped open like he was popping it open" with his fingers. (*Id.* at 13:29.) Shelly further testified that she started crying because "he was hurting me." (*Id.*) When asked how it felt, Shelly replied, "It hurt." (*Id.* at 13:30.) This evidence clearly demonstrates that the record supports by a preponderance of the evidence that Appellant "caused physical harm to some of" the victims—Rana Patrick, Kelly Easter, and Shelly Cluff.

Appellant next argues that the trial court's "physical harm" finding is improper because it is "redundant" to the "emotional harm" finding under A.R.S. § 13–702(C)(9). Specifically, he contends that "[t]o cite factor (C)(9) twice . . . is nothing less than a double-counting of aggravators." (Opening Brief at 60.) Although a trial court may use a single fact to establish two aggravating circumstances, in balancing the aggravating and mitigating factors it cannot weigh that fact twice. *State v. Alvarez*, 205 Ariz. 110, ¶ 11, 67 P.3d 706 (App. 2003); *State v. Germain*, 150 Ariz. 287, 290–81, 723 P.2d 105, 108–09 (App. 1986); *see also State v. Medina*, 193 Ariz. 504, ¶ 25, 975 P.2d 94 (1999); *State v. Scott*, 177 Ariz. 131, 144, 865 P.2d 792, 805 (1993). In other words, a trial court cannot "double count" a single fact twice to impose a higher sentence.

In this case, the trial court found as an aggravating circumstance the fact that Appellant "caused emotional harm to his victims, including depression, humiliation and fear, [and] has caused physical harm to some of them." (R.T. 1/2/03, at 18.) Whether this constitutes more than one aggravating factor, as Appellant contends, is of no consequence. Instead, the inquiry is whether the trial court used a single *fact* to establish two aggravating circumstances, and, if so, did it weigh that fact twice. The facts used to establish "emotional harm" included "depression, humiliation and fear." (*Id*.) Although the trial court did

not explicitly list those facts used to establish "physical harm," nothing in the record suggests that he weighed the "emotional harm" facts twice, and it is presumed that the trial court did not. *See Medina*, at ¶¶ 25–26. Moreover, the fact that the court limited the application of its "physical harm" finding to only "some" of the victims demonstrates that they could not have been based on the same facts. Rather, the facts used to establish "physical harm" are those discussed above. Therefore, the trial court's finding that Appellant "caused physical harm to some of" the victims was not erroneous.

     ii.   Lack of Remorse.

Appellant next argues that the trial court's finding that Appellant did not "express[] any remorse," and "has not accepted any responsibility for his crimes" violates the "self-incrimination privilege of the Fifth Amendment to the United States Constitution." (Opening Brief at 61.) During allocution, the following exchange took place:

> [APPELLANT]:  [I] have read the report from the pre-sentence report from APO, Patty McDunna which she states because I intend to exercise my Constitutional rights to appeal these verdicts in this case that I'm not showing remorse and not showing guilt.  That's not true, Your Honor.  I'm very remorseful about the things that happened to the patients.
>
> I do feel guilt that they are so traumatized by this trial and I wish that I had been more aware of their sensations.  To the victims or the current victims --

THE COURT:  Before you go on, you're remorseful for what?

[APPELLANT]:  For just not understanding their needs, Your Honor.  I was in a very stressful practice.  I got caught up in my own stress because of the fact that I too have been and I was currently and constantly being harassed by domestic terrorists.  I put up a shield to protect myself from the patients I hoped to protect, I hoped to provide services to.

And perhaps I overcompensated and came across as rude, cold, uncompassionate.  Sorry if I hurt their feelings.  Sorry if I caused them emotional stress.

But I never sexually abused them, Your Honor.  And that is my -- that was my position in the past.  That's my position now.  That will be my position in the future.

(R.T. 1/2/04, at 10–11.)  At sentencing, the trial court made the following finding in aggravation:  "[I] do not feel the defendant has expressed any remorse.  He has not accepted any responsibility for his crimes.  And as pointed out in the pre-sentence report, this does not bode well for rehabilitation."  (*Id.* at 18.)

