# EXHIBIT  H

**Form 24(c). (Amended) Notice Of Post-conviction Relief**

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

MICHAEL K. JEANES, CLERK
BY [signature] DEP.
FILED
2007 DEC -3 AM 4:32

| | |
|---|---|
| STATE OF ARIZONA, Plaintiff, v. BRIAN L. FINKEL, Defendant | No. CR 2001-015515 and CR 2002-001431 Notice of Post-Conviction Relief |

**Instructions:** When the notice is complete, file it with the clerk of the superior court of the county in which the conviction occurred.

A person unable to pay costs of this proceeding and to obtain the services of a lawyer without substantial personal or family hardship should indicate this by requesting counsel in Question 6 of this notice and execute the AFFIDAVIT OF INDIGENCY on page 3. In the event an attorney is not appointed, a Request for Preparation of Post-conviction Relief Record form must be filed by the defendant if some portion of the record is needed and has not previously been obtained.

NO ISSUE WHICH HAS ALREADY BEEN RAISED AND DECIDED ON APPEAL OR IN A PREVIOUS PETITION FOR POST-CONVICTION RELIEF MAY BE USED AS A BASIS FOR A SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF.

1. Defendant's Name and prison number (if any): Brian L. Finkel - ADC #182486

2. Defendant's address: ASPC Florence - South - 5B1
P. O. Box 8400
Florence, Arizona 85232-8400

3. (A) Defendant was convicted of the following crimes:

Sexual Abuse

(B) Defendant was sentenced on January 2, 2004, to a term of thirty-four (34) yrs, commencing on January 2, 2004, following a

Trial by: ☒ Jury ☐ Judge without a Jury

Plea of: ☐ Guilty ☐ No Contest

Probation Revocation: ☐ Admission ☐ Violation Hearing

in the Superior Court of ________________ County with Judge __________ presiding.

(C) The file number of the case was CR 2001-015515.

4. Defendant has taken the following actions to secure relief from his convictions or sentences:

(A) Direct Appeal: ☒ Yes ☐ No

(B) Previous Rule 32 Proceedings: ☐ Yes ☒ No

5. Defendant was represented by the following lawyers at: (provide name of counsel and counsel's address, if known)

Trial or change of plea: Richard Gierloff; 45 W. Jefferson, #412; Phoenix 85003

Kristin Curry; 814 W. Roosevelt; Phoenix, AZ 85007

Sentencing Hearing: Richard Gierloff (see above) Kristin Curry (see above)

Appeal (if any): Edward McGee; 620 W. Jefferson, #4015; Phoenix, AZ 85003

Consuelo Ohanesian; 3800N. Central Ave, #1500; Phoenix, AZ 85012

Previous Rule 32 Proceedings (if any): N/A

6. Defendant is presently represented by a lawyer. ☐ Yes ☒ No
(If yes, provide name and address.)

If no, does the defendant request the court to appoint a lawyer for this proceeding? ☒ Yes ☐ No.

7. **Respond to this section only if this is an untimely notice or the defendant has filed a previous Rule 32 petition in this case.**

(A) Is a claim pursuant to Rule 32.1(d), (e), (f), (g) or (h) being raised in this petition? ☐ Yes ☐ No

(B) If yes, state the specific exception:

☐ The defendant is being held in custody after the sentence imposed has expired.

☐ Newly discovered material facts exist which probably would have changed the verdict or sentence.

☐ The defendant's failure to file a timely notice of post-conviction relief or notice of appeal was without fault on the defendant's part.

☐ There has been a significant change in the law that would probably overturn the conviction or sentence.

☐ Facts exist which establish by clear and convincing evidence that the defendant is actually innocent.

(C) State the facts that support the claim and the reasons for not raising the claim in the previous petition or in a timely manner.

I AM REQUESTING POST-CONVICTION RELIEF. I UNDERSTAND THAT I MUST INCLUDE IN MY PETITION EVERY GROUND FOR RELIEF WHICH IS KNOWN AND WHICH HAS NOT BEEN RAISED AND DECIDED PREVIOUSLY. I ALSO UNDERSTAND THAT FAILURE TO RAISE ANY KNOWN GROUND FOR RELIEF IN MY PETITION WILL PROHIBIT ME FROM RAISING IT AT ANY FUTURE DATE.

11/01/07 — Date

[signature] — Defendant

**AFFIDAVIT OF INDIGENCY**

I have requested the appointment of a lawyer to represent me in Question 6. I swear under oath and penalty of perjury that I am indigent and because of my poverty I am financially unable to pay for the cost of a lawyer to represent me without incurring substantial hardship to myself or my family. Please see attached Minute Entry.

[signature] — Defendant

Subscribed and sworn to before me on 11-1-07 (date)

[signature] — Notary Public

My Commission Expires

EDITH J. POGUE
Notary Public - Arizona
Pinal County
My Commission Expires
September 7, 2008

## RULE 32 - GROUNDS FOR RELIEF

Dr. Brian Leslie Finkel is the Petitioner in the Rule 32 action concerning CR2001-015515 and CR2002-001431, State of Arizona v. Brian L. Finkel. Petitioner motions the court for appointment of counsel. Petitioner has been previously declared indigent by Maricopa County Superior Court Judge Jeffrey Cates. Dr. Finkel will need assistance of counsel due to the complexity of this petition, lack of legal training and no access to a law library. Petitioner has no access to the 10,000 plus pages of pretrial, trial and post conviction transcripts.

Petitioner motions to secure appropriate relief under the following grounds:

      1) The conviction or the sentence was in violation of the Constitution of the United State or of the State of Arizona.

      2) Newly discovered impeachment material facts exist and such facts probably would have changed the verdict or sentence.

      3) The sentence imposed is not in accordance with the sentence authorized by law.

      4) Petitioner received ineffectiveness of counsel.

      5) The trial judge violated Code of Judicial Conduct Canon 3B(7) by holding ex parte meetings with prosecution and the media.

## ISSUES PRESENTED FOR REVIEW

### ARGUMENT ONE

The trial court abused it's discretion and reversibly erred when it ruled a disqualifying conflict of interest between the Maricopa County Attorney's Office (MCAO) and Petitioner was a collateral issue. The MCAO hid disqualifying conflict of interest from the Grand Jury; thus allowing a disqualifying person to be present while the Grand Jury was deliberating or voting. The Petitioner was denied due process. Having a disqualified authorized person at sessions of the Grand Jury causes those sessions to be tainted as to invalidate them. Defense counsel did not motion for a mistrial; thus denying Petitioner effectiveness of counsel. Petitioner was denied a fair and impartial hearing. Arizona Constitution Article II, Section 4, A.R.S. and the 14th Amendment to the U.S. Constitution provide that no person shall be deprived of life, liberty or property without due process of law. Dr. Finkel requests the trial court quash the indictments and reverse all convictions.

ARGUMENT TWO

The trial judge violated Canon 1, 2, 3(B)(7)(9) of the Arizona Code of Judicial Conduct. The judge gave a lengthy interview to a reporter from the Arizona Republic newspaper. The reporter was invited into his chambers by the judge. The judge selected DVD's of previously recorded witness testimony that cast Petitioner in a bad light. The trial court judge made disparaging biased remarks to the reporter about the Petitioner that were printed in Arizona's largest circulated daily newspaper. The Court's actions brings discredit to the integrity, impartiality, and independence of the judiciary. Trial defense counsel did not file a motion for mistrial, thus providing Petitioner with ineffective counsel. Trial judge's unethical action denied Petitioner to the U.S. Constitution's due process of law guaranteed by Amendments 5, 6, and 14. Petitioner motions for remand for new trial.

ARGUMENT THREE

The trial court abused it's discretion and reversibly erred in joining counts in the sex offense prosecution on the theory that all counts would be cross-admissible as "other acts" pursuant to Rule 404(c) of the Arizona Rules of Evidence - first, because before ruling, the court did not personally evaluate the credibility of the complainants as required by State v. Aguilar; secondly, because before ruling, the court did not receive expert testimony on the limits of proper touching in gynecologic procedures. Trial defense counsel did not file a motion requesting mistrial, thus Petitioner received ineffective counsel. Petitioner motions for remand for new trial.

ARGUMENT FOUR

The trial court violated Canon 1, 2, 3(B)(7)(9) of the Arizona Code of Judicial Conduct. The trial court originally ruled that Doctor Finkel was entitled to separate trials for each complaint. The court then had an ex parte meeting with Deputy County Attorney Blaine Gadow. The court received non-sworn hearsay evidence at this meeting. The MCAO did not notify defense counsel of the meeting. Neither did not provide defense with copies of the ex parte meeting documents. The materials were never presented as evidence at the Petitioner's trial. The trial court used this unethically received material to reverse his original ruling. He issued a new ruling that showed favoritism and bias for the MCAO. Trial court's unethical action brings discredit to the integrity, impartiality and independence of the judiciary. Trial defense counsel did not motion for a mistrial, thus Petitioner was provided with ineffective counsel. Trial court's action illegally allowed the MCAO to use hearsay evidence to lobby the jury. Petitioner was denied the due process of law guaranteed by the U.S. Constitution amendments 5, 6, 11 and 14. Petitioner motions for remand for new trial.

ARGUMENT FIVE

The trial court abused it's discretion and reversibly erred when it permitted Dr. Ann Burgess to testify about the responses of sexual abuse victims because, in the end, this amounted to nothing more than prohibited "rape trauma syndrome" and "offender profile evidence". Petitioner motions for remand for new trial.

ARGUMENT SIX

The Maricopa County Attorney's Office deputies introduced all complainants in State v. Finkel to each other at a State funded function. Complainants exchanged names, addresses and telephone numbers and reviewed each other's complaints at this meeting. Complainants were unethically exposed to post-event information that caused many to alter memories from the initial police reports. Many complainants bonded with each other. Several held joint press conferences with State and national medical outlets. This unethical contamination of witness testimony by State sponsored and funded implantation of memories denies Petitioner due process of law contrary to the protections of his 5th and 14th Amendments of the U.S. Constitution and Article 2 and 4 of the Arizona Constitution. Trial defense counsel did not motion for mistrial; thus, Petitioner was denied effective counsel. Petitioner motions for remand for new trial.

ARGUMENT SEVEN

The trial court reversibly erred when it barred defense expert witness Dr. Elizabeth Loftus from offering testimony about the risk of implanted memories. In doing so, this denied Petitioner to the protections of the 5th and 14th Amendments to the U.S. Constitution and Article 2 and 4 of the Arizona Constitution. Petitioner motions for remand for new trial.

ARGUMENT EIGHT

The trial court abused it's discretion and reversibly erred when it allowed State witness Rene Imresik to testify about evidence obtained during an illegal search and seizure of Petitioner's private medical practice. Ms. Imresik was a disgruntled employee of Petitioner with no expert training on the limits of proper touching in gynecologic procedures. Ms. Imresik was contacted by an investigator from the MCAO after she originally shared her erroneous conclusions to the Phoenix police officer assigned to a protection detail at Petitioner's pro-choice medical office. The MCAO investigator recruited Ms. Imresik to become a civilian investigative agent for the MCAO. Ms. Imresik illegally conducted on the Petitioner an unannounced warrantless search of privileged doctor-patient medical records. She divulged confidential privileged information to law enforcement that was unethically presented to the jury at trial. The trial court abused it's discretion and reversibly erred by refusing to declare the illegally obtained information "fruit of the poisoned tree". Trial defense counsel did

ARGUMENT TWELVE

The trial court reversibly erred and denied Petitioner his rights to confrontation and a public trial secured to him by the 6th Amendment of the U. S. Constitution and Article 2 and 4 of the Arizona Constitution when it permitted the witness, Shelly Cluff, to testify by means of a DVD taped deposition without first establishing Ms. Cluff was available to testify. The trial judge closed the courtroom to the jury, media and the public during Ms. Cluff's testimony. He did so even though Ms. Cluff was an adult female in her middle 30's. The trial defense counsel did not file a motion for mistrial, thus denying Petitioner effective counsel. Dr. Finkel petitions for remand and new trial.

ARGUMENT THIRTEEN

The trial court abused it's discretion and reversibly erred with it refused to recuse itself from conducting the Rule 31.8(h) remand hearing ordered by the Arizona Court of Appeals and from conducting the informal conference that preceded the Rule 31.8(h) hearing. There is a colorable claim of improper ex parte conduct by both the prosecuting attorneys and the trial judge under E.R. 3.5(b) of the Rules of Professional Conduct, Rule 42 of the Rules of the Arizona Supreme Court and Canon 3(B)(7) of the Code of Judicial Conduct, Rule 42 of the Rules of the Arizona Supreme Court. The trial judge should not sit in any proceeding, formal or informal, without a conflict of interest, where questions of his own credibility and propriety of his own actions are raised. The trial judge refused to recuse himself. Petitioner motions for remand for new trial because he was denied a fair and impartial hearing. Petitioner was denied due process of law as provided by Arizona Constitution Article II, Section 4, A.R.S. and the 14th Amendment of the U. S. Constitution.

