# EXHIBIT  N

*(handwritten)* 2 cones    Incomplete    04-0096 Acudo

```
 1              COURT OF APPEALS

 2             STATE OF ARIZONA

 3              DIVISION ONE

 4

 5  STATE OF ARIZONA              )
                                  )
 6                                )
            Appellant,            )   1 CA-CR 04-0046
 7                                )
        vs.                       )   CR 2001-015515
 8                                )
    BRIAN L. FINKEL,              )
 9                                )
                                  )
10              Appellant.        )
    _____)
11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16              Phoenix, Arizona
                September 15, 2003
17

18

19  Before The Hon. Jeffrey Cates

20

21

    Prepared For:
22
    ATTORNEY GENERAL              MICHAEL A. BABICKY, RPR
23                                Certified Court Reporter
                                        AZ # 50361
24                                201 W. Jefferson, 7-D
                                  Phoenix, Arizona 85002
25                                    (602) 506-3552
    (Copy)
```

2

```
 1                     I N D E X

 2    Witness                                    Page

 3    Trial                                        4

 4

 5

 6

 7

 8

 9

10                   E X H I B I T S

11    No.      Description                        Page

12    None Marked

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1              REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2

3    taken on September 15, 2003, commencing at the hour of

4    10:30 a.m., before the Hon. Jeffrey Cates, Phoenix,

5    Arizona.

6

7    COUNSEL APPEARING:

8              MS. CINDY NANNETTI
                  Deputy County Attorney
9              MR. BLAINE GADOW
                  Deputy County Attorney
10

11             MS. KRISTEN CURRY
                  Attorney at Law
11             MR. RICHARD GIERLOFF
12                Attorney at Law

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  How many witnesses today?

2        MR. GADOW:  We'll finish Ms. Harris and Tracy,

3   Jennifer Harris and Tracy.

4        THE COURT:  Jennifer Harris?

5        MR. GADOW:  And Tracy Piencha.

6        THE COURT:  As soon as Richard gets back, I want

7   to take up the matter of the video of the deposition.

8   What's her name?

9        MR. GADOW:  Shelly Cluff.

10       THE COURT:  Can we talk about Shelly Cluff's

11   deposition?  I got your objection.  I really think the

12   earlier we deal with this the better it is.  The objection

13   you have is based upon, you said, a denial of the client's

14   right of confrontation at the deposition.  Let's assume

15   that it's here.

16       MR. GIERLOFF:  Right.

17       THE COURT:  Let's assume that we videotape it.

18   You've seen the quality of this.  Your client is here.

19   The attorneys are here.  The jurors are able to see the

20   mannerism of the witness when she testifies.  What is

21   interfering with any rights of your client?

22       MR. GIERLOFF:  That there's no provision for the

23   video deposition of an adult in a criminal proceeding,

24   Your Honor.  And I assume there's no provision for that

25   because the right to confrontation is a bedrock principle

1    of our Constitutional rights.

2              THE COURT:  The question I'm asking is not asking

3    for a legal answer.  But how was your client's rights

4    being compromised?

5              MR. GIERLOFF:  Well, Your Honor, if you recall

6    when we had the meeting in chambers, Ms. Cluff said that

7    had she known she was actually going to have to testify,

8    she may not have made a report.

9              And I think anything that erodes the gravity

10   of testimony denies the right to confrontation.  Giving

11   her testimony without the jury present erodes the gravity

12   of the occasion.

13             THE COURT:  So it's that the jury was not here

14   when she was actually testifying?

15             MR. GIERLOFF:  Correct.  And then I don't know

16   how we're going to deal with jury questions.

17             THE COURT:  Anything from the State?

18             MS. NANNETTI:  Well, yeah, Your Honor, you know,

19   the videotape statute that -- I don't know what -- I can't

20   remember what statute it is, applies to children.  But

21   that allows children to testify outside the presence of

22   the defendant here in this case.

23             We're talking about having the defendant

24   present in court.  Even the Arizona Constitution, which is

25   more strict, allows for face to face, would be covered by

1    the Court's ruling.  And I think that the rules allow for

2    the Court to make accommodations for witnesses to testify

3    and that's what the Court has done in this particular

4    case.

5              THE COURT:  What about Mr. Gierloff's argument

6    that the jury wouldn't have an opportunity to question the

7    witness?

8              MS. NANNETTI:  Your Honor, I think that if we do

9    have questions, after viewing it, we could have those

10   questions, discuss them, see if there's anything

11   absolutely necessary to ask that witness and have her, you

12   know, come back for 15 minutes or whatever if need be to

13   have those questions asked.

14                  But it might be, Your Honor, in fact, there's

15   been several victims where they haven't had any questions

16   once the Court has allowed both sides to go through both

17   direct, cross, redirect, and we've been able to get

18   through the witness without any questions.  So

19   Mr. Gierloff's bringing up a hypothetical that may never

20   happen.

21             THE COURT:  Mr. Gierloff, anything else?

22             MR. GIERLOFF:  Just that I move to preclude her

23   as a witness for Rule 15 and discovery violations, Your

24   Honor.  She told us when she was in chambers with us the

25   other day that she had had some sort of nervous breakdown

1    and was institutionalized a year or so after she would

2    have had her appointment with Dr. Finkel.

3            I think that that is Brady material and it

4    was not disclosed to me and I would certainly have wanted

5    to have those records before she was allowed to testify

6    and be permitted to cross-examine her on those matters and

7    those were not disclosed to me on a timely basis.  I move

8    to preclude it.

9            THE COURT:  Anything else on that one?

10           MS. NANNETTI:  Well, Your Honor, obviously the

11   State doesn't have that inclination.  And I don't think

12   either side should be able to go into any of that.

13   Obviously it happened after the incident with Dr. Finkel.

14   I don't think the defense has a right to go through

15   personal and private records of all these patients no

16   matter what.

17           I think what's relevant is what happened at

18   Dr. Finkel's office, not all this other information.  I

19   think under victim's rights she has the right to be

20   treated with dignity and respect and I don't believe

21   getting into any of that information is relevant

22   whatsoever.

23           MR. GIERLOFF:  I'm all for treating Ms. Cluff

24   with dignity and respect including her wish to not be

25   subjected to this process because she fears that it will

1   have an extremely adverse impact upon her mental health

2   and physical well-being.

3           The fact that she was institutionalized is an

4   intervening event between her visit, her alleged visit

5   with Dr. Finkel and her testimony, I think clearly

6   implicates her ability to recall the earlier medical

7   procedures with Dr. Finkel.  I think it's clearly Brady

8   material.

9           THE COURT:  Let me throw one thing out to the

10  State, as I already indicated in my ruling, I don't see

11  how I can prevent the State from calling her.

12          The State has indicated its intention to call

13  her, that's fine.  What if we proceed with a videotaped

14  deposition?  And after hearing what she has to say, you

15  don't like what she has to say, and you decide you don't

16  want to call her or you don't want to present her

17  testimony and the defense does.  I know it's a

18  hypothetical.

19          Do you feel you should be afforded the choice

20  of calling her or not calling her after you hear what she

21  has to say?

22          MS. NANNETTI:  Your Honor, I think both of us

23  agree we are doing this in lieu of presenting it before

24  the jury.  So no matter if we proceed with the video

25  deposition, I believe that it should -- no matter what it

1    should be shown to the jury.

2         THE COURT:  That's fine.  Okay.  I don't know if

3    I indicated this in the minute entry.  But I do feel that

4    there's a realistic chance this could be detrimental to

5    the mental health of the defendant, testifying in front of

6    the jury here, if not, maybe detrimental to her mental

7    health if she were to testify as I've proposed in my last

8    ruling.

9         I'm going to reaffirm my ruling and my ruling

10   is going to be entered under the Rule 611 of the Rules of

11   Evidence, protecting the witness from harassment or undue

12   embarrassment.  But I'm going to order that the testimony

13   be given here in this courtroom.

14        It will be -- one of the problems here is

15   that I don't know of the quality of the videotape.  In

16   fact -- well, let me ask the staff.  Have you seen the

17   quality of a videotape versus -- it may have to be edited

18   depending on objections and what rulings are made.

19        I'm going to reaffirm my prior ruling, but

20   it's modified so that the testimony be given here in this

21   courtroom at a mutually agreeable date and time and

22   preferably that I'm here to resolve any rulings.

23        So that will be the ruling on the Shelly

24   Cluff deposition.  When do you think you can finalize a

25   date and time?

1           MS. NANNETTI:  Your Honor, after receiving the

2    Court's ruling sometime last week, I called, I called

3    twice to her attorney, left messages, asking them to check

4    with her counselor's schedule and see.  And obviously I

5    asked for a Friday.  Thursday she did call the office and

6    myself and Mr. Gadow were both gone.  But I received that

7    message when I was out of town.

8           I called twice on Friday, finally the second

9    time on Friday her attorney staff told me that her

10   attorney wasn't working on Friday.  So I will try and call

11   at the lunch break today with what I wanted to do and I

12   left her a message asking if we could set it up for next

13   Friday afternoon so that we could get enough time lead

14   time for her counselor to clear his schedule so that he

15   could be here.

16           THE COURT:  Can we start-up with the trial and

17   continue with Ms. Sullivan's testimony?

18           MR. GIERLOFF:  Sure.

19           THE COURT:  Where are we, on cross-examination?

20           MR. GIERLOFF:  I think they were still on direct.

21           MR. GADOW:  Judge, I just wanted to check with

22   the bailiff to see where I was.

23           THE COURT:  Okay.

24           (A recess was held).

25           THE COURT:  Good morning and welcome back.  We

# EXHIBIT  O

04-0096
1  Acedo

2 Boxes

```
 1                    COURT OF APPEALS

 2                   STATE OF ARIZONA

 3                     DIVISION ONE

 4

 5   STATE OF ARIZONA,            )

 6             Appellee,       .)   1 CA-CR 04-0046

 7        vs.                    )   No. CR 2001-01551

 8   BRIAN FINKEL,               )

 9             Appellant.        )

10   _____)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  Phoenix, Arizona

15                  October 7, 2003

16

17   Before The Hon. Jeffrey S. Cates

18

19                         MICHAEL A. BABICKY, RPR

20                         Certifed Court Reporter

21   PREPARED FOR:             AZ # 50361

22   ATTORNEY GENERAL          201 W. Jefferson, 4-C

23                             Phoenix, Arizona 85002

24                             (602) 506-3479

25   (Copy)
```

2

```
 1                    I N D E X

 2

 3   Witness                              Page

 4

 5   TRIAL                                   4

 6

 7

 8

 9

10

11

12

13

14

15                  E X H I B I T S

16

17   No.       Description                Page

18

19   None Marked

20

21

22

23

24

25
```

1                    REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2

3    taken on October 7, 2003, commencing at the hour of 8:30

4    a.m., before the Hon. Jeffrey S. Cates, 201 W. Jefferson,

5    Phoenix, Arizona.

6

7    COUNSEL APPEARING:

8

9            MR. BLAIN GADOW

10               Deputy County Attorney

11           MS. CINDY NANNETTI

12               Deputy County Attorney

13

14           MR. RICHARD GIERLOFF

15               Attorney at Law

16           MS. KRISTEN CURRY

17               Attorney at Law

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  We're going to take a
 2     witness out of order?
 3              MR. GADOW:  Yes, sir.  Thank you.  Frankie Segal.
 4              THE COURT:  Sir, would you come forward?
 5
 6                        FRANKIE SEGAL,
 7     having been first duly sworn, was examined and testified
 8     as follows:
 9
10                     DIRECT EXAMINATION
11
12
13              THE COURT:  Have a seat in the witness chair.
14     BY MR. GADOW:
15         Q   Please tell us your name, sir?
16         A   Frankie Segal.
17         Q   And where do you currently reside?
18         A   Los Angeles, California.
19         Q   How old are you, sir?
20         A   Forty-four.
21         Q   Do you run a business in California?
22         A   Yes, I do, sir.
23         Q   And were you at some point previously a
24     resident of the State of Arizona?
25         A   You're correct.
```

1          Q   When did you live in Arizona?

2          A   Between 1973 and 1990.

3          Q   When you lived in Arizona in the 1980's, did

4    you run a business here?

5          A   Yes, I did.

6          Q   What was nature of that business?

7          A   It was a personal training service.

8          Q   Where did it operate out of?

9          A   Beauve's Fitness and Aerobics Gym, 8th Street

10   and Camelback.

11         Q   When you operated that business -- can you

12   describe that business for us, please?

13         A   It was a personal training nutritional

14   business.

15         Q   Did you have private clients?

16         A   Yes, I did.

17         Q   How did you obtain your clients?  Did your

18   clients come to you by referrals?

19         A   Referrals, Yellow Page ads through the gym,

20   flyers, brochures.

21         Q   These people pay you for your services?

22         A   Correct.

23         Q   And was it a contract based business or was it

24   individual payments for individual sessions?

25         A   Both.

1      Q   What kind of training sessions would you

2  provide?

3      A   I would provide either hourly or more personal

4  training on weights or nutritional consulting.

5      Q   What is your background in order for you to

6  have that business?

7      A   I was multi-certified through ACSM.

8      Q   Which is?

9      A   American College of Sports Medicine.

10     Q   Go ahead?

11     A   And APFA.

12     Q   What?

13     A   American Physical Fitness Association and

14  Aerobics.

15     Q   Do you have an educational background that

16  relates to this field?

17     A   Other than community college health and

18  fitness related subjects.

19     Q   So you've been to community college?  Do you

20  have a degree?

21     A   No.

22     Q   You have course work in that area?

23     A   Yes.

24     Q   And what were the years during which you ran

25  your business here in Phoenix?

1          A   1981 until 1990, around November of 1990.

2          Q   In November of 1990, what happened?

3          A   I prepared my move to California.

4          Q   And you've lived in California since?

5          A   Yes, I have.

6          Q   While you lived here in Phoenix and were

7   running this business, did you know a person named Brian

8   Finkel?

9          A   Yes, I did.

10         Q   And do you see him in the courtroom today?

11         A   Yes, I do.

12         Q   Can you point him out, identify him for us,

13   please?

14         A   The man over there with the glasses.

15         Q   Could the record reflect the witness

16   identified the defendant?