"The Self-Incrimination Clause of the Fifth Amendment provides that no 'person . . . shall be compelled in any criminal case to be a witness against himself.'"  *Pennsylvania v. Muniz*, 496 U.S. 582, 588, 110 S. Ct. 2638 (1990).  This guarantee extends to the sentencing phase of a trial.  *Mitchell v. United States*, 526 U.S. 314, 328–29, 119 S. Ct. 1307 (1999).  A defendant's Fifth Amendment right against self-incrimination is fulfilled "when a criminal

defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'" *Estelle v. Smith*, 451 U.S. 454, 468, 101 S. Ct. 1866 (1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489 (1964)).  Due process prohibits a court from punishing a defendant for exercising this constitutional right: "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663 (1978); *State v. Kerekes*, 138 Ariz. 235, 237, 673 P.2d 979, 981 (App. 1983).   Thus, when a defendant remains silent at sentencing, a sentencing judge cannot "draw a negative inference of lack of remorse from the defendant's silence . . . where he has maintained, throughout the proceedings, that he did not commit the offense of which he stands convicted." *State v. Shreves*, 60 P.3d 991, 996 (Mont. 2002).

When, however, a defendant "chooses to speak in the unfettered exercise of his own will," *Estelle*, 451 U.S. at 468, the Fifth Amendment's privilege against self-incrimination does not preclude a sentencing judge to consider those statements, and to conclude that the defendant lacks remorse for his crimes. *State v. Knight*, 701 N.W.2d 83, 87–88 n.1 (Iowa 2005); *State v. Muscari*, 807 A.2d 407, 416–17 (Vt. 2002); *Shreves*, 60 P.3d at 260–61; *see also People v. Lopez*, No. 03CA0049, 2005 WL 1773911, at *6 (Colo. App.

July 28, 2005) (where defendant "elected to take the stand and testify at trial and to make a statement for inclusion in the presentence report . . . he waived his privilege against self-incrimination . . . and subjected his credibility to evaluation like that of any other witness."); *People v. Villarreal*, No. 03CA2396, 2005 WL 2155504, at **6–7 (Colo. App. Sept. 8, 2005) (trial court's finding in aggravation that defendant did not accept responsibility for crimes did not improperly penalize her for exercising Fifth Amendment right against self-incrimination where defendant addressed court on the merits of her conviction at sentencing); *see generally United States v. Johnson*, 903 F.2d 1084, 1090 (7th Cir. 1990) (recognizing that there is a distinction between "punishing a defendant for exercising his right to remain silent" and "considering a defendant's failure to show remorse.").

In *State v. Henderson*, 200 Ariz. 300, ¶ 36, 100 P.3d 911 (App. 2004), *vacated in part on other grounds*, 210 Ariz. 561, 115 P.3d 601 (2005), the trial court found the defendant's lack of remorse to be an aggravating factor. This finding was based on statements made by the defendant at sentencing. *Id.* at ¶¶ 41–42. This Court held:

> [T]his is not a circumstance in which a defendant has remained silent. Thus, we need not consider whether the Fifth Amendment's right to silence precludes the use of lack of remorse as an aggravator. This is a case where the trial judge affirmatively considered the defendant's own

> statements made to her at sentencing as a basis for finding
> lack of remorse.

*Id.* at 43 (citations omitted).  This case is analogous to *Henderson*.  Here,

Appellant relinquished his right to remain silent, and elected to address the trial

court at sentencing.  These statements were considered by the trial court, and

formed the basis for its finding that Appellant did not express any remorse or

accept responsibility for his crimes.  (R.T. 1/2/04, at 10–11, 18.)  Therefore, the

trial court's finding did not implicate, or violate, Appellant's privilege against

self-incrimination.[23]

Appellant's reliance on *State v. Hardwick*, 183 Ariz. 649, 905 P.2d 1384

(App. 1995) is unavailing.   In *Hardwick*, the trial court aggravated the

defendant's sentence based on his "lack of contrition."  183 Ariz. at 656, 905

P.2d at 1391.  This Court noted that a defendant's "lack of contrition is, for

legal purposes, tantamount to a refusal to admit guilt."  *Id*.  Then, relying on

*State v. Carriger*, 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984), for the

proposition that a defendant's "decision not to publicly admit guilt is irrelevant

to a sentencing decision," this Court held that the trial court's use of this factor

"offend[ed] the Fifth Amendment privilege against self-incrimination."  (*Id*.)

---

[23] Appellant does not argue that there was insufficient evidence to support this finding.  Therefore, he has abandoned this claim on appeal.  *See Weekley*, at ¶ 15.