ARGUMENT FOURTEEN

The Maricopa County Attorney and his deputies aggressively used their position of trust and under the color of authority to try the case of State v. Finkel in the media. The MCAO issued inflammatory and pejorative statements with their initial press conference and in subsequent news releases. This was part and parcel of the Maricopa County Attorney's conflict of interest scheme meant to protect the reputation of his office regarding allegations on his part or the part of a senior staff member resulting in a mistress coming to Dr. Finkel for abortion services. The MCAO aggressively manipulated the press to promote this scheme. The MCAO even arranged for multiple members of the print, radio and television media to be present at Petitioner's second arrest just blocks from Petitioner's home. Pictures of this arranged "perp walk" flooded the print and electronic media. Dr. Finkel was arrested in this unethical position after his trial attorney had told the MCAO he would surrender Dr. Finkel himself if a second arrest was planned. These and other reporters allowed themselves to be exploited by the MCAO as it issued press releases filled with malevolent innuendo; and, in many instances, outright misinformation and disinformation. The maelstrom caused by the MCAO's manipulation of the media made it close to impossible to find jurors who had not been compromised by pretrial publicity. The seated jurors themselves asked the trial judge to remove one

juror at the end of the trial testimony because they felt he was biased against the Petitioner. The result of the MCAO's electronic media lynching was that the accused did not enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the crime was allegedly to have been committed; thus, denying him the due process protection provided by the 6th Amendment of the U. S. Constitution. The defense counsel did not motion for a change of venue; thus, Petitioner was denied effective counsel. Petitioner motions for remand for a new trial in a subdivision of the State of Arizona other than Maricopa County. The Petitioner motions for a gag order to be issued on all parties at a future trial.

ARGUMENT FIFTEEN

The trial court erroneously aggravated all of the Petitioner's prison sentences - first, because it cited aggravating factors that were illegal or not supported by evidence and, secondly, because it did not grant him a jury trial on the sentence aggravators contrary to the requirements of the 6th Amendment of the U. S. Constitution and Article 2, 23 and 24 of the Arizona Constitution and the holding of Blakely v. Washington. Trial counsel did not advise Petitioner not to comment at the sentencing. Petitioner was led to believe he was required to address the court and was unaware that, by doing so, he could become a witness against himself, thus losing the constitutional privilege guaranteed in the 5th Amendment of the U. S. Constitution. Petitioner motions for remand of the sentencing phase of the trial due to ineffective counsel and for the reasons set forth above.

CONCLUSION

For all of the reasons set forth above, Petitioner is entitled to a new trial in a political subdivision of the State of Arizona separate from Maricopa County if a new Grand Jury finds reason to indict in a conflict of interest free environment. Petitioner is entitled to a new trial on all counts with instructions to conduct the joinder/severance proceedings in conformity with the requirements of State v. Aguilar. At the new trial, the court should be barred from evidence obtained as "fruit of the poisoned tree", from offering offender profile evidence, and Petitioner should be allowed to offer expert testimony on the implanted memory phenomena. At the new trial, no available witness should be allowed to testify by way of a DVD deposition, the prosecution must not suborn perjury nor have ex parte meetings with the trial court. The trial court must maintain it's objectivity, impartiality and freedom from political pressure and intrigue. As to all counts, Dr. Finkel should have a just trial on the aggravating factors and the sentencing court should not aggravate his sentence with factors not proved or illegal. First and foremost, Dr. Finkel is entitled to a Grand Jury hearing that is not compromised by a disqualifying conflict of interest. No disqualified person should be present while the Grand Jury is deliberating or voting. The trial court should quash the original indictments and order remand..

Respectfully submitted,

Brian L. Finkel, ADC #182486
ASPC Florence - South - 5B1
P. O. Box 8400
Florence, Arizona 85232-8400

Attachments:

1) Minute Entry declaring Petitioner indigent by Judge Jeffrey Cates

2) Internal Affairs report - Phoenix Police department Kalmansohn v. Haduck

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515 01/30/2004

CLERK OF THE COURT
J. Baldwin
Deputy

HONORABLE JEFFREY S. CATES

FILED: 02/03/2004

STATE OF ARIZONA

v.

BRIAN L FINKEL

BLAINE D GADOW

RICHARD D GIERLOFF
KRISTEN M CURRY

DOCKET-CRIMINAL-CCC
PUBLIC DEFENDER-APPEALS SECTION
PUBLIC DEFENDER-APPOINT COUNSEL-CCC
VICTIM SERVICES DIV-CA-CCC

MINUTE ENTRY

State's Attorney: Blaine Gadow
Defendant's Attorney: Richard Gierloff
Defendant: Not Present, waived appearance
Court Reporter: Michael Babicky

This is the time set for hearing on defense counsel's Motion to Withdraw/Indigency Determination.

Upon motion having been made and good cause appearing therefore,

IT IS ORDERED withdrawing Richard D. Gierloff and Kristen Curry from further representation in this matter all in accordance with the formal written order signed by the Court this date.

IT IS FURTHER ORDERED taking the Indigency Determination issue Under Advisement.

**LATER:**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515                                          01/30/2004

      After considering defendant's financial statement subscribed 1/29/2004, which includes
substantial liabilities,

      IT IS ORDERED appointing the Public Defender to represent defendant on his appeal
and that defendant and his marital estate pay $275.00 per month to Maricopa County as a
contribution toward the cost of the Public Defender's Office handling defendant's appeal.  The
foregoing payments are to commence 3/1/2004 and continue until further order of the court.

      Defense counsel is directed to provide a copy of this Court's ruling to the defendant and
his spouse.

S101-0030

## Investigations Checklist

Complaint # N/A Date Initiated: 1-12-01 Date Completed 2/15/01

| | DATE | REVIEWER INITIALS |
|---|---|---|
| **Supervisor**<br>Will complete the date box as items are prepared. Reviewer (most cases the Lt.) will initial when completed packet is reviewed. | | |
| 1. Administrative complaint form completed/signed | 2-22-01 | [initials] |
| 2. N.O.I. to officer/s | 1-12-01 | [initials] |
| 3. Notice of findings to officer/s | 2-16-01 | [initials] |
| 4. Tapes of interviews attached to investigation folder | 2-16-01 | [initials] |
| 5. Written reprimand completed (if recommended) | N/A | [initials] |
| 6. Attachments complete | | [initials] |
| 7. Findings letter ready for Commander signature | N/A | [initials] |
| **Investigation Format**<br>This section will normally be completed by the first level of review (usually the lieutenant). | | |
| 1. Proper format (based on findings per G.O. B-2) | | [initials] |
| 2. Allegations properly and accurately worded | | [initials] |
| 3. Details addressing the allegations | | [initials] |
| 4. Findings substantiated by facts | | [initials] |
| 5. N.O.I. wording accurately reflecting allegations | | [initials] |
| 6. Findings consistent in report and notice to officers | | [initials] |
| **Administrative Content**<br>This section will normally be completed by the first level of review (usually the lieutenant). | | |
| 1. White control form signed by Sergeant/Lieutenant | | [initials] |
| 2. Last page of investigation signed by Lieutenant | | [initials] |
| 3. Letter of acknowledgment to complainant | | N/A |
| 4. Letter of findings to complainant | 4-01 | [initials] |
| 5. N.O.I.'s signed off | | [initials] |
| 6. Tapes attached and properly labeled on the tape itself | | [initials] |
| 7. Pink copy of complainant form (filed at precinct) | | [initials] |
| 8. Investigative review form (IRC) completed | | [initials] |
| If accident, IRC is signed by employee before review | | [initials] |
| 9. Ensure no Dept. reports or criminal records are attached (DR's may be attached for pursuits) | | [initials] |
| **Distribution**<br>These boxes will be dated and initialed by the designated reviewer. | | |
| 1. Forwarded to the Lieutenant | 3-6-01 | [initials] |
| 2. Forwarded to the Commander | 3-6-01 | [initials] |
| 3. Forwarded to the Division Chief | 3-7-01 | [initials] |
| 4. Forwarded to the DRB (if recommended) | | |

sf/pad/invstchklst PWtempl

[handwritten annotation, largely illegible] 1/30/02

Copy

# INVESTIGATIVE REVIEW CONTROL FORM

(STATISTICAL TRACKING FORM)

Employee Name: ART HADUCH Serial #: 3679 Investigation #: NA

Investigating Supervisor: SGT. JIM MARKEY #4036

**SECTION I INVESTIGATIVE PHASE: (COMPLETED BY INVESTIGATING SUPERVISOR)**

Draft Copy Completed: 2-23-01 (date) Copy to Employee 2-26-01 (date)

Commander / Administrator will provide a copy of the investigation to the employee and will schedule a meeting with the employee and/or employee's representative:

Meeting with Commander: ________ (date) Facts Agreed Upon ☒ YES ☐ NO

If Subsequent Meeting Necessary: ________ (date)

Disputed Facts and/or Findings Have Been Resolved: ☐ YES ☐ NO

Facts in Dispute:

Agree on facts no meeting required

Employee's Signature [signature] Date: 2/26/01

Returned to Investigating Supervisor ☐ YES ☐ NO Final Report Prepared ________ (date)

**SECTION II MANAGEMENT INPUT** (completed by bureau/ precinct/ commander/administrator. NOTE: In case of accidents/pursuits this section will be completed after the investigation is returned by the Accident Analysis Committee).

Unresolved Accusation

Supervisory Counseling ________ Written Reprimand ________ DRB ________

CMDR or CMDR's Representative [signature] Date: 3-7-01

**SECTION III DRB RECOMMENDATION**

Management Recommendations at DRB:

Employee Offer at DRB:

Board Recommendation:

Accepted by Employee: ☐ YES ☐ NO

DRB Chair: ________ Date: ________

Date sent to PLEA: ________ Date sent to MAPE: ________ Date sent to AFSME: ________

City of Phoenix

# NOTICE OF INVESTIGATION

| ART HADUCH #3679 | 01/12/01 | 1945 HRS |
|---|---|---|
| Employee Name | Date | Time |

__X__* An administrative investigation is being conducted into allegations of possible violations of City or department work rules and regulations concerning the following incident/s: [Include date, time, location (if known), and description of the specific nature of the allegation]

DURING THE MONTH OF DECEMBER 2000, WHILE CONDUCTING A PHONE CONVERSATION WITH A VICTIM IN A CRIMINAL INVESTIGATON YOU MADE COMMENTS TO THIS VICTIM THAT WERE INAPPROPRIATE REGARDING THE COUNTY ATTORNEY'S OFFICE BEING INVOLVED IN MISCONDUCT.

______* An administrative investigation is being conducted into the circumstances of your direct involvement in a police shooting, in-custody death, use of force incident, City equipment accident or pursuit. The incident is described as follows:

Per Operations Order 3.19 and the Memorandum of Understanding, as an employee you have specific rights and responsibilities in this investigation.

A. You are being compelled by a Phoenix Police Department supervisor to truthfully answer questions relating to your duties/conduct, and you can be disciplined up to and including dismissal for refusal to answer these questions.

B. Questions, tests, or examinations will be narrowly and specifically related to your performance of duties and fitness for office.

C. Any such statements, tests, or examination results can be used against you in a disciplinary/administrative/civil proceeding, but will not be used against you in any subsequent criminal action.

D. Voluntary statements or confessions by you may be admissible in subsequent criminal action.

You have the right to mechanically record this interview. The Department reserves the right to transcribe any mechanical recording of this interview for the purpose of verifying the accuracy of the interview. If requested, you shall review the transcription and sign said transcription if it is found to be accurate.

☒ Yes ☐ No You are being given a direct order not to discuss this investigation, including your interview, with any unauthorized person. Other than the investigating supervisor/s, the only persons you may speak to concerning this investigation are enumerated in Operations Order 3.19 and the MOU for your respective work unit, as follows: Privileged communications between the employee and his/her attorney, minister, unit representative, or spouse.

| [signature] 4536 | [signature] 3679 | 1/12/01 |
|---|---|---|
| Investigating Supervisor Signature | Employee Signature | Date |

* Investigator's Initials



**City of Phoenix**

## Notice of Findings for Internal Investigation

| ART HADUCH | 3679 | NA |
|---|---|---|
| Employee | Serial# | Investigation# |

SGT. J. MARKEY #4036
Investigating Supervisor

You were recently involved in an internal investigation in which you were questioned by a supervisor concerning allegations of misconduct that were directed toward you. This memorandum is to inform you of the findings of each allegation. This investigation has been completed and has been forwarded to your Division Commander for review and recommendations.