17         THE COURT:   Give us the color of the sport coat.

18         A   Should I put on my glasses?

19         THE COURT:   What color coat does he have?

20         A   Looks like a multi-colored coat with a white

21   shirt and a colored tie.   Gray hair.

22         THE COURT:   The record will reflect

23   identification of the witness.

24   BY MR. GADOW:

25         Q   Thank you, Your Honor and Mr. Gierloff as well

1    for removing your glasses.

2              MR. GIERLOFF:  Welcome.

3    BY MR. GADOW:

4         Q  Mr. Segal?

5         A  Yes.

6         Q  Did Dr. Finkel retain you for services as a

7    personal trainer in the late 1980s?

8         A  Yes, he did.

9         Q  Roughly when did you start working with Dr.

10   Finkel?

11        A  It was around the third month of 1989.

12        Q  And the services that you were retained to do,

13   were they personal training services?

14        A  Correct.

15        Q  You were retained?

16        A  Correct.

17        Q  Out of the gym you mentioned?

18        A  Correct.

19        Q  And how often would you see Dr. Finkel during

20   the year or so after you started with him?

21        A  Average between one to three days a week.

22        Q  And how long -- during those days, how long

23   were the sessions?

24        A  Approximately an hour.

25        Q  Was it one on one sessions or in a group

1    setting?

2              A   It was one on one.

3              Q   Were there any documents or paperwork filled

4    out by you or by him to identify information about each of

5    you?

6              A   Yes, there was.

7              Q   Were those documents for your business or were

8    those documents you filled out for him so he knew who you

9    were?

10             A   They are for my business.

11             Q   And was payment made on an individual session

12   basis?

13             A   I think it was made on an amount of sessions

14   paid for, as opposed to individual sessions per day.  So

15   he would pay up front.

16             Q   So tell us about that?

17             A   He would pay for 6, 12, 10 up front.

18             Q   And when did your relationship with Dr. Finkel

19   end?

20             A   It was around the fifth month of 1990.

21             Q   And you said that you moved to California in

22   November of 1990?

23             A   Around December.

24             Q   So the fifth month is May, if I'm not

25   mistaken, correct?

1        A   Correct.

2        Q   So that means that there was a period of time

3   when you were here in Phoenix but your relationship with

4   Dr. Finkel terminated?

5        A   Correct.

6        Q   Mr. Segal, after you moved to California --

7   well, let me start with this.   Subsequent to your

8   termination of the relationship with Dr. Finkel, did the

9   two of you have a dispute about a financial settlement?

10       A   Correct.

11       Q   What was that dispute?

12       A   That I was being -- I was charging him for

13   sessions not rendered.

14       Q   And that was his position?

15       A   That was his position.

16       Q   What was your position on that dispute?

17       A   That sessions, according to the contract, were

18   terminated and with no more applicable time.

19       Q   What was the total amount that was in dispute?

20       A   I think $180.00.

21       Q   Did you or he ever end up paying $180.00 to

22   the other?

23       A   I refunded the money back to him.

24       Q   Why did you do that?

25       A   Why not?

1          Q  Did the two of you exchange at least one

2    letter in that regard?

3          A  Yes.  I have it here.

4          Q  And did you have a policy with your business

5    with cancellation of sessions?

6          A  Yes, I did.

7          Q  What was that policy?

8          A  Twelve to 24 hours notice.

9          Q  Had you discussed that policy with Dr. Finkel?

10         A  Correct.

11         Q  Did the dispute arise over cancelled sessions?

12         A  Correct.

13         Q  Why would that be a concern in your business?

14         A  Well, that's lost revenue.

15         Q  How so?

16         A  Well, if I'm not given notice of cancellation,

17   then I can't fill that position, that time slot.

18         Q  And had Dr. Finkel, as you viewed the

19   situation, failed to give notice?

20         A  Correct.

21         Q  In any event, at some point, did you refund

22   his $180.00?

23         A  Absolutely.

24         Q  And how long after the termination of your

25   relationship with him did you refund that money?

1       A  That money was refunded to him pretty quick.

2       Q  Was it in the year 1990 you sent him the

3 money?

4       A  Yes.

5       Q  What manner did you send him the money?

6       A  I think it was a cashier's check.

7       Q  All right.  So were you living in California

8 at that time?

9       A  Which time?

10       Q  The time that the money was refunded to the

11 doctor?

12       A  No, I was still here.

13       Q  And before you moved to California, did you

14 close your business in Arizona?

15       A  No.  I brought it over to California.

16       Q  Did you have clients in Arizona that traveled

17 to California?

18       A  No.

19       Q  So --

20       A  I still came back a couple times to finish up

21 some sessions.

22       Q  And did you establish a business, similar to

23 the one you had here, in California?

24       A  Correct.

25       Q  Eventually did there come a point in time when

1    you were not coming to Arizona regularly for business?

2         A  Correct.

3         Q  Do you have family here?

4         A  Yes, I do.

5         Q  Would you visit them from time to time?

6         A  Yes, I would.

7         Q  All right.

8         A  And friends.

9         Q  And friends?

10        A  And colleagues.

11        Q  Jump ahead to -- well, from the time you left

12   Phoenix in 1990, the end of '90 until 2002, did you see

13   anything about Dr. Finkel that you recalled in the

14   intervening business?

15        A  From 1990 until 2002?

16        Q  Yes?

17        A  No.

18        Q  And in those years, had you had any contact

19   with Dr. Finkel?

20        A  Absolutely not.

21        Q  In those years, did you keep some records from

22   your business concerning Dr. Finkel?

23        A  It's funny you should ask.

24        Q  What records did you keep?

25        A  Dr. Finkel's.

1          Q  Did you keep any other records from any other

2     Phoenix clients?

3          A  I sure didn't.

4          Q  Let's talk a minute then about your contacts

5     with Dr. Finkel during the personal training sessions?

6          A  Please do.

7          Q  Did you develop a professional relationship?

8          A  A professional relationship, yes.

9          Q  Did you develop a good rapport with him as far

10    as you saw it?

11         A  Yes, in the beginning.

12         Q  In the beginning?  Did he talk to you about

13    the work that he did?

14         A  At times, he did.

15         Q  Did you know he was an abortion doctor?

16         A  Yes, I did.

17         Q  And did he talk to you about doing that work?

18         A  At times, he did.

19         Q  Did he talk to you about his patients in

20    general?

21         A  In general.

22         Q  Did he ever mention any specific patients by

23    name?

24         A  Never.

25         Q  When you would talk to him about -- when he

1   talked to you about his patients, would you respond and

2   would the two of you have a conversation about those

3   things?

4           A   Yes.

5           Q   Did Dr. Finkel ever tell you anything about

6   having contact with his patients that was unusual?

7           A   Yes.

8           Q   Did the discussions involve sexual matters?

9           A   Yes.

10          Q   What did Dr. Finkel tell about the contacts he

11  had with his patients involving sexual matters?

12          A   You ready for me to be explicit?

13          Q   Please describe exactly what Dr. Finkel said

14  to you?

15          A   He told me that he plays with women's pussy

16  and he had a great time sticking it up their vaginas like

17  this.

18          Q   You understand he was an abortion doctor,

19  correct?

20          A   Yes, I do.

21          Q   And it might be a necessary part of his job?

22          A   Well, I don't know.

23          Q   Did he tell about any other activities that he

24  would do with his patients that he put in a sexual manner?

25          MR. GIERLOFF:   Object to the form of the

1    question.

2              THE COURT:  Overruled.

3         A  Would you like to say it again, please?

4    BY MR. GADOW:

5         Q  Did he tell but any other activities that he

6    conducted, any other -- let me rephrase the question.

7    That's a bad one.

8              Did he tell you anything else that he did

9    with his patients that he described as being sexual?

10        A  Just stick his fingers up and go like this.

11        Q  What way would he describe that?

12        A  He used to live to do that to women's pussies.

13        Q  This was in his room in --

14        A  Operating room.

15        Q  Talking about his practice?

16        A  His practice, his patients.

17        Q  In any of these conversations, did he mention

18   any patient by name?

19        A  No.

20        Q  Did he ever mention any -- strike that

21   question.

22              How did you respond to these comments by

23   Dr. Finkel?

24        A  Well, it didn't sit with me.

25        Q  Okay.  At the time you talked to him when he

1   was telling you these things, did you tell him it didn't

2   stick with you?

3           A   No, I didn't.

4           Q   Why not?

5           A   He said it in a joking manner.

6           Q   What does that mean?

7           A   Well, he used to joke a lot.

8           Q   Did you know whether or not at the time he was

9   being serious?

10          A   Well, I guess that's why I'm here, right,

11  maybe that's why it is.

12          Q   Okay.  Considering that you were having these

13  conversations, it was a man to man conversation?

14          A   Correct.

15          Q   During the course of the workout session?

16          A   Correct.

17          Q   Any other -- well, those conversations were

18  not the reason why your relationship with him terminated

19  though; is that right?

20          MR. GIERLOFF:  Object to the form of the

21  question.

22          THE COURT:  One second.  Sustained.

23  BY MR. GADOW:

24          Q   Let me rephrase the question.  I'm sorry.

25  What was the basis for the termination of your

1    relationship with Dr. Finkel?

2              A  Honestly?

3              Q  Yes.

4              A  He is weird.  He is unusual.

5              Q  Did the cancellation of the sessions without

6    notice play a part in your termination?

7              MR. GIERLOFF:  Objection, leading.

8              A  One more time, sorry.

9              THE COURT:  The objection is overruled.

10   BY MR. GADOW:

11             Q  Did the cancellation of the sessions without

12   notice play a role in your termination of the relationship

13   ship with him?

14             A  Yes, it did.  That was the governing factor.

15             Q  Did the comments have anything to do with it?

16             A  Absolutely.

17             Q  Did the comments, the beginning of these

18   comments with his patients in this way, were they at the

19   beginning of the relationship, at the middle, the end or

20   throughout?

21             A  I would say late middle through the end.

22             Q  Now, over the course of time between 1990 and

23   2002, did you think occasionally of Dr. Finkel?

24             A  Obviously I did, if I had his folder out of

25   the hundreds of clients I trained, this was the only one

1   left, yes.

2          Q   Only folder you kept?

3          A   Only folder I kept, sir.

4          Q   In 2002, were you planning a trip back to

5   Phoenix?

6          A   Yes.

7          Q   And were you on the Internet?

8          A   Yes.

9          Q   Did you see anything on the Internet regarding

10  Dr. Finkel?

11         A   Yes, I did.

12         Q   What did you see and where did you see it?

13         A   I saw it on the Arizona Republic.

14         Q   On the website?

15         A   Yes, I did.

16         Q   What did you see?

17         A   I saw information about his arrest.

18         Q   Approximately when did you see that on the

19  Internet?

20         A   January, February.

21         Q   Of?

22         A   2002.

23         Q   And did you read the article that was

24  contained on the Internet?

25         A   Oh, yes, I did.  I read all of them.

1          Q  I was about to ask you, after reading that

2     article, did you go back and read additional articles

3     about Dr. Finkel?

4          A  Yes, I did.

5          Q  Did you go to the Republic's archives?

6          A  Yes, I did.

7          Q  Did you print the articles?

8          A  Yes, I did.

9          Q  I want to show you an Exhibit marked 323, just

10    have you flip through that a second.  Tell us if those are

11    the articles that you printed and provided?

12         A  Absolutely.

13         Q  And those articles are all articles that you

14    read sometime between January and February of 2002 and

15    when?

16         A  Up until I contacted Mark Stribling.

17         Q  When did that happen?

18         A  Around April 1st.

19         Q  Of?

20         A  2002.

21         Q  Why did you contact Detective Stribling?

22         A  Why?

23         Q  Yes.

24         MR. GIERLOFF:   Object on relevance.

25         THE COURT:   Overruled.

1        A   It's called moral obligations.

2        Q   Had you read all of those articles that are in

3   your hand before you contacted Mr. Stribling?

4        A   Absolutely.

5        Q   Did those articles describe in detail any of

6   the allegations made by any particular victims against Dr.

7   Finkel?

8        A   Yes.

9        Q   When looking at those articles, did they

10   refresh your recollection about your experience with him?

11        MR. GIERLOFF:   Object to the form of the

12   question.

13        A   Yes, I did.

14        THE COURT:   Overruled.

15        A   Yes, they did.

16        Q   Did they refresh your recollection?

17        A   Yes, they did.

18        Q   And when you called Mr. Stribling, did you

19   contact him at the Maricopa County Attorney's Office?

20        A   Yes, I did.

21        Q   And did you provide him with some information

22   about yourself?

23        A   Yes, I did.

24        Q   Did you have any concerns with regard to

25   making any reports?

1          MR. GIERLOFF:  Object on relevance.

2          A  Absolutely.

3          THE COURT:  Overruled.

4     BY MR. GADOW:

5          Q  What were those concerns in your mind?

6          A  Publicity.

7          Q  Why was publicity a concern?

8          A  The wrong publicity.

9          Q  Meaning what?

10         A  Drawing attention.

11         Q  To who?

12         A  To me, my business.

13         Q  Anything else that was of concern to you?

14         A  Maybe safety.

15         Q  At the time that you contacted Detective

16    Stribling, did he do an in depth interview with you over

17    the phone?

18         A  Yes, he did.

19         Q  Well, did he do an interview with you that

20    went into the details of what you heard?

21         A  Somewhat, yes.

22         Q  Well, did you give him a basic idea?

23         A  I gave him a basic idea what I knew.

24         MR. GIERLOFF:  Objection.

25         THE COURT:  Overruled.

1    BY MR. GADOW:

2           Q   And did the two of you try to make some

3    arrangement to contact one another later?

4           A   Yes.

5           Q   Subsequent to that conversation on April 1st,

6    2002, did your mind change at all about wanting to be

7    involved in this matter?

8           A   I don't understand the question.

9           Q   Well, you made the call April of 2002?

10          A   Correct.

11          Q   You wanted to at that point make some reports

12   about things that Dr. Finkel had said to you earlier?

13          A   Correct.

14          Q   After you talked to Mr. Stribling, did you get

15   cold feet?