*Hardwick* lends no support to the issue before us now.   First, in *Hardwick*, it is unclear whether the trial court's finding was based on his silence at sentencing, or whether it was based on statements made by him at sentencing.   Moreover, *Henderson* cited *Hardwick* and *Carriger* to support its holding. *Henderson*, at ¶ 43. Therefore, *Henderson* is dispositive.

  iii. <u>Crimes Committed Over an Extended Period of Time.</u>

Appellant next argues that "the trial court erred when it found that [he] had committed his crimes over a period of fifteen years." (Opening Brief at 61.) Appellant was found guilty of 22 counts of sexual abuse. The charges arose from 14 separate incidents, involving 13 different victims, between June 1986 and August 2001. The trial court enhanced Appellant's sentences pursuant to § 13–702.02, as multiple offenses not committed on the same occasion but consolidated for trial, and further imposed aggravated sentences. As the basis for imposing the aggravated sentences, the court cited the fact that Appellant "committed [the acts] over an extended period of time, approximately 15 years." (R.T. 1/2/04, at 18.)

Relying on *Alvarez*, Appellant contends that "because the repetitive quality of [his] conduct [had] already been used to justify sentence enhancement pursuant to A.R.S. § 13–702.02," he "cannot be punished for his repeated misdeeds a second time." (*Id.* at 61–62.) In *Alvarez*, the defendant

was convicted of 13 offenses committed on six different occasions, and involving six different victims. *Id.* at ¶ 1.   The trial court enhanced the defendant's sentences pursuant to § 13–702.02, and further imposed aggravated sentences based on the fact that there were "multiple victims." *Id.* at ¶¶ 1, 4.

On appeal, the defendant argued that it was improper to aggravate his sentences on the basis of "multiple victims" because that fact had already been factored into the enhanced range under § 13–702.02. *Id.* at ¶ 6.  This Court held that the "multiple victims" finding was "subsumed in the multiple offenses already used to enhance the sentencing range for those offenses under § 13–702.02." *Id.* at ¶ 18.  In so holding, this Court relied on its earlier holding in *Germain* that, "if the degree of a defendant's conduct exceeds the minimum level needed to establish the offense, that extreme misconduct may be considered as an aggravating factor." *Id.* at ¶¶ 10–11 (citing *Germain*, 150 Ariz. at 290, 723 P.2d at 108).  Because the existence of a victim was "implicit in the cluster of offenses Alvarez committed on each occasion," however, this Court held that the "multiple victims" finding reflected "nothing more . . . than his commission of multiple offenses over time." *Id.* at ¶ 11.

This case is distinguishable because the trial court's finding in aggravation pointed to conduct that *exceeded* that necessary to establish the

enhancing circumstance.   Under § 13–702.02, a trial court may enhance a
defendant's sentence if he was convicted of two or more felony offenses that
were not committed on the same occasion but consolidated for trial.   Because
Appellant was convicted of 22 offenses committed on 12 different occasions,
the trial court properly sentenced him pursuant to § 13–702.02.   The trial
court's finding in aggravation that Appellant "committed [the acts] over an
extended period of time, approximately 15 years" did not duplicate the facts
supporting the § 13–702.02 enhancement.   That is, the trial court did not
*aggravate* Appellant's sentence simply because he committed multiple offenses
not on the same occasion, or because of the "repetitive quality" of his conduct,
as Appellant contends.   Rather, the trial court's finding was based on the fact
that Appellant's conduct occurred "over an *extended* period of time"—
approximately 15 years.   Like in *Germain*, Appellant's sentences were
aggravated because the *degree* of his conduct *exceeded* that necessary to
establish the enhancing circumstance.   150 Ariz. at 290–91, 723 P.2d at 180–
09.   Therefore, the trial court did not employ "the same justification already
used to enhance the sentences as its reason for imposing aggravated
sentences." *Alvarez*, at ¶¶ 16–18.   Because Appellant has failed to establish
that any error occurred, he has forfeited his right to obtain appellate relief on
this claim. *Henderson*, at ¶ 19.

112

b.   *Any Conceivable Error was not Fundamental in Nature.*

Even assuming, *arguendo*, that any of these findings in aggravation were "improper," any conceivable error was not fundamental in nature. An error is fundamental only if it involves "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Henderson*, at ¶¶ 19, 24 (citations omitted). Although the supreme court did not specify those types of errors that could be deemed "fundamental," it strongly indicated that such was limited to those *approaching* the level of "structural error." *See id.* at ¶ 25 (discussing denial of a jury trial on aggravating facts, applying the wrong burden of proof, and shifting the burden of proof to the defendant).