**Allegation #1:** ☐ Unfounded ☐ Exonerated ☐ Sustained ☒ Unresolved

Describe Allegation: During the month of December 2000 you alledgedly made an inappropriate comment to the victim of a sex crime investigation.

**Allegation #2:** ☐ Unfounded ☐ Exonerated ☐ Sustained ☐ Unresolved

Describe Allegation:

**Allegation #3:** ☐ Unfounded ☐ Exonerated ☐ Sustained ☐ Unresolved

Describe Allegation:

**Allegation #4:** ☐ Unfounded ☐ Exonerated ☐ Sustained ☐ Unresolved

Describe Allegation:

| [signature] 4036 | 2/16/01 | [signature] 3679 | 2/16/01 |
|---|---|---|---|
| Serving Supervisor's Signature | Date | Employee Signature | Date |

80-58DC New 9/94 (grm)

4

COP000215

# ADMINISTRATIVE COMPLAINT CONTROL FORM

Entered 4/12/01

☒ Supervisor Initiated (NO CONTROL / NEEDED) ☐ Citizen complaint of police misconduct (CONTROL / REQUIRED)

Attachments: ☒ Yes ☐ No    Control Number ST01-0030

Complainant: ______ LAST NAME / FIRST NAME / M.I. / ORIGIN / SEX / DOB / SS NUMBER

Address: ______ NUMBER AND STREET / CITY / STATE / ZIP CODE / TELEPHONE NUMBER

Employer: ______ COMPANY AND ADDRESS / ZIP CODE / TELEPHONE NUMBER / WORK HOURS

ATTACHMENT 4
AUDIO TAPES
VIDEO TAPES
PHOTOS
~~MEDICAL RECORDS~~

R & I Checked: ☒ No Record ☐ See narrative    A. Checked: ☒ No history ☐ See narrative

Employee Involved: ART HADUCH (NAME) 3679 (SERIAL NUMBER) C24 (DUTY ASSIGNMENT)

Employee Involved: ______ NAME / SERIAL NUMBER / DUTY ASSIGNMENT

Employee Involved: ______ NAME / SERIAL NUMBER / DUTY ASSIGNMENT

RECEIVED
APR 09 2001
PROFESSIONAL STANDARDS BUREAU

Witness: KALMANSOHN (LAST NAME) KATHE (FIRST NAME) M.I. W (ORIGIN) W (SEX) 6-4-64 (DOB) SS NUMBER

Address: 9331 E. KAREN DR. (NUMBER AND STREET) SCOTTSDALE (CITY) AZ (STATE) 85260 (ZIP CODE) 480-860-4237 (TELEPHONE NUMBER)

Employer: PV HOSPITAL 3929 E. BELL RD. (COMPANY AND ADDRESS) ZIP CODE 602-923-5669 (TELEPHONE NUMBER) VARIOUS (WORK HOURS)

Witness: STRIBLING (LAST NAME) MARK (FIRST NAME) M.I. W (ORIGIN) M (SEX) DOB SS NUMBER

Address: NUMBER AND STREET / CITY / STATE / ZIP CODE 602-215-0533 (TELEPHONE NUMBER)

Employer: COUNTY ATTORNEY INVESTIGATOR (COMPANY AND ADDRESS) 85004 (ZIP CODE) 602-506-7934 (TELEPHONE NUMBER) VARIOUS (WORK HOURS)

Complaint received: ☐ In person ☐ Telephone ☐ Letter

Received by: ______ (SUPERVISOR ONLY) / TELEPHONE NUMBER / DATE / TIME / ROUTED TO

Verification letter sent: ☐ Yes ☒ No If not, why? Supervisory Initiated.

Investigating Supervisor: Sergeant Jim Markey    Duty Assignment: C24

Findings of Complaint: UNRESOLVED

Complainant contacted at conclusion of investigation: ☐ Yes ☐ No    Officer notification sent: ☒ Yes ☐ N/A

If not, why? ______

Location of occurrence: ______ Date: DECEMBER 2000 Time: ______

Complaint/Incident (summary): DURING THE MONTH OF DECEMBER 2000, DETECTIVE HADUCH #3679 ALLEGEDLY MADE AN INAPPROPRIATE COMMENT TO A VICTIM OF A SEX CRIME INVESTIGATION. THE COMMENT INDICATED THAT THE COUNTY ATTORNEY'S OFFICE WAS NOT PURSUING PROSECUTION BECAUSE THE SUSPECT HAD DONE FAVORS FOR AN ATTORNEY IN THEIR OFFICE.

Complaint Routing:
White - Investigator [ ]
Yellow - Chief's Office, Administrative Major [ ]
Pink-Investigator's Bur/Pct Commander [ ]

[signature] 4B3C
INVESTIGATOR'S SIGNATURE

[signature] 2-22-01
INVESTIGATOR'S BUREAU/PRECINCT COMMANDER

5

COP000216

# ADMINISTRATIVE COMPLAINT CONTROL FORM

THIS SECTION TO BE COMPLETED BY INVESTIGATOR AND SENT TO THE ADMINISTRATIVE MAJOR IN THE POLICE CHIEF'S OFFICE UPON COMPLETION OF THE INVESTIGATION.

**INVESTIGATION NARRATIVE:** ☒ **ATTACHMENT/S**

SEE ATTACHED SUPPLEMENT

INVESTIGATING SUPERVISOR'S SIGNATURE: Sgt [signature] 4256

REVIEWED BY: [signature] 3447 DATE: 2-15-01

REVIEWED BY: [signature] DATE: 2-22-01

(adcmtfrm)

**COMPLAINT**
**Page 2**

**ALLEGATION:** That Detective Art Haduch #3679 made a comment to a victim of a sex crimes investigation that the County Attorney was not prosecuting a case because the suspect had performed favors for someone at the County Attorney's office. This is a violation of Operations Order 3.18.3, "Inappropriate or discourteous conduct."

**FINDING:** **UNRESOLVED**

**ATTACHMENTS:**

1. Notice of Investigation to Det. Art Haduch dated 01/12/01
2. Taped phone interview of Mark Stribling, dated 01/1101
3. Taped interview of Kathe Kalmansohn first interview dated 01/11/01
4. Taped interview of Det. Art Haduch dated 01/12/01
5. Taped follow-up phone interview of Kathe Kalmansohn dated 01/23/01
6. Notice of Findings to Det. Art Haduch

**SUMMARY OF INVESTIGATION:**

Sometime during the month of December 2000, Detective Art Haduch was engaged in a phone conversation with the victim of a sex abuse case, Kathe Kalmansohn, involving a Dr. Finkel. The case had been submitted to the County Attorney in June of 2000 and this victim was upset that there had been no action. This victim states she was told by Detective Art Haduch that the reason they (County Attorney) are dragging their feet is because he (Dr. Finkel) performed his special service for someone at the County Attorney's office and they are hesitant to prosecute.

Detective Art Haduch denies this statement was made to Kathe Kalmansohn at any time during his multiple contacts with her. There are no witnesses or tape recordings to confirm one account of the conversation or the other.

**DETAILS OF INVESTIGATION:**

On 1-10-01 I was contacted by Commander Donald Swanson, Family Investigations Bureau and advised that an inquiry had come from the County Attorney's office reference Detective Art Haduch. Commander Swanson had spoken with a Mark Stribling, investigator for the County Attorney. Mark Stribling had stated that he had a conversation in December 2000 with Kathe Kalmasohn. Kathe had stated that she was told by Detective Art Haduch that the County Attorney was hesitant to prosecute her case because the suspect in the case, Dr. Finkel had performed an abortion for someone in the County Attorney's office. Commander Swanson asked me to investigate this incident.

PAGE 3

On 1-11-01 I spoke with Mark Stribling by telephone. This conversation was tape-recorded and that tape is attached to the investigation. Mark is a former police officer with the Phoenix Police Department now working as an investigator with the Maricopa County Attorney. Mark believes that on or around December 28, 2000 he was asked to contact Kathe Kalmansohn reference a sexual abuse investigation that lists her as a victim. He believed that Kathe had questions as to the status of her case. Mark along with a Dr. Larry Mayer, met with Kathe in person at her residence. They met for approximately 2 hours and during this meeting Kathe had stated to Mark that Detective Haduch had made a statement to her that disturbed her. She went on to tell Mark that Detective Haduch told her, "Just between you and I the reason the County Attorney is dragging their feet is because some high level at the County Attorney got his girlfriend pregnant and that person is married and Finkel did an abortion on that person."

Mark Stribling told Kathe not to have any further contact with Detective Haduch until someone contacts her at the police department. He further suggested that she might be asked to conduct a confrontation call with Detective Haduch in order to elicit any comments concerning this statement. Ms. Kalmansohn told Mark that she would cooperate in any way necessary.

Mark Stribling left Ms. Kalmansohn's residence and immediately advised Richard Romley of his findings. Mr. Romley's office then contacted the Phoenix Police Department.

On 1-11-01 at approximately 1830hrs I met with Kathe Kahlmansohn in person at her residence. This conversation was audiotape recorded and this tape is attached to this investigation. I advised Ms. Kallmansohn that I was Detective Haduch's supervisor and I was investigating a statement that she had been told by Detective Haduch. Ms. Kalmansohn was aware that was the reason I was there. Ms. Kalmansohn went on to tell me that in February of 2000 she had filed a sexual abuse report with the Phoenix Police Department. She named Dr. Finkel as the suspect who had assaulted her during the course of an abortion. Ms. Kalmansohn had been in contact with Detective Haduch during the months that followed her initial report. She stated that she had no problems with Detective Haduch and how he had been handling the case. After several months had passed Ms. Kalmansohn became upset over the fact that the County Attorney had not filed any charges in her case. She had made several attempts to contact the County Attorneys office but no one had called her back. In December of 2000 she had a phone conversation with Detective Haduch. This conversation was one of approximately 6 phone calls she has had with Detective Haduch since the investigation began. Ms. Kalmansohn could not recall the specific date of the call but believed it was towards the latter part of December. During the course of this conversation Ms. Kalmansohn expressed her anger and frustration to Detective Haduch over the County Attorney's office handling of her case. As they spoke Detective Haduch told her that "just between you and I the reason they are dragging their feet over there is because someone over there...he has performed his special services for somebody over there and their hesitant to continue with the investigation." Ms. Kalmansohn told Detective Haduch that that was "bull shit' and she was going to call the county Attorney to find out if this was true. She could not recall any other specifics of this conversation.

After speaking with Detective Haduch, Ms. Kalmansohn immediately called the County Attorneys' office and either that day or shortly thereafter Mark Stribling contacted her at home. She told Mark what Detective Haduch had said and wanted to know if this was true.

I asked Ms Kalmansohn a follow-up question about this statement that Detective Haduch had made. I specifically wanted to know that when Detective Haduch had said "they" who she thought he meant. She told me "they" meant the County Attorney. I asked her when Detective Haduch used the word "he" who she thought that meant. Ms. Kalmansohn told me she knew it meant Dr. Finkel. Ms Kalmansohn was positive that Detective Haduch had made this statement to her. She told me that she was not upset or angry with Detective Haduch at any time during the course of this investigation. I asked Ms. Kalmansohn about the statement that Dr. Finkel had performed an abortion on a girlfriend of an attorney at their office who was married. She told me when Mark Stribling spoke with her after Detective Haduch's comment she made that statement to Mark and those were her words not Detective Haduch's.

On 1-12-01 at 1445hrs I spoke with Detective Haduch reference this investigation. This interview was audiotape recorded and a copy of the tape is attached to this investigation. I issued Detective Haduch a Notice of Investigation and advised him of the focus of the investigation. Detective Haduch told me that since this case has been assigned to him he has had approximately 5 or 6 telephone conversations with Kathe Kalmansohn. These conversations were general in nature and most consisted of her being upset that the County Attorney was not moving fast enough in prosecuting her case. Detective Haduch tried to reassure her that the County Attorney was reviewing the case and they would be rendering a decision. I advised Detective Haduch of the specific comment that Ms. Kalmansohn had told me he had made. Detective Haduch stated that he did not make any comment like that to her during any of his conversations with her. I asked Detective Haduch if at some point she might have misunderstood any comment he may have made. Again Detective Haduch denied making any such comment. He did state that during one conversation with Ms. Kalmansohn he had talked with her about Dr Finkel and they both knew he may have political connections as he has been around the valley for some time and knows a lot of people. Detective Haduch spoke to Ms. Kalmansohn about this and they both had an understanding that politics can sometimes play a role in investigations. This conversation was in relationship to the length of time an investigation and prosecution may take. Detective Haduch told me he had no misunderstanding with Ms.Kalhmansohn.. In fact he indicated in no way did this mean that the County Attorney was not going to pursue the case on Finkel, it was simply his attempt trying to assure Ms. Kalmansohn that the County Attorney needed a solid and winnable case before taking it to court. He did not want her to have any misconceptions about this investigation but reassured her that it was his and the county Attorney's desire to pursue criminal charges if appropriate. I asked Detective Haduch if it was possible that Ms. Kalmansohn had miss construed this statement. He told me that he was not going to deceive her about Finkel having political influence but that was not going to stop him or the Office of the County Attorney from pursuing this case. Detective Haduch felt that Ms Kalmansohn could not have misinterpreted this, as he never mentioned the County Attorney in this statement about Dr. Finkel. He repeated to me that he did tell her because of the potential notoriety of a case such as this the County Attorney may take a little longer to initiate prosecution in order to firm up their case and make sure it is solid enough for a conviction.