16          MR. GIERLOFF:   Objection, leading.

17          A   I probably did.

18          MR. GADOW:   When there's an objection, you need

19   to stop and let the Judge rule.

20          THE COURT:   Objection overruled.   The answer will

21   stand.

22   BY MR. GADOW:

23          Q   When you -- well, did you make further efforts

24   to contact the Maricopa County Attorney's Office after

25   April 1st of 2002?

1        A   I believe I did.

2        Q   Okay.

3        A   I think I did.  I know --

4        Q   Pardon me?

5        A   I know you guys contacted me quite a bit.

6        Q   All right.  Let's talk about that?

7        A   Okay.

8        Q   In June of 2002, did Mr. Stribling and I

9   travel to California to see you?

10        A   You sure did.

11        Q   Was that a surprise to you?

12        A   Yes, it was.

13        Q   Between April and June, had you had any

14   contact with our office about this case?

15        A   No.

16        Q   No?  Is that what you said, no?  I didn't hear

17   you?

18        A   Say that again.

19        Q   Between April and June, did you have any

20   contact with us about this case?

21        A   Yes, I did.  Yes, yes, I did.

22        Q   But did you give a full in depth interview

23   over the phone?

24        A   Yes.

25        Q   At that time?

25

1        A   Yes.

2        Q   You did?

3        A   Well --

4        Q   When was the actual interview?

5        A   With Stribling?

6        Q   That was your conversation with Mr. Stribling?

7        A   Right, right.

8        Q   My question is, did Mr. Stribling call you

9    back?

10       A   No, no.

11       Q   So then in June 2002, were you expecting a

12   visit from Mr. Stribling to discuss these matters in more

13   detail?

14       A   Yes.

15       Q   You were expecting that visit?

16       A   I think I was, yeah.

17       Q   Were you surprised when we showed up on your

18   door step?

19       A   Yes, I was.

20       Q   So then were you expecting a visit or not?

21       A   Maybe I wasn't.

22       Q   Were you annoyed with us?

23       A   Yes, I was.

24       Q   Why?

25       A   Well, it was a surprise.

1        Q  Mr. Stribling is a detective?

2        A  Yes, he is.

3        Q  Did that frighten you at all?

4        MR. GIERLOFF:  Objection, leading.

5        A  Wouldn't it frighten you?

6        THE COURT:  Try to pause between his question and

7  your answer, okay?

8        A  Okay, Judge.

9  BY MR. GADOW:

10       Q  Why did it frighten you?

11       THE COURT:  Doesn't have to be that long a pause.

12       Q  Why?

13  BY MR. GADOW:

14       Q  Why did it frighten you?

15       A  Because it's a court case, it's a serious

16  matter.  Serious matters frighten a lot of people that

17  don't have anything to do with the law.

18       Q  In any event, that day did we make

19  arrangements to meet the next day so you could give us a

20  full interview in the case?

21       A  Yes.

22       Q  Did you show up for that interview?

23       A  No, I didn't.

24       Q  Why not?

25       A  Cold feet.

1   Q Subsequent to -- why did you get cold feet?

2   A Because I wasn't sure, I guess, that I was

3 making the right decision in my life.

4   Q Why not?

5   A Because I was worrying about my business,

6 worrying about my future.

7   Q After that June 2002 series of events, did you

8 receive a subpoena from me to testify in this case?

9   A Yes.

10   Q Did you contact me after that?

11   A Yes, I did.

12   Q And in July of this year, 2003, did you give a

13 telephonic interview with Mr. Gierloff?

14   A Yes, I did.

15   Q Did you describe to him the reason for your

16 call to the County Attorney's Office?

17   A Yes, I did.

18   Q May I have these marked as a single bundle.

19 Now, Mr. Segal when you spoke with Mr. Gierloff and I on

20 the telephone, did Mr. Gierloff ask you to provide me with

21 copies of the materials including the articles and these

22 other materials you had today?

23   A Yes.

24   Q Did you do that?

25   A No, I couldn't.

1          Q   How come?

2          A   Because I have a storage room that houses all

3    my equipment and it was behind a lot of equipment.   And I

4    wasn't quite sure where it was at.   I had to pull a lot of

5    equipment out in order to get to a chest full of stuff.

6          Q   But you have it today?

7          A   Yes, I do have it today.

8          Q   You brought it because we asked you to bring

9    it?

10         A   Absolutely.

11         Q   Show you what's been marked as Exhibit 324 for

12   identification.   Looking through that exhibit, are those

13   documents that you had received from Dr. Finkel's file?

14         A   Yes.

15         Q   Does that include a letter from you to Dr.

16   Finkel?

17         A   Yes.

18         Q   A letter from Dr. Finkel to you?

19         A   Correct.

20         Q   Calendars, scheduling, Dr. Finkel's

21   appointments with you for a period of time?

22         A   Yes.

23         Q   And some kind of a ledger card?

24         A   Yes.

25         Q   What is that ledger card?

1          A   This one here?

2          Q   No, this one?

3          A   This is a progress chart.

4          Q   It's a --

5          A   Documents the progress of a person's weight to

6    finish measurements and their weight.

7          Q   Is that Dr. Finkel's progress card?

8          A   Yes.

9          Q   Is there a money order attached to that as

10   well?

11         A   Yes.

12         Q   Is that written to Dr. Finkel?

13         A   Correct.

14         Q   For $180.00?

15         A   Correct.

16         Q   From you?

17         A   From me.

18         Q   What is the date on that?

19         A   July 26th, 1990.

20         Q   Is that the payment you made to Dr. Finkel,

21   the refund?

22         A   Yes, it is.

23         Q   You heard these things from Dr. Finkel in 1989

24   and '90, why didn't you do anything about them at that

25   time?

1          A   Because I wasn't sure it was actually true.

2          Q   And what in 2002 caused you to decide to do

3   something about it?

4          A   The articles about the women coming forward.

5          Q   I'm finished, Your Honor, thank you.

6          THE COURT:   Cross-examination?

7

8                          CROSS-EXAMINATION

9

10   BY MR. GIERLOFF:

11          Q   Mr. Segal?

12          A   Yes.

13          Q   You were Dr. Finkel's trainer in '89?

14          A   Correct.

15          Q   During that time -- well, you were employed as

16   a personal trainer, correct?

17          A   Correct.

18          Q   You have a mobile DJ service; is that correct?

19          A   Yes, I do.

20          Q   And you're a private chauffeur; is that

21   correct?

22          A   Correct.

23          Q   All right.   Dr. Finkel, during these training

24   sessions, would make these comments to you; is that

25   correct?

1          A  Correct.

2          Q  All right.  And they were unwelcome to you; is

3    that correct?

4          A  At times.

5          Q  And you told Dr. Finkel to not talk like that;

6    is that correct?

7          A  Correct.

8          Q  You told him to not say anything like that to

9    you again; is that correct?

10         A  Correct.

11         Q  All right.  And yet he persisted in talking

12   that way to you; is that correct?

13         A  Correct.

14         Q  All right.  But you didn't terminate him as a

15   client when he made the comments, correct?

16         A  Correct.

17         Q  All right.  And you couldn't tell if he was

18   joking or if he was serious?

19         A  I couldn't tell.

20         Q  And whether it was a joke or serious, it was

21   still offensive to you?

22         A  At times, yes.

23         Q  And you told us three things today, that he

24   liked sticking his finger in women's pussies; is that

25   correct?

1          A   Correct.

2          Q   And he liked moving the tube around; is that

3   correct?

4          A   Correct.

5          Q   And you made this gesture with your fingers

6   and your tongue?

7          A   Yes, I did.

8          Q   Now, when you were talking to Mr. Stribling in

9   April of 2000, you didn't mention anything about any

10   licking, any comment by Dr. Finkel about licking, correct?

11          A   Correct.

12          Q   That's something you remembered after that,

13   after your telephone conversation?

14          A   Correct.

15          Q   So you saw the newspaper articles about Dr.

16   Finkel, you think, in January of 2000?

17          A   Correct.

18          Q   All right.  And after you saw the first one,

19   then you went back and downloaded every news story you

20   could find; is that correct?

21          A   Rephrase that again.

22          Q   After you found the first article, then you

23   went back and downloaded all the other articles that you

24   could find about Dr. Finkel?

25          A   Not all the other articles, just a few.

1    Q   Okay.  And the articles had detail about the

2    allegations --

3    A   Correct.

4    Q   -- against Dr. Finkel; is that correct?

5    A   Correct.

6    Q   All right.  And then from January to April,

7    you don't do anything, correct?

8    A   Correct.

9    Q   You don't act on it, correct?

10   A   Correct.

11   Q   But on April 1st, 2002, you do act on it.  You

12   call Mr. Stribling; is that correct?

13   A   Correct.

14   Q   You called Beth Defalco first?

15   A   You're correct.

16   Q   She directs you to Mr. Stribling?

17   A   Correct.

18   Q   April 1st, that's April Fool's Day, isn't it?

19   A   I don't know.  I didn't look at it as April.

20   Q   April 1st is April Fool's Day, isn't it?

21   A   I'm --

22   Q   Is that correct?

23   A   I'm sure it was.  I don't celebrate it.

24   Q   People play practical jokes on other people?

25   MR. GADOW:  Objection, relevance.

1               THE COURT:   Overruled.

2    BY MR. GIERLOFF:

3          Q  Don't they?

4          A  Come on.

5          Q  Do people play practical jokes on other people

6    on April Fool's Day?

7          A  Do they?

8          Q  I'm asking you a question, sir?

9          A  They probably do.  I don't know everybody's

10   lives.

11         Q  Thank you.  All right.  And even though when

12   Dr. Finkel would make these comments to you, and you would

13   tell him that they were unwelcome, and you would tell him

14   to not say anything to you again, he'd persist in saying

15   these things; is that correct?

16         A  Correct.

17         Q  And, in fact, not only did he persist in

18   saying these things to you which were unwelcome, he

19   threatened you as well, should you ever reveal him having

20   said these things, correct?

21         A  Correct.

22         Q  All right.  So he's making statements to you

23   that, I guess, could be harmful to him in some fashion; is

24   that correct?

25         A  Correct.

1          Q   All right.   And you're telling him they are

2    unwelcome.   And yet he persists in saying these things

3    which could be harmful to him to you and, in fact, even

4    threatens you should you reveal to anyone that he's saying

5    these things, correct?

6          A   Right.

7          Q   Certainly would have been a lot easier for him

8    to stop saying this stuff, right?

9          MR. GADOW:   Objection, argumentative.

10         A   I don't understand the question.

11         THE COURT:   Objection sustained.

12   BY MR. GIERLOFF:

13         Q   Well, if he's concerned that you would reveal

14   these things, he could just stop saying them, correct?

15         A   Not necessarily.

16         Q   Well, in order to protect himself from

17   possible disclosure by you, he could protect himself by

18   not saying them; is that correct?

19         A   I don't understand the question.   I really

20   don't.

21         Q   All right.   Well -- and the threat was that

22   he'd shut down your business; is that correct?

23         A   Right.

24         Q   Now, you had your own business; is that right?

25         A   Yes.

1         Q   You were working out of this gym out of

2   Beauve's World Gym at the time?

3         A   It is now.

4         Q   Beauve's at the time?

5         A   Correct.

6         Q   You had a very good relationship with the

7   owner of that gym, correct?

8         A   Correct.

9         Q   And so Dr. Finkel would go to the owner of the

10   gym and say, I'm Brian Finkel, and even though you have a

11   good business relationship with Mr. Segal, I want you to

12   kick him out; is that correct?  That's what he would do?

13         A   Are you asking me if he would do it or asking

14   me if he would?

15         Q   That would have to be how he would act on the

16   threat, right?

17         A   Possibly.

18         Q   Now, well, the other thing -- well, okay.

19             What makes you think that he could have

20   accomplished getting you kicked out the gym?

21         A   Well, that particular time, he was very

22   influential, carried a gun, wore a vest, very

23   intimidating.

24         Q   Um-hum.

25         A   Disrespectful.

1       Q   All right.   Well, so he goes to the manager of

2  the gym, now, you were an asset to the gym, correct?

3       A   I'm sure I was.

4       Q   The gym owner made money off you being there?

5       A   I'm sure he did.

6       Q   So Dr. Finkel puts on his vest and his gun and

7  walks in and said, I'm the very powerful Brian Finkel and

8  I want you to kick Frankie Segal out.   I want you to end

9  this lucrative business relationship.   Is that how that

10  was going to work?

11       A   Are you asking me?

12       Q   I'm asking you.

13       A   Are you asking me to foresee what he would do?

14       Q   You said he threatened to shoot you down,

15  right, get you kicked out, is that how he would accomplish

16  it?

17       A   I don't know how he would accomplish it.

18       Q   All right.   That was the only?

19       A   I can't read people's minds.

20       Q   That was the only gym in Phoenix?

21       A   No, sir, it wasn't the only gym in Phoenix.

22       Q   And the other thing that he could do would be

23  to make a false accusation against you, correct?

24       A   Possibly.

25       Q   All right.   You mentioned that during the

1    interview I had -- Mr. Gadow and I had with you on July

2    30th, 2003, correct?

3            A   Correct.

4            Q   All right.   And that's how people make life

5    hard for other people by making false accusations,

6    correct?

7            A   Or rumors.

8            Q   Is that correct?

9            A   That's correct.

10           Q   And that's something that you had mentioned

11   spontaneously during my interview with you on July 30th,

12   2002, correct?

13           A   Correct.

14           Q   So people can make life hard for other people

15   by making false accusations, right?

16           MR. GADOW:   Asked and answered.

17           THE COURT:   Sustained.

18           A   You just asked me.

19           THE COURT:   It's been sustained.

20   BY MR. GIERLOFF:

21           Q   All right.   Now, you did move to California in

22   November of 1990, correct?

23           A   Between November and December.

24           Q   Right.   And, in fact, Dr. Finkel trained with

25   you, what, January through April of 1990; is that correct?

1          A   Correct.

2          Q   So within seven or eight months, you'd

3    relocated to California, correct?

4          A   Correct.

5          Q   All right.  And, in fact, your plan to

6    relocate to California had been in the works for two years

7    before you moved there; is that correct?