The error alleged here—i.e., the trial court's consideration of "improper" aggravating factors, a state law violation—does not rise to that level. *See, e.g., Smith*, 114 Ariz. at 420, 561 P.2d at 744 (holding that fundamental error "usually, if not always, involves the loss of federal constitutional rights."). Nor has *Appellant* demonstrated that it went to the foundation of his case, took from him a right essential to his defense, *and* was error of such magnitude that he could not possibly have received a fair sentencing, as required by *Henderson*.

Although the imposition of an illegal sentence constitutes fundamental error, *see State v. Cox*, 201 Ariz. 464, ¶ 13, 37 P.3d 437 (App. 2002), the trial court's consideration of "improper" aggravating factors did not make the resulting aggravated sentences "illegal." A sentence is illegal if it is "one that is outside the statutory range." *See State v. Viramontes*, 208 Ariz. 336, ¶ 5, 93 P.3d 536 (App. 2004) (citation omitted); *State v. House*, 169 Ariz. 572, 573, 821 P.2d 233, 234 (App. 1991). Under § 13–702.02(B)(4), a person who is convicted of two or more felony offenses that were not committed on the same occasion but consolidated for trial may receive a presumptive term of 2.25 years' imprisonment for all offenses subsequent to the second offense. A.R.S. § 13–702.02(D) allows an increase of this presumptive sentence to a maximum of 3.75 years upon a finding of *one or more* of the aggravating circumstances set forth in § 13–702(C). If at least one aggravating circumstance is found to exist, a trial judge is *required* to impose an aggravated sentence if there are no mitigating circumstances. A.R.S. §§ 13–702(D), –702.02(B).

In this case, the trial court found a total of *five* aggravating circumstances and no mitigating circumstances. (R.T. 1/2/04, at 18.) Even assuming that three of the aggravating factors were "improper," the remaining two aggravating factors (emotional harm caused to the victims and violation of position of trust) were statutorily sound. *See* A.R.S. 13–702(C)(9) (physical,

emotional, and financial harm caused to the victim); –702(C)(21) (any factor that the court deems appropriate to the ends of justice).  Appellant concedes this point.  (Opening Brief at 59.)  Either one of these aggravating factors not only permitted, but mandated, the trial *court* to impose an aggravated sentence up to 3.75 years.  *See* A.R.S. § 13–702(D); –702.02(B)(4); –702.02(D).  The trial court's imposition of 2.75 year sentences for all offenses subsequent to the second offense was well within this statutorily authorized range.[24]  Therefore, the aggravated sentences were not illegal.

c.    *Any Conceivable Fundamental Error did not Prejudice Appellant.*

Even assuming that the trial court's consideration of the "improper" aggravating factors was fundamental error, the error did not cause Appellant prejudice.  Fundamental-error review places the burden on the defendant to affirmatively prove prejudice.  *Henderson*, at ¶¶ 19–20.  Here, Appellant has

---

[24] The trial court's sentences on Counts 31/32 and 10 (CR 2002–001431), which constitute the first and second offenses for purposes of § 13–702.02, are governed by §§ 13–702.01(A)(4) and 13–702.02(B)(3), respectively, and authorize maximum sentences of 2.5 years.  As discussed above in Argument VI, a remand for clarification of sentence/resentencing is necessary on these sentences.  On remand, the trial court must rely on at least *two* "proper" aggravating factors to impose a sentence up to 2.5 years on Counts 31/32, and at least *one* "proper" aggravating factor to impose a sentence of 2.5 years on Count 10 for the sentences to be lawful.  A.R.S. §§ 13–702.01(A)(4); –13–702.02(B)(3).

failed to make *any* showing of prejudice.   Rather, he simply concludes that "[b]ecause three of the five sentencing aggravators cited by the trial court were either illegal, or unproved, or both," this Court should vacate his sentences and remand for resentencing.   (Opening Brief at 62.)   This claim is insufficient to satisfy his burden of proving actual prejudice.   Under *Henderson*, a defendant must affirmatively prove prejudice before obtaining appellate relief.   *Id.* at ¶¶ 19–20.