On 1-23-01 I conducted a follow-up interview with Kathe Kalmansohn via the telephone. I advised her that I had interviewed Detective Haduch and relayed what he had said. I asked Ms. Kalmansohn if there was absolutely any misunderstanding between what she had heard Detective Haduch say. She said she had not confused what he had said with any other conversation. She repeated to me the statement that she had heard Detective Haduch make.

Ms. Kalmansohn told me she was not upset with Detective Haduch at all and was simply concerned about this statement

**CONCLUSION:**

The allegation is that Detective Art Haduch #3679 made an unprofessional and inappropriate statement to a victim when he told her that a suspect in a sex abuse had performed special favors for the County Attorney's office. The witness to this statement is the victim in the sex abuse case. She is adamant that Detective Haduch made this statement. When interviewed Detective Haduch denies making this statement. There is no corroborating evidence or witnesses to this statement and therefore no conclusive answer can be drawn. Based on the facts of this investigation the allegation is **UNRESOLVED.**

**OFFICER HISTORY:**

R and I check: No history.

Prior Discipline:

| | |
|---|---|
| 5-24-99 | Written for failure to properly investigate a child abuse. |

Commendations:

| | |
|---|---|
| 7-2000 | Commendation for a sexual assault investigation. |
| 7-1999 | Commendation on sexual assault investigation and call out. |
| 5-1999 | Commendation from the City of Modesto California PD. |
| 1-1998 | Commended for the SRB social committee. |
| 12-1997 | Commended for the SRB social committee. |
| 11-1997 | Commended for the SRB social committee. |
| 5-1997 | Commendation for exceptional burglary investigation. |
| 5-1997 | Commended for the SRB social committee. |
| 3-1997 | Commended for the SRB social committee. |
| 12-1996 | Commendation for an exceptional burglary investigation. |

Prior Ratings:

| | |
|---|---|
| 2001 | 5 |
| 2000 | 5 |
| 1999 | 5 |
| 1998 | 6 |
| 1997 | 5 |

PAGE 6

**RECOMMENDATION:**

After interviewing all parties involved and reviewing this investigation the alleged complaint is **UNRESOLVED.** I recommend that this report be filed in the Professional Standards Bureau and no further action be taken.

I AGREE WITH THE "UNRESOLVED" FINDING IN THIS ALLEGATION. THERE ARE NO WITNESSES OR RECORDINGS TO THE CONVERSATION BETWEEN DET. HAVTCH AND MR. KALMANSOHN. THE ALLEGATION CAN NOT BE PROVEN OR DISPROVEN. I RECOMMEND NO FURTHER ACTION AND THIS INVESTIGATION BE FORWARDED FOR FILING. Lt. [signature] 3471

I agree. Forward to Chief Dubriel.
[signature]

3-15-01
Noted - Silverio Ontiveros, Asst. Chief

# EXHIBIT  I

**Form 24(c). (Amended) Notice Of Post-conviction Relief**

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

FILED 12-6-07 5:00pm
MICHAEL K. JEANES, Clerk
By [signature] Deputy

STATE OF ARIZONA, Plaintiff,

v.

BRIAN L. FINKEL, Defendant

No. CR 2001-015515
CR2002-001431

Notice of Post-Conviction Relief

**Instructions:** When the notice is complete, file it with the clerk of the superior court of the county in which the conviction occurred.

A person unable to pay costs of this proceeding and to obtain the services of a lawyer without substantial personal or family hardship should indicate this by requesting counsel in Question 6 of this notice and execute the AFFIDAVIT OF INDIGENCY on page 3. In the event an attorney is not appointed, a Request for Preparation of Post-conviction Relief Record form must be filed by the defendant if some portion of the record is needed and has not previously been obtained.

NO ISSUE WHICH HAS ALREADY BEEN RAISED AND DECIDED ON APPEAL OR IN A PREVIOUS PETITION FOR POST-CONVICTION RELIEF MAY BE USED AS A BASIS FOR A SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF.

1. Defendant's Name and prison number (if any): Brian L. Finkel - ADC #182486

2. Defendant's address: ASPC Florence - South - 5B1
P. O. Box 8400
Florence, Arizona 85232-8400

3. (A) Defendant was convicted of the following crimes: Sexual Abuse, etc.

(B) Defendant was sentenced on January 2, 2004, to a term of thirty-four (34) yrs, commencing on January 2, 2004, following a

Trial by: [X] Jury [ ] Judge without a Jury

Plea of: [ ] Guilty [ ] No Contest

0001

Probation Revocation: ☐ Admission ☐ Violation Hearing in the Superior Court of ____________ County with Judge ____________ presiding.

(C) The file number of the case was CR 2001-015515.

4. Defendant has taken the following actions to secure relief from his convictions or sentences:

(A) Direct Appeal: [X] Yes ☐ No

(B) Previous Rule 32 Proceedings: ☐ Yes [X] No

5. Defendant was represented by the following lawyers at: (provide name of counsel and counsel's address, if known)

Trial or change of plea: Richard Gierloff; 45 W. Jefferson, #412; Phoenix 85003
Kristin Curry; 814 W. Roosevelt; Phoenix, AZ 85007

Sentencing Hearing: Richard Gierloff (see above) Kristin Curry (see above)

Appeal (if any): Edward McGee; 620 W. Jefferson, #4015; Phoenix,AZ 85003
Consuelo Ohanesian; 3800N. Central Ave, #1500; Phoenix, AZ 85012

Previous Rule 32 Proceedings (if any): N/A

6. Defendant is presently represented by a lawyer. ☐ Yes [X] No
(If yes, provide name and address.)

If no, does the defendant request the court to appoint a lawyer for this proceeding? [X] Yes ☐ No.

7. **Respond to this section only if this is an untimely notice or the defendant has filed a previous Rule 32 petition in this case.**

(A) Is a claim pursuant to Rule 32.1(d), (e), (f), (g) or (h) being raised in this petition? ☐ Yes ☐ No



I AM REQUESTING POST-CONVICTION RELIEF. I UNDERSTAND THAT I MUST INCLUDE IN MY PETITION EVERY GROUND FOR RELIEF WHICH IS KNOWN AND WHICH HAS NOT BEEN RAISED AND DECIDED PREVIOUSLY. I ALSO UNDERSTAND THAT FAILURE TO RAISE ANY KNOWN GROUND FOR RELIEF IN MY PETITION WILL PROHIBIT ME FROM RAISING IT AT ANY FUTURE DATE.

11/01/07
Date

[signature]
Defendant

**AFFIDAVIT OF INDIGENCY**

I have requested the appointment of a lawyer to represent me in Question 6. I swear under oath and penalty of perjury that I am indigent and because of my poverty I am financially unable to pay for the cost of a lawyer to represent me without incurring substantial hardship to myself or my family. Please see attached Minute Entry.

[signature]
Defendant

Subscribed and sworn to before me on 11/1/07
(date)

9/20/07
My Commission Expires

[signature]
Notary Public

0003

(B) If yes, state the specific exception:

☐ The defendant is being held in custody after the sentence imposed has expired.

☐ Newly discovered material facts exist which probably would have changed the verdict or sentence.

☐ The defendant's failure to file a timely notice of post-conviction relief or notice of appeal was without fault on the defendant's part.

☐ There has been a significant change in the law that would probably overturn the conviction or sentence.

☐ Facts exist which establish by clear and convincing evidence that the defendant is actually innocent.

(C) State the facts that support the claim and the reasons for not raising the claim in the previous petition or in a timely manner.

BRIAN LESLIE FINKEL IS THE PETITIONER IN THIS RULE 32 ACTION. DR FINKEL PETITIONS THE COURT FOR APPOINTMENT OF COUNSEL. FINKEL HAS BEEN DECLARED INDIGENT BY MARICOPA COUNTY SUPERIOR COURT JUSTICE JEFFREY CATES. FINKEL WILL NEED ASSISTANCE OF COUNSEL DUE TO THE COMPLEXITY OF THIS PETITION, HIS LACK OF LEGAL TRAINING AND NO ACCESS TO A LEGAL LIBRARY

FINKEL PETITIONS TO SECURE APPROPRIATE RELIEF UNDER THE FOLLOWING GROUNDS:

(A) THE CONVICTION OR THE

0004

THE SENTENCE WAS IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES OR OF THE STATE OF ARIZONA

(B) NEWLY DISCOVERED IMPEACHMENT MATERIAL FACTS EXISTS AND SUCH FACTS PROBABLY WOULD HAVE CHANGED THE VERDICT OR SENTENCE

(C) THE SENTENCE IMPOSED IS NOT IN ACCORDANCE WITH THE SENTENCE AUTHORIZED BY LAW

(D) PETITIONER RECEIVED INEFFECTIVENESS OF COUNSEL

(E) TRIAL JUDGE HELD TWO EX PARTE MEETINGS; ONE WITH PROSECUTOR, THE OTHER WITH A REPORTER WITH THE "ARIZONA REPUBLIC" TRIAL JUDGE VIOLATED CODE OF JUDICIAL CONDUCT CANON 3 B(7)

ARGUMENT ONE

THE TRIAL COURT ABUSED IT'S DISCRETION AND REVERSIBLY ERRED WHEN IT RULED A DISQUALIFYING CONFLICT OF INTEREST BETWEEN THE MARICOPA COUNTY ATTORNEY'S OFFICE, [MCAO], AND DEFENDANT WAS A COLLATERAL ISSUE.

THE MCAO HID THE DISQUALIFYING CONFLICT OF INTEREST FROM THE GRAND JURY. THUS ALLOWING A DISQUALIFIED PERSON TO BE PRESENT WHILE THE GRAND JURY WAS DELIBERATING OR VOTING. THE DEFENDANT WAS DENIED DUE PROCESS. HAVING A DISQUALIFIED AUTHORIZED PERSON AT SESSIONS OF THE GRAND JURY CAUSES THOSE SESSIONS TO BE TAINTED AS TO INVALIDATE THEM. DEFENSE TRIAL ATTORNEY DID NOT ASK FOR A MISTRIAL. THUS, PETITIONER RECEIVED INEFFECTIVE COUNSEL. PETITIONER WAS DENIED A FAIR AND IMPARTIAL HEARING. ARIZONA CONSTITUTION ARTICLE II, SECTION 4, A.R.S AND THE 14TH AMENDMENT TO THE U.S. CONSTITUTION PROVIDE THAT NO PERSON SHALL BE DEPRIVED OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW. PETITIONER REQUESTS THAT THE TRIAL COURT QUASH THE GRAND JURY INDICTMENTS AND REVERSE ALL CONVICTIONS

ARGUEMENT 2

THE TRIAL JUDGE VIOLATED CANON 1, 2, 3(B)(2)(9) OF THE ARIZONA CODE OF JUDICIAL CONDUCT. THE JUDGE GAVE A LENGTHY INTERVIEW TO A REPORTER FROM THE "ARIZONA REPUBLIC". THE JUDGE INVITED THE REPORTER TO HIS CHAMBERS AND ALLOWED HIM TO VIEW DVD'S OF TRIAL TESTIMONY. THE JUDGE MADE REMARKS TO THE REPORTER SHOWING A PERSONAL BIAS TOWARD PETITIONER. THE TRIAL COURT'S ACTION BRINGS DISCREDIT TO THE INTEGRITY, IMPARTIALITY AND INDEPENDENCE OF THE JUDICIARY. TRIAL COUNCELS DID NOT MOTION FOR A MISTRIAL, THUS PROVIDING INEFFECTIVE COUNCEL TO PETITIONER. TRIAL COURT'S UNETHICAL ACTION DENIED PETITIONER TO THE U.S. CONSTITUTION DUE PROCESS OF LAW GUARANTEED BY AMENDMENTS 5, 6, & 14.