8          A   Correct.

9          Q   All right.  So, even before Dr. Finkel was a

10   client of yours, you were planning on relocating to

11   California, correct?

12         A   It was a plan.

13         Q   All right.  All right.  So Dr. Finkel saying

14   these things to you and he's threatening to shut down your

15   business if you say anything, get you kicked out of that

16   gym, but you were planning on leaving that gym?

17         A   Planning?

18         Q   Before you ever met him, right?  Is that

19   correct?

20         A   Planning?

21         Q   Exactly.

22         A   Does not mean that would have been executed.

23         Q   Is that correct?

24         A   It was planning, planning.

25         Q   You were planning on leaving?

1          A   Planning.

2          Q   Is that yes?

3          A   That's a yes.

4          Q   Thank you.  So it's Dr. Finkel who is saying

5    this stuff to you that's unwelcome.  And you tell him to

6    not say it and he persists in saying it and threatens that

7    he's going to get you kicked out of that gym.

8                So he goes to Mr. Beauve and tells some

9    lie, makes up some lie about you and said, I want you to

10   kick Frankie Segal out of this gym.

11               Why then doesn't Mr. Beauve say, what, kick

12   him out?  He's leaving anyway, right?

13          A   I don't think he knew I was leaving.

14          Q   Odd business relationship with this man,

15   correct?

16          A   Yes.

17          Q   Did you pay some sort of rent?

18          A   Yes.

19          Q   All right.  Did you have a lease?  Did you

20   have a contract?

21          A   Wasn't any contract.

22          Q   Just month to month?

23          A   Month to month.

24          Q   All right.  So you never discussed you had a

25   good business relationship?

1              THE COURT:  We need you to speak up.

2    BY MR. GIERLOFF:

3         Q  All right.  You had a good business

4    relationship with this man, correct?

5         A  Correct.

6         Q  And that's something that you would like to

7    maintain even in the future?

8         A  Absolutely.

9         Q  All right.  So you wouldn't want to burn that

10   bridge with this gym owner, correct?

11        A  Absolutely not.

12        Q  You wouldn't walk out without any notice,

13   correct?

14        A  Correct.

15        Q  So I mean, you did let him know you were going

16   to California before you left, didn't you?

17        A  Yes, I did.

18        Q  You gave him some notice?

19        A  Yes, I did.

20        Q  Sixty, 90 days?

21        A  I don't remember, sir, it's over ten years

22   ago.

23        Q  Yes, it is.  And so you relocate to

24   California, and as you said, for ten years you don't say

25   anything to anybody about Dr. Finkel's comments, correct?

1          A   Correct.

2          Q   And you see some stuff in the paper in January

3   of 2002, correct?

4          A   Correct.

5          Q   And you don't do anything about it until April

6   1st, 2002, correct?

7          A   Correct.

8          Q   And then you don't do anything after April

9   1st, of 2002, correct?

10         A   Right.

11         Q   But then one morning, June 5th, Mr. Gadow and

12   Mr. Stribling show up at your front door, correct?

13         A   Correct.

14         Q   You hadn't contacted them subsequent to that?

15         THE COURT:   Would you repeat that?

16   BY MR. GIERLOFF:

17         Q   You hadn't contacted them after April 1st,

18   2002, right?

19         A   Correct.

20         Q   In fact, you didn't want to give Mr. Stribling

21   your address when you called him on April 1st, correct?

22         A   Correct.

23         Q   And, in fact, you did not give him your

24   address when you are -- during that telephone

25   conversation, correct?

```
1            A   Correct.

2            Q   So he shows up on your front door and you're

3    upset about that, right?

4            A   Yes.

5            Q   You're angry about that, right?

6            A   Right.

7            Q   And you refuse to talk to them, right?

8            A   Right.

9            Q   You make an appointment to speak to them at

10   your house at 8:30 the next morning, correct?

11           A   Correct.

12           Q   So that's something that on the 22nd of June,

13   I'm sorry, the 5th of June, you work out with Mr. Gadow

14   and Mr. Stribling, correct?

15           A   Correct.

16           Q   You say, I don't want to talk to you now, but

17   I'll talk to you tomorrow morning at 8:30, right?

18           A   Right.

19           Q   And then at 8:30, the next morning when they

20   show up at your house and knock on the door, you're gone,

21   correct?

22           A   You're correct.

23           Q   You avoided speaking with them at the time

24   that you had agreed to speak to them?

25           A   Yes, I did.
```

1       Q  And that's because you didn't want to speak to

2  them; is that correct?

3       A  Correct.

4       Q  All right.  And you left them a note, correct?

5  Stuck a note on your front door?

6       A  Correct.

7       Q  Telling Mr. Stribling that you didn't like

8  being hunted down like that, correct?

9       A  Correct.

10      Q  All right.  And telling them that now they

11  were going to have to call you to talk, right?

12      A  Correct.

13      Q  And after that, you didn't make any attempt to

14  contact them until you received a subpoena in the mail,

15  correct?

16      A  Correct.

17      Q  And I asked you during the telephone interview

18  that I had with you in July of this year, why you didn't

19  talk and why you wouldn't give your address to

20  Mr. Stribling, correct?

21      A  Correct.

22      Q  All right.  And you told me that -- you said

23  that you didn't because you were probably -- because you

24  got a little afraid, right?

25      A  Correct.

45

1          Q  And I asked you, afraid of what?  This is Page

2     4?

3          MR. GADOW:  Thank you.

4     BY MR. GIERLOFF:

5          Q  I asked you afraid of what?  Correct?

6          A  Correct.

7          Q  And you told me, afraid that -- like I said to

8     Mr. Stribling or Blaine that I wanted to be careful that I

9     was not using this as a get back tactic or I was not

10    letting my emotions override the true sense of the

11    information I had, correct?

12         A  Correct.

13         Q  So like a get back tactic, I mean, that could

14    be like a kind of a dirty trick someone might play on

15    somebody on April Fool's Day, right?

16         A  No.

17         Q  All right.  And the termination of your

18    business relationship with Dr. Finkel, I mean, he sent you

19    a letter terminating the relationship; is that correct?

20         A  Correct.

21         Q  In fact, he hired another personal trainer

22    after he terminated the relationship with you?

23         A  I have no idea.

24         Q  Well, you had an idea when you talked to

25    Mr. Stribling, you told him that he started working out

1    with Jackie Pasley, right?

2             A   That's a possibility.

3             Q   It's Page 9.  Mr. Stribling asked you, do you

4    know Jackie Pasley?

5             A   Yes, I do.

6             Q   And he asked you -- in fact, Dr. Finkel hired

7    Jackie Pasley as a trainer and continued to work out in

8    that same gym where you'd trained him, correct?

9             A   I think so.

10            Q   All right.  So everyone going to that gym

11   could see that Dr. Finkel was no longer being trained by

12   you.  He was being trained by a woman named Jackie Pasley,

13   correct?

14            A   I never saw it.

15            Q   And the documents that you have given us

16   today, we did ask you for those July 30th of 2003,

17   correct?

18            A   Correct.

19            Q   And you said they were at home, correct?

20            A   Correct.

21            Q   And Mr. Gadow asked you if you could provide

22   them to us, correct?

23            A   Correct.

24            Q   And asked you if you could fax them over and

25   do that within the next day or two, correct, next couple

1    days?

2                A   Correct.

3                Q   And you agreed on the telephone that you could

4    do that, correct?

5                A   Correct.

6                Q   But you didn't do that, right?

7                A   Correct.

8                Q   Because it turned out they were in a box in

9    the back of a store room behind a lot of equipment?

10               A   Correct.

11               Q   And you kept Dr. Finkel's file for ten years?

12               A   Correct.

13               Q   And I guess it was, what, quite a coincidence

14   when Mr. Gadow asked about it this morning?

15               A   Pardon me?

16               Q   Well, when Mr. Gadow asked if you had Dr.

17   Finkel's file, you said, funny you should ask, right,

18   correct?

19               A   You're talking about today?

20               Q   Yeah.

21               A   Correct.

22               Q   So you weren't expecting him to ask you about

23   Dr. Finkel's file?

24               A   Of course I was.

25               Q   What was so funny about him asking?

1          A   I don't understand the question.

2          Q   That's all I have.

3          THE COURT:   Redirect.

4

5                              REDIRECT EXAMINATION

6

7     BY MR. GADOW:

8          Q   The gym that you were associated with, what

9     was the importance to you about being associated with that

10    gym?

11         A   Well, the son that ran the gym or I should say

12    the owner of the gym was the son of the America West

13    founder.

14         Q   Okay.   What about the gym made it important to

15    you to work at the gym?

16         A   He had a slew of gyms around Phoenix at the

17    time.   So the gym was a very popular gym.

18         Q   Was it close to where you lived?

19         A   Yes, it was.

20         Q   Did you have a client base there?

21         MR. GIERLOFF:   Objection; leading.

22         A   Yes, I did.

23         THE COURT:   The objection is sustained.

24

25    BY MR. GADOW:

1      Q   What about that gym made it important for you

2   to work at that gym?

3      A   Location.   The way he treated the trainers,

4   the kind of equipment, it had state of the art equipment

5   back then.   It was clean.

6      Q   Where was it in relationship to where you

7   lived?

8      A   Gosh, I could ride my bike, probably two and a

9   half, three miles away.

10      Q   How old were you at the time that you were

11   training Dr. Finkel?

12      A   I was in my mid 20s, actually late 20s.   27.

13      Q   Was Dr. Finkel a client of the gym or a client

14   of yours?

15      A   He was a client of mine.   I'm not sure if he

16   was a client of the gym.   I'm sure he was.   I'm thinking

17   he had to pay a membership to get in for a daily rate.

18      Q   Mr. Gierloff went through with you a scenario

19   whereby Dr. Finkel would go in, talk to the owner, so on

20   and so forth, how your business would be closed down,

21   right, you heard that question?

22      A   Correct, I did.

23      Q   Was that a concern that was real to you in

24   1989 and '90?

25         MR. GIERLOFF:   Objection.

1           A   Correct, it was.

2           THE COURT:   Overruled.

3   BY MR. GADOW:

4           Q   Remember to pause a second because if there's

5   an objection, the Judge has to make a ruling.

6           A   Sorry.

7           Q   Okay.   Let me ask the question again.   Was

8   that a real concern to you in 1989 and '90?

9           A   Yes.

10          Q   Did you receive a subpoena in the mail to

11  testify in this case?

12          A   Yes.

13          Q   Mr. Gierloff asked you about the fact you

14  didn't say anything about these matters in 1990.   And you

15  left the gym.   Asked you about burning bridges, remember

16  that question?   Whether you burned any bridges or would

17  burn a bridge?

18          A   From the transcript?

19          Q   No.   From the questions you were asked today?

20          A   All right.

21          Q   Did he ask you about burning bridges with the

22  owner of the gym?

23          A   Yes.

24          Q   And you had ongoing client contact with other

25  clients in that gym even after you moved to California?

1          A   Correct.

2          Q   So you didn't burn that bridge with that gym

3    owner?

4          A   Absolutely not.

5          Q   And he talked to you about the fact that Dr.

6    Finkel continued to workout at that gym with Ms. Pasley

7    even after your relationship with him was over?

8          A   He was talking about it, yes.

9          Q   And you mentioned that in response to some of

10   Mr. Gierloff's questions today that you did have these

11   concerns about Dr. Finkel being able to walk in and shut

12   you down?

13         A   Correct.

14         Q   Did any of those concerns come from anything

15   that Dr. Finkel said to you about his power?

16         A   I believe not.

17         Q   Did Dr. Finkel talk to you about a belief that

18   he is a powerful person?

19         MR. GIERLOFF:   Object to the form of the

20   question.

21         THE COURT:   Overruled.

22         A   That's a hard one.   I'm going to do the best I

23   can to remember.

24

25   BY MR. GADOW:

1       Q  Okay.

2       A  Okay?

3       Q  Well, let me ask you another question rather

4  than go down that road.

5            Did you tell us in the interview with

6  Mr. Gierloff, that you believed he was pretty powerful at

7  the time?

8       A  Yes.

9       Q  And that he bragged that he was powerful?

10      A  Yes.

11      Q  Mr. Gierloff asked you about your plans to

12  leave and go to California and they were in the works for

13  two years and so on.  When did those plans become

14  concrete?

15      A  Probably right around July, August of 1990.

16      Q  Until then, were you still running your

17  business as though you were going to be staying in

18  Phoenix?

19      A  Absolutely.

20      Q  Mr. Segal, my last question for you today is,

21  are you testifying in this case over a $180.00 refund to

22  Dr. Finkel?

23      MR. GIERLOFF:  Objection.

24      A  Absolutely not.

25      MR. GIERLOFF:  Objection, argumentative.

1      THE COURT:  The objection is sustained.  The last

2  answer is stricken.  The jury is instructed to disregard

3  it.

4  BY MR. GADOW:

5      Q  Was it an April Fool's joke for you to call

6  Mr. Stribling on April 1st and make a report about Dr.

7  Finkel?

8      A  Absolutely not.

9      Q  That's all I have.

10     THE COURT:  Do any of the jurors have any

11  questions of this witness?

12          We have some questions.

13          (A sidebar discussion was held.)

14     MR. GADOW:  I guess I have a sticker on the

15  second one.

16     THE COURT:  The second one too?  One and two are

17  out?

18     MR. GIERLOFF:  Yes.

19     THE COURT:  Okay.  Who is next?

20     MR. GADOW:  Well, Ms. Brown is coming at 1:00

21  o'clock.  We could -- I propose we start playing the tape

22  to fill the morning.

23     THE COURT:  Can you make her available?

24     MR. GADOW:  Ms. Brown?

25     THE COURT:  Or Shelly?

1          MR. GADOW:  We can call her.

2          THE COURT:  The follow-up questions of Ms. Brown,

3    I will allow more latitude to do on your follow-up

4    questions than I normally would.

5          MR. GIERLOFF:  Sorry?

6          THE COURT:  In other words on Brown, not Brown,

7    Ms. Cluff, when the jurors have any questions, I will

8    allow you people to get into other areas even if they were

9    not directly related to the juror's questions.

10          MR. GADOW:  We'll make a call at the break.

11              (In open court.)