More importantly, *nothing* in the record suggests that Appellant would have received a different sentence had the trial court not considered the "improper" aggravating factors.   Speculation, conjecture, or the possibility of prejudice is insufficient to satisfy this burden.   If the effect of the alleged error is uncertain, prejudice cannot be established.   *See Jones v. United States*, 527 U.S. 373, 395, 119 S. Ct. 2090 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); *see generally United States v. Olano*, 507 U.S. 725, 734–741, 113 S. Ct. 1770 (1993).   Placing the burden on the defendant "discourage[s] a defendant from 'tak[ing] his chances on a favorable [sentence], reserving the 'hole card' of a later appeal on [a] matter that was curable at trial, and then seek[ing] appellate reversal.'"   *Henderson*, at ¶ 19 (quoting *State v. Valdez*, 160 Ariz. 9, 13–14, 770 P.2d 313, 317–18 (1989)).

Absent a specific showing of prejudice by the defendant, his sentences must be affirmed.  *Henderson*, at ¶¶ 19–20.   Prior appellate decisions that hold otherwise, *see, e.g., Alvarez*, at ¶ 19 (holding that where "it is unclear whether the judge would have imposed the same sentences absent the inappropriate factor, the case must be remanded for resentencing"), are no longer good law. *See Henderson*, at ¶ 21 (specifically disapproving prior appellate decisions that are inconsistent with its holding, including the defendant's burden of affirmatively proving prejudice).

This Court recently reached the same conclusion.  In *State v. Ruggiero*, 211 Ariz. 262, ¶ 23, 120 P.3d 690 (App. 2005), the trial court imposed an aggravated sentence after finding and considering several aggravating and mitigating circumstances.   The defendant argued that "[t]he trial court committed fundamental error by considering the improper aggravating factor of failure to accept responsibility." *Id.* at ¶ 29 n.6.  This Court agreed that the trial court improperly considered that aggravating circumstance, but held that the defendant had failed to carry her burden under *Henderson* because she did not demonstrate how the error prejudiced her. *Id.*  Because the trial court's consideration of *this* "improper" factor did not constitute fundamental error, the court upheld the aggravated sentence based on the trial court's "proper"

consideration of another aggravating factor which authorized the aggravated sentence. *Id.*

Like Ruggiero, Appellant has failed to demonstrate actual prejudice. Furthermore, the fact that Appellant did not object to any of the aggravated factors at sentencing further demonstrates that no prejudice occurred. Thus, because Appellant has failed to make any showing of prejudice resulting from the trial court's consideration of "improper" aggravating factors, *and* no prejudice in fact occurred, he has forfeited appellate relief on this claim. *Henderson*, at ¶¶ 19–20.

## CONCLUSION

Based on the foregoing authorities and arguments, Appellee respectfully requests that this Court affirm the judgments of the trial court. Appellee further requests that this Court affirm the sentences of the trial court, with the exception of Counts 10 and 48 (CR 2002–01431), which should be remanded for resentencing, and Counts 31 and 32 (CR 2002–01431), which should be remanded for clarification of sentence.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL

RANDALL M. HOWE
CHIEF COUNSEL
CRIMINAL APPEALS SECTION

NICHOLAS D. ACEDO
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF SERVICE

TWO COPIES of this Brief were deposited for mailing
this 27th day of March, 2006, to:


CONSUELO OHANESIAN
Office of the Legal Advocate
3800 N. Central Avenue, Suite 1500
Phoenix, Arizona 85012


Attorney for APPELLANT


Liz Gallagher
Legal Secretary
Criminal Appeals Section
1275 West Washington
Phoenix, Arizona  85007–2997

CRM04–0096
124384

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 31.13, Arizona Rules of Criminal Procedure, undersigned counsel certifies that this brief is double spaced, uses a 14-point proportionately-spaced typeface, and contains 26,927 words.