ARGUEMENT 3

THE TRIAL COURT ABUSED IT'S DISCRETION AND REVERSIBLY

ERRED IN JOINING COUNTS IN THIS SEX OFFENSE PROSECUTION ON THE THEORY THAT ALL COUNTS WOULD BE CROSS ADMISSIBLE AS "OTHER ACTS", PURSUANT TO RULE 404(C) OF THE ARIZONA RULES OF EVIDENCE, FIRST, BECAUSE BEFORE RULING THE TRIAL COURT DID NOT PERSONALLY EVALUATE THE CREDIBILITY OF THE COMPLAINTS AS REQUIRED BY "STATE V. AGUILAR". AND SECONDLY, BECAUSE BEFORE RULING, THE COURT DID NOT RECEIVE EXPERT TESTIMONY ON THE LIMITS OF PROPER TOUCHING IN GYNECOLOGICAL PROCEDURES.

ARGUMENT 4

THE TRIAL COURT VIOLATED CANON 1, 2, 3(B)(2)(9) OF THE ARIZONA CODE OF JUDICIAL CONDUCT. THE TRIAL COURT ORIGINALLY RULED THAT PETITIONER WAS ENTITLED TO SEPARATE TRIALS FOR EACH COMPLAINT. THE COURT THEN HAD AN EX PARTE MEETING WITH A DEPUTY MCAO ATTORNEY. COURT RECEIVED HEARSEY

EVIDENCE AT THIS MEETING. THIS EVIDENCE WAS NEVER GIVEN TO DEFENSE COUNCEL OR ENTERED INTO EVIDENCE IN FRONT OF THE JURY. TRIAL JUDGE USED THIS UNETHICALLY RECEIVED INFORMATION TO REVERSE HIS ORIGINAL RULING AND ISSUE NEW RULING THAT SHOWED FAVORITISM AND BIAS FOR THE MCAO'S POSITION. TRIAL COURT'S UNETHICAL ACTION BRINGS DISCREDIT TO THE INTEGRITY, IMPARTIALITY AND INDEPENDENCE OF THE JUDICIARY. TRIAL COUNCEL did NOT MOTION FOR A MISTRIAL, THUS PROVIDING PETITIONER WITH INEFFECTIVENESS OF COUNCEL. TRIAL COURT'S ACTION ALLOWED PROSECUTION TO LOBBY THE JURY SINCE ALL COUNTS WERE JOINED IN ONE TRIAL. TRIAL COURT'S ACTION DENIED PETITIONER TO DUE PROCESS OF LAW GUARANTEED BY U.S. CONSTITUTION AMENDMENTS 5, 6, AND 14. PETITIONER MOTIONS FOR REMAND FOR NEW TRIAL

ARGUEMENT 5

THE TRIAL COURT ABUSED IT'S DISCRETION AND REVERSIBLY ERRED WHEN IT PERMITTED DR. ANN BURGESS TO TESTIFY ABOUT THE RESPONSE OF SEXUAL ABUSE VICTIM'S BECAUSE, IN THE END, THIS AMOUNTED TO NOTHING MORE THAN PROHIBITED "RAPE TRAUMA SYNDROME" AND "OFFENDER PROFILE EVIDENCE.

ARGUMENT 6

THE MCAO INTRODUCED ALL COMPLAINANTS IN "STATE V. FINKEL" TO EACH OTHER AT A STATE FUNDED FUNCTION. COMPLAINANTS EXCHANGED NAMES, PHONE NUMBERS, ADDRESSES AND REVIEWED EACH OTHER'S EVIDENCE AT THIS MEETING COMPLAINANTS WERE EXPOSED TO POST EVENT INFORMATION THAT CAUSED MANY TO ALTER THEIR MEMORIES FROM THE INITIAL POLICE REPORTS TO THEIR TESTIMONY AT TRIAL THIS UNETHICAL CONTAMINATION OF WITNESS TESTIMONY BY STATE SPONSORED IMPLANTATION

OF MEMORIES DENIES PETITIONER DUE PROCESS OF LAW CONTRARY TO THE PROTECTIONS OF THE 5TH & 14TH AMENDMENTS OF THE U.S. CONSTITUTION AND ARTICLE 2 AND 4 OF THE ARIZONA CONSTITUTION. PETITIONER MOTIONS FOR NEW TRIAL

ARGUMENT 6

THE TRIAL COURT REVERSIBLY ERRED WHEN IT BARRED DEFENSE EXPERT, DR ELIZABETH LOFTUS, FROM OFFERING TESTIMONY ABOUT THE RISK OF IMPLANTED MEMORIES, AND IN DOING SO DENIED PETITIONER THE PROTECTIONS OF THE 5TH & 14TH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 2 AND 4 OF THE ARIZONA CONSTITUTION.

ARGUMENT 7

THE TRIAL COURT ABUSED ITS DISCRETION AND REVERSIBLY ERRED WHEN IT ALLOWED STATE WITNESS

RENE IMRESIK TO TESTIFY ABOUT EVIDENCE OBTAINED DURING AN illegal SEARCH AND SEIZURE. IMRESIK WAS A DISGRUNTLED EMPLOYEE OF PETITIONER WITH NO EXPERT TRAINING ON THE LIMITS OF PROPER TOUCHING IN GYNECOLOGICAL PROCEDURES. IMRESIK WAS CONTACTED BY AN INVESTIGATOR FROM THE MCAO. SAID INVESTIGATOR RECRUITED IMRESIK TO BECOME A CIVILIAN INVESTIGATIVE AGENT FOR THE MCAO. IMRESIK illegally CONDUCTED AN UNANNOUNCED WARRANTLESS SEARCH OF DOCTOR-PATIENT MEDICAL RECORDS AND DEVULGED CONFIDENTIAL PRIVILEDGED INFORMATION TO LAW ENFORCEMENT THAT WAS UNETHICALLY PRESENTED IN TRIAL. TRIAL COURT ABUSED IT'S DISCRETION BY REFUSING TO DECLARE THIS illegally OBTAINED INFORMATION FRUIT OF THE POISON TREE. TRIAL COUNCEL DID NOT FILE MOTION OBJECTING TO THE TRIAL COURT'S RULING, THUS DENYING PETITIONER EFFECTIVE

COUNCEL. PETITIONER MOTIONS FOR MISTRIAL AND DISMISSAL OF CONVICTIONS RELATED TO INFORMATION THAT WAS SEIZED IN VIOLATION OF DUE PROCESS RIGHTS GUARANTEED BY 4TH AMENDMENT OF THE U.S. CONSTITUTION.

ARGUEMENT 8.

DEPUTY COUNTY ATTORNEY NANETTI' SUBORNED PERJURY FROM STATE WITNESS RENE IMRESIK DURING THE JURY TESTIMONY. BOTH TRIAL COUNCELS WERE AWARE OF THE SUBORNED TESTIMONY BUT DID NOT MOTION TRIAL COURT THAT IT BE BROUGHT TO THE ATTENTION OF THE JURY. THIS EVIDENCE WOULD PROBABLY CHANGED THE VERDICT OR SENTENCE. PETITIONER MOTIONS FOR REMAND FOR NEW TRIAL DUE TO INEFFECTIVENESS OF COUNCEL

ARGUEMENT 9

THE MCAO WITHHELD EVIDENCE

THAT STATE WITNESS [TO BE SUPPLIED BY APPOINTED COUNCEL] HAD OUTSTANDING ARREST WARRANTS FOR PROSTITUTION AND PROVIDING THERAPY AS A MASSAGE THERAPIST WITHOUT A LICENSE. MCAO COMMITTED A FRAUD UPON THE COURT, JURY, AND PETITIONER BY NOT REVEALING THESE WARRANTS WERE A YEAR OLD AT THE TIME OF WITNESS' TESTIMONY. THE MCAO ALLOWED THE WITNESS TO PERJURE HERSELF CONCERNING HER OCCUPATION AT THE TIME OF HER TESTIMONY. THESE NEWLY DISCOVERED MATERIAL FACTS WERE DISCOVERED AFTER THE TRIAL AND PROBABLY WOULD HAVE CHANGED THE VERDICT AND SENTENCE. PETITIONER MOTIONS FOR NEW TRIAL BECAUSE HE WAS DENIED DUE PROCESS RIGHTS GUARANTEED BY ARTICLE II, SECTION 4, A.R.S. AND THE 5TH, 6TH, AND 14TH AMENDMENT OF THE U.S. CONSTITUTION.

ARGUMENT 10

STATE WITNESS RENA TOBIN PERJURED HERSELF AT THE TIME OF

HER TESTIMONY WHEN SHE TOLD THE COURT AND JURY SHE WAS A MASSAGE THERAPIST. SHE WAS IN FACT A PROSTITUTE USING THE MASSAGE PARLOR SHE WORKED AT AS A FRONT FOR PROSTITUTION. NEWLY DISCOVERED MATERIAL FACTS EXIST THAT SHOW TOBIN WAS ARRESTED BY THE MARICOPA COUNTY SHERIFF'S OFFICE FOR PROSTITUTION SHORTLY AFTER PETITIONER'S TRIAL. THE MCAO REFUSED TO PROSECUTE TOBIN. THESE NEWLY DISCOVERED MATERIAL FACTS WOULD HAVE CHANGED THE VERDICT OR SENTENCE. PETITIONER MOTIONS FOR REMAND FOR NEW TRIAL

ARGUMENT II

THE TRIAL COURT REVERSIBLY ERRED AND DENIED PETITIONER HIS RIGHTS TO CONFRONTATION AND A PUBLIC TRIAL, SECURED HIM BY THE 6TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 2 § 24 OF THE ARIZONA CONSTITUTION

WHEN IT PERMITTED THE WITNESS SHELLY CLUFF TO TESTIFY BY MEANS OF A VIDEO TAPED DEPOSITION, WITHOUT FIRST ESTABLISHING THAT CLUFF WAS AVAILABLE TO TESTIFY. TRIAL COUNCEL DID NOT FILE A MOTION OBJECTING TO VIDEO TAPED TESTIMONY, THUS DENYING PETITIONER EFFECTIVE COUNCEL. PETITIONER MOTIONS FOR REMAND FOR NEW TRIAL.

ARGUEMENT 12

THE TRIAL COURT ABUSED IT'S DISCRETION AND REVERSIBLY ERRED WHEN IT REFUSED TO RECUSE ITSELF FROM CONDUCTING THE RULE 31.8 (H) REMAND HEARING ORDERED BY THE COURT OF APPEALS AND FROM CONDUCTING THE INFORMAL CONFERENCE THAT PROCEDED THE RULE 31.8(h) HEARING. THERE IS A COLORABLE CLAIM OF IMPROPER EX PARTE CONDUCT BY BOTH THE PROSECUTING ATTORNEYS AND THE TRIAL JUDGE UNDER E.R. 3.5(b) OF THE RULES OF PROFESSIONAL

CONDUCT, 42 RULES OF THE ARIZONA SUPREME COURT AND CANON 3(B)(7) OF THE CODE OF JUDICIAL CONDUCT, 42 RULES OF THE ARIZONA SUPREME COURT. THE ORIGINAL TRIAL JUDGE SHOULD NOT SIT IN ANY PROCEEDING, FORMAL OR INFORMAL, WITHOUT A CONFLICT OF INTEREST, WHERE QUESTIONS OF HIS OWN CREDIBILITY AND THE PROPRIETY OF HIS OWN CONDUCT ARE RAISED. THE TRIAL COURT REFUSED TO RECUSE HIMSELF, PETITIONER MOTIONS FOR REMAND FOR NEW TRIAL BECAUSE HE WAS DENIED A FAIR AND IMPARTIAL HEARING, PETITIONER WAS DENIED DUE PROCESS OF LAW AS PROVIDED BY ARIZONA CONSTITUTION ARTICLE II, SECTION 4, A.R.S. AND THE 14th AMENDMENT TO THE U.S. CONSTITUTION

ARGUMENT 13

THE MARICOPA COUNTY ATTORNEY AND HIS DEPUTIES AGGRESSIVELY USED THEIR POSITION OF TRUST

AND UNDER THE COLOR OF AUTHORITY TO TRY THE CASE OF "STATE V. FINKEL" IN THE MEDIA. THE MCAO ISSUED INFLAMATORY AND PREJUDICIAL STATEMENTS TO THE MEDIA STARTING WITH THEIR INITIAL PRESS CONFERENCE AND IN SUBSEQUENT NEWS RELEASES. THIS WAS PART AND PARCEL OF THE MCAO'S CONFLICT OF INTEREST SCHEME MEANT TO PROTECT AND PROMOTE COUNTY ATTORNEY RICK ROMLEY'S POLITICAL CAREER. THE MCAO EVEN ARRANGED FOR MULTIPLE MEMBERS OF THE ELECTRONIC AND PRINT PRESS TO BE PRESENT AT THE PETITIONER'S SECOND ARREST NEAR HIS HOME IN NORTH PHOENIX. THIS INSPITE OF THE FACT THAT TRIAL COUNCEL HAD ADVISED THE MCAO THAT HE WOULD TURN IN PETITIONER IF A SECOND ARREST WARRANT WAS ISSUED. THESE AND OTHER REPORTERS ALLOWED THEMSELVES TO BE EXPLOITED BY THE MCAO AS IT ISSUED PRESS RELEASES FILLED WITH MALEVOLENT INNUENDO