12          THE COURT:  Mr. Segal, first question, why did

13    you keep Dr. Finkel's file?

14          A   Why?

15          THE COURT:  And only his.

16          A   Maybe I knew in the back of my mind something

17    was true.

18          THE COURT:  And when you moved to California, why

19    didn't you say something then about Finkel?

20          A   That's something I can't answer.  I'm not

21    sure.

22          THE COURT:  Did you keep on your files the

23    comments that Finkel made to you?  Was it documented?

24          A   No.

25          THE COURT:  And why did you return the $180.00?

1         A  That's why.

2         THE COURT:  His letter to you?

3         A  Correct.

4         THE COURT:  Okay.  Asking for money back?

5         A  I'm sorry.

6         THE COURT:  Asking for money back?

7         A  Correct, sir.

8         THE COURT:  Next question is, when Dr. Finkel

9    threatened you, could you tell if he was serious or

10   playing?

11        A  No, I couldn't.

12        THE COURT:  Why did you only decide to keep Dr.

13   Finkel's file, same answer you gave before?

14        A  Exactly.

15        THE COURT:  And what did you do with your other

16   client's files.

17        A  Threw them out.

18        THE COURT:  Why did you keep -- did you imagine

19   that Dr. Finkel's files would be needed for some purpose

20   in the future?

21        A  Possibly.  In the back of my mind, yes.

22        THE COURT:  Where were you when you called

23   Detective Stribling on April 1st, 2002?

24        A  At my home.

25        THE COURT:  Are there any confidentiality

1  agreements in writing between you and your clients?

2        A  Which clients?

3        THE COURT:  Your clients in your gym when you

4  were working.

5        A  Not at that time, no.

6        THE COURT:  Are there any implied

7  confidentiality -- first question was, were there any

8  confidentiality agreements and then if not --

9        A  No.

10       THE COURT:  Are there any implied

11  confidentiality --

12       A  No.

13       THE COURT:  Next question, did Dr. Finkel give

14  you details how he would play with women's pussies?

15       A  Yes.

16       THE COURT:  Explain why Dr. Finkel's records were

17  the only record you retained.  You already explained that.

18  Why did you call Detective Stribling on April 1st and not

19  March 30th or April the 2nd?

20       A  Well, I had no idea it was really April 1st.

21  I ran an entertainment business.

22              So sometimes I don't get home till 2:00,

23  3:00 o'clock in the morning.  So days and hours and times

24  overlap each other.

25              THE COURT:  Any further questions from the

 1   jurors?

 2                    Any follow-up questions, Mr. Gadow?

 3   BY MR. GADOW:

 4          Q   Would it have mattered to you if you'd known

 5   it was April 1st?

 6          A   No.

 7          THE COURT:   Any further questions?

 8   BY MR. GIERLOFF:

 9          Q   Sure.   The letter -- I'm sorry.   Were you

10   done?

11          MR. GADOW:   Yes, I am.

12          MR. GIERLOFF:   Okay.

13          MR. GADOW:   I actually am.

14   BY MR. GIERLOFF:

15          Q   You asked a question and your response was to

16   dangle the letter in front of the Judge.   You kept the

17   file because of the letter?

18          A   No.

19          Q   Well, in the letter, he's telling you he wants

20   his money back, correct?

21          A   Correct.

22          Q   He wanted $200 back?

23          A   No.

24          Q   I request you refund to me $200 in a timely

25   fashion?

1            MR. GADOW:   Your Honor, I object to the portions

2       of the letter being admitted or not being admitted.

3            THE COURT:   Objection overruled.

4       BY MR. GIERLOFF:

5            Q   Right?

6            A   Said right here in the letter.

7            Q   Right.

8            A   Okay.

9            Q   And if you don't refund the money, he might

10      report you to the Better Business Bureau, right?

11           A   Correct.

12           Q   So if that -- if that were to ever happen,

13      then you could show the letter to The Better Business

14      Bureau, saying this is --

15           A   Sir, I was in my 20s.

16           Q   I'm asking you a question.

17           A   Sir?

18           Q   I'm asking you a question.   It was a fee

19      dispute, right?

20           A   I don't know.   I can't think back ten years

21      like that, that type of business tactic.

22           Q   You can't think back ten years?

23           A   Not for that type of business tactic.   I never

24      thought about The Better Business Bureau, sir.

25           Q   Thanks.   That's all I have.

1            THE COURT:  Anything further?

2   BY MR. GADOW:

3            Q  Could you have also shown The Better Business

4   Bureau a copy of the refunded money order?

5            A  I'm sure I could have.

6            Q  Thank you.

7            THE COURT:  May this witness be permanently

8   excused?

9            MR. GIERLOFF:  Fine with me.

10           THE COURT:  Thank you for your assistance.

11           A  Very welcome, Judge.

12           THE COURT:  Take a ten minute recess.

13                (A recess was held).

14           THE COURT:  Thank you.  Please be seated.

15   Mr. Gadow here?

16           MS. NANNETTI:  I think he stepped out to make a

17   call.

18           THE COURT:  Do you want me to tell the jury what

19   we're going to do next?  Do you want me to tell them what

20   we're going to do next?

21           MS. NANNETTI:  Please.

22           THE COURT:  Ladies and gentlemen, last Friday

23   afternoon we took trial testimony of a witness, Shelly

24   Cluff, right here in this courtroom.  And the Court

25   Reporter was here.  I was here.  And the attorneys were

1   here.  And so we're going to be playing right now the

2   video tape of her trial testimony.

3           Now, when we get through with the tape, we're

4   hoping that she will be here to answer any questions.

5           One more thing I want to mention to you is

6   that just because there's a video tape and the video tape

7   is received in evidence does not mean that you're going to

8   have this video tape with you in the jury room when you

9   deliberate.  So -- yes, sir?

10          A JUROR:  With the transcript?

11      THE COURT:  No.  Mr. Strong just asked the

12   question.  You're going to be hearing her testimony.

13   You're going to be seeing it in a moment.

14          This is part of the technology.  There are

15   cameras here, three here and two in the back.  And if I

16   press one button, it locks into one location.  If I don't

17   press the lock button, then it's voice activated.  So

18   whoever is speaking it picks up a camera.  I think you

19   will enjoy it.  When I say enjoy, enjoy the technology.

20          But you have an opportunity to ask the

21   witness questions because we're going to try to get her

22   down here when the video tape is finished.

23          But you're not going to have a transcript

24   with you of any witness's testimony.  The reason for this,

25   I will explain the reason for this.  If we sent this

1    deposition in with you to the jury room for deliberations

2    or sent a transcript of anyone's testimony, the argument

3    is going to be that that's going to lend -- that's going

4    to be undue influence to that witness's testimony over the

5    other witness's testimony.  So we just don't provide you

6    with testimony of anyone, talking about transcripts.  The

7    video tape is what exhibit?

8          Okay.  325 is received in evidence, will not

9    go into the jury room during deliberations.  So just sit

10   back, relax and listen and watch.  And we don't serve

11   popcorn.

12         One last thing that is that the Court

13   Reporter need not be here to take down what she said

14   because he's already taken it down.

15         MR. GADOW:  Right.

16         (Tape playing.)

17         (A recess was held.)

18         (A sidebar discussion was held.)

19         THE COURT:  Did you all have a chance to go over

20   the questions?

21         MR. GIERLOFF:  The only one I have, how long did

22   the clitoral touching last.  I think it misstates

23   testimony.  She never did say they touched.

24         MS. NANNETTI:  Never said what?  I specifically

25   asked did he touch you on your clitoris?  Mr. Gierloff

1    objected to the leading aspect of that question and the

2    Court overruled and she answered it.

3            THE COURT:  It will be asked.  Any other

4    problems, questions?

5            MR. GADOW:  There's one I put a sticker on.

6            MS. NANNETTI:  Just to clarify when.

7            MR. GADOW:  The question whether she said

8    anything to the doctor and it's not clear about when that

9    was.

10           MR. GIERLOFF:  I'd like the record to reflect

11   Ms. Cluff is in the courtroom now hearing the discussion.

12           THE COURT:  Ms. Cluff, would you mind stepping

13   out?

14           MR. GADOW:  Sorry, Judge, I asked her to come in

15   and didn't remember we were having this question in open

16   court.

17           THE COURT:  Another one is what?

18           MR. GIERLOFF:  This is Blaine's tag.  Why didn't

19   you say something to the doctor?  And his tag said when?

20           MS. NANNETTI:  At the time, after, before?

21           MR. GADOW:  She did testify she said something to

22   him.  We don't know what the jurors are thinking when,

23   what point.

24           THE COURT:  Do you want me to ask it at the time

25   it was occurring?

1        MR. GADOW:  At the time of what?  I guess my

2    problem with the question --

3        THE COURT:  Let me see the question.

4        MR. GIERLOFF:  And I think it can be asked.

5        THE COURT:  Why didn't she say something to the

6    doctor?  I think I'll ask it as it stands or at the time.

7        MR. GADOW:  I guess my only issue, Judge, I don't

8    understand the question in terms of we don't know what the

9    juror is thinking.  You can ask her, during the entire

10   examination process, did you say anything to the doctor,

11   because I think otherwise we don't know what point that

12   question is referring to.

13       THE COURT:  Maybe the question isn't asking for a

14   precise point.  But at any point, along the lines of her

15   consultation or examination, I'm going to ask it as it is.

16   And as I indicated to you before, when I ask her further

17   questions, I'm not going to say -- if there's anything you

18   want to get into, have at it.

19       MR. GIERLOFF:  I can bring up the hearing we had

20   on the demeanor?

21       THE COURT:  What?

22       MR. GIERLOFF:  The hearing we had on her demeanor

23   during the hearing.

24       THE COURT:  Like what?

25       MR. GIERLOFF:  She is tearful in contrast to her

1    demeanor on the video.

2         THE COURT:  Depends how you ask it.  I don't know

3    if it's a proper way of questioning.

4         MR. GIERLOFF:  That's why I'm asking, are you

5    saying we can have at it?

6         THE COURT:  You can ask further questions.

7         MR. GIERLOFF:  Okay.

8         MS. NANNETTI:  Your Honor, in terms of anything

9    he can go into, I don't want to go through the whole

10   thing.

11        THE COURT:  If it's asked and answered, I don't

12   want to get into it.  If it's something new, I'll probably

13   allow it, if it's a proper question.  I'm going to take it

14   a question at a time.  Okay.

15        Why don't you bring the jurors back in?  And

16   I'm going to have her re-sworn.

17        Please be seated.  Ms. Cluff, why don't you

18   come forward?

19        Why don't you come up here?  Give your name

20   to the clerk.  She'll give you a oath one more time.  And

21   we have a few questions.  Why don't you have a seat in the

22   witness chair?

23

24

25

```
 1                        SHELLY CLUFF,

 2    having been first duly sworn, was examined and testified

 3    as follows:

 4

 5                     DIRECT EXAMINATION

 6

 7            THE COURT:  A few questions from the jurors.

 8    First, what kind of blouse were you wearing, shirt or

 9    T-shirt?

10            A  I believe it was a T-shirt.  I wore a lot of

11    T-shirts back then.

12            THE COURT:  And were you wearing a bra?

13            A  No.

14            THE COURT:  Why didn't you say something to the

15    doctor?

16            A  Why didn't I what?

17            THE COURT:  Why didn't you say something to the

18    doctor?

19            A  I was -- it's an intimidating situation to be

20    in.

21            THE COURT:  Let me ask the questions.  You talk

22    to the jurors.  Okay?

23            A  Sorry.

24            THE COURT:  It's understandable.  Why didn't you

25    say something to the doctor?
```

1          A   I think most women understand the intimidating

2     situation that that is.

3          THE COURT:   When the doctor did a breast exam,

4     was he wearing gloves?

5          A   No, he was not.

6          THE COURT:   When you went to the doctor's office,

7     when you were done, why didn't you ask him then why you

8     had a breast exam?

9          A   Can you repeat that, please?

10         THE COURT:   When you went to the doctor's office,

11    when you were done, why didn't you ask him then, why it

12    was you had a breast exam?

13         A   It was the -- it was my second gynecological

14    exam in my life, and I didn't know that that wasn't the

15    standard for a 16 year old.

16         THE COURT:   Why didn't you tell your mother?

17         A   I didn't live with my parents at the time.

18         THE COURT:   Did the doctor explain to you what a

19    yeast infection was and what caused it?

20         A   No.   He did not.   He told me that I had a

21    yeast infection.   He did not tell me what caused it.   And

22    like I said, I can't remember if he gave me a sample or if

23    I was given a prescription.

24         THE COURT:   Was Dr. Finkel saying the jokes to

25    you or the nurse?

1          A  To me.

2          THE COURT:  Being 16, did the doctor give you

3     your first pelvic exam?  Did the doctor that gave you your

4     first pelvic exam tell you what he was doing as he was

5     examining you?

6          A  Yes, he did.  Every time he went to touch me,

7     he told me before he was going to go touch me and where.

8          THE COURT:  Did Dr. Finkel?

9          A  No, he did not.

10          THE COURT:  Then says, did Dr. Finkel go along

11     with the crude joking?

12          A  Pardon me?

13          THE COURT:  I think you answered it.  Why didn't

14     you come forward earlier?

15          A  Who believes a 16 year old girl who lives on

16     her own?

17          THE COURT:  Did you consider contacting officials

18     when you saw Dr. Finkel in the newspaper prior to 2001?

19          A  I had never told anyone about what had

20     happened to me.  I'm sorry, repeat that.

21          THE COURT:  Did you consider contacting officials

22     when you saw Dr. Finkel in the newspaper prior to 2001?

23          A  When I was 16, I considered calling the

24     Medical Board because that's what my friend James

25     suggested.  That's what my friend James suggested at the

1    time along with kicking him in the face.  Why didn't I

2    kick him in the face?  But he suggested that I call the

3    Medical Board.

4                   And when you're 16 and you don't -- and you

5    live on your own, guidance isn't there.

6                   THE COURT:  Why did you come forward when you

7    did?

8           A   I didn't want to be involved in this.  I came

9    forward because I know what happened to me in that room,

10   sorry.