_____
NICHOLAS D. ACEDO

# ATTACHMENT 1

## Court of Appeals Division One

Criminal

| 1 CA-CR 04-0046 | | STATE v FINKEL |
|---|---|---|

### 87 PROCEEDING ENTRIES

| | | |
|---|---|---|
| 55. | 4-Jan-2005 | FILED: Letter, 01/04/2005, to superior court from court, re: enclosing certified copy of Order filed 01/04/2005 |
| 56. | 10-Jan-2005 | FILED: Reporters Transcript (09/05/03 [Dotty Reaume]) |
| 57. | 23-Feb-2005 | FILED: Exhibit # 3 in small white box |
| 58. | 23-Feb-2005 | FILED: Supplemental Index No. 1 |
| 59. | 23-Feb-2005 | FILED: Additional Minute Entry dated 2/22/05, re: Settling the Record in Furtherance of Appeal |
| 60. | 16-Mar-2005 | FILED: Reporters Transcript (02/28/05 [Amy C Prellwitz-Fuller]) |
| 61. | 4-Apr-2005 | FILED: APPELLANT'S OPENING BRIEF |
| 62. | 9-May-2005 | FILED: Motion to Extend Filing Deadline of Appellee's Answering Brief (Appellee) |
| 63. | 12-May-2005 | ORDERED: granting motion/Answering Brief due date EXTENDED from Thursday, 05-19-2005 to Friday, 08-05-2005. FURTHER ORDERED: If Answering Brief not filed by date above, Nicholas D Acedo is to appear before this court on Wednesday, 08-10-2005 at 1:30 pm, Dept. E, to show cause why sanctions should not be imposed. Mr. Anthony Mackey, ProTem Judge - Author |
| 64. | 12-May-2005 | FILED: Receipt for Certified Mail, # 7000 1670 0006 3010 5433, to Nicholas D Acedo |
| 65. | 16-May-2005 | FILED: Return Receipt for Certified Mail, # 7000 1670 0006 3010 5433, to Nicholas D Acedo signed by Mike Phillips 5/13/05 |
| 66. | 19-May-2005 | FILED: Memorandum, 5/19/05, Re: Record having been examined, the disclosure of the unsealed documents and exhibits is not barred by confidentiality, privacy or the best interests of the State. (Anthony Mackey, Staff Attorney) |
| 67. | 1-Jul-2005 | FILED: Motion to Withdraw as Counsel on Direct Appeal (Appellant) |
| 68. | 8-Jul-2005 | ORDERED: granting motion to withdraw. FURTHER ORDERED: appointing Office of the Legal Advocate. FURTHER ORDERED: Maricopa County Public Defender immediately forward all related files to new counsel. FURTHER ORDERED: newly-appointed counsel shall file on/before 8/1/05, a written notice indicating whether counsel intends to adopt opening brief previously filed, or whether counsel intends to file new brief. FURTHER ORDERED: Answering Brief extended to/including 8/31/05. FURTHER ORDERED: copy of order mailed to Court Administrator, Criminal Appeals Division, Maricopa County Superior Court, to Clerk of Maricopa County Superior Court, and to appellant personally. Mr. Anthony Mackey ProTem Judge - Author |
| 69. | 1-Aug-2005 | FILED: Motion for Extension of Time in Which to Adopt Previously-Filed Brief or File New Opening Brief (Appellant) |
| 70. | 8-Aug-2005 | ORDERED: granting motion/extended time to file written notice adopting filed Opening Brief, or file new Opening Brief to/including 10/3/05. FURTHER ORDERED: If counsel's written notice adopting filed Opening Brief, or a new Opening Brief not filed by date above, Consuelo M. Ohanesian is to appear before this court on Wednesday, 10/5/05 at 1:30 pm, Dept. E, to show cause why sanctions should not be imposed. Mr. Anthony Mackey ProTem Judge - Author |
| 71. | 8-Aug-2005 | FILED: Receipt for Certified Mail, # 7000 1670 0006 3008 2703, to Consuelo M. Ohanesian |
| 72. | 15-Aug-2005 | FILED: Return Receipt for Certified Mail, # 7000 1670 0006 3008 2703, to Consuelo M. Ohanesian signed by Amy Christman 8/9/05 |
| 73. | 3-Oct-2005 | FILED: Notice of Adoption of Brief Previously Filed by the Public Defender's Office. |
| 74. | 14-Oct-2005 | FILED: Receipt for Certified Mail, # 7000 1670 0006 3008 2314, to Nicholas Acedo |
| 75. | 14-Oct-2005 | ORDERED: extend time to file answering brief to Monday, 12-12-2005; FURTHER ORDERED: If answering brief not filed by date above, Nicholas Acedo is to appear before this court on Wednesday, 12/14/05 at 1:30 pm, Dept. E, to show cause why sanctions should not be imposed. Mr. Anthony Mackey ProTem Judge - Author |

[22438]

Information presented in this document may not reflect all case activity and is subject to change without notice.

1 CA-CR 04-0046 CR040046 CR 04 0046 CR-04-0046