AND IN MANY INSTANCES, OUT RIGHT MISINFORMATION AND DISINFORMATION. THE MAELSTROM CAUSED BY THE MCAO'S MANIPULATION OF THE MEDIA MADE IT CLOSE TO IMPOSSIBLE TO FIND POTENTIAL JURORS WHO HAD NOT BEEN COMPROMISED BY THE PRETRIAL PUBLICITY. THE SEATED JURORS THEMSELVES ASKED THE TRIAL COURT TO REMOVE ONE JUROR AT THE END OF TRIAL TESTIMONY FOR THEY FELT HE WAS BIASED AGAINST PETITIONER. THE RESULT OF THE MCAO'S SMEAR CAMPAIGN WAS THE ACCUSED DID NOT ENJOY THE RIGHT TO A SPEEDY AND PUBLIC TRIAL, BY AN IMPARTIAL JURY OF THE STATE AND DISTRICT WHERE THE CRIME SHALL HAVE BEEN COMMITTED; THUS DENYING HIM THE DUE PROCESS PROTECTION PROVIDED BY THE 6TH AMENDMENT OF THE U.S. CONSTITUTION. THE PETITIONER'S TRIAL COUNCEL WAS AWARE OF THE MEDIA LYNCHING BUT did NOT ASK FOR A CHANGE OF VENUE. PETITIONER WAS THUS PRESENTED WITH

INEFFECTIVE COUNCEL. PETITIONER MOTIONS FOR REMAND FOR A NEW TRIAL IN A NEW POLITICAL SUBDIVISION OF THE STATE OF ARIZONA. PETITIONER REQUEST GAG ORDER BE ISSUED ON ATTORNEYS FOR THE STATE AND PETITIONER.

ARGUEMENT 14

THE TRIAL COURT ERRONEOUSLY AGGRAVATED ALL OF PETITIONER'S PRISON SENTENCES, FIRST, BECAUSE IT CITED AGGRAVATING FACTORS THAT WERE ILLEGAL, OR NOT SUPPORTED BY EVIDENCE, AND SECONDLY BECAUSE IT DID NOT GRANT HIM A JURY TRIAL ON THE SENTENCING AGGRAVATORS, CONTRARY TO THE REQUIREMENTS OF THE 6TH AMENDMENT OF THE U.S. CONSTITUTION ARTICLE 2, 23 AND 24 OF THE ARIZONA CONSTITUTION AND THE HOLDING OF "BLAKELY V. WASHINGTON". TRIAL COUNCEL DID NOT ADVISE PETITIONER NOT TO COMMENT AT THE SENTENCING HEARING. PETITIONER THOUGHT HE WAS REQUIRED TO

ADDRESS THE COURT AND WAS UNAWARE THAT BY DOING SO HE WOULD BECOME A WITNESS AGAINST HIMSELF, THUS LOSING THE CONSTITUTIONAL PRIVILEDGE GUARANTEED IN THE 5th AMENDMENT OF THE U.S. CONSTITUTION. PETITIONER MOTIONS FOR REMAND FOR SENTENCING PHASE OF TRIAL DUE TO INEFFECTIVENESS OF COUNCEL AND FOR REASONS SET FORTH ABOVE.

CONCLUSION.

FOR ALL THE REASONS SET FORTH ABOVE, PETITIONER IS ENTITLED TO A NEW TRIAL IN A NEW POLITICAL SUBDIVISION OF THE STATE OF ARIZONA IF A NEW GRAND JURY FINDS REASON TO INDITE. PETITIONER IS ENTITLED TO A NEW TRIAL ON ALL COUNTS WITH INSTRUCTIONS TO THE COURT TO CONDUCT THE JOINDER/SEVERANCE PROCEEDINGS IN CONFORMITY WITH THE REQUIREMENTS OF "STATE V. AGUILAR." AT THE NEW TRIAL

THE STATE SHOULD BE BARRED FROM EVIDENCE OBTAINED AS "FRUIT OF THE POISON TREE," FROM OFFERING OFFENDER PROFILE EVIDENCE, AND PETITIONER SHOULD BE ALLOWED TO OFFER EXPERT TESTIMONY ON IMPLANTED MEMORY PHENOMENA AT THE NEW TRIAL, NO AVAILABLE WITNESS SHOULD BE PERMITTED TO TESTIFY BY WAY OF VIDEO DEPOSITION, THE PROSECUTOR MUST NOT SUBORN PERJURY NOR HAVE EX PARTE MEETINGS WITH TRIAL COURT. THE TRIAL COURT MUST MAINTAIN IT'S OBJECTIVITY, IMPARTIALITY AND FREEDOM FROM POLITICAL PRESSURE AND INTRIQUE AS TO ALL COUNTS, DR FINKEL SHOULD HAVE A JURY TRIAL ON THE AGGRAVATING FACTORS, AND THE SENTENCING COURT SHOULD NOT AGGRAVATE HIS SENTENCES WITH FACTORS THAT ARE NOT PROVED OR ARE ILLEGAL. FINALLY, PETITIONER IS ENTITLED TO A GRAND JURY HEARING THAT IS NOT COMPROMISED BY A DISQUALIFYING

CONFLICT OF INTEREST. NO DISQUALIFIED PERSON SHOULD BE PRESENT WHILE THE GRAND JURY IS DELIBERATING OR VOTING. THE TRIAL COURT SHOULD QUASH THE INDITEMENTS IN "STATE V. FINKEL" AND ORDER REMAND

RESPECTFULLY,

Brian Finkel DO

BRIAN LESLIE FINKEL DO
#182486
ASPC FLORENCE
SOUTH UNIT S5B7
PO BOX 8400
FLORENCE, AZ 85232-8400
USA

SUBMITTED TO
ASPC FLORENCE MAILROOM
ON 4 DECEMBER 2007

EXHIBIT ONE

01/30/2004
MINUTE ENTRY
CR 2001-015515

STATE V. FINKEL

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515 01/30/2004

HONORABLE JEFFREY S. CATES

CLERK OF THE COURT
J. Baldwin
Deputy

FILED: 02/03/2004

STATE OF ARIZONA BLAINE D GADOW

v.

BRIAN L FINKEL RICHARD D GIERLOFF
KRISTEN M CURRY

DOCKET-CRIMINAL-CCC
PUBLIC DEFENDER-APPEALS SECTION
PUBLIC DEFENDER-APPOINT COUNSEL-CCC
VICTIM SERVICES DIV-CA-CCC

MINUTE ENTRY

State's Attorney: Blaine Gadow
Defendant's Attorney: Richard Gierloff
Defendant: Not Present, waived appearance
Court Reporter: Michael Babicky

This is the time set for hearing on defense counsel's Motion to Withdraw/Indigency Determination.

Upon motion having been made and good cause appearing therefore,

IT IS ORDERED withdrawing Richard D. Gierloff and Kristen Curry from further representation in this matter all in accordance with the formal written order signed by the Court this date.

IT IS FURTHER ORDERED taking the Indigency Determination issue Under Advisement.

**LATER**:



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515                                                01/30/2004

After considering defendant's financial statement subscribed 1/29/2004, which includes substantial liabilities,

IT IS ORDERED appointing the Public Defender to represent defendant on his appeal and that defendant and his marital estate pay $275.00 per month to Maricopa County as a contribution toward the cost of the Public Defender's Office handling defendant's appeal. The foregoing payments are to commence 3/1/2004 and continue until further order of the court.

Defense counsel is directed to provide a copy of this Court's ruling to the defendant and his spouse.



# EXHIBIT  J

MICHAEL K. JEANES, CLERK
BY L. Sam DEP
FILED

DEC 03 2008 AM 9:11

LAW OFFICES
MICHAEL J. DEW
6501 N. Central Avenue
Phoenix, Arizona 85012-1139
Tel/Fax (602) 234-0087
State Bar No. 004543

Attorney for Defendant/Petitioner

IN THE SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

| | | |
|---|---|---|
| STATE OF ARIZONA, Plaintiff, vs. BRIAN L. FINKEL, Defendant. | ) | NO. CR 2001-015515 NOTICE OF COMPLETION OF POST-CONVICTION REVIEW *and* REQUEST FOR EXTENSION OF TIME TO ALLOW PETITIONER TO PROCEED *PRO PER* |

Undersigned has communicated with Petitioner, reviewed the transcripts and all relevant documents in this matter, and is unable to discern any colorable claim upon which to base a Petition for Post-Conviction Relief.

Pursuant to *Lammie v. Barker,* 185 Ariz. 263, 915 P.2d 662 (1996), and Rule 32.4(c)(2), a forty-five day extension of time is requested for Petitioner to file a *pro per* pleading. Similarly, undersigned will remain counsel of record until such time as Rule 32 proceedings are completed, in order to assist in the event Petitioner or this Court should discover a viable issue.

RESPECTFULLY SUBMITTED: December 2, 2008.

MICHAEL J. DEW

Copy of the foregoing mailed/
faxed/delivered December 2, 2008:

James P. Beene
Deputy County Attorney
3131 W. Durango Street 2nd Floor
Phoenix, Arizona 85009-6217

Rule 32 Management Unit
East Court Building 514B
101 W. Jefferson
Phoenix, Arizona 85003-2202

Brian L. Finkel #182486
ASPC Eyman — Cook
P.O. Box 3200
Florence, Arizona 85232-3200

# EXHIBIT  K

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/10/2008 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515 12/04/2008

HON. GARY E. DONAHOE

CLERK OF THE COURT
S. Yoder
Deputy

STATE OF ARIZONA

MJC2 APPEALS COUNTY ATTORNEY

v.

BRIAN L FINKEL

BRIAN L FINKEL
ASPC - EYMAN #182486
PO BOX 3200
FLORENCE AZ 85232
MICHAEL J DEW

COURT ADMIN-CRIMINAL-PCR
VICTIM SERVICES DIV-CA-CCC

NOTICE OF COMPLETION OF POST-CONVICTION REVIEW BY COUNSEL; REQUEST FOR EXTENSION OF TIME TO ALLOW DEFENDANT TO FILE PRO PER PETITION FOR POST-CONVICTION RELIEF/GRANTED

This Court has received defense counsel's Notice of Completion of Post-Conviction Review.

IT IS ORDERED as follows:

1) Defense counsel shall remain in an advisory capacity for the Defendant until a final determination is made by the trial court regarding any post-conviction relief proceeding, pursuant to Rule 32.4(c)(2), Arizona Rules of Criminal Procedure.

2) The Defendant shall have 45 days from today's date to file a *Pro Per* Petition for Post-Conviction Relief. Pursuant to Rule 32.5, the *Pro Per* Petition shall contain the Defendant's certification that he/she has included every ground known to him/her for vacating, reducing, correcting or otherwise changing all judgments or sentences imposed upon him/her.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515                                    12/04/2008

The Defendant must also allege facts within his/her personal knowledge under oath, and support the allegations in the petition with affidavits, records or other evidence currently available to him/her.  One copy of the petition shall be served upon the Criminal Presiding Judge/Rule 32 Management Unit, and one copy shall be served upon the attorney for the state.  The Court advises the Defendant that failure to timely file the *Pro Per* Petition for Post-Conviction Relief may be grounds for dismissal.

    3)  The State's response to the petition shall be filed within 45 days after the petition is filed.

    4)  The Defendant may file a reply within 15 days after the response is filed.

# EXHIBIT  L

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/11/2009 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2001-015515

03/10/2009

HON. GARY E. DONAHOE

CLERK OF THE COURT
S.M. Perez
Deputy

STATE OF ARIZONA

v.

BRIAN L FINKEL

MJC2 APPEALS COUNTY ATTORNEY

BRIAN L FINKEL
ASPC - EYMAN #182486
PO BOX 3200
FLORENCE AZ 85232
MICHAEL J DEW

COURT ADMIN-CRIMINAL-PCR
VICTIM SERVICES DIV-CA-CCC

**PCR DISMISSED**

The Court ordered that the Petition for Post-Conviction Relief be filed by 01/20/2009. This deadline has passed and the defendant has not filed any petition. No good cause appearing,

**IT IS ORDERED** dismissing the Rule 32 proceeding

# EXHIBIT  M

BOX

04-0096
Acedo

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA,<br>Plaintiff,<br>vs.<br>BRIAN L. FINKEL,<br>Defendant. | ) | No. 1 CA-CR 04-0046<br>No. CR 2001-015515<br>No. CR 2002-001431 |

BEFORE THE HONORABLE JEFFREY S. CATES
JUDGE OF THE SUPERIOR COURT

Phoenix, Arizona
September 5, 2003

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Copy)

PREPARED FOR APPEAL

Prepared by:
Dotty Reaume, RMR
Certified Court Reporter
Certificate No. 50210

A P P E A R A N C E S:

The plaintiff was represented by its attorneys, Mr. Blaine Gadow and Ms. Cindi Nannetti.