11                  THE COURT:  That's all right.

12          A   A few of my friends knew what happened to me

13   in that room.  One of those friends said that it was my

14   duty to support the women who did come forward.  Sorry.

15                  THE COURT:  Is that the end of the answer?

16          A   Yes.

17                  THE COURT:  You said he made mean jokes.  Do you

18   remember what it was he said?

19          A   There were a lot -- because I felt that I had

20   to go through the exam, I didn't want him to make me more

21   nervous because he seemed very irritated with me and I was

22   very uncomfortable with what he was doing.

23                  He was hurting me.  I was crying.  The one

24   that really had stuck in my head was the one about the

25   last comment about her piece, about not having her piece

1    yet.

2              THE COURT:  How long did the clitoral touching

3    last?

4              A   It's hard to recall, but it seemed to be about

5    three minutes.

6              THE COURT:  Any further questions from the

7    jurors?  Any follow-up questions, Ms. Nannetti or any

8    further questions Ms. Nannetti?

9              MS. NANNETTI:  Nothing, Your Honor.

10             THE COURT:  Mr. Gierloff?

11   BY MR. GIERLOFF:

12             Q   Thank you.  When you first made your statement

13   to the police, you didn't believe you would ever have to

14   testify?

15             A   Right.

16             Q   When you first made your statement to the

17   police, you had no idea that you would some day have to

18   answer questions?

19             A   That is correct.  I was told that the Statute

20   of Limitations was probably up.  I thought I was safe in

21   making the statement.

22             Q   All right.  So when you made your statement,

23   you thought that would be the last of it for you?

24             A   Correct.

25             Q   And you thought you would never be confronted

1   by any person about your statement?

2           A   Pardon me?

3           Q   You thought you would never been confronted by

4   any person about your statement?

5           A   I thought I might be confronted about it and

6   that was fine.

7               But I didn't think under these

8   circumstances that I would be confronted about it.

9           Q   You didn't think there would be any further

10  consequences forever after you made the statement,

11  correct?

12          A   I don't know what you mean.

13          Q   Well --

14          A   Consequences coming in front of strangers,

15  having to display my private life, yeah, I didn't think

16  that would have to happen.

17          Q   All right.  And to that end, you obtained the

18  services of a lawyer to try to quash a subpoena that was

19  served on you?

20          A   Yes, I did.

21          Q   And there was actually a hearing in the

22  Judge's chambers a little while ago?

23          A   Yes, there was.

24          Q   All right.  And you were at that hearing with

25  your lawyers?

1         A   That is correct.

2         Q   A psychologist, I'll say, testified

3    telephonically?

4         A   Yes.

5         Q   And ultimately you ended up having to testify

6    though, correct?

7         A   Yes.

8         Q   Although it was last Friday without these

9    people here?

10        A   Yes.

11        Q   And that seemed to -- well, during your

12   testimony when the jury wasn't here, you were composed?

13        A   Yes.

14        Q   You were assertive?

15        A   Yes.

16        Q   Sometimes you laughed from time to time?

17        A   Yes.

18        Q   And --

19        A   At my own mistakes.

20        Q   Right.  We've seen the tape?

21        A   Yeah.

22        Q   Okay.  At that time in your life, this was

23   '86?

24        A   Yes.

25        Q   '85, '86, there were a number of problems in

1   your life?

2           A   Oh, yes.

3           Q   Problems with your father?

4           A   Oh, yes.   And mother.

5           Q   His conduct toward you?

6           A   That was later.

7           Q   All right.

8           A   That was later on.   No, that never happened

9   until I was 17.

10          Q   And the problems in your home caused you to be

11  living alone?

12          A   Yes.

13          Q   And that was related to your being

14  institutionalized when you were 17?

15          A   My problems at home?

16          Q   Yes.

17          A   All of the problems that happened to me were

18  related to my being institutionalized.

19          Q   All right.

20          A   I didn't ask to be born.   I didn't ask to be

21  born under the circumstance under which I was born.

22          Q   Thank you very much.

23          THE COURT:   Anything further?

24  BY MR. GADOW:

25          Q   Shelly, Mr.  Gierloff asked you about your

1   demeanor when you testified?

2          A  I'm sorry?

3          Q  That's okay.  Mr. Gierloff just asked you

4   about your demeanor when you testified on Friday that you

5   were composed and you laughed from time to time?

6          A  Yes.

7          Q  Was it easier for you to testify on Friday

8   without the presence of the jury?

9          A  Yes.

10         Q  Is it more difficult for you to talk about

11  what had happened to you in front of other people?

12         A  Yes.

13         Q  Nothing further.

14         THE COURT:  Okay.  May this witness be

15  permanently excused?

16             Shelly, appreciate your coming.

17         A  Thank you.

18         THE COURT:  Next witness?

19         MR. GADOW:  Your Honor, like to recall Ms. Brown

20  to the stand from the other day.

21         THE COURT:  Ms. Brown, you're still under oath

22  from last week.

23             Why don't you resume your seat in the witness

24  stand?

25

1                    CONT. TESTIMONY OF HEATHER BROWN

2

3     BY MR. GIERLOFF:

4              Q   Thank you, Your Honor.

5                  Ms. Brown, I think when you were last

6     testifying, I ended up with your conversation with Dr.

7     Finkel prior to the actual examination in which you would

8     have told him of your condition of cervical dysplasia and

9     he would have advised you that that was secondary to STD?

10             A   Yes.

11             Q   So I'd like to pick up there.  You'd signed a

12    consent form in which you acknowledged that the doctor was

13    going to examine you for any other unhealthy conditions,

14    correct, that he may discover?

15             A   I don't remember doing that, but I guess if it

16    was part of the paperwork, I probably did.

17             Q   Sure.  If I may hand you Number 108.  Here we

18    go.  This sheet right on top.

19                 That sheet, pardon me, is headed Metro

20    Phoenix Women's Center.  And the second paragraph, I also

21    consent that said doctor may proceed during and following

22    the operation perform any other procedure or reasonably

23    indicated tests which he deems necessary or desirable in

24    order to perform the abortion or correct any other

25    unhealthy conditions he may encounter whether or not

1    related to the presently known condition?

2            A   Yes.   That's what it said.

3            Q   All right.   Thank you.   And now you've just

4    had a discussion with him which would have indicated to

5    him that you would have been exposed to STD at some point

6    in your past because you have the cervical dysplasia,

7    correct?

8            A   Yes.

9            Q   So it would be reasonable to assume that he

10   was -- he would physically examine you during the pelvic

11   exam?

12           A   Yes.

13           Q   And that he may be looking for evidence of

14   either the presence of the STD or evidence that it was

15   once active and now gone?

16           A   Yes.

17           Q   And he did, in fact, perform a pelvic exam

18   upon you?

19           A   Yes.

20           Q   And I believe it was your testimony that

21   during that pelvic exam, actually did touch your clitoris?

22           A   Yes.

23           Q   And when he did that, you did not ask him what

24   he was doing, correct?

25           A   Correct.

1        Q  So you didn't give him an opportunity to

2   explain that he was looking for lesions or adhesion or

3   inflammation?

4            MR. GADOW:  Objection, argumentative.

5            THE COURT:  Sustained.

6   BY MR. GIERLOFF:

7        Q  You were aware of -- your regular gynecologist

8   had never touched you there, correct?

9        A  That is correct.

10       Q  All right.  And it's the same gynecologist who

11  failed to detect your cervical dysplasia until April 1999?

12       A  He did not fail to find it.  That's when it

13  showed up after my -- the second child was born.  I went

14  in for my PAP smear and he said that he wanted to take a

15  scraping and perform a test and it came back that there

16  was pre-cancerous cells on my cervix.  And he called it

17  cervical dysplasia.

18       Q  In April of 1999, when your regular

19  gynecologist detected it, you were at Stage Three out of

20  five possible stages, correct?

21       A  I don't remember.  I'm sorry.

22       Q  Do you remember speaking to Mr. Newhouse?

23       A  Yes.

24       Q  Detective Newhouse?

25       A  Yes.

1          Q   If I can show you a transcript of that

2    conversation.   And I will give you a page number in just a

3    minute.   Probably through with that chart for the time

4    being.   I can just put it aside.   Thank you.

5                  All right.   I think we're going to Page 18.

6    Okay.   Page 18.   It's the first paragraph.   And picking up

7    with the conversation that's relevant to the point we're

8    talking about now.

9                  She said there's a small amount of

10   pappiloma in there, but I don't know that is what it is.

11   It is pre-cancer.   It goes in different grades to three,

12   four, five.   If you hit five, you pretty much have cancer,

13   and the last time I had my cervix scraped, it was Grade

14   Three?

15          A   Yes.

16          Q   You go on to say, I went from three to four

17   and back?

18          A   Yes.

19          Q   All right.   So the doctor didn't detect it

20   until it was Stage Three?

21          A   I really couldn't tell you.   This was after I

22   had seen Dr. Finkel that he explained everything to me.

23          Q   Okay.

24          A   So I don't know what stage it was at when he

25   found it.

1          Q   If we can back up just to the preceding page.

2   You're talking about that long paragraph and just for

3   right now, just that last sentence, Dr. Finkel is actually

4   the one that said, birth control does not cause that,

5   honey.  It is a sexually transmitted disease.

6                   So that kind of blew my mind and my mom had

7   told me before that it was the papilloma virus that causes

8   it which is something a man gives you.

9                   Mr. Newhouse asked you, so it's a sexually

10  transmitted disease?  You say, well, when I talked to

11  Ellen, Tony was with me, so I don't know if she was trying

12  to be soft about it and not try -- and then Detective

13  Newhouse said, that is one reason why we don't have them

14  sitting in here.

15                  So actually you had that conversation with

16  Ellen previously before going to Dr. Finkel and she had

17  failed to advise you of the cause of the cervical

18  dysplasia?

19          A   No.  Said I talked to my mom.

20          Q   I understand that.  But you also then go into

21  when you are talking to Ellen, that Tony was with me, and

22  you don't know if she was just trying to be soft about it,

23  correct?

24          A   Yes.  At the end there, yes.  When Tony was

25  with me, I didn't know if she was not telling me

1    everything because he was there.

2         Q  Right.  And when you went to Dr. Finkel, you

3    were already aware that you had cervical dysplasia?

4         A  Yes, I found out in April.

5         Q  Right.

6         A  But I was not aware what degree it was at.  We

7    didn't discuss it until afterwards.

8         Q  All right.  And actually, as I recall, when

9    you were here testifying last, I asked you a question

10   about your doctor and you said Ellen was your doctor?

11        A  No.  Allen is my doctor.

12        Q  Allen?  Then I misheard you.  All right.

13   Well, then this would be the doctor who never did detect

14   the underlying STD that gave you the cervical dysplasia?

15        MR. GADOW:  Asked and answered.

16        THE COURT:  Overruled.

17   BY MR. GIERLOFF:

18        Q  He did not detect the underlying STD which

19   caused the cervical dysplasia to develop; is that correct?

20        A  If he did, he did not bring it to my attention

21   either to keep me calm or it just wasn't there yet.  They

22   did several tests on it and that's what Ellen told me.

23        Q  Well, that doctor apparently never examined

24   you thoroughly enough to detect the STD?

25        A  I don't understand what this has to do with

1    the case, sorry.  I just don't.

2            MR. GADOW:  Your Honor.  When the witness is

3    finished I object to the argumentative nature of the

4    questions.

5            THE COURT:  The last question is argumentative.

6    Objection sustained.

7    BY MR. GIERLOFF:

8            Q  All right.  And prior to Dr. Finkel telling

9    you what caused this condition, your doctor did not tell

10   you what caused cervical dysplasia?

11           MR. GADOW:  Asked and answered, Your Honor.

12           THE COURT:  Objection sustained.

13           A  No.  He did not.

14   BY MR. GIERLOFF:

15           Q  So here on Page 17, when he talks to Ellen

16   should that be Allen?

17           A  No, it's Ellen.  That was the nurse's name.

18           Q  All right.  The absence of either Allen, the

19   doctor or Ellen, the nurse, telling you what caused

20   cervical dysplasia, actually contributed in a major way to

21   you becoming pregnant again, correct?

22           A  No.  I don't think it was the doctor who told

23   me.  I think it's the pamphlet that comes with the birth

24   control pills that says it can cause pre-cancerous cells

25   on your cervix because I smoked.  And it's on the

1   commercials as well that if you smoke and take birth

2   control pills that you can get cancer.

3        Q   And because of that, you stopped taking birth

4   control pills?

5        A   That's correct.

6        Q   You couldn't afford an IUD at the time,

7   correct?

8        A   Correct.

9        Q   So you ended up becoming pregnant?

10       A   Yes.

11       Q   I think we've already talked about your

12   comments to Officer Kaminski about the breast exam.   So

13   I'll skip that.   You spoke with Detective Newhouse on

14   January 31st, correct?

15       A   Yes.

16       Q   That was six days after you spoke to Officer

17   Kaminski?

18       A   Yes.

19       Q   When you spoke to Detective Newhouse, you

20   described the process that occurred that there was Dr.

21   Finkel coming into the exam room, he was kind of nice, he

22   said, sit up, angel, correct?

23       A   Correct.

24       Q   He checked your breathing, correct?

25       A   Correct.

1          Q   Told you to lay back down, correct?

2          A   Correct.

3          Q   He checked your breasts, correct?

4          A   Correct.

5          Q   All right.  And that's the same order that you

6    told Officer Kaminski, correct, the breast exam before the

7    pelvic exam?

8          A   I'm sure it is.

9          Q   And with neither Officer Kaminski or Detective

10   Newhouse did you refer to the breast exam as being more of

11   a grope, correct?

12         A   Yes.  That's correct.

13         Q   And you told neither of them that it was

14   disgusting, correct?

15         A   That's correct.

16         Q   What you told Detective Newhouse is, which I

17   don't understand why, and I still don't know why he had to

18   do what he was doing, correct?

19         A   Correct.

20         Q   And you compared it to the same thing your

21   gynecologist does to Detective Newhouse, correct?