The defendant was represented by his attorney, Mr. Richard D. Gierloff.

Ms. Shelly Cluff was represented by her attorneys, Ms. Sherri Toussaint and Mr. Paul de Blank.

Also present was Ms. Shelly Cluff and, appearing telephonically, Gregory M. Crow, Ph.D.

(Whereupon, the following proceedings were held in chambers:)

THE COURT: State versus Brian Finkel, 2001-015515.

MR. GIERLOFF: Richard Gierloff on behalf of Dr. Finkel. I'll waive his appearance.

MS. NANNETTI: Cindi Nannetti for the State.

MR. GADOW: Blaine Gadow, G-a-d-o-w.

MS. TOUSSAINT: Sherri Toussaint, T-o-u-s-s-a-i-n-t, for Shelly Cluff.

(Whereupon, Dr. Crow joined the proceedings telephonically.)

THE COURT: Doctor?

DR. CROW: Yes, your Honor.

THE COURT: This is Judge Cates, and I've got everyone here who is involved in the case. Do you want me to have them introduce themselves to you, or is it okay if we just get input from you?

DR. CROW: I'm not really sure who is who.

THE COURT: Let me go around and have everyone tell you who they are and what involvement they have in the case.

DR. CROW: That would be great.

MR. GIERLOFF: Richard Gierloff,

representing Dr. Finkel.

DR. CROW: Okay.

MS. NANNETTI: Dr. Crow, Cindi Nannetti for the State.

DR. CROW: Thank you.

MR. GADOW: Blaine Gadow, also for the State.

MS. TOUSSAINT: Dr. Crow, Sherri Toussaint, appearing for Shelly Cluff. An attorney here also with me is Paul de Blank, my partner, who you talked to.

MR. DE BLANK: That's me.

DR. CROW: Didn't hear the last.

MR. DE BLANK: Last name is Paul de Blank.

DR. CROW: You're with Sherri Toussaint?

MS. TOUSSAINT: Sherri Toussaint.

Shelly Cluff is here as well, and she has signed --

DR. CROW: Hi, Shelly.

MS. TOUSSAINT: She signed the release that you requested.

THE COURT: Okay?

DR. CROW: Thank you.

THE COURT: Who wants to go first on this?

MR. DE BLANK: Why don't I, your Honor.

We've -- we filed our motion on the 7th of

August, and on the 8th there was kind of a very brief hearing that I didn't -- that Ms. Toussaint had and where I guess the suggestion was made why don't counsel meet with Dr. Crow and make a decision and then you wouldn't rule yet.

We had a telephonic conference on the 15th of August. And at the end of that, Dr. Crow, I think, justified all the reasons why she should not have to testify. At the end of that, I was told by Ms. Nannetti that she would make a decision over the weekend and let us know by Monday whether we'd be required to show up or not. And I specifically said at that time that if the decision is not to, then all right; if the decision is that you do want to push it, then we need a hearing.

THE COURT: Okay. Let me hear from Ms. Nannetti as to where the State stands on this.

MS. NANNETTI: Your Honor, I did interview Dr. Crow, and it's the State's position that Ms. Cluff was lawfully subpoenaed and should still come to court. I had offered some other options that might be suitable to Ms. Cluff to alleviate the stress, one of which was to have Dr. Crow come to court with her and that we would pay for his time so that he could be in the gallery if that would be helpful to Ms. Cluff. And I did get that approval from Mr. Romley, to be able to do

that.

THE COURT: Okay. Doctor, why don't you tell me what your position is with respect to Ms. Cluff.

DR. CROW: Okay. Yeah, what I have said is that I was concerned about her doing this. I understand that people need to testify and they need to -- it is important for the truth to be told.

I was very concerned about Shelly's stability. She was having panic attacks, and she's undergoing a divorce situation right now, and she's got children. And some of the issues that are going on in the divorce, which I don't necessarily want to get into very much, are triggering old memories and trauma for her. And then this, this at the same time, I was very concerned that she was going to go over the edge and end up being hospitalized, and I really had a concern with that.

She -- I knew about this, and about the same time she had some conversations with a therapist involved with her husband and some other things, and again, it just set her off. So in view of the fact that she wasn't sleeping, she was having panic attacks, we worked to try to get her in to see -- to get some medication going, which she tried some Paxil and so on, and she just had a lot of trouble sleeping. She was

just on the edge.

I talked to her on the phone, which I wouldn't normally do, just to try to get an assessment. I talked to a nurse practitioner at the office. We were in a crisis mode, trying to manage the situation. I was really afraid of what would happen. And I felt I was justified to take the position that this could put her over the edge, it could hospitalize her, and that's what I shared before.

THE COURT: Let me have anyone ask the doctor a question while we have him on the phone.

MS. NANNETTI: Doctor, has your position changed?

DR. CROW: No. I think that Shelly has -- I've seen her at this point nine times. The last couple of times I've seen her I think she's doing better. But I think she's still very much right on that edge. She's just doing the best she can. She's putting up a good, valiant front and trying to be strong. She knew that this could still happen and she was trying to deal with that reality, but I, I, I saw her decompensate pretty quickly when some of these things started rolling, and I'd be very anxious for what would happen. So my position hasn't changed.

THE COURT: Go ahead.

MS. NANNETTI: Oh, and are you still willing -- I -- when I spoke with you last, you said you would be willing to come to court with her to be able to support her.

DR. CROW: Well, I mean, I'm willing to help Shelly. If -- I haven't done anything like that before exactly, but I would certainly be willing to help. You know, again, it's involved with a whole bunch of my time schedule. We'd have to arrange things. I could certainly do that. It might be of some help to have someone there for her.

I'm not sure what would happen. I can't predict that. I don't know if it would make all the difference in the world or if it would make little difference. I haven't been through that kind of thing.

THE COURT: Doctor, this is Judge Cates. Is the problem in large part facing a jury or being exposed to the public in connection with this trial?

DR. CROW: I don't think that -- I think the main thing, your Honor, would be if -- all of you there probably know that people who have been through abusive situations tend to take the blame. They tend to feel a lot of shame and guilt even when they're not the ones who have perpetrated these crimes and so on, but they have been a part of it, and a part of them somehow feels

they participated and they're guilty and they're ashamed of themselves.

And I think that's the biggest threat here for her, is as she goes through this procedure it's going to stimulate a lot of shame, which will stimulate a lot of anxiety and depression for her. And she's already dealing with a significant amount of that, going through a -- actively going through a divorce procedure right now, and particularly with children who are -- she is concerned about what they're experiencing and having similarity as to what she has gone through as a child, so it's triggering her.

What happens with these people is there's shame and trauma, like it's like a posttraumatic stress disorder, and we do label it such. And it gets triggered, be like a Viet Nam veteran and they're getting exposed to something. All of a sudden they're just freaking out. They're having nightmares. They're having panic attacks. They're back in the jungle and they're under attack or they're seeing somebody get shot. It's very, very similar to that. That's my concern for her.

THE COURT: Paul, is there anything you want to ask?

MR. DE BLANK: Yes, your Honor.

Doctor, have you had any experience with abuse victims before, other --

DR. CROW: Yes, uh-huh.

MR. DE BLANK: A lot? A little?

DR. CROW: Quite a bit.

MR. DE BLANK: And is she -- do you feel that -- when we talked earlier you made it sound like abuse victims often have problems, but you felt in her case it simply was compounded and worse than the typical, if there is such a thing, abuse victim.

DR. CROW: Well, what I said was that I know that nobody wants to testify. I know that they're going to -- the shame is going to be triggered -- whatever they do, if they go in and testify they're certainly going to get their shame triggered and feel part of the opposing side is to discredit them. They're going to experience all that, and that's hard, and that's very difficult, extremely difficult. And so I know that none of them want to go through that. And it's extremely stressful for any of them to do it.

My concern here is that this is a lady who has already been triggered and she's already got huge things on her plate that are triggering her with this, and I'm quite concerned about adding this on top of everything else.

MR. DE BLANK: Is one of her concerns that if she were to snap and would need hospitalization, that there wouldn't be a safe place for her children?

DR. CROW: Well, I think that's a good point. Who would take care of the kids?

MR. DE BLANK: You mentioned medication. Are you coordinating medication with a --

DR. CROW: We -- what I did is I coordinated with her nurse practitioner and some medications were begun. I think she had some side effects with one of them and she still takes another one for sleep, and I believe that is helping her.

MR. DE BLANK: I guess I don't have any other questions at this time.

THE COURT: Any further questions of the doctor?

MS. NANNETTI: No.

THE COURT: Can we excuse him?

MR. GIERLOFF: I would like to ask one question.

THE COURT: Mr. Gierloff is going --

MS. NANNETTI: Your Honor, the only thing I am concerned about is I'm not so sure if the question relates to her ability to testify here, but I'm not sure if it's anything that can be used for Ms. Cluff's

impeachment during the trial. I don't believe he has a right to talk to her counselor.

THE COURT: Let's see if he has a question that's objectionable and then you can object.

Go ahead.

MR. GIERLOFF: Well, and to that end, Doctor, you had mentioned that Ms. Cluff is -- this is Richard Gierloff. You had mentioned that Ms. Cluff is taking medication. And in your opinion is that medication going to affect her ability to testify in any way?

DR. CROW: Not that I would think, no, not that I would be aware of.

MR. GIERLOFF: Okay. And you have mentioned while you were speaking to the other attorneys this possibility of Ms. Cluff actually suffering some sort of breakdown in the process of testifying. And I assume you feel that that is a real risk.

DR. CROW: I do.

MR. GIERLOFF: All right. Thank you.

THE COURT: Can we excuse the doctor?

MS. NANNETTI: Yes.

THE COURT: Doctor, thank you very much. I appreciate your joining up with us.

DR. CROW: So we're done?

THE COURT: Well, we're done with you.

DR. CROW: Okay.

THE COURT: But I'm not done.

DR. CROW: Okay. Thank you very much, your Honor.

THE COURT: Okay. Thank you.

DR. CROW: Okay. Bye-bye.

(Whereupon, Dr. Crow left the proceedings.)

THE COURT: Let me ask that Shelly step outside. I don't know if you want to accompany her. At least one of the two of you should stay here.

MS. CLUFF: I'm okay by myself.

THE COURT: I just wanted to talk with the attorneys about something that I -- that's kind of legal business with the trial. And that's the only reason I'm asking you to step outside. Okay?

(Whereupon, Ms. Toussaint and Ms. Cluff left the proceedings.)

THE COURT: The question I have is, with so many other victims, why do we need her? I mean, she hasn't got the strongest of the stories. I mean, there are others who are stronger. That's one question I have.

And the other comment, the other observation, is this could really backfire on you in

front of the jury. I recently saw a case -- it was not this type of a case, but I saw a case backfire on the County Attorney's Office because of overkill, and I didn't think the jury appreciated it.

MR. GIERLOFF: Can I add one thing to that, your Honor?

THE COURT: Well, I'm asking a question.

MR. GIERLOFF: I beg your pardon.

THE COURT: Do you need her?

MS. NANNETTI: Yes, we need her, Judge. And I don't want to go into it, because Mr. Gierloff is here.

THE COURT: Is there something unique about her story?

MS. NANNETTI: Yes, yes. And I mean, your Honor, she's got a lawful subpoena here. And if the court gets involved with letting people off for -- you know, because they're traumatized, you know, where are all our domestic violence cases and most of the sex crimes cases? We have people, most of the victims that we've called in this trial don't want to be here.

THE COURT: I understand that. But they haven't presented to me with underlying psychiatric problems that might be pushing her -- pushing them off the edge if they were to testify. They'll cry. They

all have shame.

MS. NANNETTI: Yeah. And many people do, and many of the victims may well have had it. They just didn't have a lawyer or didn't have somebody to follow up on it. But I don't believe that anything we have heard -- and if Mr. Gierloff is concerned about her, that she might do something in front of the jury, then let's do a video deposition and show it to the jury so we don't have that concern. But she should have to testify.

MR. GIERLOFF: That's why I asked the doctor the question, is it a problem of her not wanting to appear in front of the jury and not wanting to make it public, because that can be done.