22         A   Correct.

23         MR. GADOW:  What page, Counsel?

24   BY MR. GIERLOFF:

25         Q   Oh, that was seven.

1          MR. GADOW:   Thank you.

2          MR. GIERLOFF:   And, in fact, later Detective

3   Newhouse asks you if anything that Dr. Finkel did was

4   similar.   This is Page 19.   He asks you, it's the very top

5   of the page, was there anything that was done during those

6   examinations that was similar to when Dr. Finkel examined

7   you?   And you said, with Dr. Sawyer?   He said, correct.

8   And you told him, well, I was pregnant at the time, so he

9   examined my breasts, which that is what they do when

10  you're pregnant.   And he clarified, Dr. Sawyer did?   You

11  said, yes, correct?

12          A   Yes.

13          Q   All right.   So you were comparing what Dr.

14  Finkel did.   You were pregnant when you saw Dr. Finkel,

15  correct?

16          A   Yes.

17          Q   And so you were comparing what Dr. Finkel did

18  as being similar to what Dr. Sawyer did, correct?

19          A   Correct.

20          Q   And then after you spoke with Mr. Newhouse,

21  Detective Newhouse about a year and a half passed and

22  Mr. Stribling called you, correct?

23          A   Correct.

24          Q   Were you ever contacted by a detective named

25  Haduch?

1          A   I don't recall being contacted.

2          Q   Had you moved in the intervening 18 months?

3          A   Between this and --

4          Q   Between speaking with Detective Newhouse?

5          A   Yes, I had.

6          Q   Still within the Valley, though?

7          A   Yes.

8          Q   When you spoke to Mr. Stribling, that was the

9    first time you characterized the breast exam as feeling

10   all over my boobs, correct?

11         A   That's correct.

12         Q   And boobs was your word, it's kind of a slang

13   word?

14         A   Yes.

15         Q   And that was the first time you mentioned

16   pinching at the nipple area, correct?

17         A   Correct.

18         Q   First time you said that it was disgusting?

19         A   Correct.

20         Q   And when you speak to Mr. Stribling, you say

21   that the exam was nothing like your exams by your regular

22   doctor, correct?

23         A   Correct.

24         Q   All right.  Which is different from what you

25   told Detective Newhouse, correct?

1          A   Correct.

2          Q   When you're speaking to the first two

3    officers, Officer Kaminski and Detective Newhouse, all of

4    the conduct you complained of by Dr. Finkel started with

5    him yanking you down into the stirrups, correct?

6          A   Yeah.

7          Q   And the breast exam was actually before you

8    were yanked down into the stirrups, correct?

9          A   Correct.

10         Q   But when you're speaking to Mr. Stribling, you

11   remember then that the breast exam -- you remember the

12   breast exam occurring after the pelvic exam, correct?

13         A   I'm not sure.

14         Q   If I can give you a transcript of that, I

15   think we are headed to Page 5, the big paragraph.  Let's

16   pick it up from about the middle.  You're talking about

17   the second time you went.  You've already told him about

18   not having any problems with the first abortion procedure.

19              The second time that I went, I was in there

20   and they gave me the shot.  And Dr. Finkel put like a

21   jelly or something on his hand.  He had gloves on, I

22   think.  I'm pretty sure he had gloves on.  He put this

23   jelly stuff on his hands, and then proceeded to moisten

24   the hole down there so that they could use the machine.

25   While he was doing so, the hole was down further.  He went

1    up to the clitoris area and was rubbing it.  I jerked a

2    little bit and he stopped and he continued to do what he

3    was doing and he gave me a breast exam which didn't make

4    sense to me because there was no reason for it.

5              A   Correct.

6              Q   Right?  So the sequence you're telling

7    Mr. Stribling is --

8              A   Is the opposite of what I said in the first

9    one.

10             Q   Right.

11             A   Yes.

12             Q   The breast exam after the pelvic?

13             A   Yes.

14             Q   And then Mr. Stribling said to you, okay,

15   let's just get -- I'm looking at the report here.  Let's

16   just go with the breast exam first, because it sounds like

17   that was -- right?

18             A   That's what he says, yes.

19             Q   Now, obviously Mr. Stribling wasn't there at

20   the time, correct?

21             A   Correct.

22             Q   All right.  So he just tells you to just go

23   with the breast exam, correct?

24             A   Yes.

25             Q   All right.  And what is your recollection

1    today?  Do you remember if the breast exam was before the

2    pelvic?

3              A   My recollection today?

4              Q   Yes, ma'am?

5              A   Without going by what I've read, my

6    recollection today, everything is mixed.  I mean, I know

7    what happened.  But to put it in the right sequence for

8    you like it is in the first interview --

9              Q   Um-hum?

10             A   -- I'm sorry, I can't do that for you.  It's

11   there but everything is mixed.

12             Q   All right.  Well, later when you mentioned to

13   Mr. Stribling about pinching at the nipple area,

14   Mr. Stribling didn't pull out that report again and say,

15   let's just go with feeling your breasts, does he?

16             MR. GADOW:  Object to the form of the question,

17   foundation and argumentative.

18             THE COURT:  Sustained.

19   BY MR. GIERLOFF:

20             Q   You do tell Mr. Stribling that there was

21   pinching at the nipple area, correct?

22             A   Yes, I told him that.

23             Q   All right.  That's Page 7, correct?

24             A   Yes.

25             Q   In fact, the first line that's you say, he

1    started feeling all over my boobs and pinching the nipple

2    area, correct?

3         A  Yes.

4         Q  When you told that to Mr. Stribling, he didn't

5    take out Detective Newhouse's report and examine it for

6    the absence of that kind of complaint and suggest to you

7    that you just go with feeling your breasts, correct?

8         MR. GADOW:  It's a compound question, Your Honor,

9    I object to it.

10        THE COURT:  Sustained.

11   BY MR. GIERLOFF:

12        Q  When you had said that to Mr. Stribling, he

13   didn't refer to Detective Newhouse's report, correct?

14        A  No.

15        Q  He did not say at that point, let's just go

16   with feeling your breasts, correct?

17        A  Correct.

18        Q  All right.  When you -- and I think it's --

19   there you go.  Later on the same page, this was more like

20   a grope and it was disgusting, correct?

21        A  Correct.

22        Q  When you said that, Detective Stribling did

23   not refer to Detective Newhouse's report, correct?

24        A  Correct.

25        Q  He didn't say, let's just go with, I thought

1    my gynecologist does that, so I figured, well, whatever,

2    right?

3              A   Correct.

4              Q   And after you say that -- that's fine.  Well,

5    what you described to Mr. Stribling is a pinching at the

6    nipple area, correct?

7              A   Correct.

8              Q   All right.  That's still Page 7 and two

9    questions -- well, yeah, two questions later he asked you

10   to explain.  He said, okay, explain that to me, if you

11   can.  Now, you say that doctor was -- Dr. Finkel was

12   pinching your nipples, correct?

13             A   Correct.

14             Q   All right.  Now you haven't said pinching your

15   nipples.  You said pinching at the nipple area, correct?

16             A   Correct.

17             Q   And he said, rubbing your breasts.  And you've

18   not called it rubbing your breasts, correct?

19             A   Correct.

20             Q   All right.  So pinching your nipples, rubbing

21   your breasts are Mr. Stribling's words, correct?

22             MR. GADOW:  I object to the portion of that

23   question, Your Honor, misstates the evidence.

24             THE COURT:  You will be allowed in

25   cross-examination.

1   BY MR. GIERLOFF:

2            Q   Those are Mr. Stribling's words, correct?

3            A   Yeah.   They were my words, only I used them

4   differently.

5            Q   During the breast exam, Dr. Finkel didn't make

6   any comments to you, correct?

7            A   Correct.

8            Q   And Dr. Finkel pulled you down into the

9   stirrups roughly, correct?

10           A   Correct.

11           Q   Dr. Finkel did not mention to you that he may

12   touch your clitoris, correct?

13           A   Correct.

14           Q   Mr. Stribling asked you about that several

15   times during the interview; is that accurate?

16           A   Further on, yes.

17           Q   Right.   You tell Mr. Stribling that at the

18   time of the breast exam that there was a nurse there,

19   correct?

20           A   Yes.   That I was pretty sure there was a nurse

21   in there.

22           Q   All right.   All right.   You describe -- Page

23   11 you describe the contact.   Middle of the page.   Do you

24   remember if Dr. Finkel did mention that he -- that he's

25   going to -- you say, no.   Mr. Stribling asks, do a vaginal

1    exam and may touch your clitoris or -- you say, he did not

2    say anything like that.  He just said you're going to feel

3    me touch you here and then I did.  And then he went up

4    from there, from where he was and proceeded to rub my

5    clitoris area, correct?

6              A  Correct.

7              Q  So you're describing an initial contact that

8    Dr. Finkel said, you're going to feel me touch you here,

9    and then he does touch you there.  And then you feel the

10   fingers move from there to your clitoris area, correct?

11             A  Correct.

12             Q  All right.  You don't tell Mr. Stribling that

13   Dr. Finkel put his fingers inside your vagina and then

14   took them out and went up to the clitoris area, correct?

15             A  No, I didn't say that.

16             Q  All right.  But thereafter, he asks you to

17   describe the rubbing motion and how long it lasted,

18   correct?  You say, it didn't last very long, correct?

19             A  Correct.

20             Q  He asks you, what was he doing?  You say, took

21   just a few seconds, he just -- then Mr. Stribling said, I

22   know this is difficult.  Did he pull his fingers out of

23   your vagina?  And you say, yes, correct?

24             A  Correct.

25             Q  And he finished the thought, then move them

1    up, correct?

2              A   Correct.

3              Q   Now, you haven't told Mr. Stribling that Dr.

4    Finkel had put his fingers in your vagina and then pulled

5    them out before he touched your clitoris, correct?

6              A   Correct.

7              Q   And after he said, and then move them up, you

8    say, yes, he was rubbing that area moistening that area

9    with the KY Jelly or whatever it was and he rubbed up, I'm

10   assuming probably with his middle finger and he rubbed the

11   clitoris area at least two or three times, correct?

12             A   Correct.

13             Q   So again, you don't say there that even though

14   you said, yes, then he asked you, pull the fingers out of

15   your vagina?  You don't say -- you don't again describe

16   that conduct?

17             A   No.

18             Q   Okay.  And there were no comments made by Dr.

19   Finkel at that time, correct?

20             A   Correct.

21             Q   And you felt the affects of the sedation,

22   correct, you felt like the room was spinning, everything

23   fading in and out and blurry?

24             A   Correct.

25             Q   And you describe feeling the hot breath,

1    correct, actually that's probably ahead at Page 14.

2           A  I think it's 13.

3           Q  Right.  Okay, 13.  Well, in fact, right,

4    you're describing from Page 12 to Page 13 of being aware.

5    You say, kind of want to -- and this is the bottom of Page

6    12, I want to say like drunk, maybe I felt like the room

7    was spinning a little bit, everything was fading in and

8    out and blurry, correct?

9           A  Correct.

10          Q  And you say, well, this -- actually the

11   transcript says, but was totally unaware of everything

12   going on.  Do you think that's probably a --

13          A  A typo.

14          Q  -- typo because I was totally of aware

15   everything going on.  I could hear the machine?

16          A  Correct.

17          Q  I could hear the doctor and the nurse talking?

18          A  Correct.

19          Q  Couldn't tell what they were saying?  You

20   started telling them, it hurts, it hurts, it hurts, right?

21          A  Correct.

22          Q  They told me to shut up?

23          A  Correct.

24          Q  They said, you've been through this before?

25          A  Correct.

1        Q  Other girls down the room, down the hall,

2  they've never done this.  You're going to scare them.

3  Shut up, shut up?

4        A  Correct.

5        Q  Both the nurse and the doctor?

6        A  Correct.

7        Q  And what you're describing -- and then you

8  say, well, he actually asked you a question.  And the next

9  event was when you were laying back and felt a hot breath

10  on your clitoris area?  And you say, yes, I did.  Right?

11        A  Correct.

12        Q  So what you're describing is the abortion

13  procedure being over and then at the end or towards the

14  end of that procedure is when you feel the breath,

15  correct?

16        A  That's what it says, yes.

17        Q  And then at Page 15, about the middle of the

18  page, apparently you were -- oh, you had to compose

19  yourself here.  So the tape went off for a little bit,

20  right?

21        A  Yeah.  He stopped the tape for a little bit

22  while I got my breath.

23        Q  You knew the feeling, you're 100 percent sure?

24  And you still stand by that?  And you say, yes, correct?

25        A  Correct.

1          Q  Mr. Stribling said, it looks like after you

2    felt the licking then you heard the door close and Dr.

3    Finkel left the room.  Is that what you remember?  And you

4    say, yes.  Then he says, okay, okay, after you recovered,

5    before we get into that, I want to make sure of the order

6    of the events here now.  The licking part, did that take

7    place prior to the actual abortion procedure or -- and you

8    say, it was after, I think.  I'm pretty sure it was after,

9    right?

10         A  Correct.

11         Q  You had never told Mr. Stribling that the

12   licking had occurred before, prior to the actual abortion,

13   correct?

14         A  I don't think so, no.

15         Q  You never -- you hadn't told Officer Kaminski

16   that licking was before the actual abortion, right?

17         A  I don't remember Officer Kaminski.  I remember

18   talking to an officer but I can't tell you exactly what

19   was said.

20         Q  All right.

21         A  I remember talking to Detective Newhouse.

22         Q  And you didn't tell Detective Newhouse the

23   licking occurred prior to the abortion?

24         A  Correct.  I guess not.  I guess not.

25         Q  So there was nothing to suggest to

1    Mr. Stribling that the licking had occurred prior to the

2    actual abortion, correct?

3              A  I guess not.

4              Q  Thank you very much.  That's all I have.

5              THE COURT:  Redirect?

6

7                              REDIRECT EXAMINATION

8

9    BY MR. GADOW:

10             Q  Okay.  The question that you were just asked

11   about, you see the transcript on Page 15 there, Heather?

12             A  Yes.

13             Q  It says, Mr. Stribling's question is, okay,

14   okay, now after you recovered well before -- it says while

15   but probably a typo, should say well before he gets into

16   that, okay, well before he gets into that, I want to make

17   sure the order of events here.

18                  Now, the licking part, did that take place

19   prior to the actual abortion procedure or -- see that?