MS. NANNETTI: Ms. Cluff has come to our office every time we've asked her to. She's had the ability to come down. She's worked with our advocates.

You know, we -- I had taken the steps to try and ask for approval to get, to pay for her therapist. Whether we do a video deposition or bring her to trial, our office will cover that, for him to be here or at a video deposition. We can pay for a video deposition. We'll set it up. But I don't believe that she should be released from the subpoena.

THE COURT: The only thing I want to talk

about now is something that cannot be said with her present. I didn't want to taint her testimony if she were to testify by mentioning what I did in front of her.

MR. GIERLOFF: Right.

THE COURT: Is there anything -- I want to talk to her with all of us present, but is there anything you want to add?

MR. GIERLOFF: Well, I asked her, her doctor that specific question, that he feels this is a very real risk of her suffering some sort of breakdown, and that's mistrial. You know, if that happens in this case, that has to be a mistrial.

Presumably, I don't know. Just for the sake of argument, if she makes it all the way through direct and then she's being cross-examined and she completely decompensates, I'm deprived the right of confrontation, and it would be a hugely prejudicial scene in front of the jury. And just given the fact that her complaint is remote -- this is one of the more remote ones -- there's no medical file. The, the claim -- the claimed misconduct is investigative. It's not a particularly strong count.

THE COURT: Paul, is there anything you want to say outside of your client's presence?

MR. DE BLANK: Well, the comment was made just she has had a lawyer, and that makes it sound a little bit like you have somebody who has some money to spend. This case came through to us from the Arizona's Women's Center, and we're doing this on a pro bono basis because we really feel this was unusual and required, required a lawyer.

THE COURT: What am I supposed to do as a judge? Can I deprive the State of an opportunity to bring a charge like this?

MR. GIERLOFF: I think in this particular case you can. It is not a situation where this is the sole witness, that the State's case lives or dies on this, this witness.

THE COURT: Let me bring her in. I have got some questions of her.

Paul, why don't you get her.

(Whereupon Ms. Toussaint and Ms. Cluff rejoined the proceedings.)

THE COURT: Shelly, let me just talk to you just about something I have not shared with anyone else in the room.

It's tough to testify. I know, and I know that you're going through a lot. I think almost every person in your situation who has testified so far has

broken down crying. It's tough; I know. And I want to make it as easy as possible.

There have been times where I have taken breaks for people. And I want to make it as easy as possible for you.

I turned this on for a moment just so you could see that I have an electronic courtroom. And right now if I turn on the microphone -- just do it for a second; I don't want to interfere with their discussion -- but you can hear everything that is going on.

Do you see how the camera bounces around, and if somebody were on the witness stand, it could record the person behind the witness stand? Also, if we were to stay in here, we could get a recording in here. And it can be, it can be recorded. So we could do the questioning and answering of the questions without the jury here. Would that help? I'm not saying is it going to cure the entire problem.

Would that help, if we didn't have a jury here, you were not here during the actual trial itself, but I let the attorneys question you with, with no one else being present in the courtroom? I wouldn't be in the courtroom. You'd be in there. You'd be in the witness stand. Your doctor can be here if he wants.

And we would record it and play it to the jury. Would that help?

MS. CLUFF: You know, I just, I just want to be left alone and I just want to get my divorce. I just want to make sure my kids are safe and that they have as normal a life as possible.

THE COURT: Why would your kids not be safe if you were to testify?

MS. CLUFF: Because I -- when I --

THE COURT: Take your time. Would you like some water?

MS. CLUFF: (Shakes head.)

MR. DE BLANK: Do you want me to explain that part?

THE COURT: Go ahead.

MR. DE BLANK: Your Honor, I think the biggest single problem is that she has found out that her husband has been abusing her little children, and she's very concerned that if something -- if she snaps and can't handle this, that she -- that there won't be anybody there to take care of them.

THE COURT: How old are the kids?

MR. DE BLANK: Seven and 14.

THE COURT: Okay.

MR. DE BLANK: And I think that's the

additional factor that makes it very different from a victim of past abuse. It's the problem that's going on right now in her life.

MS. CLUFF: My husband is in a treatment program for sex offenders.

THE COURT: So he's acknowledged that he did this?

MS. CLUFF: (Nods head.)

THE COURT: Brief questioning to ask her about it?

MS. NANNETTI: No. I knew that. She had shared that with me.

THE COURT: Okay.

Paul, anything else you want to say?

MR. DE BLANK: No, your Honor.

MS. TOUSSAINT: The only other thing I might add that I don't think has come up before is that although Dr. Crow did talk about it, Shelly has had breakdowns before. So the likelihood that she could have another -- I mean, there's already a past history of having nervous breakdowns.

THE COURT: Was she institutionalized with her breakdowns?

MS. CLUFF: I was 17 and I was institutionalized when, when all of this -- I moved out

from my house when I was 16 because I was being beaten. And I lived on my own and I -- that's when I went to Dr. Finkel. And then after that my dad -- I just, I just want to be left alone.

I got over this a long time ago, and I was not told when I signed my statement until after -- before I signed it. I was told after. I had no idea I was going to be dragged into this or I wouldn't have come forward. And I wasn't told until afterwards, after I signed it, that I would be dragged into it. And I'm not a lawyer. I'm a high school dropout, you know. I didn't know what it was.

THE COURT: How old are you now?

MS. CLUFF: I'm 33.

THE COURT: So it's been quite some time since you had that first breakdown?

MS. CLUFF: Yeah.

THE COURT: Okay.

MS. CLUFF: But I haven't had this much, this many sexual issues coming. Then I had a lot of sexual abuse coming down on me from every direction and I couldn't trust anyone. And I lived alone. I had -- and now I'm in a similar situation, where I have no family. I don't have anyone here that I can count on except for one friend who I can occasionally count on to

help me with my kids, and that's, you know, about once a month she'll take the kids for a couple hours if I go to therapy and they're out of school or...

But it's when all of -- you know, when it starts coming in from all sides, I'm just trying to deal with my husband and what may have happened to my kids and what his -- you know, I'm just trying to hold all the pieces together and I don't need another thing.

THE COURT: What is the status of the domestic relations situation?

MS. CLUFF: I'm in -- we're in mediation. I'm arranging for supervised visitation for him with the kids and -- and Sherri is my lawyer for the divorce. And once all of -- you know, every -- all the paperwork is -- I mean, we're right in the kind of the beginning, between the beginning and the middle, in mediation. And I'm waiting to hear about the supervised visitation.

He has agreed to that because he is in a treatment program and his therapist understands that I have every right to be concerned about the safety of my children.

THE COURT: When is she scheduled to testify?

MS. NANNETTI: We haven't scheduled her yet.

THE COURT: You haven't scheduled her.

Okay. Anyone else want to question?

Okay. Why don't you people go home and enjoy your weekend and I'll just talk with the lawyers. Okay? And we'll get in contact with you.

MR. DE BLANK: All right. Thank you.

(Whereupon, Ms. Toussaint, Ms. Cluff, and Mr. de Blank left the proceedings.)

MR. GIERLOFF: Your Honor, I am in a completely untenable situation. Everything that she is talking about, the crisis in her life and at this period of time, being institutionalized shortly after some time of visiting Dr. Finkel, being abused by other persons, I mean, that is relevant information for cross-examination.

I'm not going to -- I am certainly loath to ask this woman those sorts of questions. I think I'm derelict if I don't. It's -- she, she won't survive that no matter how, how nicely she's asked. She just, she will not tolerate the procedure well.

MS. NANNETTI: Well, I mean, I disagree with that. I mean, I've met with her. I met with her for a long time in my office. And the more I told her she had to go to court, the more very vocal she was, and she was more afraid of him getting off. That was her bottom line. Not anything about -- you know, she did disclose

the stuff with the kids, which now I'm very troubled, because they have not notified law enforcement and if she's saying here on the record that her husband now has admitted that he's done this, like I just said to Blaine, I think we have a duty to report this now.

When we're hearing from the mother and under the new law, I do think we have a duty to report this. I'm very troubled by that. She did not tell me that before. She did say she thought he had been molesting the kids.

THE COURT: The concern I have is something raised by Richard I thought about before you even mentioned it.

What if she gets through direct examination, doesn't get through cross-examination? I don't think under the circumstances I can just ask the jury to forget her testimony and not pay any attention to it. I mean, that's a real risk for a mistrial.

MS. NANNETTI: Well, then where is the risk of doing a video deposition, Judge? The jury is not there.

THE COURT: I understand.

MR. GIERLOFF: What do we do about jury questions? That's probably more of a housekeeping issue, and I'm opposed to a video depo.

Go to p. 28

THE COURT: Anything else?

MR. GADOW: Not on that issue, Judge.

THE COURT: What?

MR. GADOW: Not on that issue, Judge.

THE COURT: Is there anything else you want to talk about?

MR. GADOW: Well, only if the Court has time.

THE COURT: Okay. What about this question that came in from the jurors?

MR. GADOW: It's a good question.

MR. GIERLOFF: Ask that one.

THE COURT: What else can we take up?

MR. GADOW: One of our witnesses is -- late Monday or Tuesday morning has some felony convictions. We need to do a 609 hearing. Now is as good a time as any if the Court is willing to hear it.

THE COURT: Is this the one in custody?

MR. GADOW: Yes. I met with her this morning. We ironed out exactly what her convictions are and I disclosed them to Richard today.

THE COURT: The jury is going to know she's in jail now?

MR. GADOW: Well, they will when I start asking her about that. She's going to be dressed out

for the trial, but I'm going to ask her where she is and where she's living and all that, and I will bring out her felony convictions as well. But I think for the record we have to have had a hearing where the Court indicates that that's appropriate, and I'd like them sanitized.

THE COURT: How many felony convictions are there?

MR. GADOW: Four total, three dates. Three CR numbers but four convictions.

THE COURT: Let me tell you how I would normally handle this. I always sanitize them, but it's at the option of the person wanting the jurors to know what they're for.

So if it's a defendant, the defendant could choose to let the jurors know it's for burglary and not for child molest if he's being charged with child molest, but that's not what we have here.

I'd probably limit it to two. Four is probably overkill. I would admonish the jury right there and then the matter of felony prior felony conviction bears only as to the issue of the person's credibility.

MR. GADOW: I will let the Court know that her convictions are only as old as 1998. She's got one

in '98 --

MR. GIERLOFF: Some of the --

MR. GADOW: -- two in 2000 and/or one in 2003 so...

MR. GIERLOFF: Some of the nature, I think, the nature of the crimes are relevant. One is a theft and unlawful use of food stamps. That's active dishonesty. There's -- the two in these are so hard to read. Is this 2002?

MR. GADOW: Yeah, 2002. Is it 2002?

MR. GIERLOFF: Looks like 2002.

One is a possession of dangerous drugs charge. I mean, I think that opens up for us to be able to ask her about her drug usage. And the other one in 2002 is a forgery, another act of dishonesty. And the fourth is a theft of means of transportation. I actually see that as maybe not as probative on the issue of honesty as the theft of food stamps or a forgery.

THE COURT: A juror can be told that a felony conviction bears upon the issue of credibility, so what do you need to bring out the nature for?

MR. GIERLOFF: Well, because they're dishonest acts for -- are all acts of dishonesty. And obviously the possession of dangerous drugs, if either a person that has been using drugs and --

THE COURT: Well, you could use that to impeach them if they respond negatively to your question: Have you used drugs?

MR. GADOW: Well, and that brings up a whole other issue. The Court should know this women's counts are dated in 1989. She was 17 and her drug use convictions are some, what, 11 years later. For whatever it's worth.

THE COURT: Let's deal with this Monday. She's going to be scheduled for late Monday?

MR. GADOW: She's the next witness after the one that's on the stand now.

MS. NANNETTI: So it will be really late.

MR. GADOW: Tuesday morning.

THE COURT: I'll deal with it.

I'm going to think about Shelly Cluff in the meantime.

Okay. Something else I guess that's an option, I guess I could always -- it's not an acceptable solution to anyone, but I guess I could always enter an order preserving her claim but separating her out from this trial. I don't think that's a wise choice but that's an option.

Yes, Richard?

MR. GIERLOFF: I would, I would agree with

your assessment as to that course of action.

THE COURT: It's not a wise choice for the State.

MR. GIERLOFF: It's certainly not a wise choice for Dr. Finkel either.

MS. NANNETTI: We could have her trial letter the judge got.

(Whereupon, the proceedings were adjourned at 4:14 p.m.)

C E R T I F I C A T E

I, Dotty Reaume, Certified Shorthand Reporter, do hereby certify that the foregoing constitutes a true and accurate printed record of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

Dotty Reaume
Certified Court Reporter
Certificate Number 50210