20             A  Um-hum.

21             Q  Did you interrupt him and say it was after?

22             A  I think I probably did.  I interrupted him

23   quite a bit, answered his questions before he finished

24   asking them.

25             Q  Spoke over him?

1   A Yeah.

2   Q When he started saying, did it take place

3 prior, you interrupted, said, no, wait, it was after?

4   A Yes.

5   Q And that's your memory, right?

6   A Yes.

7   Q That's what you testified here last week?

8   A That's my memory, yes.

9   Q Mr. Gierloff asked you if you were in his

10 words asked several times by Mr. Stribling in the

11 interview about whether Dr. Finkel ever said anything to

12 you about touching your clitoris?

13   A That's correct.

14   Q Remember that question he just asked you?

15   A Yes.

16   Q Turn to Page 10, please, of Stribling's

17 interview.

18   MR. GIERLOFF:  Thank you, sir.

19 BY MR. GADOW:

20   Q Do you see it there toward the middle of the

21 page?  Mr. Stribling says, then you said Dr. Finkel told

22 you, you're going to feel me touch you?

23   A Yes.

24   Q You say, yes, that was normal because my

25 doctor said it every time?

1          A   Yes.   That's correct.

2          Q   He asked you the question, Mr. Gierloff asked

3    you about right now, let me ask you, brought up the fact

4    that has your OB/GYN ever said to you, when I do touch

5    you, I may touch your clitoris or anything, right?

6          A   Right.

7          Q   That's the first time in that interview that

8    he asks you about that, isn't it?

9          A   That's correct.

10         Q   Turn to Page 11, and then actually the two of

11   you have a bit of a discussion about that and you say your

12   doctor's never done that?

13         A   That's correct.

14         Q   So then you talk about there's no reason to,

15   and you move on, and then on Page 11, Mr. Stribling asked

16   you specifically if Dr. Finkel did mention that he's going

17   to then do a vaginal exam and he may touch your clitoris

18   and you told him --

19         A   I cut him off.

20         Q   Right.   What do you say?

21         A   No.   He did not say anything like that.   He

22   just said, I was going to feel him touch me there and then

23   I did and then he went up from there.

24         Q   And proceeded to rub my clitoris area, is that

25   what you said, right?

1          A   Yes.

2          Q   That's the second time that Mr. Stribling asks

3    you about that.  Any comments by Dr. Finkel that he is

4    going to touch your clitoris, right?

5          A   Correct.

6          Q   But the first time he's asking you actually

7    about your doctor saying that to you, correct?

8          A   Correct.

9          Q   The second time is a clarification about Dr.

10   Finkel talking about that?

11         A   Correct.

12         Q   Let's turn to Page 7 of your interview with

13   Mr. Stribling, please.  Mr. Gierloff asks you about this

14   page.  The very top of that page, you start talking about,

15   he started going all over my boobs and pinching the

16   nipples.  Okay?  I don't know why he's doing it.  Those

17   are your words --

18         A   Yes.

19         Q   And then going down Mr. Stribling asks you --

20   two questions later he said, he asks you about pinching

21   your nipples and rubbing your breasts, right?

22         A   Correct.

23         Q   When Mr. Gierloff asked you about that, you

24   said the following, they were my words, only I used them

25   differently, that's a quote.  What did you mean when you

1    said that?

2            A  Well, I said, feeling all over my boobs, and

3    he used rubbing my breasts instead of feeling all over my

4    boobs.  And I said pinching at the nipple area.  It's all

5    in the area.  So he said pinching the nipples, the same

6    area.

7            Q  Rubbing your breasts as used by Mr. Stribling,

8    does that describe the same conduct that you were

9    describing when you said feeling all over my boobs?

10           MR. GIERLOFF:  Objection, argumentative.

11           A  Yes.

12           THE COURT:  Sustained.

13           MR. GIERLOFF:  Move to strike.

14           THE COURT:  Last answer is stricken.  The jury is

15   instructed to disregard.

16   BY MR. GADOW:

17           Q  Did you understand him to be asking about the

18   conduct you previously described?

19           A  Yes.

20           Q  Did Mr. Stribling have the police report that

21   had been generated by Detective Newhouse when he was

22   talking to you in the car that day?

23           A  I think he did, yes.

24           Q  Did he refer to it from time to time?

25           A  I think toward the end of the interview, he

```
 1   might have used it, but I didn't see it.  I mean, he had
 2   it, but I didn't see it.
 3           Q  What was your emotional state during this
 4   interview?
 5           A  I was very upset.
 6           Q  Were you crying?
 7           A  Yes.
 8           Q  And is that when Mr. Gierloff went through
 9   with you where the tape shuts off so you could compose
10   yourself?
11           A  Yes.  I hadn't had to think about the
12   situation.
13           Q  For a year and a half, right?
14           A  Yes.
15           Q  This interview took place on June 8th of 2001;
16   is that correct?
17           A  That's correct.
18           Q  And so in the meantime, Detective Haduch
19   hadn't contacted you, correct?
20           A  Correct.
21           Q  And Mr. Stribling's contact is the first time
22   since your interview with Newhouse that you had to deal
23   with this situation; is that fair?
24           A  Well, he had called me, Detective Stribling
25   had called me a few times trying to figure out a good time
```

1    for us to meet and talk.

2              Q   Make arrangements?

3              A   But other than that, I hadn't sat down and

4    spoke with him, no.

5              Q   I want to talk about Dr. Sawyer.  Did you go

6    to Dr. Sawyer's office the day after your abortion at Dr.

7    Finkel's office in 2000?

8              A   Yes.

9              Q   Did you describe to the staff at Dr. Sawyer's

10   office your experience with Dr. Finkel?

11             A   Yes, I did.

12             Q   And did you in general terms anyway describe

13   what had happened to you at Dr. Finkel's office?

14             A   Yes, I did.

15             Q   Did you tell them you made a police report?

16             A   Yes.

17             MR. GIERLOFF:  Object on hearsay.

18             THE COURT:  Last question?

19             MR. GIERLOFF:  Yes.

20             THE COURT:  The objection overruled.

21   BY MR. GADOW:

22             Q   Did you tell them that you made a police

23   report?

24             A   Yes.

25             Q   I wanted to clarify an issue.  The doctor's

1    name is Allen Sawyer, correct?

2              A   That's correct.

3              Q   Allen with an A?

4              A   Yes.

5              Q   Does he have a person, somebody who works in

6    the office named Ellen?

7              A   He did at the time.

8              MR. GIERLOFF:   May we approach?   And bring the

9    document with you.

10             (A sidebar discussion was held.)

11             MR. GIERLOFF:   What is there?

12             MR. GADOW:   This is my stack of information about

13   Heather Brown, something from Dr. Sawyer's office.

14             MR. GIERLOFF:   We never got this.   I've never

15   seen this before.

16             THE COURT:   What are you going to ask?

17             MR. GADOW:   I'm not going to do anything with it.

18             MR. GIERLOFF:   We don't have it.

19             MR. GADOW:   Wait a second.   Heather came with

20   some documents before the trial started.   Before she

21   testified, we disclosed this to you during that time.   I

22   handed you some stuff.

23             MR. GIERLOFF:   Let's see.

24             THE COURT:   Are you getting into it?   Richard,

25   maybe it's a moot point.   He's not going to get into it.

1              MR. GIERLOFF:   Seems untimely.   If I did this

2    during the course of trial, I apologize.   I don't remember

3    seeing it.

4              THE COURT:   He is not going to get into it.

5                   (In open court.)

6    BY MR. GADOW:

7         Q   Let me ask you a question.   I want to make

8    sure I understand.   We are talking about two people,

9    right.   Ellen and Allen?

10        A   Yes.

11        Q   Was Ellen like a nurse practitioner?

12        A   Yes.

13        Q   Who told you about the cervical dysplasia

14   first, originally, when you first heard about it?

15        A   Originally when I first heard about it, I

16   believe it was both Dr. Sawyer and Ellen were in the room

17   with me.

18        Q   Was Tony with you?

19        A   The first time?

20        Q   Yes.

21        A   I don't remember if he was with me.   I know he

22   was with me when I had the colostomy.

23        Q   Well, the colostomy was that after the

24   abortion?

25        A   I'm sorry, I don't remember.

1          Q   That's all right.  I withdraw the question.

2     At the time you went to see Dr. Finkel for your abortion

3     procedure, were you suffering from symptoms that you were

4     aware of from any STD symptoms?

5          A   No.

6          Q   Were you suffering from any gentle warts you

7     were aware of?

8          A   No.

9          Q   To your knowledge, had you ever experienced

10    symptoms of sexually transmitted disease in your genital

11    area?

12         A   No.  I don't think so.

13         Q   When you spoke with Officer Kaminski, did you

14    explain every detail of the series of events with him?

15         A   I probably did.  I would think so.

16         Q   I don't think I have anything else.

17         THE COURT:  Any questions from the jurors?  We

18    have some questions.

19              (A sidebar discussion was held.)

20         THE COURT:  Don't ask the one tabbed, the others

21    are okay?

22         MR. GADOW:  With one adjustment on this last

23    question.

24         MR. GIERLOFF:  I will put this back on here.

25         MR. GADOW:  I don't think you can swab the

1  uterus.  That's the only problem.  I think they probably

2  meant cervix.  I'll ask you make the change.

3           THE COURT:  Change it?

4           MR. GIERLOFF:  It's the whole vaginal canal.

5           THE COURT:  What should I say?

6           MR. GADOW:  Can you ask her what part?

7           MS. CURRY:  Swab the entire --

8           MR. GADOW:  Did you feel being swabbed?

9              (In open court.)

10          THE COURT:  Just a few more.  Why would you have

11 a couple drinks at Black Angus knowing that you still had

12 medication in your system and would probably take some

13 more later that day for pain?

14          A  I don't know.

15          THE COURT:  Talk to the jurors.

16          A  Sorry.  I don't know.  I really don't remember

17 ever saying that I had drinks.  I know it's in the

18 interview.  But I don't remember having drinks.  I

19 remember we went and sat and talked.  And I had a bowl of

20 soup.

21              As far as alcoholic beverages goes, I don't

22 know if it was ever specified in the interview, that's

23 what it was, just that we had a couple drinks.  I really

24 can't say whether it was alcoholic beverages or not.

25          THE COURT:  Next question.  Why didn't you go

1    home after the procedure knowing that you had just had a

2    surgical procedure?

3           A   I didn't go straight home because I was with a

4    friend of mine, my fiancee at the time, Tony, we lived far

5    out and I didn't want to drive by myself.  I was in bad

6    shape from being upset.  And I knew that he was in town

7    because he works for a company that worked in town.  And

8    he would come to me.  And so that's why I didn't go

9    straight home because I lived probably 60 miles away, if

10   not farther, from where I was.

11          THE COURT:  Who was Tony, that was your fiancee?

12          A   Yes.

13          Q   You said you took a shower.  When did you take

14   a shower?  Where and whose house?

15          A   Good Lord, I believe I took the shower at home

16   after I got home after leaving Jen's house.  I took it at

17   my own house.  It's been a very long time, sorry.  I don't

18   remember everything when it happened, how it happened or

19   what times this interview that we're going by that I gave

20   a week after it happened.  This is four years after, so

21   I'm sorry, but I don't remember everything exactly when.

22          THE COURT:  Could you see the position of Dr.

23   Finkel during the procedure, was he sitting or standing?

24          A   My knees were up and my gown was over, so I

25   couldn't see whether he was sitting or standing.

1          THE COURT:  It says, if he was sitting, could you

2     see his head?  You don't know?

3          A  I would think that I might be able to see the

4     top of his head so more than likely he was sitting on his

5     chair.

6          THE COURT:  When you felt the breath or tongue,

7     or whatever, did you attempt to look down and see what was

8     going on?

9          A  No.  I was staring at the ceiling.

10          THE COURT:  If not, why not?

11          A  I don't know.  I was scared.  I just wanted it

12     to be over with.  And I knew that the sooner it was over

13     with, the sooner I could get out of there.

14          THE COURT:  Could you feel the doctor swab you

15     with disinfectant, and if so, did he also apply it to your

16     external genitalia.

17          A  I'm sorry.

18          THE COURT:  Did the doctor swab an area of you?

19          A  Swab an area of me?

20          THE COURT:  Yes.

21          A  With an antiseptic, is that what you're --

22          THE COURT:  Said with disinfectant, do you know

23     anything about that?

24          A  No, I don't.

25          THE COURT:  Maybe the attorneys can follow-up

1    with that.   After your abortion procedure, did you doze

2    off?

3              A   No.

4              THE COURT:   You said you feel a warm breath upon

5    your clitoris.   Do you remember if you were awakened by

6    this incident?

7              A   I was awake when I had it.

8              Q   Any further questions from the jurors?   Any

9    follow-up questions of Counsel?

10   BY MR. GADOW:

11             Q   Just to try to clarify the issue of what part

12   of you was swabbed as far as you can remember?

13             A   I don't know if anything was swabbed.   I don't

14   know what you mean.

15             Q   Well, I mean --

16             A   I had a C section.   They swabbed me with

17   antiseptic over that area, no, I don't believe anything

18   was swabbed.

19             Q   Prior to the abortion, were your external

20   genitalia swabbed with anything?

21             MR. GIERLOFF:   Objection, leading.

22             THE COURT:   Overruled.

23             A   They, I think, cleaned the area, yeah.   I

24   didn't know what they meant by that.

25             Q   All right.   That's all.

1          THE COURT:  Mr. Gierloff, anything further?

2          MR. GIERLOFF:  Nothing.

3          THE COURT:  May this witness be permanently

4    excused?

5          MR. GADOW:  Yes.

6          THE COURT:  Thank you for your assistance.

7    You're free to go.

8               Ladies and gentlemen, we're going to be

9    adjourning for the evening, return tomorrow which is the

10   last day of this week, 10:00 o'clock tomorrow, bagel day.

11   And I may have some information on the projected length of

12   the trial tomorrow, some preliminary information.  I will

13   try to share it with you.  Have a good evening.  Keep in

14   mind the admonitions.

15               (A recess was held)

16

17

18

19

20

21

22

23

24

25